## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL WEATHER SERVICE<br>EMPLOYEES ORGANIZATION<br>601 Pennsylvania Ave NW<br>Suite 900<br>Washington, DC 20004 | : : : : : : | |
| PATENT OFFICE PROFESSIONAL<br>ASSOCIATION<br>P.O. Box 25287<br>Alexandria, VA 22313 | : : : : : | |
| *Plaintiffs*, | : : | **COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |
| v. | : : | |
| DONALD J. TRUMP<br>in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue, NW<br>Washington, DC 20500 | : : : : : : | Case No. 25-cv-02947 |
| HOWARD W. LUTNICK<br>in his official capacity as Secretary<br>U.S. Department of Commerce<br>1401 Constitution Ave NW<br>Washington, DC 20230 | : : : : : : | |
| LAURA GRIMM<br>in her official capacity as<br>Acting Administrator, National Oceanic<br>and Atmospheric Administration<br>1401 Constitution Ave NW, Room 5128<br>Washington, DC 20230 | : : : : : : : | |
| COKE MORGAN STEWART<br>in her official capacity as Acting Director,<br>U. S. Patent and Trademark Office<br>Box 1450<br>Alexandria, VA 22313-1450 | : : : : : : | |
| *Defendants*. | : | |

## Introduction

1.      On August 28, 2025 Donald Trump issued a Labor Day proclamation
to "honor the proud legacy of America's workforce — and we pay tribute to the
unbreakable spirit that keeps it strong nearly 250 years later." In this
proclamation he claimed that "every day, my Administration is restoring the
dignity of labor and putting the American worker first." But to remove any doubt
that this was all farce, he simultaneously issued a new Executive Order which, in
honor of the day, nearly completes his union busting of the civil service. Two
Commerce Department unions whose collective bargaining rights were stripped
by this Labor Day Executive Order bring this suit to restore the collective voice of
the public servants they represent.

## Jurisdiction, Venue and Parties

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §
1331 because the action arises under federal law, including the United States
Constitution.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)
because three of the Defendants reside here and because a substantial part of the
events or omissions giving rise to the Plaintiffs' claims occurred in this District.

4.      The Plaintiff National Weather Service Employees Organization
("NWSEO") is a national labor organization that has been certified by the Federal
Labor Relations Authority as the collective bargaining representative of nearly 4000
employees of the National Oceanic and Atmospheric Administration ("NOAA"), U.S.

2

Department of Commerce, including approximately 3,500 employees of the National Weather Service ("NWS") and 100 employees in the Office of Satellite Products and Operations ("OSPO") in the National Environmental Satellite, Data, and Information Service ("NESDIS").  The NWS employees include meteorologists, hydrologists, other physical scientists, technicians, support and administrative personnel who staff the nation's 122 Weather Forecast Offices, 13 River Forecast Centers, as well as specialized forecast centers such as the National Hurricane Center in Miami, the Aviation Weather Center in Kansas City, the Severe Storms Prediction Center in Norman, Oklahoma, the Ocean Prediction Center and Weather Prediction Center in College Park, Maryland, and Tsunami Warning Centers in Honolulu, Hawaii and Palmer, Alaska. The NESDIS employees include electronics technicians and satellite controllers at a satellite ground station in Wallops Island, Virginia and at NOAA's Satellite Operations Center in Suitland, Maryland.

5.    The Plaintiff Patent Office Professional Association ("POPA") is a labor organization that that has been certified by the Federal Labor Relations Authority as the collective bargaining representative of nearly 9,000 professional employees of the U.S. Patent and Trademark Office ("USPTO"), U.S. Department of Commerce, including approximately 8,500 patent examiners who work in the USPTO's Patents business unit under the Office of the Commissioner of Patents. These patent examiners generally have a degree in a STEM discipline and examine the 600,000 or so patent applications filed annually to determine whether a patent can be

granted for various new inventions, many of which are on the cutting edge of tomorrow's technological breakthroughs.

6.    The Defendant Donald J. Trump is the President of the United States and is being sued in his official capacity.

7.    The Defendant Howard W. Lutnick is the Secretary of the United States Department of Commerce and is being sued in his official capacity.

8.    The Defendant Laura Grimm is the Acting Administrator of the National Oceanic and Atmospheric Administration ("NOAA"), a component of the U.S. Department of Commerce that includes the National Weather Service and the National Environmental Satellite, Data, and Information Service. She is sued in her official capacity.

9.    The Defendant Coke Morgan Stewart is the Acting Director of the U.S. Patent and Trademark Office. She is sued in her official capacity.

## Factual Allegations

### *The statutory framework*

10.    In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("FSLMR Statute" or "the Statute") to provide a comprehensive statutory framework to govern collective bargaining in the federal civil service "designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). That statutory framework is based on Congress's recognition that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them …safeguards the

4

public interest, ... contributes to the effective conduct of public business, and ... facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." *Id.* § 7101(a).

