# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WEATHER SERVICE : SERVICE EMPLOYEES ORGANIZATION, *et al.*, : : Plaintiffs, : : v. : : DONALD J. TRUMP, *et al.*, : : Defendants. : : | Case No. 1:25-cv-02947-PLF |

## MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING THE MOTION FOR PRELIMINARY INJUNCTION FILED BY PLAINTIFFS NATIONAL WEATHER SERVICE EMPLOYEES ORGANIZATION AND PATENT OFFICE PROFESSIONAL ASSOCIATION

Submitted by:

Richard J. Hirn
D.C. Bar No. 291849
richard@hirnlaw.com
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
(202) 274-1812

Keith R. Bolek
D.C. Bar. No. 463129
kbolek@odonoghuelaw.com
April H. Pullium
D.C. Bar. No. 198026
apullium@odonoghuelaw.com
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, D.C. 20015
(2020) 362-0041

Counsel for Plaintiffs NWSEO and POPA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

GLOSSARY ................................................................................................................... vii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 1

   I.    Background ........................................................................................................ 1

      A.   The Patent Office Professional Association ................................................ 1

      B.   National Weather Service Employees Organization .................................... 2

   II.   President Trump Issues Executive Order 14,251 ................................................ 3

   III.   NWSEO and POPA "Fight Back" Against Defendant Trump's Attacks on Federal Employees and Public Services. ........................................................................... 6

      A.   POPA Stands Firm. .................................................................................... 6

      B.   NWSEO Stands Firm. ................................................................................ 9

   IV.   Defendant Trump Issues a New Executive Order .......................................... 14

      A.   POPA ....................................................................................................... 15

      B.   NWSEO ................................................................................................... 17

ARGUMENT ................................................................................................................ 20

   I.    The Standard for a Preliminary Injunction. .................................................... 20

   II.   The Plaintiffs Have Established a Substantial Likelihood of Success on the Merits. ...... 20

      A.   The Executive Orders are Ultra Vires. ..................................................... 20

         1.   Plaintiffs are Entitled to Ultra Vires Review of the Executive Orders. .................. 20

         2.   The Plaintiffs Have Rebutted the Presumption of Regularity. .............................. 22

         3.   National Security is Not a "Primary Function" of the NWS, NESDIS, the Office of the Commissioner of Patents, or the USPTO's Office of Chief Information Officer ....... 29

      B.   The President Stripped NWSEO and POPA of Their Collective Bargaining Rights in Retaliation for the Exercise of Their First Amendment Rights and in an Exercise of Viewpoint Discrimination. ......................................................................... 32

         1.   Executive Order 14,343 Retaliates Against Plaintiffs for Their Exercise of Their Free Speech and Petitioning Rights. ..................................................................... 33

         2.   Both Executive Orders Constitute Viewpoint Discrimination ................................ 36

   III.   POPA and NWSEO will Suffer Irreparable Injury Pendente Lite in the Absence of a Preliminary Injunction. ................................................................................. 37

   IV.   The Balance of Equities Tips in the Plaintiffs' Favor and an Injunction Would Serve the Public Interest. ......................................................................................... 41

CONCLUSION .............................................................................................................. 42

# TABLE OF AUTHORITIES

## Cases

*Aid Assn. for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) ........................................................................ 20

*Ala. Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) .................................................................................... 41

*Am. Bar Ass'n v. U.S. Dep't of Just.*,
   2025 WL 1388891 (D.D.C. May 14, 2025) ........................................................ 34

*Am. Fed'n of Gov't Emps. v. Trump*,
   2025 WL 1755442 (N.D. Cal. Jun. 24, 2025) ...................................................... 35

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
   785 F.Supp.3d 833 (W.D. Wash. 2025) ............................................................. 34

*Am. Foreign Serv. Ass'n v. Trump*,
   783 F.Supp.3d 248 (D.D.C. 2025) ............................................................... 23, 25

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) ......................................................................... 33

*Asseo v. Centro Medico del Turabo*,
   900 F.2d 445 (1st Cir. 1990) ........................................................................... 37

*Banks v. York*,
   515 F.Supp.2d 89 (D.D.C. 2007) ..................................................................... 33

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ......................................................................................... 36

*Chamber of Comm. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ......................................................................... 20

*Ctr. for Biological Diversity v. Mattis*,
   868 F.3d 803 (9th Cir. 2017) ........................................................................... 22

*Doe v. Mattis*,
   889 F.3d 745 (D.C. Cir. 2018) ......................................................................... 20

*Fed. Educ. Ass'n v. Trump*,
   2025 WL 2355747 (D.D.C. Aug. 14, 2025) ....................................... 21, 23, 28, 31

*Hercules, Inc. v. Env'tl Prot. Agency*,

ii

598 F.2d 91 (D.C. Cir. 1978) ............................................................................... 29

*Huisha-Huisha v. Mayorkas,*
27 F.4th 718 (D.C. Cir. 2022) ............................................................................ 42

*Int'l Union of Elec. Workers v. NLRB,*
426 F.2d 1243 (D.C. Cir. 1970) ......................................................................... 37

*Johnson v. United States,*
2021 WL 950421 (D.D.C. Mar. 12, 2021) ........................................................ 33

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018) .............................................................................................. 32

*Mendocino Env't Ctr. v. Mendocino Cnty.,*
192 F.3d 1283 (9th Cir. 1999) ........................................................................... 35

*Moore-Duncan ex rel. NLRB v. Horizon House Developmental Servs.,*
155 F. Supp. 2d 390 (E.D. Pa. 2001) ................................................................ 38

*Morfin v. Albuquerque Pub. Schs.,*
906 F.2d 1434 (10th Cir. 1990) ......................................................................... 33

*Mountain States Legal Found. v. Bush,*
306 F.3d 1132 (D.C. Cir. 2002) ......................................................................... 21

*Nat'l Treasury Emps. Union v. Trump,*
780 F.Supp.3d 237 (D.D.C. 2025) ..................................................................... 22

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
26 F.4th 960 (D.C. Cir. 2022) ............................................................................ 21

*NFIB v. Dep't of Lab.,*
142 S. Ct. 661 (2022) .......................................................................................... 42

*NLRB v. Electro-Voice,*
83 F.3d 1559 (7th Cir. 1996) ............................................................................. 37

*Petrario v. Cutler,*
187 F.Supp.2d 26 (D. Conn. 2002) .................................................................... 33

*Ralls Corp. v. Comm. On Foreign Inv. in U.S.,*
758 F.3d 296 (D.C. Cir. 2014) ........................................................................... 21

*Romero v. Tran,*
33 Vet. App. 252 (2021) ..................................................................................... 29

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819, 829 (1995) ............................................................................. 36, 37

*SEIU Health Care of Mich. v. Snyder,*
  875 F.Supp.2d 710 (E.D. Mich. 2012) ................................................ 37

*Small v. Avanti Health Sys., LLC,*
  661 F.3d 1180 (9th Cir. 2011) ............................................................ 37

*Stellmaker v. DePetrillo,*
  710 F.Supp. 891 (D. Conn. 1989) ....................................................... 33

*Suarez Corp. Indus. v. McGraw,*
  202 F.3d 676 (4th Cir. 2000). ............................................................. 33

*United States v. Roses Inc.,*
  706 F.2d 1563 (Fed. Cir. 1983) ........................................................... 29

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ............................................................................ 36

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)). ............................................................................. 20

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................ 41

*Zweibon v. Mitchell,*
  516 F.2d 594 (D.C. Cir. 1975) ............................................................ 22

**Statutes**

5 U.S.C. § 6503 ....................................................................................... 8

5 U.S.C. §§ 7101 ..................................................................................... 3

5 U.S.C. § 7102 ....................................................................................... 3

5 U.S.C. § 7103 ....................................................................................... 3

5 U.S.C. §7103(b) ..................................................................... 4, 14, 21, 22

5 U.S.C. § 7106 ................................................................................ 27, 41

5 U.S.C. § 7111 ....................................................................................... 3

5 U.S.C. § 7112 .................................................................................... 2, 3

5 U.S.C. § 7113 ................................................................................... 3, 14

5 U.S.C. § 7114 ................................................................................... 3, 9

iv

5 U.S.C. § 7117 ........................................................................................................ 4

15 U.S.C. § 313 ....................................................................................................... 30

15 U.S.C. § 85011 ................................................................................................... 30

35 U.S.C. § 181 ....................................................................................................... 31

**Agency Decisions**

*Army & Air Force Exch. Serv. Waco Distribution Ctr. Waco, Texas*, 53 F.L.R.A. 749 (1997) ... 28

*Dep't of the Air Force, 913th Air Wing, Willow Grove Air Reserve Station*, 57 F.L.R.A. 852
    (2002) .................................................................................................................. 28

*SPORT and Dep't of Air Force, Edwards AFB*,
    68 F.L.R.A. 9 (2014) ........................................................................................... 27

**Other Authorities**

Alexandra Marquez, *et al.*, *Firefighters Union IAFF Declines to Endorse a Candidate*,
    NBC NEWS (Oct. 3, 2024) ................................................................................... 23

*Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015). ................................. 35

Erich Wagner, *VA is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*,
    GOV'T EXEC. (Apr. 18, 2025) ............................................................................... 24

Executive Order No. 14,251, *Exclusions from Federal Labor-Management Programs*, 90 Fed.
    Reg. 14,553 (Mar. 27, 2025) ................................................................................. 4

Executive Order No. 14,343, *Further Exclusions from the Federal Labor-Management Relations
    Program*, 90 Fed. Reg. 42,683 (Sept. 3, 2025) ..................................................... 14

*Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l
    Coll. Barg. Requirements* (Mar. 27, 2025). ................................................... 5, 6, 26

FRATERNAL ORD. OF POLICE, *FOP Endorses Trump!*, (Sept. 6, 2025) ....................... 23

Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*,
    Politico.com, available at https://www.politico.com/news/2025/03/28/union-rights-federal-
    workers-donald-trump-00257010 (Mar. 28, 2025). ................................................ 4

https://www.uspto.gov/about-us/news-updates/uspto-patent-office-professional-association-sign-
    new-collective-bargaining (last visited Oct. 16, 2025). ............................................ 2

*Mandate for Leadership: The Conservative Promise*, at 675 (2023), *available at* https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf ................... 9

NAT'L BOARDER PATROL COUNCIL, *About NBPC* ........................................................................ 24

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024)............................................. 34, 36, 37