11.    The FSLMR Statute guarantees federal employees the basic rights "to form, join, or assist any labor organization, or to refrain from any such activity," 5 U.S.C. § 7102, and to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees," *id.* § 7102(2). The Statute establishes election procedures for determining if a majority of employees in an appropriate unit choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election," *id.* § 7111(a).

12.    The Statute also requires agencies to negotiate in good faith with such representatives to reach a collective bargaining agreement, 5 U.S.C. § 7114(b)(5), while setting out proscribed agency and union unfair labor practices, including a refusal by an agency or union to bargain in good faith, 5 U.S.C. § 7116(a) and (b). The Statute established an independent agency, the Federal Labor Relations Authority ("FLRA"), to resolve unfair labor practice complaints, 5 U.S.C. § 7104, as well as exceptions to arbitral awards issued under grievance procedures set out in collective bargaining agreements. 5 U.S.C. § 7105(2)(a).

13.     At the same time, given the Federal government's "special requirements and needs," *id.* § 7101(b), Congress placed limits on the scope of bargaining.  The FSLMR Statute provides statutory management rights protections that preserve "the authority of any management official of any agency" to, *inter alia*, "determine the mission, budget, organization, number of employees, and internal security practices of the agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees"; and "assign work, .. make determinations with respect to contracting out, and ... determine the personnel by which agency operations shall be conducted." 5 U.S.C. § 7106(a).

14.     The FSLMR Statute contains a narrow provision under which employees may be excluded from coverage based on their agency's involvement in national security. The Statute provides that:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).

### *The President issues Executive Order 14251*

15.    On March 27, 2025, Defendant Trump issued Executive Order No. 14251, *Exclusions from Federal Labor-Management Programs*, 90 Fed. Reg. 14553 (Mar. 27, 2025), which invoked 5 U.S.C. §7103(b) and terminated the collective bargaining rights of employees in ten Cabinet level departments and seven independent agencies whose "primary function" is ostensibly national security, allegedly because the Federal Service Labor Management Relations Statute "cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." This Executive Order also excluded every Federal agency's Office of Chief Information Officer.

16.    President Trump's initial Executive Order stripped collective bargaining rights from three-quarters of the federal employees who were represented by federal sector unions, demonstrating that it was not a targeted assessment based on national security concerns. *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com, available at https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010(Mar. 28, 2025). But for the time being, the Plaintiffs NWSEO and POPA were unaffected.

17.    The White House issued a "fact sheet" simultaneously with Executive Order 14251 in which it candidly admitted that the President's Executive Order was issued to curtail the power of and to punish those particular labor organizations who had ostensibly "obstructed" the President's efforts to illegally

dismantle the Federal government, to coerce employees into resigning by

terminating telework, and to illegally dismiss large segments of the Federal

workforce these labor organizations represent, by filing grievances:

> President Trump is taking action to ensure that agencies vital to
> national security can execute their missions without delay and protect
> the American people. The President needs a responsive and
> accountable civil service to protect our national security.
> Certain Federal unions have declared war on President Trump's
> agenda.
>
> The largest Federal union describes itself as "fighting back" against
> Trump. It is widely filing grievances to block Trump policies.
>
> For example, VA's unions have filed 70 national and local grievances
> over President Trump's policies since the inauguration—an average of
> over one a day.
>
> Protecting America's national security is a core constitutional duty,
> and President Trump refuses to let union obstruction interfere with his
> efforts to protect Americans and our national interests.
>
> President Trump supports constructive partnerships with unions who
> work with him; he will not tolerate mass obstruction that jeopardizes
> his ability to manage agencies with vital national security missions.

*Fact Sheet: President Donald J. Trump Exempts Agencies with National Security*

*Missions from Federal Collective Bargaining Requirements,*

https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-

trump-exempts-agencies-with-national-security-missions-from-federal-collective-

bargaining-requirements/ (last visited April 1, 2025).

18.     What is equally revealing about the scope of the exclusions in

Executive Order 14251 is the agencies and employees that were *not* excluded: The

President did not exclude those agencies or employees "with unions who work with him" politically and who do not oppose his efforts to neuter the civil service or, as he disparagingly calls it, "the deep state." Section 2 of the Executive Order carves out protections for the unions who have not opposed his policies or politics:

> Notwithstanding the forgoing, nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code:
>
> > (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons;

19.    The country's largest law enforcement union, the National Fraternal Order of Police ("FOP"), endorsed President Trump's candidacy in 2016, 2020, and 2024, and President Trump has regularly touted those endorsements. And the largest firefighters' union in the country, the IAFF, after having exclusively supported Democratic presidential candidates for more than 50 years, broke with that tradition, declining to endorse either candidate in the 2016 and 2024 elections and in 2020, then-candidate Trump touted his endorsement by one of IAFF's larger chapters.