Nat'l Weather Svc., *Mission*, *available at* https://www.weather.gov/aprfc/Mission#:~:text=The%20National% 20Weather%20Service's%20River,National%20Weather%20Service%20(NWS). ............... 18

*National Boarder Patrol Council Endorses President Trump*, AM. PRES. PROJECT (Aug, 18, 2025) ........................................................................................................................ 24

Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12,171, 90 Fed. Reg. 16,427 (Apr. 17, 2025) ........................................................................................ 24

*The DOGE Plan to Reform Government*, WALL STREET JOURNAL, (Nov. 20, 2024) https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020 (Last visited Oct. 16, 2025). .... 7

White House, *Fact Sheet: Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Requirements* (Aug. 28, 2025), https://perma.cc/34ME-RPUY ("Aug. 2025 Fact Sheet").......................................................................................................... 14, 15, 25

White House, *Labor Day, 2025* (Sep. 28, 2025), *available at*, https://www.whitehouse.gov/presidential-actions/2025/08/labor-day-2025/ (last visited Oct. 16, 2025)........................................................................................................................... 1

## GLOSSARY

FLRA ................................................................................... Federal Labor Relations Authority

FSLMRS ........................................................ Federal Service Labor-Management Relations Statute

NESDIS ............................................ National Environmental Satellite, Data and Information Service

NOAA ................................................................. National Oceanic and Atmospheric Administration

NWS ............................................................................................................. National Weather Service

NWSEO .............................................................. National Weather Service Employees Organization

OSPO ........................................................................................ Office of Satellite Products and Operations

POPA ........................................................................................ Patent Office Professional Association

USPTO .............................................................................. United States Patent and Trademarks Office

VA ................................................................. United States Department of Veterans Administration

## INTRODUCTION

On August 28, 2025, President Donald Trump issued a Labor Day proclamation to "honor the proud legacy of America's workforce," adding "… we pay tribute to the unbreakable spirit that keeps it strong nearly 250 years later." White House, *Labor Day, 2025* (Sep. 28, 2025), *available at*, https://www.whitehouse.gov/presidential-actions/2025/08/labor-day-2025/ (last visited Oct. 16, 2025). The President also proclaimed that "every day, my Administration is restoring the dignity of labor and putting the American worker first." *Id.* But, to remove any doubt that this was all farce, he simultaneously issued a new Executive Order which nearly completes his union busting of the federal civil service. Two unions who represent employees working for the U.S. Department of Commerce and whose collective bargaining rights were stripped by the President's Labor Day Executive Order, have brought this suit to restore the collective voice of the public servants they represent. These unions now seek a preliminary injunction restoring those collective bargaining rights while the parties litigate the merits of their claims.

## STATEMENT OF FACTS

I.    **Background**

### A.    *The Patent Office Professional Association*

The Patent Office Professional Association ("POPA") became the collective bargaining representative of all non-supervisory, non-managerial professional employees of the USPTO (other than those employed in Trademarks) in 1964 pursuant to President Kennedy's Executive Order No. 10,988, *Employee-Management Cooperation in the Federal Sector* (Jan. 17, 1962). Declaration of Dr. Patricia Duffy ("Duffy Decl.") ¶ 5. Until President Trump issued Executive Order No. 14,343 in August 2025, POPA represented approximately 8,600 patent examiners employed under the Commissioner of Patents, as well as an additional 500 professional employees

1

employed by the Commissioner of Patents and/or in other USPTO offices, such as the Office of
Chief Information Officer; the Office of Chief Financial Officer; the Office of Policy and
International Affairs; and the Patent and Trademark Appeals Board. *Id.*

POPA and the USPTO negotiated a new, five-year collective bargaining agreement in late
2024. Duffy Decl. ¶ 6. The parties executed the agreement, which became effective on December
11, 2024. *Id.* The USPTO issued a press release praising this new agreement, which read in part:

> "This landmark agreement—a generational accomplishment— represents the
> USPTO's commitment to strengthening the partnership between members of POPA
> and management," said Kathi Vidal, Under Secretary of Commerce for Intellectual
> Property and Director of the USPTO. "It supports our standards to create a space
> for thoughtful collaboration while also preserving the many characteristics that
> make the USPTO such a unique and vibrant place to work for years to come."

https://www.uspto.gov/about-us/news-updates/uspto-patent-office-professional-
association-sign-new-collective-bargaining (last visited Oct. 16, 2025).

### B.    *National Weather Service Employees Organization*

The National Weather Service Employees Organization ("NWSEO") was organized as a
labor union in 1976. Declaration of Joanne Becker ("Becker Decl.") ¶ 3. The Federal Labor
Relations Authority ("FLRA") later certified the NWSEO as the exclusive collective bargaining
representative of all employees working for the National Weather Service ("NWS") across the
United States, except for supervisors, managers, and other employees customarily excluded from
bargaining units under the Federal Service Labor Management Relations Statute ("FSLMRS"), 5
U.S.C. § 7112(b). Becker Decl. ¶ 3. According to a January 2025 report provided by NWS
management, there were 3,251 NWS employees in the FLRA-certified bargaining unit. This unit
includes employees working in 122 Weather Forecast Offices; 12 River Forecast Centers; several
centralized forecasting centers (such as the Aviation Weather Center, the National Hurricane
Center, the Storm Prediction Center and other specialized forecasting centers comprising the

National Centers for Environmental Prediction); the National Water Center; two tsunami warning centers; and various regional and national headquarters elements. Becker Decl. ¶ 4. The Weather Forecast Offices are located throughout the country; are historically staffed 24 hours a day, 365 days a year by meteorologists/forecasters; and are the nation's primary source for weather forecasts, including watches and warnings of severe, dangerous weather. *Id.* NWSEO has a collective bargaining agreement with the NWS covering all of these employees that became effective in 2021 and will expire in 2029. Becker Decl. ¶ 5.

The FLRA has also certified NWSEO as the exclusive collective bargaining representative of about 100 non-supervisory, non-managerial employees working for the Office of Satellite Products and Operations ("OSPO") in the National Environmental Satellite, Data and Information Service ("NESDIS"). Becker Decl. ¶ 6. Like the NWS, NESDIS is one of several "line offices" of the National Oceanic and Atmospheric Administration ("NOAA"), U.S. Department of Commerce. *Id.* The employees in this separate bargaining unit are primarily technicians who track and operate the nation's weather satellites from the NESDIS ground station in Wallops Island, Virginia and at the NESDIS Satellite Operations Facility in Suitland, Maryland. *Id.*

NWSEO's collective bargaining agreement with NESDIS covering the OSPO employees became effective in 2020.  Becker Decl. ¶ 7. The agreement has a term of five years, but it extends automatically from year to year thereafter unless one of the parties provides notice of their intent to renegotiate the agreement. *Id.*

## II.   <u>President Trump Issues Executive Order 14,251</u>

The Federal Service Labor Management Relations Statute ("FSLMRS") provides employees in the Executive Branch with the right to organize a union in their workplace and to bargain collectively through that union. 5 U.S.C. §§ 7101, 7102, 7103, 7111, 7112, 7113, 7114 &

7117. The FSLMRS contains a narrow provision under which employees may be excluded from coverage based on their agency's involvement in national security. The Statute provides that:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1)

On March 27, 2025, Defendant Trump issued Executive Order No. 14,251, *Exclusions from Federal Labor-Management Programs*, 90 Fed. Reg. 14,553 (Mar. 27, 2025), in which he purportedly invoked 5 U.S.C. §7103(b) to terminate the collective bargaining rights of employees in ten Cabinet level departments and seven independent agencies whose "primary function" is allegedly national security, and claimed that the Federal Service Labor Management Relations Statute "cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." *Id.* This Executive Order also excluded every Federal agency's Office of Chief Information Officer. *Id.*, Sec. 2(b) (adding sec. 1-419(a) to the exclusions in Exec. Order No. 12,171).

President Trump's initial Executive Order stripped collective bargaining rights from three-quarters of the federal employees who were represented by federal sector unions,[1] demonstrating

---

[1] *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com, available at https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010 (Mar. 28, 2025).

that it was not a targeted assessment based on national security concerns. However, for the time being, the NWSEO and POPA, along with the employees they represented, were unaffected.[2]

The White House simultaneously issued a "Fact Sheet" with Executive Order No. 14,251. *Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Requirements* (Mar. 27, 2025), https://perma.cc/26AL-73TZ ("Mar. 2025 Fact Sheet"). The White House candidly admitted in this Fact sheet that the President issued Exec. Order No. 14,251 to curtail the power of and to punish those labor organizations who had "obstructed" the President's efforts to dismantle the Federal government, to coerce employees into resigning (for example, by terminating telework), and to dismiss large segments of the Federal workforce. The "obstruction" in question involved those labor organizations filing grievances pursuant to their collective bargaining agreements:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.
>
> Certain Federal unions have declared war on President Trump's agenda.
>
> The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
>
> For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.
>
> Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

---

[2] While Plaintiff POPA represents professional employees in the USPTO's Office of Chief Information Officer and while President Trump excluded those employees from the coverage of the FSLMRS in Exec. Order No. 14,251, the USPTO did not enforce that exclusion until after President Trump issued Executive Order No. 14,343. Duffy Decl. ¶ 17.

President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Mar. 2025 Fact Sheet, *supra*.

**III.    NWSEO and POPA "Fight Back" Against Defendant Trump's Attacks on Federal Employees and Public Services.**

Despite Defendant Trump's diktat that he would not "let union obstruction interfere with his efforts" by "widely filing grievances to block Trump policies" and his threat that he "will not tolerate mass obstruction that jeopardizes his ability to manage agencies," POPA and NWSEO continued to fulfill their legal duty to protect their members' interests – as well as the public they serve – by filing grievances against the Defendants' efforts to harass, undermine, and dismantle the civil service and the mission of Federal agencies.

**A.    POPA Stands Firm.**

After the change in administrations in January 2025, the USPTO's leadership turned hostile towards POPA and the employees it represents. In turn, POPA took every effort to protect its contract and the working conditions of USPTO employees. Duffy Decl. ¶ 7.

First, in order to "increase production" (*i.e.*, examine more patent applications) at the expense of the "quality" or legal validity of patents, the USPTO suspended all non-essential training conducted on duty-time, including a bank of hours that examiners could use for continuing technical education on March 7, 2025. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. The matter is presently pending before Federal labor arbitrator James Bilik. Duffy Decl. ¶ 8.