20.    The Executive Order excluded 12 subdivisions of the Department of Homeland Security - but it did *not* exclude U.S. Customs and Border Protection. See Section 2, subsection 1-407. The National Border Patrol Council represents approximately 18,000 employees of Customs and Border Protection, and it endorsed Donald Trump for election in 2016, 2020 and 2024.

*Plaintiffs NWSEO and POPA "fight back" against the Defendant Trump's attacks on Federal employees and public services.*

21.    Despite Defendant Trump's diktat that he would not "let union obstruction interfere with his efforts" by "widely filing grievances to block Trump policies" and his threat that he "will not tolerate mass obstruction that jeopardizes his ability to manage agencies," Plaintiffs POPA and NWSEO continued to fulfill their legal duty to protect the interests of their members – and well as the public they serve – by filing grievances against the Defendants' efforts to harass, undermine and dismantle the civil service and the mission of Federal agencies.

*POPA stands firm.*

22.    In order to "increase production" (i.e., examine more patent applications) at the expense of the "quality" or legal validity of patents, the Defendant Stewart suspended all non-essential training conducted on duty-time, including a bank of hours that examiners could use for continuing technical education. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. The matter is presently pending before a Federal labor arbitrator.

23.    According to its Fiscal Year 2023 Annual Report on Telework, "the USPTO continues to be a leader of telework in the federal government. At the USPTO, telework is a business strategy that supports mission achievement and goal fulfillment," including $68 million annual savings in real estate costs. By the

end of FY 2023, 96% of USPTO employees teleworked, and 86% teleworked full-time.

24.     On January 20, 2025 the Defendant Trump issued a "Return to In-Person Work" order to undermine rather than enhance the operations of Federal agencies. Its goal was to coerce Federal employees to quit. In a Wall Street Journal editorial, DOGE Directors Elon Musk and Vivek Ramaswamy wrote: "Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome." *The DOGE Plan to Reform Government*, WALL STREET JOURNAL, (Nov. 20, 2024) https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020 (Last visited May 31, 2025).

25.     In order to implement this "Return to In-Person Work" order, the Defendant Stewart began to cancel in phases telework at the USPTO. On April 14, 2025 she cancelled telework for probationary patent examiners, 11% of whom promptly quit. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. The matter is presently pending before a Federal labor arbitrator and a hearing is scheduled for November 17, 2025.

26.     On May 19, 2025 Defendant Stewart notified POPA that employees it represented in the Office of Chief Financial Officer, Office of Chief Information Officer, Office of General Counsel, Patent and Trademark Appeals Board, Office of Policy and International Affairs and Office of Government Affairs who live within

50 miles of the USPTO headquarters could no longer routinely telework. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. The matter is presently pending before a Federal labor arbitrator and a hearing is scheduled for December 2, 2025.

27.    The USPTO routinely grants two-hours of excused absence from duty on the day before Federal holidays. The Telework Enhancement Act of 2010 provides that the head of each executive agency shall ensure that teleworkers and non-teleworkers are treated the same for purposes of work requirements or other acts involving managerial discretion. 5 U.S.C. § 6503(a). However, in order to pressure employees to abandon telework, beginning with the 2025 Memorial Day holiday the Defendant Stewart granted early dismissal to USPTO employees who worked on-site, but denied it to teleworkers. POPA grieved this violation of the Telework Enhancement Act and the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. The Federal Mediation and Conciliation Service has provided the USPTO and POPA a list of potential arbitrators but the parties have yet to select one to hear the matter.

28.    On June 3, 2025 the USPTO conducted a "Town Hall" with employees at which the Defendant Lutnick spoke. Employees who were working at the USPTO headquarters (i.e., those who were not teleworking) were excused from work in order to attend. However, teleworkers were invited to attend virtually (as the Town Hall was streamed) but were not excused from work to do so and were required to

attend on their own time. POPA grieved this violation of the Telework Enhancement Act and the POPA-USPTO collective bargaining agreement and the grievance was denied.

29.    As noted, the USPTO routinely grants its employees early dismissal before Federal holidays. However, in a break with past practice and in an act of racial bias (if not outright racial insult), Defendant Stewart failed to grant USPTO employees early dismissal before the 2025 Juneteenth holiday. POPA grieved this violation of past practice and when the grievance was denied, invoked arbitration. The Federal Mediation and Conciliation Service has provided the USPTO and POPA a list of potential arbitrators but the parties have yet selected one to hear the matter.