Second, according to its Fiscal Year 2023 Annual Report on Telework, "the USPTO continues to be a leader of telework in the federal government. At the USPTO, telework is a business strategy that supports mission achievement and goal fulfillment," including $68 million

annual savings in real estate costs. Duffy Decl. ¶ 9. By the end of FY 2023, 96% of USPTO employees teleworked, and 86% teleworked full-time. *Id.* On January 20, 2025, President Trump issued a "Return to In-Person Work" order to undermine rather than enhance the operations of Federal agencies. Duffy Decl. ¶ 10. Its goal was to coerce Federal employees to quit. In a Wall Street Journal editorial, DOGE Directors Elon Musk and Vivek Ramaswamy wrote: "[r]equiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome."[3]

In order to implement this "Return to In-Person Work" order, the USPTO began to cancel telework in phases. On April 14, 2025, the USPTO cancelled telework for probationary patent examiners, 11% of whom promptly quit. Duffy Decl. ¶ 11. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. *Id.* The matter is presently pending before Federal labor arbitrator Spilker and a hearing was scheduled for November 17 and 18, 2025. *Id.*

On May 19, 2025, the USPTO notified POPA that employees it represented in the Office of Chief Financial Officer, Office of Chief Information Officer, Office of General Counsel, Patent and Trademark Appeals Board, Office of Policy and International Affairs and Office of Government Affairs who live within 50 miles of the USPTO headquarters could no longer routinely telework. Duffy Decl. ¶ 12. POPA grieved this violation of the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. *Id.*, Exhibit C. The matter is presently pending before Federal labor arbitrator Blanca Torres and a hearing is scheduled for December 2 and 3, 2025. Duffy Decl. ¶ 12.

---

[3] *The DOGE Plan to Reform Government*, WALL STREET JOURNAL, (Nov. 20, 2024) https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020 (Last visited Oct. 16, 2025).

Third, the USPTO routinely grants two hours of excused absence from duty on the day before Federal holidays. Duffy Decl. ¶ 13. The Telework Enhancement Act of 2010 provides that the head of each executive agency shall ensure that teleworkers and non-teleworkers are treated the same for purposes of work requirements or other acts involving managerial discretion. 5 U.S.C. § 6503(a). However, beginning with the 2025 Memorial Day holiday the USPTO granted early dismissal to USPTO employees who worked on-site, but denied it to teleworkers in order to pressure employees to abandon telework. Duffy Decl. ¶ 13. POPA grieved this violation of the Telework Enhancement Act and the POPA-USPTO collective bargaining agreement and when the grievance was denied, invoked arbitration. *Id.* The matter is presently pending before Federal labor arbitrator Keith Greenberg and a hearing has not yet been scheduled. *Id.*

On June 3, 2025 the USPTO conducted a "Town Hall" with employees during which the Secretary of Commerce Howard Lutnick spoke. Duffy Decl. ¶ 14. The USPTO excused employees at the USPTO headquarters (*i.e.*, those who were not teleworking) from work in order to attend the "Town Hall." *Id.* However, teleworkers were invited to attend virtually (as the Town Hall was streamed), but USPTO did not excuse them from work and they had to attend on their own time. *Id.* POPA grieved this violation of the Telework Enhancement Act and the POPA-USPTO collective bargaining agreement and the grievance was denied. *Id.*

As noted above, the USPTO routinely grants its employees early dismissal before Federal holidays. However, in a break with past practice and in an act of racial bias, the USPTO failed to grant USPTO employees early dismissal before the 2025 Juneteenth holiday. Duffy Decl. ¶ 15. POPA grieved this violation of past practice and when the grievance was denied, invoked arbitration. *Id.* The matter is presently pending before Federal labor arbitrator Joshua Javits and a hearing has not yet been scheduled. *Id.*

Fourth, the FSLMRS guarantees the right of Federal employee unions to participate in any "formal discussion" between management and employees "concerning any grievance or any personnel policy or practices or other general condition of employment." 5 U.S.C. § 7114(a)(2)(A). The USPTO has previously honored that obligation by allowing POPA's President or other representative to participate in recurring "Town Hall" meetings that management has held with employees where working conditions are routinely discussed. Duffy Decl. ¶ 16. However, USPTO denied POPA's then-President Kathleen Duda the opportunity to participate in a "Town Hall" meeting she held with thousands of employees on March 27, 2025 at which she discussed telework, the government-wide hiring freeze, overtime, the suspension of training, employee awards, and other "personnel polic[ies] or practices or other general condition[s] of employment." *Id.* POPA responded by filing an unfair labor practice charge with the Office of General Counsel of the Federal Labor Relations Authority. Duffy Decl. ¶ 16 & Ex. G. The General Counsel's Regional Director's Office has informed POPA that it has investigated the charge; determined that there was a violation of the Statute; and that it will issue a formal unfair labor practice complaint against the USPTO once the President nominates and the Senate confirms a new FLRA General Counsel. Duffy Decl. ¶ 16.

### B.    *NWSEO Stands Firm.*

In "Project 2025: Presidential Transition Project," the Heritage Foundation wrote that "the NWS should fully commercialize its forecasting operations." *Mandate for Leadership: The Conservative Promise*, at 675 (2023), *available at https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf.* The Plaintiff NWSEO has opposed the efforts of the Defendants Trump and Lutnick to dismantle the NWS. Becker Decl. ¶ 8.

Nevertheless, the Trump administration has successfully reduced the 4,369-member workforce of the NWS by 612 employees between January and June 2025 through a combination of the Defendant Trump's January 20, 2025 government-wide hiring freeze; the February 14, 2025 mass termination of probationary employees in NWS and throughout the Federal government; the January 28, 2025 offer of "deferred resignation" with pay until September 2025 (a/k/a the "fork in the road"); and the offering of voluntary separation incentives and voluntary early retirement. Becker Decl. ¶ 9. As a result of these staffing reductions, 52 of the NWS's 122 Weather Forecast Offices were classified as "critically understaffed" because their vacancy rate exceeded 20%. Some Weather Forecast Offices have a 40% vacancy rate; and, at least eight such offices have been forced to close at night. Becker Decl. ¶ 10. Eleven offices have restricted or suspended launching weather ballons, which obtain critical data that is fed into numerical weather models. *Id.*

First, NWSEO launched an aggressive lobbying and press campaign to oppose these reductions in staff and services, as well as to educate the American public about the risks created by the NWS staffing reductions. Becker Decl. ¶ 11. NWSEO's President and its Legislative Director were interviewed in national and local print and televised media throughout the spring and summer of 2025, providing candid and uninhibited criticism of the Administration's actions. *Id.* For example, NWSEO's Legislative Director was quoted as saying that, "[i]n the last four months, our losses are unprecedented, and our offices are struggling to maintain operations," (New York Times, April 16); "The risk is extremely high – if cuts like this continue to the National Weather Service, people will die," (NBC News May 16); "There is no question that the public safety for the community is at risk," (Kansas Reflector, June 1); "Staffing has to be increased, we

have to do this across the country, we need more individuals to do this. Too many things are at stake, too many lives are at stake," (BBC News July 9). Becker Decl. ¶ 11.

NWSEO officials have also been interviewed in over 40 news stories in both national and local media concerning these cutbacks, many of which were unsparing in their criticism of the NWS's understaffing and in disclosing the substantial risks to public safety caused by these cutbacks. Becker Decl. ¶ 12. The titles of many of these news reports well convey the criticism of the Trump Administration contained therein:

> *Forecasters union expresses 'grave concern' about NWS staffing this storm season*, NBC-5 NEWS DALLAS (Mar. 11, 2025)

> *Job Cuts at NOAA drive concerns about extreme weather forecasts, as climate change worsens natural disasters*, CBSNEWS.COM (Mar. 13, 2025)

> *DOGE cuts have arrived at a federal weather agency. Air travel and hurricane alerts are at risk*, BUSINESS INSIDER (Mar. 27, 2025)

> *Weather Service Prepares for 'Degraded Operations' Amid Trump Cuts*, N.Y. TIMES (Apr. 16, 2025)

> *How Trump's National Weather Service Cuts Could Cost Lives*, SCIENTIFIC AM. (May 13, 2025)

> *The Weather Service Had a Plan to Reinvent Itself: Did DOGE Stop It?*, N.Y. TIMES (May 15, 2025)

> *Kentucky NWS Faced Staff Cuts Before Deadly Tornado Hit: Report*, NEWSWEEK.COM (May 18, 2025)

> *First came the weather service staffing cuts. Then came the tornadoes*, USA TODAY (May 20, 2025)

> *National Weather Service cuts overnight forecasters in multiple states*, NBCRIGHTNOW.COM (May 20, 2025)

> *Short-staffed NWS enters hurricane season in "uncharted territory." Meteorologists share their concerns.*, CBSNEWS.COM (June 3, 2025)

> *2025 hurricane season could see degraded forecasts because of weather service cuts*, PALM BEACH POST (June 6, 2025)

> *"Lives are at stake:"* Deadly Texas storms put spotlight on Trump's weather agency cuts," BBC.COM (July 9, 2025)
>
> *'Sledgehammer' to science: Job cuts, Trump budget plans spark hurricane fears*, ORLANDO SENTINEL (July 10, 2025)
>
> *Staffing shortages at NOAA, National Weather Service raise safety concerns in South Florida*, CBS NEWS MIAMI (July 11, 2025)
>
> *Trump cuts to California National Weather Service leave 'critical' holes: "it's unheard of,"* L.A. TIMES (July 16, 2025)

Becker Decl. ¶ 12.

Second, NWSEO has also aggressively opposed the Trump Administration's numerous other attacks on the civil service through the negotiated grievance and arbitration procedure in the NWS-NWSEO collective bargaining agreement. Becker Decl. ¶ 13. Under the NWS-NWSEO collective bargaining agreement, the agency is required to make a temporary promotion of an existing employee "as soon as practicable" after a position becomes vacant, pending selection of a permanent replacement. Becker Decl. ¶ 14. As a result of Defendant Trump's government-wide hiring freeze, which he imposed on January 20, 2025, the NWS refused to make these required temporary promotions. *Id.* Instead, the NWS assigned employees the higher graded duties of these prolonged vacancies without higher graded pay. NWSEO grieved this violation of the parties' collective bargaining agreement. *Id.* Rather than respond to the grievance's merits as required by the agreement, the NWS sent NWSEO a caustic letter on June 9, 2025, demonstrating the Administration's anti-union animus. The letter read:

> Your April 2, 2025 communication in which you filed a grievance concerning temporary promotions seeks, *inter alia*, that all temporary promotions resume, employees receive back pay, and the Union receive attorney's fees. Providing a response to your grievance would contravene with the current priorities of the administration. Therefore, the Department will not be issuing a response.