30.    The Federal Service Labor Management Relations Statute guarantees the right of Federal employee unions to participate in any "formal discussion" between management and employees "concerning any grievance or any personnel policy or practices or other general condition of employment." 5 U.S.C. § 7114(a)(2)(A). The USPTO has until now honored that obligation by allowing POPA's President or other representative to participate in recurring "Town Hall" meetings management has held with employees at which working conditions are routinely discussed. However, when the Defendant Stewart denied POPA's President the opportunity to participate in a "Town Hall" meeting she held with thousands of employees on March 27, 2025 at which she discussed telework, the government-wide hiring freeze, overtime, the suspension of training, employee

awards, and other "personnel polic[ies] or practices or other general condition of employment," POPA filed an unfair labor practice charge which is under investigation by the Office of General Counsel of the Federal Labor Relations Authority.

### *NWSEO stands firm.*

32.     In "Project 2025: Presidential Transition Project" the Heritage Foundation wrote that "the NWS should fully commercialize its forecasting operations." *Mandate for Leadership: The Conservative Promise,* at 675. The Plaintiff NWSEO has opposed the efforts of the Defendants Trump, Lutnick and Grimm to dismantle the NWS.

33.     Through a combination of the Defendant Trump's January 20, 2025 government-wide hiring freeze, the February 14, 2025 mass termination of probationary employees in NWS and throughout the Federal government, the January 28, 2025 offer of "deferred resignation" with pay until September 2025 (a/k/a the "fork in the road"), and the offering of voluntary separation incentives and voluntary early retirement, the Defendants Trump, Lutnick and Grimm have successfully drawn down the 4,000 member workforce of the National Weather Service by over 600 employees. As a result, the NWS has been forced to close numerous Weather Forecast Offices at night, reduce the frequency of weather balloon launches thereby degrading the quality of the weather models that rely on the data obtained by those launches, and curtail other services.

34.    NWSEO launched an aggressive lobbying and press campaign to oppose these reductions in staff and services. These efforts have produced news stories in which NWSEO official have been interviewed, such as:

"As NOAA cuts loom, scientists and industry are pushing back," Washington Post, (March 7, 2025);

"As NOAA braces for more cuts, scientists say public safety is at risk," PBS News, (March 14);

"How Weather Service Layoffs Could Affect North Texas During Tornado Season," Dallas Observer, (March 25);

"Weather Service Prepares for 'Degraded Operations' Amid Trump Cuts," *New York Times* (April 16);

"Weather service prepares for 'degraded operations' amid Trump cuts," Seattle Times, (April 16);

"How Trump's National Weather Service Cuts Could Cost Lives," *Scientific American* (May 13);

"The Weather Service has a plan to reinvent itself: Did DOGE Stop it?." *New York Times* (May 15);

"After Cuts, a Kentucky Weather Office Scrambles for Staffing as Severe Storms Bear Down," *New York Times* (May 16);

"Kentucky NWS forecast office faced federal staffing cuts before deadly tornadoes hit," *USA Today* (May 17);

"First came the weather service staffing cuts. Then came the tornadoes," USA Today, (May 20);

"National Weather Service Cuts concerns KC area officials," *Kansas City Star* (May 28);

"2025 hurricane season could see degraded forecasts because of weather service cuts," Palm Beach Post (June 6);

"'Lives are at stake:' Deadly Texas storms put spotlight on Trump's weather agency Cuts," BBC online (June 9);

"Staff vacancies hit Texas weather offices as they brace for a busy hurricane season," Texas Tribune (June 9);

" 'Sledgehammer' to science: Job cuts, Trump budget plans spark hurricane fears," *Orlando Sentinel* (July 10);

"Staffing shortages at NOAA, National Weather Service raise safety concerns in South Florida," in CBS News Miami online (July 11);

"As Floods Hit, Key Roles Were Vacant at Weather Service Offices in Texas," New York Times, (July 5);

"Weather Service Staffing 'Clearly a Concern' Ahead of Deadly Texas Floods," Newsweek, (July 5); and

"Trump cuts to California National Weather Service leave 'critical' Holes," Los Angeles Times (July 16).

35.    NWSEO officials have been interviewed about these staffing and services

cuts on televised news broadcasts including:

"Forecasters union expresses 'grave concern' about NWS staffing this storm season," NBC News Dallas-Fort Worth (March 11, 2025)

"Job cuts at NOAA drive concerns about extreme weather forecasts, as climate change worsens natural disasters," CBS Evening News Plus (March 13)

BBC News (May 20, 2025)

"Tornadoes expose staffing crisis at National Weather Service." WMUR (May 20).

KSEE24 Hanford News (May 21, 2025)

MSNBC Reports (May 27, 2025)

36.    NWSEO officials have been interviewed in at least 40 news stories in both national and local media concerning these cutbacks.