Becker Decl. ¶ 15 & Ex. C. The union invoked arbitration nonetheless and the Federal Mediation and Conciliation Service appointed Arbitrator Sarah Espinosa to arbitrate the matter. Arbitrator Espinosa has scheduled a hearing date for December 16, 2025. Becker Decl. ¶ 15.

Third, while most NWS employees are weather forecasters or others whose work normally requires them to be in a forecast facility to monitor and forecast the weather, flooding, and tsunamis, over 360 employees represented by NWSEO have routinely teleworked because their duties are more administrative and/or can be performed from outside the office. Duffy Decl. ¶ 16. The NWS and NWSEO confirmed this right to telework in an agreement negotiated in 2022 at the end of the COVID pandemic, which demonstrates that many duties performed by NWS employees could be successfully and efficiently performed at home. *Id.* Even operational employees were guaranteed the right to telework when assigned to supernumerary or administrative non-operational shifts. *Id.* This all came to an end when the NWS implemented President Trump's January 20, 2025 "Return to In-Person Work" order by cancelling telework throughout the NWS. *Id.*

On April 9, 2025, NWSEO grieved this violation of the NWSEO-NWS collective bargaining agreement. Becker Decl. ¶ 17 & Ex. D. Once again, instead of providing a substantive response to this grievance, the NWS sent NWSEO another caustic letter stating that "[p]roviding a response to your grievance would contravene the current priorities of the administration. Therefore, the Department will not be issuing a response." Becker Decl. ¶ 17 & Ex. E. The Union again invoked arbitration and the FMCS appointed Arbitrator Joshua Javits to arbitrate the grievance. Arbitrator Javits scheduled a hearing for November 20, 2025. Becker Decl. ¶ 17.

Fourth, the Department of Commerce granted "national consultation rights" to NWSEO in 2002. Under the FSLMRS, before an agency changes conditions of employment at an agency or

departmentwide level, a union that has national consultation rights must be afforded prior notice and "a reasonable time to present its views and recommendations regarding the changes." 5 U.S.C. §§ 7113(b)(1)(A) & 7113(b)(1)(B). The agency must then "consider the views or recommendations before taking final action" and "provide the labor organization a written statement of the reasons for taking the final action." 5 U.S.C. §§ 7113(b)(2)(A), (b)(2)(B).

On January 24, 2025, the Commerce Department unilaterally eliminated its telework program without providing a reasonable opportunity to NWSEO for presenting its views as required by the FSLMRS. Becker Decl. ¶ 18. NWSEO filed an unfair labor practice charge with the FLRA over this violation of its consultation rights. Becker Decl. ¶ 18 & Ex. F. The FLRA's Office of General Counsel investigated the matter and advised NWSEO that it had determined that the Commerce Department had committed an unfair labor practice in violation of the FSLMRS and that it intended to issue a formal unfair labor practice complaint against the Department when a General Counsel of the Authority is nominated and confirmed. Becker Decl. ¶ 19.

## IV.    **Defendant Trump Issues a New Executive Order**

Defendant Trump followed through again on his threat that he "will not tolerate" any union that challenges the implementation of his policies. The President issued Executive Order No. 14,343, *Further Exclusions from the Federal Labor-Management Relations Program*, 90 Fed. Reg. 42,683 (Sept. 3, 2025) on August 28, 2025. In this order, Defendant Trump purportedly invoked 5 U.S.C. § 7103(b) to exempt six additional agencies from the coverage of the FSLMRS. *Id.* As with Executive Order 14,251, the White House issued a contemporaneous Fact Sheet with Executive Order No. 14,343. White House, *Fact Sheet: Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Requirements* (Aug. 28, 2025), https://perma.cc/34ME-RPUY ("Aug. 2025 Fact Sheet").

14

### A.    POPA

One of the agencies targeted by President Trump in Executive Order No. 14,343 is the "Office of the Commissioner for Patents and subordinate units, Patent and Trademark Office," which, as noted above, includes the nearly 9,000 patent examiners represented by POPA. The White House explained the basis for the exclusion:

> The Invention Secrecy Act tasks the [US]PTO with reviewing inventions made in the United States, assessing whether their release could harm national security, and if so, issuing secrecy orders that prevent public disclosure. Effectively performing this work is essential to ensuring U.S. inventions with military or other national security applications do not fall into enemy hands.

Aug. 2025 Fact Sheet at 1-2. This basis is incorrect: the Invention Secrecy Act tasks *defense agencies* – like the Atomic Energy Commission or the Department of Homeland Security – with the task of assessing whether the release of an invention could harm national security. Declaration of Robert Stoll ("Stoll Decl.") ¶¶ 5, 7. The USPTO does not make that assessment; instead, if the defense agency makes that affirmative determination, it notifies the Commissioner of Patents who issues a secrecy order and withholds the publication of the application or granting of the patent for such period of time as required by the national interest. Stoll Decl. ¶ 5. An office within the USPTO – the Office of Licensing and Review – conducts a firststep, automated review of incoming patents to identify any applications that should go undergo additional screening to determine whether they should be forwarded to defense agencies. That additional screening is performed by just two dozen patent examiners (out of 9,000 examiners) who work under the Office of the Commissioner of Patents. Stoll Decl. ¶¶ 6-7.

Nonetheless, the Acting Under Secretary of Commerce for Intellectual Property, who is also USPTO's Acting Director, sent all USPTO employees an email on August 28, 2025 stating:

> The administration has determined that the Patents business unit and the Office of the Chief Information Officer (OCIO) business unit have "as a primary function . . .

15

national security work," and that the federal labor statute cannot be applied to
Patents and OCIO "in a manner consistent with national security requirements and
consideration." As a result, employees in Patents and OCIO are no longer
represented by unions (POPA and NTEU 243). These changes are effective
immediately, and do not affect employees in other business units.

Duffy Decl. ¶ 17 & Ex. H. POPA also received a letter from the USPTO's Acting Deputy Director

of Human Resources, Benjamin Ahlstrom, on August 28 informing the union that "[t]he Agency

will no longer recognize POPA as the exclusive representative for any employees in Patents and

OCIO [Office of Chief Information Officer]." Duffy Decl. ¶ 18 & Ex. I. Alstrom also wrote that

"Patents and OCIO employees will no longer be entitled to 'official time,' described in 5 U.S.C.

§ 7131 to carry out their representational duties since they are no longer bargaining unit employees

or covered by the CBA." *Id.*, Ex. I. Alstrom further advised that "[t]he Agency will discontinue

its participation in grievance and arbitration procedures arising under the Statute involving

disputes brought on behalf of employees in Patents and/or OCIO, including those matters currently

pending before a grievance official and/or arbitrator." *Id.* Finally, Alstrom stated that "the Agency

will terminate payroll deductions of union dues for employees in Patents and OCIO who are no

longer in the bargaining unit as soon as practicable." *Id.*

The foregoing actions reduced the bargaining unit that POPA represents from 9,000

employees to approximately 160 employees. Duffy Decl. ¶ 26. The remaining employees work in

the Office of the Chief Financial Officer, the Office of Policy and International Affairs, at the

Patent and Trademark Appeals Board, and in the Office of the Director of the USPTO. *Id.*

The collective bargaining agreement between POPA and the USPTO provides that POPA

representatives are entitled to "official time," or release time from duties with pay, for bargaining,

meetings and consultations with management, responding to management communications,

investigation, preparation and presentation of grievances, and other representation matters

authorized by the agreement and the FSLMRS. Duffy Decl. ¶ 19. Since August 28, 2025, USPTO has prohibited POPA's officers and representatives (all of whom are assigned to the recently excluded Office of the Commissioner of Patents) from utilizing any official time, even to represent the few remaining employees in the POPA bargaining unit, who are unaffected by Executive Order No. 14,343 and who retain collective bargaining rights. *Id.*

On September 9, 2025, USPTO counsel wrote Arbitrator Spilker to unilaterally cancel the arbitration hearing scheduled for November 17 and 18, 2025 involving the grievance POPA filed over the termination of telework for probationary patent examiners. Duffy Decl. ¶ 20 & Ex. J.

During pay period 16, covering the period of August 9 through August 22, 2025, the USPTO (through its payroll administrator, the Department of Agriculture's National Finance Center) collected and remitted to POPA $21,215 in dues from 4,243 members of POPA who had elected dues allotment. Duffy Decl. ¶ 21. No members paid dues directly to POPA; the automatic dues allotment authorized by the FSLMRS was the only mechanism that POPA utilized for collecting dues. *Id.* Following the issuance of the Executive Order on August 28, 2025, in pay period 17 the USPTO withheld and remitted just $190 in dues from 38 members remaining in POPA's bargaining unit. *Id.*

### B.    *NWSEO*

President Trump also excluded two line offices of NOAA, namely, NWS and NESDIS, whose employees are represented by the NWSEO, in Executive Order 14,343. In the Fact Sheet, the White House explained:

> NWS was first established as a subdivision of the U.S. Army Signal Service Corps. Today NWS and NESDIS provide weather and climate data that inform the weather forecasting used to plan U.S. military deployments. Weather forecasts have long been critical factor [sic] in the success or failure of military operations.

Aug. 2025 Fact Sheet at 1.[4] This explanation is misleading: the NWS provides the *same data* to the U.S. military that it provides to the public. Declaration of Dr. William Richard Spinrad ("Spinrad Decl.") ¶ 7. It does not provide any additional or different data to the military. *Id.* In addition, while NESDIS tracks and operates three weather satellites for the U.S. Department of Defense, all three satellites will be decommissioned in 2026. Spinrad Decl. ¶ 8. The Defense Department will track and operate the replacement satellites. *Id.*

Even so, on August 29, 2025, NOAA's Director of Workforce Relations Division sent NWSEO's President a notice informing her that:

> Pursuant to Executive Order "Further Exclusions from the Federal Labor-Management Relations Program" (August 28, 2025) . . . the National Weather Service (NWS), National Oceanic and Atmospheric Administration (NOAA) hereby terminates any and all collective bargaining agreements currently in effect between NWS and the National Weather Service Employee Organization (NWSEO). This is effective immediately.

Becker Decl. ¶ 20 & Ex. G. NWSEO's senior officer at NESDIS received a similar letter from NOAA terminating the collective bargaining agreement between NESDIS and NWSEO that covered the 100 employees working in OSPS. Becker Decl. ¶ 21 & Ex. H.