37.    Under the NWS-NWSEO collective bargaining agreement, the agency is required to make a temporary promotion of an existing employee "as soon as practicable" after a position becomes vacant, pending selection of a permanent replacement. As a result of the government-wide hiring freeze imposed by Defendant Trump on January 20, 2025, the NWS refused to make these required temporary promotions but instead assigned employees the higher graded duties of these prolonged vacancies without higher graded pay. NWSEO grieved this violation of the parties' collective bargaining agreement. But instead of providing a response to the merits of the grievance as required by the agreement, on June 9 the NWS wrote instead that "providing a response to your grievance would contravene with the current priorities of the administration." The union invoked arbitration and the matter is now set to be heard by a Federal labor arbitrator on December 16, 2025.

38.    Although most NWS employees are weather forecasters or others engaged in operations that normally require them to be in a forecast facility to monitor and forecast the weather, flooding, and tsunamis, over 360 employees represented by NWSEO whose work is more administrative or can be performed from outside the office have routinely teleworked. This right to telework was confirmed in an agreement negotiated in 2022 at the end of the COVID pandemic which demonstrated that many duties performed by NWS employees could be

17

successfully and efficiently performed at home. Even operational employees were guaranteed the right to telework when assigned to supernumerary or administrative non-operational shifts. This all came to an end when the NWS implemented Defendant Trump's Return to In-Person Work order by cancelling telework throughout the NWS. On April 9, 2025 NWSEO grieved this violation of the NWSEO-NWS collective bargaining agreement and when the grievance was denied, invoked arbitration. The matter is presently pending before a Federal labor arbitrator and a hearing is scheduled for November 20, 2025.

39. In 2002, NWSEO was granted "national consultation rights" by the Department of Commerce. Under the FSLMR Statute, before it changes conditions of employment at an agency or departmentwide level, those unions that have national consultation rights must be afforded prior notice and "a reasonable time to present its views and recommendations regarding the changes." The agency must then "consider the views or recommendations before taking final action" and "provide the labor organization a written statement of the reasons for taking the final action." 5 U.S.C. § 7113. On January 24, 2025 the Department of Commerce unilaterally eliminated its telework program without providing NWSEO a reasonable opportunity to present its views as required by the Statute. NWSEO filed an unfair labor practice charge with the FLRA over this violation of its consultation rights, which is under investigation by the FLRA Office of General Counsel.

*Defendant Trump issues a new Executive Order*

40.    The Defendant Trump carried through on his promise that he "will not tolerate" any union that challenges implementation of his policies, including POPA and NWSEO. On August 28, 2025 Defendant Trump issued a new Executive Order, *Further Exclusions from the Federal Labor-Management Relations Program,* exempting six additional agencies from the coverage of the FSLMR Statute under the authority of 5 U.S.C. § 7103(b)(1) because their unions were not among those "constructive partnerships" that would "who work with him."

41.    Among the agencies that were exempted from coverage of the FSLMR Statute by this new Executive Order was the "Office of the Commissioner for Patents and subordinate units, Patent and Trademark Office," which includes the nearly 9,000 patent examiners represented by POPA. Section 2(b), revising section 1-411 of Executive Order 12171 of November 19, 1979.

42.    Also among the agencies that were exempted from coverage of the FSLMR Statute were two NOAA line offices whose employees are represented by NWSEO – the National Environmental Satellite, Data and Information Service and the National Weather Service. Section 2(b), revising section 1-411 of Executive Order 12171 of November 19, 1979.

43.    The White House simultaneously issued a "Fact Sheet" containing spurious reasons why these additional agencies were exempted from the FSLMR Statute.

44.     Section 7103(b)(1)(A) of the Statute authorizes the President to exempt agencies or subdivisions of agencies only if "the agency or subdivision has as a *primary function* . . . national security work." (emphasis added). According to the Fact Sheet, the Office of the Commissioner of Patents was excluded because:

> The Invention Secrecy Act tasks the PTO with reviewing inventions made in the United States, assessing whether their release could harm national security, and if so, issuing secrecy orders that prevent public disclosure. Effectively performing this work is essential to ensuring U.S. inventions with military or other national security applications do not fall into enemy hands.

45.     However, the USPTO does ***not*** assess whether the release of patent applications could harm national security. Under the Invention Security Act, 35 U.S.C. § 181, patent applications whose release might be detrimental to national security are referred to the Atomic Energy Commission, the Secretary of Defense or other defense agencies who make the determination whether the publication or disclosure of the invention would be detrimental to national security and should be kept secret. Rather than being a primary function of the USPTO, the screening of the patent applications for referral to the defense agencies is an ancillary duty of just 26 patent examiners in the Office of Licensing and Review of the nearly 9,000 examiners employed by the USPTO. And only about 50 of the 600,000 patent applications received each year by the USPTO are ultimately subject to a secrecy order after being assessed by the defense agencies.