On September 4, 2025, counsel for the Commerce Department sent letters to Arbitrator Espinosa and Arbitrator Javits advising that, as a result of the August 28 Executive Order, the collective bargaining agreement with NWSEO had been terminated. Becker Decl. ¶¶ 22, 23 & Exs. I, J. The counsel further advised that "the NWS will not be participating in any arbitrations invoked pursuant to any terminated collective bargaining agreements," which includes the arbitration

---

[4] As an historical aside, the U.S. Army Signal Service Corps was established *in 1870.* Nat'l Weather Svc., *Mission*, *available at* https://www.weather.gov/aprfc/Mission#:~:text=The%20National%20Weather%20Service's%20River,National%20Weather%20Service%20(NWS). Twenty years later, *in 1890*, Congress transferred all weather and river services to the U.S. Department of Agriculture, which were consolidated into the U.S. Weather Bureau. *Id.* That entity became the National Weather Service *in 1970*. *Id.*

hearing involving temporary promotions scheduled for December 16 and the arbitration hearing concerning the termination of telework scheduled for November 20. *Id.*

The termination of the NWS and NESDIS collective bargaining agreements has resulted in the termination of the automatic dues withholding from union members' paychecks, through which NWSEO received almost all of its income. Becker Decl. ¶ 24. In the two-week pay period immediately preceding the Executive Order, NWSEO received $ 42,514 dues from its members in the NWS and NESDIS through the automatic dues withholding authorized by the FSLMRS. *Id.*

Under the NWS-NWSEO collective bargaining agreement, NWSEO President Becker was released from her forecasting duties at the Aviation Weather Center to perform full-time representational duties on behalf of NWSEO and its represented employees at the NWS. Becker Decl. ¶ 25. NWS terminated Becker's use of official time on August 28, 2025. *Id.* Similarly, under the collective bargaining agreement, the union's Vice President (who is a forecaster at the Raleigh Weather Forecast Office) was authorized 60 hours of official time per pay period; and NWSEO's Secretary-Treasurer (who is an Observing Program Leader at the Shreveport Weather Forecast Office), along with each of its eight Regional Chairs, were authorized 16 hours of official time each pay period. *Id.* The NWS has cancelled this official time and no longer permits NWSEO's officers to engage in representational activities on duty time (nor do they continue to recognize these union officers as union representatives at all). *Id.* Furthermore, each of the union's local stewards at each forecast office or other facility is authorized a reasonable amount of official time on an as-needed basis by the collective bargaining agreement. Becker Decl. ¶ 26. Stewards use this time to resolve local workplace disputes and to engage in collaborative discussions with management to improve office operations (known in the agreement as "Local Office Teams"). *Id.* NWS has also cancelled this official time, along with the "Local Office Teams." *Id.* NESDIS has

also terminated the use of official time by NWSEO's representatives in OSPS, which was authorized by their collective bargaining agreement. Becker Decl. ¶ 27.

## ARGUMENT

## I.    The Standard for a Preliminary Injunction.

The standard for a preliminary injunction is four-fold. A plaintiff must demonstrate that (1) it is likely to succeed on the merits of the action; (2) it is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in the plaintiffs' favor; and (4) an injunction would serve the public interest. *Doe v. Mattis*, 889 F.3d 745, 751 (D.C. Cir. 2018) (citing *Winter v. Natural Res. Def. Council, Inc.*¸ 555 U.S. 7, 20 (2008)).

## II.    The Plaintiffs Have Established a Substantial Likelihood of Success on the Merits.

### A.    *The Executive Orders are Ultra Vires.*

#### 1.    Plaintiffs are Entitled to Ultra Vires Review of the Executive Orders.

NWSEO and POPA are "entitled to bring a non-statutory cause of action questioning the legality of the Executive Order." *Chamber of Comm. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Judicial review of the President's conduct is not limited to "actions that run afoul of the Constitution or which contravene direct statutory prohibitions"; that review can encompass other "statutory limitations on governmental authority." *Reich*, 74 F.3d at 1332. "In sum, we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions . . . ." *Id*. "It does not matter whether the unlawful action arises because the disputed [action] defies the plain language of the statute or because the [President's] construction is utterly unreasonable and thus impermissible." *Aid Assn. for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003).

Section 7103(b)(1) does not simply grant the President discretion to exclude employees from the FSLMRS's coverage by executive order for "national security" reasons. "Section 7103(b)(1) contains not one, but two fairly exacting limitations on the President's authority to invoke the statutory provision." *Fed. Educ. Ass'n v. Trump*, No. 25-cv-1362-PLF, 2025 WL 2355747, *9 (D.D.C. Aug. 14, 2025), *stay denied*, No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025). The statute clearly provides that such exclusions can take place only if the President determines that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" *and* "the provisions of this [FSLMRS] subchapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b). These two conditions constitute specific limitations on the President's authority to exclude members of the civil service from coverage of the labor statute and thus "delineate[ ] the outer limits" of his authority. "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022). "Although the limits on Presidential authority at issue derive from the [FSLMRS] itself rather than an independent statute, *Reich* is instructive," and "[c]ourts remain obligated to determine whether statutory restrictions have been violated." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

Courts "do not automatically decline to adjudicate legal questions if they implicate foreign policy or national security" but instead "conduct a discriminating analysis of the particular question posed in the specific case." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) (internal quotations omitted). "When confronting a statutory question

touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017). Indeed, when the executive invokes its authority or seeks to "infringe liberty in the name of security and order …, the judiciary must remain vigilantly prepared to fulfill its own responsibility to *channel* Executive action within constitutional bounds." *Zweibon v. Mitchell*, 516 F.2d 594, 604–05 (D.C. Cir. 1975) (emphasis added), *quoted in Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, *13 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring) ("*FEA*").

In summary, "Congress can and often does cabin the discretion it grants to the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *Am. Forest Resource Council*, 77 F.4th at 797. That is the case with Section 7103(b)(1).

### 2.    The Plaintiffs Have Rebutted the Presumption of Regularity.

There is a *rebuttable* presumption of regularity when a president determines that an agency or its subdivision is excluded from coverage pursuant to the national security exemption. *American Fed'n of Govt. Emps. v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989) ("*AFGE*"). This presumption can be rebutted by demonstrating that the President "was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *Id.* at 728.

In this case, the President's own words and deeds demonstrate that the exclusions were not a *bona fide* determination that USPTO, NWS and NESDIS have national security as a primary function, let alone that the FSLMRS cannot be applied to those agencies "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(2). The Court should find that the presumption of regularity has been rebutted for the same reasons as it did in *Nat'l Treasury Emps. Union v. Trump*, 780 F.Supp.3d 237, 254-257 (D.D.C. 2025), *Am. Foreign Serv.*

*Ass'n v. Trump*, 783 F.Supp.3d 248, 264-265 (D.D.C. 2025), and *Fed. Educ. Ass'n v. Trump*, 2025 WL 2355747 (D.D.C. Aug. 14, 2025). In *NTEU*, the Court found that Executive Order No. 14,251's "unprecedented scope that seemingly conflicts with Congress's intent – coupled with the contemporaneous statements contained in the White House Fact Sheet and OPM Guidance reflected that the President was either indifferent to or acted in contravention of the requirements of the FSLMRS." *AFSA*, 783 F.Supp.3d at 264.

And in *AFSA*, the plaintiff presented additional evidence that the Court found rebutted the presumption of regularity: the fact that favored unions who either endorsed the Defendant for President or did not oppose his policies were unaffected. *Id.* at 264-65. Or, in the words of the White House Fact Sheet that accompanied the order, the President did not exclude those agencies or employees "with unions who work with him" politically.

Section 2 of Executive Order No. 14,251 selectively excluded police and firefighter unions from exemption. The Fraternal Order of Police and other police unions endorsed President Trump for election in 2024.[5] The International Association of Fire Fighters ("IAFF") withheld an endorsement sought after by his opponent.[6] And, most notably, Customs and Border Protection was *not* included among the twelve agencies and subdivisions of the Department of Homeland Security that were excluded from coverage of the labor statute. *See* Exec. Order 14,251, Section

---

[5]   *See* FRATERNAL ORD. OF POLICE, *FOP Endorses Trump!*, (Sept. 6, 2024) https://fop.net/2024/09/fop-endorses-trump/.

[6] Alexandra Marquez, *et al.*, *Firefighters Union IAFF Declines to Endorse a Candidate*, NBC NEWS (Oct. 3, 2024) https://www.nbcnews.com/politics/2024-election/firefighters-union-iaff-declines-endorse-presidential-candidate-rcna173918. Thus, IAFF-represented firefighters on military bases retain their collective bargaining rights, but teachers in the Department of Defense dependent schools on those bases, who are represented by unions that oppose the President and his policies, do not. Exec. Order 14251, Sec. 2.

2, subsection 1-407. The CBP's union also endorsed the President in last year's election.[7] If those who protect the border do not have national security as a primary mission, then neither do any of the employees who are excluded by the Executive Order.

Section 4 of the Executive Order allowed for further exemptions from its scope by the Secretaries of the Department of Veterans Affairs ("VA") and the Department of Defense. On April 17, Secretary Collins restored collective bargaining rights, not to particular subdivisions, *but to particular unions* in his Department. Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12,171, 90 Fed. Reg. 16,427 (Apr. 17, 2025). A VA spokesperson explained that bargaining rights were restored to these unions, not because continued bargaining in their organizational subdivisions were "consistent with national security requirements and considerations," but because these unions were compliant:

> The unions in the exempted units have posed no or minimal hinderance to VA operations," he said. "They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to manage the agency.

Erich Wagner, *VA is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*, GOV'T EXEC. (Apr. 18, 2025), available at, https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/. As the Court found

---

[7] The National Border Patrol Council is the exclusive representative of approximately 18,000 Border Patrol agents and support personnel assigned to the U.S. Border Patrol, which is under the direction of CBP. NAT'L BOARDER PATROL COUNCIL, *About NBPC*, https://bpunion.org/about-nbpc/ (last visited Oct. 3, 2025). It endorsed President Trump for election in 2024 (as it did in 2020 and 2016). *National Border Patrol Council Endorses President Trump*, AM. PRES. PROJECT (Aug, 18, 2025), https://www.presidency.ucsb.edu/documents/trump-campaign-press- release-national-border-patrol-council-endorses-president-trump-joe/

in AFSA, special treatment of favored unions "offers further evidence of a retaliatory motive." 783 F. Supp.3d at 265.