46.     The grounds for exclusion of NWS and NESDIS are equally spurious. According to the White House Fact Sheet:

20

> Today NWS and NESDIS provide weather and climate data that
> inform the weather forecasting used to plan U.S. military deployments.
> Weather forecasts have long been critical factor [sic] in the success or
> failure of military operations.

While the latter statement is true, the former statement simply isn't. The NWS

does not provide the military with weather forecasts for military operations. The

military departments have their own weather forecasting units (such as the Fleet

Weather Centers in Norfolk and San Diego, the Fleet Numerical Meteorology and

Oceanography Center in Monterey, the 1St Combat Weather Squadron at Fort

Lewis, and the 557th Weather Wing at Offutt Air Force Base and many others) that

provide forecasting and support for military operations.

47.    NESDIS does track and command three polar orbiting weather

satellites known as the "Defense Meteorological Satellite Program" along with

NOAA's own weather satellites. But DOD will cease processing the data from these

satellites in 2026 as they are replaced by a new generation of military weather

satellites.

48.    The August 28, 2025 White House Fact Sheet also erroneously stated

that these exclusions were necessary because delays caused by collective

bargaining "can impact the ability of agencies with national security

responsibilities to implement policies swiftly and fulfill their critical missions"

and that bargaining "can delay the implementation of time-sensitive national

security measures."  The FSLMR Statute preserves management's right "to take

whatever actions may be necessary to carry out the agency mission during

emergencies." 5 U.S.C. § 7106(a). And an agency need not complete bargaining before changing conditions of employment when immediate implementation is "consistent with the necessary functioning of the agency, such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission." *SPORT and Dep't of Air Force, Edwards AFB*, 68 F.L.R.A. 9, 10-11 (2014), *recon. denied*, 68 F.L.R.A. 107 (2014).

49.    On August 28, 2025 the Acting Director of the USPTO's Office of Human Resources sent the President of POPA a memorandum informing the union that the USPTO would apply the August 28, 2025 Executive Order to the Office of Commissioner of Patents, and that it would also apply Executive Order 14251 of March 27, 2025 to the Office of Chief Information Officer, which it had not done to date. This notice read in pertinent part:

> The Agency will no longer recognize POPA as the exclusive representative for any employees in Patents and OCIO [Office of Chief Information Officer].
>
> In alignment with the Office of Personnel Management (OPM) Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Exclusions), dated March 27, 2025, the Agency will terminate payroll deductions of union dues for employees in Patents and OCIO who are no longer in the bargaining unit as soon as practicable under 5 U.S.C. § 7115.
>
> Patents and OCIO employees will no longer be entitled to "official time," described in 5 U.S.C. § 7131 to carry out their representational duties since they are no longer bargaining unit employees or covered by the CBA.
>
> The Agency will discontinue its participation in grievance and arbitration procedures arising under the Statute involving disputes brought on behalf of employees in Patents and/or OCIO, including

those matters currently pending before a grievance official and/or arbitrator.

50.     On August 29, 2025 NOAA's Director of Workforce Relations Division sent NWSEO's President a notice that stated:

Pursuant to Executive Order "Further Exclusions from the Federal Labor-Management Relations Program" (August 28, 2025) . . . the National Weather Service (NWS), National Oceanic and Atmospheric Administration (NOAA) hereby terminates any and all collective bargaining agreements currently in effect between NWS and the National Weather Service Employee Organization (NWSEO). This is effective immediately.

51.     Similarly, on August 29, 2025 NOAA's Director of Workforce Relations Division sent NWSEO's senior official at NESDIS a notice that stated:

Pursuant to Executive Order "Further Exclusions from the Federal Labor-Management Relations Program" (August 28, 2025) . . . the National Environmental Satellite, Data, and Information Service (NESDIS), Office of Satellite and Product Operations (OSPO), National Oceanic and Atmospheric Administration (NOAA) hereby terminates any and all collective bargaining agreements currently in effect between the NESDIS, OSPO and the National Weather Service Employee Organization (NWSEO). This is effective immediately.

## CLAIMS FOR RELIEF

### First Cause of Action

### *Ultra Vires (Violation of Federal Service Labor-Management Relations Statute)*

52.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 51 as if fully set forth here.

53.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*. Courts have jurisdiction to grant relief when the President and his subordinate officials act beyond the scope of their authority and violate the law to the injury of an individual or organization.