While this evidence informed the Court's decisions that the regularity of Executive Order No. 14,251 was rebutted, it is also applicable to assessing the regularity of Executive Order No. 14,343. As the Court wrote in its Memorandum Opinion and Order of October 7 overruling the Defendants' Objection to Notice of Relatedness, "[t]he Court finds that Executive Order 14343, titled 'Further Exclusions from the Federal Labor-Management Relations Program,' is a supplemental continuation of Executive Order 14251." The Court also noted that this suit challenges *both* Executive Order 14,343 and Executive Order 14,251 (which excluded the USPTO's Office of Chief Information Officer, along with CIO offices in other agencies).

Section 7 of Executive Order 14,251 expressly contemplates further exclusions by instructing the head of each agency with employees covered by the FSLMRS to submit a report to the President identifying any additional agency subdivisions for potential exclusion under 5 U.S.C. § 7103(b). Executive Order 14,353 is exactly the type of further exclusion order anticipated by its predecessor. In fact, in its August 28 notice to POPA withdrawing recognition, the USPTO wrote that Executive Order 14,343 "builds upon the President's prior determination in Executive Order, Exclusions from Federal Labor-Management Relations Programs, issued on March 27, 2025." Duffy Decl., Ex. I.

Moreover, Defendants have provided nearly identical alleged rationales for the two orders. In "Fact Sheets" issued alongside both orders, the White House claimed that it excluded employees from collective bargaining in part because of the restrictions that collective bargaining agreements ("CBAs") allegedly impose on modification of agency employment policies. *Compare* August 2025 Fact Sheet[8] (complaining that CBAs "remain in effect until their expiration, limiting

---

[8] August 2025 Fact Sheet, https://perma.cc/34ME-RPUY.

agencies' ability to modify policies promptly" and that "even when changes are permissible under CBAs, agencies must complete 'midterm' union bargaining, which can delay the implementation of time-sensitive national security measures) *with* March 2025 Fact Sheet[9] (complaining that "[a]gencies cannot modify policies in [CBAs] until they expire" and that "[a]gencies cannot make most contractually permissible changes until after finishing "midterm" union bargaining). And the August 2025 Fact Sheet repeats verbatim the assertion from the March 2025 Fact Sheet that the exclusions are necessary for the purpose of:

> SAFEGUARDING AMERICAN INTERESTS: President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

*See supra* nn. 8-9. Clearly, the August 2025 Fact Sheet derives from the March 2025 Fact Sheet, and this case involves both documents. A thread of retaliatory animus runs through and connects both Fact Sheets. Specifically, the March 2025 Fact Sheet attacked unions for filing grievances against Trump administration policies and threatened that the President "will not tolerate mass obstruction." When Plaintiffs filed grievances after March 2025 and embarrassed the Administration in the press, the President issued Executive Order No. 14,353, targeting Plaintiffs for the same spurious reasons he issued Executive Order No. 14,251. The Fact Sheet that accompanied the latter Executive Order is highly relevant to this case because it contained the threat that the President "will not tolerate mass obstruction" by unions "widely filing grievances to block Trump policies," that went unheeded by NWSEO and POPA.

Both Fact Sheets also contain other evidence that national security was a pretext that has not yet been fully explored by the Court's earlier decisions. It is incorrect to say that the FSLMRS

---

[9] March 2025 Fact Sheet, https://perma.cc/26AL-73TZ.

allows "Federal unions to obstruct agency management," as the March 2025 Fact Sheet claims. Nor is it correct to say that because "Agencies cannot make most contractually permissible changes until after finishing 'mid-term' union bargaining," collective bargaining is "dangerous in agencies with national security responsibilities." Nor is it true that either statute precludes the agencies from "execut[ing] their missions without delay." Or that "[e]ven when changes are permissible under CBAs, agencies must complete 'midterm' union bargaining, which can delay the implementation of time-sensitive national security measures," as the August 2025 Fact Sheet falsely claims.

*First*, the statute has an expansive management rights clause that protects management prerogatives and precludes bargaining over a host of issues, not the least of which includes the right "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," to "assign work," and, importantly, "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a). As a result, although unions may bargain only over the "procedures" that the agency will use in exercising its management rights and over "appropriate arrangements for employees adversely affected by the exercise" of those management rights, they cannot bargain over the substance of the agency's decision itself.

*Second*, an agency need not complete bargaining before changing conditions of employment when immediate implementation is "consistent with the necessary functioning of the agency, such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission." *SPORT and Dep't of Air Force, Edwards AFB*, 68 F.L.R.A. 9, 10–11 (2014), *recon. denied*, 68 F.L.R.A. 107 (2014) (agency properly furloughed employees without completing implementation bargaining).

*Third*, even when the FLRA finds that an agency committed an unfair labor practice by failing to bargain with a union, the FLRA may forgo ordering the agency to restore the *status quo ante* as a remedy for that failure if it would disrupt and impair the efficiency and effectiveness of an agency's operations. *Dep't of the Air Force, 913th Air Wing, Willow Grove Air Reserve Station*, 57 F.L.R.A. 852, 858 (2002); *Army & Air Force Exch. Serv. Waco Distribution Ctr. Waco, Texas*, 53 F.L.R.A. 749, 759–63 (1997) (remanding to reopen record to determine whether retroactive remedy following failure to bargain over impact of a RIF would be disruptive).

Even if the President's Fact Sheets are not a pretextual misrepresentation, they reveal his fundamental misunderstanding of the FSLMRS. This misunderstanding further demonstrates that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728.

As the Court found in *FEA*, "the entire Executive Order likely was motivated by considerations outside of those identified in the statute: the exclusions were intended as retaliation against labor organizations that have opposed President Trump or in furtherance of unrelated policy goals," and thus "warrants considering [and setting aside] the Executive Order as a whole . . . rather than by determining whether individualized exclusions are justified." 2025 WL 2355747, *12, *13.

Alternatively, Plaintiffs will demonstrate in the next section that the President exceeded the discretion granted him by § 7103(b)(1) when he excluded the NWS, NOAA and most of the USPTO from coverage of the Statute and that the reasons given in the Fact Sheet for their exclusion are simply further evidence of pretext.

**3.    National Security is Not a "Primary Function" of the NWS, NESDIS, the Office of the Commissioner of Patents, or the USPTO's Office of Chief Information Officer.**

Once the presumption of regularity is rebutted, the burden falls on the government to demonstrate that the President interpreted and applied Section 4103 correctly. Once the presumption of regularity has been overcome, "further explication can be required of the decisionmaker." *Hercules, Inc. v. Env'tl Prot. Agency*, 598 F.2d 91, 123 (D.C. Cir. 1978). If the presumption of regularity is rebutted, "the Government is put to proof." *Romero v. Tran*, 33 Vet. App. 252, 261 (2021). "If it appears irregular, it is irregular, and the burden shifts to the proponent to show the contrary." *United States v. Roses Inc.*, 706 F.2d 1563, 1567 (Fed. Cir. 1983).

The grounds for exclusion of NWS and NESDIS are spurious. According to the August 28 White House Fact Sheet:

> Today NWS and NESDIS provide weather and climate data that inform the weather forecasting used to plan U.S. military deployments. Weather forecasts have long been critical factor [sic] in the success or failure of military operations.

While the latter statement is true, the former statement simply isn't. The NWS does not provide the military with weather forecasts for military operations. The military departments have their own weather forecasting units (such as the Fleet Weather Centers in Norfolk[10] and San Diego,[11] the Fleet Numerical Meteorology and Oceanography Center in Monterey[12], and the 557th Weather Wing at Offutt Air Force Base[13] and many others) that provide forecasting and support for military operations. According to Dr. Richard Spinrad, who served as Under Secretary of Commerce for Oceans and Atmosphere and NOAA Administrator from June 2021 to January 2025, "the data

---

[10] https://www.metoc.navy.mil/fwcn/fwcn.html

[11] https://www.metoc.navy.mil/fwcsd/fwc-sd.html

[12] https://www.metoc.navy.mil/fnmoc/fnmoc.html

[13] https://www.557weatherwing.af.mil/Units/

which the NWS provides the U.S. military are the same as what the NWS provides to the public. Nothing exclusive is provided. Foreign military, both friend and foe, have access to the same data." Spinrad Decl. ¶ 7.

NESDIS does track and operate three weather satellites which comprise the Defense Meteorological Satellite Program ("DMSP") for the Department of Defense. These satellites are scheduled to be decommissioned in 2026 and DOD will operate their replacements. Spinrad Decl. ¶ 8 and 13 May 2025 Memorandum of Brig Gen Kyle C. Paul, "Defense Meteorological Satellite Programmed End of Life," attached hereto. According to former NOAA Administrator Spinrad, "other than the data obtained from the three satellites in the DMSP program, neither the NWS nor NESDIS provide any weather, ocean or climate data that is not generally available to anyone." Spinrad Decl. ¶ 9.

The National Weather Service Organic Act of 1890 defines the NWS's primary functions, and no mention is made of national security:

> The Secretary of Commerce shall have charge of the forecasting of weather, the issue of storm warnings, the display of weather and flood signals for the benefit of agriculture, commerce, and navigation, the gauging and reporting of rivers, the maintenance and operation of seacoast telegraph lines and the collection and transmission of marine intelligence for the benefit of commerce and navigation, the reporting of temperature and rain-fall conditions for the cotton interests, the display of frost and cold-wave signals, the distribution of meteorological information in the interests of agriculture and commerce, and the taking of such meteorological observations as may be necessary to establish and record the climatic conditions of the United States, or as are essential for the proper execution of the foregoing duties.

15 U.S.C. § 313. More recently, Congress enacted the Weather Research and Forecasting Innovation Act of 2017 in which it made public safety, not national security, the primary priority of NOAA's research efforts:

**SEC. 101. PUBLIC SAFETY PRIORITY.**

> In conducting research, the Under Secretary shall prioritize improving weather data, modeling, computing, forecasting, and warnings for the protection of life and property and for the enhancement of the national economy.

15 U.S.C. § 85011. As Dr. Spinrad concludes, "[n]either NWS or NESDIS have as a primary function intelligence, counterintelligence, investigative, or national security work." Spinrad Decl. ¶ 10. The NWS or NESDIS "may have a function that tangentially benefits 'national security work,'" but such an incidental relationship is hardly sufficient to conclude that [they have] has a 'primary function' of 'national security work.'" *FEA*, *supra*. at *12.