54.    The President may exclude an agency or subdivision from coverage of the Federal Service Labor Management Relations Statute *only* if that subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, *and* only if the provisions of the Statute cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

55.    The President is not entitled to any presumption of regularity that might otherwise be due him when he issued the two Executive Orders because the Defendant was indifferent to the purposes of the Federal Service Labor Management Relations Statute and has acted deliberately in contravention of them. The President's invocation of Section 7103(b) to now exclude well over two-thirds of the federal workforce – coupled with contemporaneous evidence reflecting motivations for the Executive Orders plainly outside those contemplated by statute – represents that the two Executive Orders patently disregard the specific and unambiguous directives in the FSLMR Statute. The fact sheets that the White House issued accompanying the companion Executive Orders reveal other motives for terminating the Plaintiffs' and other labor organizations' collective bargaining rights, as does the sweeping scope of the Orders as well as the selective exclusions

24

from the Orders of a handful of favored unions (such as the police unions and Border Patrol agents) who are viewed as supporters of the President's agenda. The fact sheets exaggerate if not misstate both the national security responsibilities of the agencies being excluded as well as misrepresent the agencies' bargaining obligations under the statute when there is an exigency or emergency and thus demonstrate that the reasons proffered for issuing the two Executive Orders are a pretext for other impermissible and extra-statutory motivations. Therefore, the two Executive Orders, taken as a whole, exceed the President's authority and are *ultra vires.*

56.    Alternatively, since "national security work" is not a responsibility of NWS, NESDIS, Office of the Commissioner for Patents or the USPTO's Office of Chief Information Officer, no less their "primary function," the President clearly exceeded the authority granted to him by Congress in 5 U.S.C. § 7103(b) when he exempted the NWS, NESDIS, Office of the Commissioner for Patents and the USPTO's Office of Chief Information Officer, from coverage of the FSLMR Statute. In so doing, the Defendant Trump exercised power that was specifically withheld by Congress and acted in contravention of a specific statutory prohibition and therefore his action was *ultra vires.*

57.    The Defendants Lutnick and Grimm and their subordinates' actions in terminating the collective bargaining agreements with NWSEO covering employees of the NWS and NESDIS are *ultra vires* because they rely on and enforce an illegally issued and invalid Executive Order.

58.    The Defendants Lutnick and Stewart and their subordinates' actions in terminating recognition of POPA as the collective bargaining representative of the employees in the Office of the Patent Commissioner and in USPTO's Office of Chief Information Officer and the termination of those employees' official time, dues allotment and pending grievances is also *ultra vires* because they rely on and enforce an illegally issued and invalid Executive Order.

## Second Cause of Action
### *Violation of NWSEO's and POPA's First Amendment Rights*

59.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 58 as if fully set forth here.

60.    The right of public employees to assemble and to petition for redress of grievances by filing grievances through a negotiated union grievance procedure is protected by the First Amendment and public employees have a right to be free from retaliation for engaging in such activities. *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1438 (10th Cir. 1990); *Petrario v. Cutler,* 187 F.Supp.2d 26, 31-32 (D. Conn. 2002); *Stellmaker v. DePetrillo*, 710 F.Supp. 891, 892-93 (D. Conn. 1989).

61.    POPA's grievances against the Trump Administration's termination of telework, discrimination against teleworkers with regard to early dismissal and time to attend Town Halls, elimination of training, and failure to grant early dismissal for the Juneteenth holiday, and the filing of the unfair labor practice charge concerning

the refusal to allow POPA to participate in the "formal discussion" at the Town Hall meeting, constitute First Amendment activity by POPA and its members.

62.     NWSEO's grievances against the Trump Administration's termination of telework and refusal to make temporary promotions, its unfair labor practice charge filed for failing to honor its national consultation rights, and its lobbying and aggressive press campaign and interviews warning the public about staffing and service cuts at the NWS, constitute First Amendment activity by NWSEO and its members.

63.     The Executive Order retaliates against NWSEO and POPA and its members for that protected First Amendment activity. Indeed, the White House's Fact Sheet on the Executive Order 14251 threatens such retaliatory action against those unions who continue to "widely fil[e] grievances to block Trump policies."

64.     The fact that the POPA and NWSEO bargaining units were not included among the first tranche of exemptions in the March Executive Order but were excluded after they engaged in robust opposing to the Defendants' policies, evinces that national security concerns were not the motivation for their exclusion. The Defendant Trump made a threat in the fact sheet which accompanied Executive Order 14251 that he "will not tolerate mass obstruction" that was carried out only after it was not heeded by the Plaintiffs.

65.     The Executive Orders collectively constitute "viewpoint discrimination" because they exclude those labor organizations which have been

supportive of the Defendant Trump. As the Fact Sheet frankly explains,

"President Trump supports constructive partnerships with unions who work with

him" but that "he will not tolerate mass obstruction that jeopardizes his ability to

manage agencies with vital national security missions."

66.    Defendants have also acted to illegally curtail and infringe Plaintiffs'

First Amendment rights by carrying out the Executive Orders and terminating

Plaintiffs' collective bargaining rights and abrogating their collective bargaining

agreements and the privileges and benefits Plaintiffs enjoy under the Statute and

which they have negotiated in its collective bargaining agreements.