According to the August 28 Fact Sheet, the Office of the Commissioner of Patents was excluded from coverage of the FSLMRS because:

> The Invention Secrecy Act tasks the PTO with reviewing inventions made in the United States, assessing whether their release could harm national security, and if so, issuing secrecy orders that prevent public disclosure. Effectively performing this work is essential to ensuring U.S. inventions with military or other national security applications do not fall into enemy hands.

However, the USPTO does ***not*** assess whether the release of patent applications could harm national security. Under the Invention Security Act, 35 U.S.C. § 181, patent applications whose release might be detrimental to national security are referred to the Atomic Energy Commission, the Secretary of Defense or other defense agencies who make the determination whether the publication or disclosure of the invention would be detrimental to national security and should be kept secret. Rather than being a primary function of the USPTO, the screening of the patent applications for referral to the defense agencies is an ancillary duty of just 25 patent examiners in the Office of Licensing and Review of the nearly 9,000 examiners employed by the USPTO, who spend little more than two minutes per application to determine whether a particular patent application warrants referral to the defense agencies for the assessment that the Fact Sheet incorrectly claims is done by the USPTO. And only about 50 of the 600,000 patent applications

received each year by the USPTO are ultimately subject to a secrecy order after being assessed by

the defense agencies. Stoll Decl. ¶¶ 4-7; Declaration of Gabriel Chu ("Chu Decl.) ¶¶ 3-8.

According to the former Commissioner of Patents, Robert Stoll, "[i]ntelligence,

counterintelligence, investigative, or national security work" is **not** 'a primary function' of the

Office of the Commissioner of Patents. Administration of its responsibilities under the Invention

Secrecy Act involves only a few dozen of the 10,000 or so employees who work in that Office and

is a minor part of its responsibilities."  Stoll Decl. ¶ 9. The former Commissioner concludes:

> Moreover, the provisions of the Federal Service Labor Management Relations Statute
> have been applied in and by the Office of the Commissioner of Patents "in a manner
> consistent with national security requirements and considerations" for nearly half a
> century. While I was employed by the USPTO, none of the procedural requirements
> in Federal labor-management relations, including the USPTO's collective bargaining
> agreement with the Patent Office Professional Association, created any delays that
> impacted the ability of the Commissioner of Patents or the Office of Licensing and
> Review to carry out its responsibilities under the Invention Secrecy Act, and I cannot
> imagine a situation or scenario under which that could occur.

Stoll Decl. ¶10.

Finally, neither the White House Fact sheet nor the USPTO have offered any explanation

why the USPTO's Office of Chief Information Officer (or any other agency's CIO Office) has

been excluded from coverage of the Statute by Executive Order No. 14,251.

> **B.      The President Stripped NWSEO and POPA of Their Collective Bargaining
> Rights in Retaliation for the Exercise of Their First Amendment Rights and in
> an Exercise of Viewpoint Discrimination.**

In light of the skepticism which some Judges on the Court of Appeals have expressed about

the viability of an *ultra vires* challenge to Executive Order 14,251 (*e.g.*, *AFSA* stay order of June

20, 2025), it is essential that plaintiffs seek a preliminary injunction based not only upon *their ultra*

*vires* claim but one grounded on their First Amendment claim as well.

32

1.     **Executive Order 14,343 Retaliates Against Plaintiffs for Their Exercise of Their Free Speech and Petitioning Rights.**

It is beyond debate that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). The First Amendment protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Government action constitutes retaliation in violation of the First Amendment where a plaintiff (1) "engaged in conduct protected under the First Amendment," (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [the plaintiffs'] position from speaking again," and (3) there is "a causal link between the exercise of a constitutional right and the adverse action taken." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F.Supp.2d 89, 111 (D.D.C. 2007)).

First, NWSEO unquestionably engaged in activity protected by the First Amendment. In the months before the President issued Executive Order 14,343, NWSEO flooded national and local media with new stories exposing the Trump Administration's efforts to dismantle the National Weather Service and warned of the danger to public safety caused by the cutback in staff, hours of operations, and services by the NWS. There is no doubt that NWSEO was poking the bear. "Keep poking the bear and it will eventually claw back." *Johnson v. United States,* No. 17-2411 (CRC), 2021 WL 950421, at *1 (D.D.C. Mar. 12, 2021).

The right of public employees to assemble and to petition for redress of grievances by filing grievances through a negotiated union grievance procedure is also protected by the First Amendment and public employees have a right to be free from retaliation for engaging in such activities. *Morfin v. Albuquerque Pub. Schs.*, 906 F.2d 1434, 1438 (10th Cir. 1990); *Petrario v.*

33

*Cutler*, 187 F.Supp.2d 26, 31-32 (D. Conn. 2002); *Stellmaker v. DePetrillo*, 710 F.Supp. 891, 892-93 (D. Conn. 1989). POPA's grievances against the Trump Administration's termination of telework, discrimination against teleworkers with regard to early dismissal and time to attend Town Halls, elimination of training, and failure to grant early dismissal for the Juneteenth holiday, and the filing of the unfair labor practice charge concerning the refusal to allow POPA to participate in the "formal discussion" at the Town Hall meeting, constitute First Amendment activity by POPA and its members. Likewise, NWSEO's grievances against the Trump Administration's termination of telework and refusal to make temporary promotions because of the Administration's hiring freeze constitute First Amendment activity by NWSEO and its members. The plaintiffs' grievances concerned more than typical workplace disputes; they challenged signature policies of the new Trump Administration such as the elimination of telework.

Second, the Executive Orders chill protected speech "sufficient[ly] to deter a person of ordinary firmness in [the plaintiffs'] position from speaking again." The elimination of collective bargaining representation for two-thirds of the Federal workforce sends a clear message throughout the civil service that any concerted opposition to the Administration's policies will not be tolerated. "[A] person of ordinary firmness would reasonably be deterred from engaging in further litigation if he or she feared loss of job-related benefits." *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F.Supp.3d 833, 860 (W.D. Wash. 2025). The fact that the President himself engaged in the retaliation further intensifies the coercive effect of the Executive Order. "The power that a government official wields" is a relevant factor in assessing the deterrence effect of the adverse action. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024). And, "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191-92. President Trump's issuance of Executive Order 14,251,

dripping with animus and retaliatory motive, is enough "to deter a person of ordinary firmness in [plaintiffs'] position from speaking again." *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-CV-1263 (CRC), 2025 WL 1388891, at *7 (D.D.C. May 14, 2025) (quoting *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-716 (BAH), 2025 WL 1276857, at *30 (D.D.C. May 2, 2025), *appeal filed*, No. 25-5241 (D.C. Cir.)). The fact that the initial Executive Order and the threat contained therein did not deter NWSEO and POPA is immaterial "[b]ecause it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Mendocino Env't Ctr. v. Mendocino Cnty.,* 192 F.3d 1283, 1300 (9th Cir. 1999).

Finally, NWSEO's and POPA's "constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015). The Fact Sheet that accompanied the initial Executive Order issued in March threatened future retaliatory action. After complaining about unions that were "widely filing grievances to block Trump policies," the Fact Sheet warned that the President would not "let union obstruction interfere with his efforts" and that he "will not tolerate mass obstruction that jeopardizes his ability to manage agencies." Section 7 of the Executive Order 14,251 directed agency heads to identify additional agency subdivisions to be excluded from the FSLMRS in the future. The fact that the POPA and NWSEO bargaining units were not included among the first tranche of exemptions in the March Executive Order but were excluded after they engaged in robust opposition to the defendants' policies evinces that their subsequent First Amendment activity rather than national security concerns is the motivation for their exclusion. And, as demonstrated in the previous section and by the declarations of former NOAA Administrator Spinrad and former Patents Commissioner Stoll, NOAA and the USPTO do not have the national security responsibilities

35

attributed to them by the new Executive Order and its Fact Sheet and are thus a pretext masking another motivation. Even if they did, "a claim of national security does not … automatically negate the Constitution, particularly with respect to the First Amendment." *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-cv-03070-JD, 2025 WL 1755442, *11 (N.D. Cal. Jun. 24, 2025) (*citing Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)), *stayed*, 148 F.4th 648 (9th Cir. 2025).

### 2.    Both Executive Orders Constitute Viewpoint Discrimination.

The Executive Orders violate the First Amendment in more ways than one; they also violate the Constitution by discriminating against federal unions based on viewpoint. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Viewpoint discrimination is "an egregious form of content discrimination," and thus the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

President Trump and his administration have repeatedly admitted that they are removing collective bargaining rights from federal unions who have opposed the President's policies. They have also clearly conveyed the converse: that those unions who choose to "work with" the President can continue to bargain collectively on behalf of their members. Thus, it is undeniable that the Exclusion Orders discriminate based on viewpoint by targeting unions who have been critical of President Trump's agenda and have publicly expressed those views through constitutionally protected speech and petitioning activity.

The government "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Such actions are even more problematic where, as here, the viewpoint discrimination is directed at those who have challenged the legality of the President's expansive assertions of executive authority through normal constitutionally protected channels. *Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). "A government official can share [his] views freely and criticize particular beliefs, and [he] can do so forcefully in the hopes of persuading others to follow [his] lead . . . What [he] cannot do, however, is use the power of the State to punish or suppress disfavored expression" as the President has done here. *Vullo*, 602 U.S. at 188.

## III. POPA and NWSEO will Suffer Irreparable Injury Pendente Lite in the Absence of a Preliminary Injunction.

The exclusion of employees from a labor-management relations statute inflicts immediate, irreparable harm upon both the employees and their collective bargaining representative. *SEIU Health Care of Mich. v. Snyder*, 875 F.Supp.2d 710, 724–25 (E.D. Mich. 2012) (explaining the extent of the irreparable injury). Federal courts have repeatedly found that employers' refusal to recognize unions or their withdrawal of recognition, along with the repudiation of collective bargaining agreements, causes irreparable harm to unions and the employees they represent. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011); *NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996); *Asseo v. Centro Medico del Turabo*, 900 F.2d 445, 455 (1st Cir. 1990).

The Court of Appeals recognizes the long-term harm that unions suffer when an employer refuses to recognize or deal with a union:

> Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees.

*Int'l Union of Elec. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970), *cert. denied,* 400 U.S. 950 (1970). Collective bargaining derives its value in real time, enabling employees to address their employment conditions through their collective bargaining representative when it matters the most. If a union is unable to bargain on behalf of its members and represented employees as changes unfold, then the employees' interest in and support for collective bargaining will weaken. *Moore-Duncan ex rel. NLRB v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396–97 (E.D. Pa. 2001). These losses create a "mutually reinforcing cycle," whereby the union's lack of power and the employees' declining interest further weaken the union's support. *Id.* The end result of that cycle is irreparable. *See*, *e.g.*, *Small v. Avanti Health, supra.* at 1191–92. (finding order cannot remedy lost support for union).