67.    The Executive Orders thus "constitutes a sufficiently adverse action"

against Plaintiffs "to give rise to an actionable First Amendment claim." *Hous.*

*Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Orders collectively, in

other words, "would deter a similarly situated individual of ordinary firmness from

exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th

322, 325 (2d Cir. 2023).

### Third Cause of Action

***Violation of the Fifth Amendment's Guarantee of***
***Equal Protection of the Laws***

68.    Plaintiffs reassert and reallege the allegations contained in

paragraphs 1 through 67 as if fully set forth here.

69.    The due process guarantee of the Fifth Amendment to the United

States Constitution includes a guarantee of equal protection. *See United States v.*

*Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

70.    "The Constitution's guarantee of equality 'must at the very least mean that a bare . . .  desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973)).

71.    A "bare . . . desire to harm a politically unpopular group" is precisely what motivated the Executive Orders' exclusion of 75% of union-represented employees across multiple Cabinet departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported President Trump. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the exclusions is to harm and punish federal unions like NWSEO and POPA that have voiced opposition to Trump Administration policies and petitioned the government for redress from those policies.

72.    The Executive Orders and actions of the Defendants have denied NWSEO and POPA and their members of equal protection of the laws because they have stripped them of their collective bargaining rights and simultaneously allowed the employees of U.S. Customs and Border Protection and members of police and firefighter unions who support the President politically to retain their collective bargaining rights.

## Prayer for Relief

WHEREFORE, the Plaintiffs National Weather Service Employees Organization and Patent Office Professional Association request judgment against

29

the Defendants:

A.    Declaring that Section 2(b) of the August 28, 2025 Executive Order as applied to the Office of the Commissioner of Patents and subordinate units, and to the National Environmental, Satellite, Data and Information Service and the National Weather Service is unlawful and null and void;

B.    Declaring that Section 2(b) of Executive Order 14251 as applied to the USPTO's Office of Chief Information Officer is unlawful and null and void;

C.    Enjoining Defendant Lutnick, Stewart, Grimm, their successors and all their agents and subordinates from implementing 2(b) of the August 28, 2025 Executive Order in the Office of the Commissioner of Patents and subordinate units, and in the National Environmental, Satellite, Data and Information Service and the National Weather Service;

D.    Enjoining Defendants Lutnick, Stewart, their successors and all their agents and subordinates from implementing Section 2(b) of Executive Order 14251 in USPTO's Office of Chief Information Officer;

E.    Enjoining Defendants Lutnick and Stewart, their successors and all their agents and subordinates from continuing to fail to recognize POPA as the exclusive representative of the professional employees of the Office of the Commissioner of Patents and of the employees of the USPTO's Office of Chief Information Officer, and ordering Defendants Lutnick and Stewart, their successors and their agents and subordinates to restore POPA's collective bargaining agreements and relationship with the USPTO and to honor the agreements'

30

provisions and any of the FSLMR Statute's provisions concerning dues allotments, official time, use of and access to agency resources;

F.    Enjoining Defendants Lutnick and Grimm, their successors and all their agents and subordinates from continuing to fail to recognize NWSEO as the exclusive representative of the employees of the Office of Satellite Products and Operations in the National Environmental, Satellite, Data and Information Service as well as the employees of the National Weather Service and ordering Defendants Lutnick and Grimm, their successors and their agents and subordinates to restore NWSEO's collective bargaining agreements and relationship with NESDIS and NWS and to honor the agreements' provisions and any of the FSLMR Statute's provisions concerning dues allotments and official time;

G.    Awarding Plaintiffs reasonable attorney fees and costs incurred; and

H.    Ordering such further relief as the Court may deem just and appropriate.


                                        Respectfully submitted,


                        By:     _/s/ Richard J. Hirn_____
                                Richard J. Hirn
                                D.C. Bar No. 291849
                                richard@hirnlaw.com
                                5335 Wisconsin Ave., NW, Suite 440
                                Washington, D.C. 20015
                                (202) 274-1812

                                *General Counsel*
                                *National  Weather Service*
                                *Employees Organization*

31

*General Counsel*
*Patent Office Professional*
*Association*


By:    _/s/ Keith R. Bolek_
          Keith R. Bolek
          Bar No. 463129
          kbolek@odonoghuelaw.com

          April H. Pullium
          Bar No. 198026
          apullium@odonoghuelaw.com

          O'Donoghue & O'Donoghue LLP
          5301 Wisconsin Avenue, Suite 800
          Washington, D.C. 20015
          (202) 362-0041

          *Attorneys for Plaintiffs National*
          *Weather Service Employees*
          *Organization and Patent Office*
          *Professional Association*