This is not a case in which the employer is simply disregarding the collective bargaining agreement and leaving it to the union to contest those breaches through the grievance and arbitration procedures. NWS and NESDIS have both formally cancelled their collective bargaining agreements with NWSEO, and the NWS has unilaterally cancelled pending arbitration cases even though hearing dates had been set. Becker Decl. ¶¶ 20-23. The USPTO also notified POPA that it "will discontinue its participation in grievance and arbitration procedures arising under the Statute involving disputes brought on behalf of employees in Patents and/or OCIO, including those matters currently pending before a grievance official and/or arbitrator." Duffy Decl., Ex. I. It then wrote Arbitrator Spilker and unilaterally cancelled an arbitration hearing on telework scheduled for November 17 and 18. Duffy Decl., Ex. J.

The loss of recognition and bargaining rights for the nearly 9,000 patent examiners POPA has previously represented at this particular time is causing great injury to the patent examining corps because the USPTO is making significant changes in their working conditions to effectuate the new Administration's policies without providing POPA with an opportunity to bargain over the impact and implementation of those changes. Duffy Decl. ¶ 22. For example, during the summer, POPA and USPTO management began preliminary discussions about possible changes to the patent examiners' Performance Appraisal Plan (or "PAP") – which does more than just establish the procedures by which a patent examiner's work is to be annually appraised. The patent examiners' PAP establishes production quotas and allocates the amount of time in which an examiner is to process a patent application, which varies based on the complexity of the technology involved and the examiner's GS level. Whether an examiner will retain his or her job depends on whether he or she meets these production quotas, and examiners may earn significant financial bonuses by exceeding them by certain percentages. On October 2, 2025, USPTO management notified the examining corps that it was unilaterally changing the PAP by, among other things, increasing the production quota, thereby reducing the amount of time examiners were allocated to act on each patent application to retain employment. Duffy Decl. ¶ 23. (Independent studies have found that a substantial portion of the examiner corps already spend a significant amount of unpaid overtime meeting existing production quotas and that unrealistic quotas result in the grant of invalid patents.) According to the notice sent to examiners, these changes were ostensibly being made "to respond to increased focus on performance and accountability as detailed in the Office of Personnel Management's (OPM) memorandum on *Performance Management for Federal Employees.* POPA has traditionally been afforded the opportunity to bargain over the impact of changes to the patent examiners' PAP but USPTO terminated its discussions with POPA on these

changes at an early stage as a result of the Executive Order. Duffy Decl. ¶ 23. Similarly, USPTO is also making significant changes to awards programs for bargaining unit employees without bargaining over those changes with POPA. Duffy Decl. ¶ 24.

On October 1, 2025 the USPTO announced plans to close its satellite office in Denver, Colorado. POPA previously represented employees in that office and it has been denied the opportunity to bargain over the impact that this closure will have on those employees because of the August 28 Executive Order. Duffy Decl. ¶ 25.

The withdrawal of recognition of NWSEO has come at a most vulnerable time for the future of its members' employment security. The NWS is in the planning stages of a major transformation of its staffing and operations. It is developing a new "operations model" that will fundamentally change how the NWS issues weather forecasts and watches, as well as who will issue them. Becker Decl. ¶ 28. Presently, and historically, the weather forecasts the NWS issues to the public are prepared by the meteorologist forecasters on shift at each of the 122 Weather Forecast Offices ("WFOs") located throughout the country, based on computer-generated model guidance, updated local weather observations, and the forecasters' knowledge and judgment of local climatological conditions and weather patterns. Similarly, these local forecasters issue weather "watches" when there is a possibility of significant or hazardous weather occurring in the next 24 or 48 hours. Becker Decl. ¶ 29. As part of this new "operations model," NWS leadership has proposed to remove the responsibility for preparing and issuing local forecasts from the forecasters in the 122 WFOs and centralize them. In addition, NWS leadership has proposed removing from these local forecasters and centralizing the responsibility to issue weather

"watches"[14] (although they would retain the responsibility to issue more imminent and certain "warnings" of severe weather). This will represent a dramatic change in the way the NWS operates and a fundamental shift in its forecasting philosophy. The last major change of this scale occurred in the 1990s when the NWS increased the number of WFOs from around 50 to 122 so that the local communities could benefit from more localized weather forecasting. Becker Decl. ¶ 30. These proposed changes jeopardize both the quality of the services provided to the public and the long-term employment security of the approximately 1300 forecasters employed at the 122 WFOs. Becker Decl. ¶ 30.

The FSLMRS requires Federal agencies to negotiate with their unions the "implementation and impact" of management-initiated changes in operations and organization such as the NWS transformation, as well as "appropriate arrangements for employees adversely affected" by changes initiated by agency management. See 5 U.S.C. § 7106(b)(3). The cancellation of NWSEO's collective bargaining rights leaves NWS employees totally unprotected during this "transformation" because the collective bargaining representative that they have selected – NWSEO – will no longer be able to bargain over the impact and implementation of this on-going "transformation" or for "appropriate arrangements" for those employees whose careers will be adversely affected by these changes.

## IV.    The Balance of Equities Tips in the Plaintiffs' Favor and an Injunction Would Serve the Public Interest.

Whether the government is injured pendente lite depends on whether it or the plaintiff unions are likely to succeed on the merits, as the rights they each say will be injured are found in

---

[14] A watch is used when the risk of a hazardous weather or hydrologic event has increased significantly, but its occurrence, location or timing is still uncertain. It is intended to provide enough lead time so those who need to set their plans in motion can do so. A watch means that hazardous weather is possible. https://www.weather.gov/sjt/WatchWarningAdvisoryExplained.

the statute in dispute. The public's interest resides with whomever has the better of the merits

argument:

> [T]he Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests. In *Youngstown Sheet & Tube Co. v. Sawyer*, for example, the Supreme Court affirmed the district court's preliminary injunction of an illegal executive order even though a wartime President said his order was "necessary to avert a national catastrophe." 343 U.S. 579, 582 (1952). More recently, the Supreme Court confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021); *see also NFIB v. Dep't of Lab.*, 142 S. Ct. 661, 666 (2022) (staying an illegal vaccine mandate even though the government said the mandate would save more than 6,500 lives).

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (cleaned up). Should the Court

determine that NWSEO and POPA are likely to succeed on the merits, it logically follows that the

public's interest in collective bargaining embodied in the FSLMR Statute outweighs the non-

existent interest of the President in exempting NWS, NESDIS and the USPTO from the statute.

*Fed. Educ. Ass'n*, 2025 WL 2738626, *12 (Pan, J. concurring) (finding public interest does not

support the issuance of Exec. Order No. 14,251 to undermine statutory protections of employees

where the order is "likely unlawful").

## CONCLUSION

For the foregoing reasons, Executive Orders 14,251 and 14,343 constitute unlawful action

that is *ultra vires* and a violation of the First Amendment. NWSEO and POPA respectfully request

that the Court enter a preliminary injunction prohibiting the enforcement of the executive orders

in those agency subdivisions in which the plaintiffs have been certified as the employees'

collective bargaining representatives.

42

Dated: October 24, 2025                    Respectfully submitted,


                                  By:      _/s/ Richard J. Hirn_____
                                           Richard J. Hirn
                                           D.C. Bar No. 291849
                                           richard@hirnlaw.com
                                           5335 Wisconsin Ave., NW, Suite 440
                                           Washington, D.C. 20015
                                           (202) 274-1812

                                           *General Counsel*
                                           *National Weather Service Employees*
                                           *Organization*

                                           *General Counsel*
                                           *Patent Office Professional Association*


                                  By:      _/s/ Keith R. Bolek_____
                                           Keith R. Bolek
                                           Bar No. 463129
                                           kbolek@odonoghuelaw.com

                                           April H. Pullium
                                           Bar No. 198026
                                           apullium@odonoghuelaw.com

                                           O'Donoghue & O'Donoghue LLP
                                           5301 Wisconsin Avenue, Suite 800
                                           Washington, D.C. 20015
                                           (202) 362-0041

                                           *Attorneys for Plaintiffs*

# ATTACHMENT - DMSP

# PROGRAMMED END OF LIFE



**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES SPACE FORCE**
**HEADQUARTERS SPACE OPERATIONS COMMAND**

13 May 2025

MEMORANDUM FOR DISTRIBUTION

FROM: HQ SpOC/S3/5/7
150 Vandenberg St. Ste 1105
Peterson SFB CO 80914-4250

SUBJECT: Defense Meteorological Satellite Program (DMSP) Programmed End of Life

1. DMSP operations and sustainment are currently programed through the end of FY26 and as a result the SES Director for NOAA's DMSP operations has indicated they will be unable to continue operating DMSP past September 2026.

2. I acknowledge that DMSP currently provides operationally relevant capabilities to the Joint force; however, the DoD requirements process previously decided that some current capabilities provided by the DMSP constellation (e.g., DMSP space weather sensors) will not be provided by follow-on programs. Moreover, unless additional resources are allocated to extend DMSP End of Life timelines and because the programmed replacement for DMSP's electro-optic infrared capabilities is not expected to be delivered until early to mid FY27, a capability gap will exist in this area from September 2026 until program delivery. Ultimately, unless additional funding becomes available to extend DMSP, it will reach End of Life on 30 September 2026.

3. If your operations are impacted by DMSP ceasing at the end of FY26, we recommend you follow established Joint processes to highlight your impacts to OSD.

4. My POC for this matter is Lt Col Tyler West, HQ SpOC/S35SE, DSN 692-4301, COMM 719-554-4301; e-mail: tyler.west.1@spaceforce.mil.

PAUL.KYLE.CH
RISTOPHER.15
47679187
Digitally signed by
PAUL.KYLE.CHRISTOPHE
R.1547679187
Date: 2025.05.13
15:30:28 -06'00'

KYLE C. PAUL, Brig Gen, CAN Exchange Officer
Deputy Commander, Force Development

RUIZ.FERNAND
O.1029187998
Digitally signed by
RUIZ.FERNANDO.1029187
998
Date: 2025.05.13 14:42:38
-06'00'

FERNANDO RUIZ, Colonel, USAF
Asst. Deputy Commander, Force Development

**SEMPER VENATOR**