UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL WEATHER SERVICE
EMPLOYEES ORGANIZATION, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.

Defendants.

Civil Action No. 1:25-cv-2947 (PLF)

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    I.    The President's Authority to Control the Conduct of Federal Employees ..................... 4

    II.   The FSLMRS Framework and Related Executive Orders ................................................ 5

    III.  The Instant Action and Plaintiffs' Motion for Preliminary Injunction ......................... 11

LEGAL STANDARD ................................................................................................... 12

ARGUMENT ............................................................................................................... 12

    I.    Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims .............. 13

          A.   The FSLMRS Precludes District Court Jurisdiction Over Plaintiffs' claims. ........ 13

          B.   Plaintiffs are unlikely to succeed on the merits of their ultra vires claim. ............ 18

          C.   Plaintiffs are unlikely to succeed on the merits of their First Amendment
               retaliation claim. .................................................................................................... 32

    II.   Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction ................ 39

    III.  The Balance of the Equities and the Public Interest Favor the Government ................ 42

    IV.  Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, It Should
          Decline to Enter Plaintiffs' Proposed Order. ............................................................... 44

CONCLUSION ............................................................................................................ 45

## **TABLE OF AUTHORITIES**

**Cases**

*AFGE v. Loy*,
    367 F.3d 932 (D.C. Cir. 2004) ........................................................................ 15, 16

*AFGE v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) ............................................... 21-22, 22, 24, 31

*AFGE v. Sec'y of Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ........................................................................ 14, 17

*AFGE v. Trump*,
    148 F. 4th 648 (9th Cir. 2025) ..................................... 2, 13, 30, 34, 35, 37, 39, 41

*AFGE v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ............................................... 15, 16-17, 17, 18

*AFGE, AFL-CIO v. Loy*,
    281 F. Supp. 2d 59 (2003) ........................................................................ 38

*AFSA v. Trump*,
    No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) .... 2, 13, 18, 20-23, 42

*Ark. Dairy Coop. Ass'n v. USDA*,
    573 F.3d 815 (D.C. Cir. 2009) ........................................................................ 12

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023) ........................................................................ 17, 18

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) ........................................................................ 38

*Bailey v. BOP*,
    780 F.Supp.3d 96–24 (D.D.C. April 11, 2025) ........................................ 37

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996) ........................................................................ 35

*Black Lives Matter D.C. v. Trump*,
    544 F. Supp. 3d 15 (D.D.C. 2021) ........................................................ 33

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ........................................................................ 4

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
    464 U.S. 89–92 (1983) ........................................................................ 5, 18

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................. 12, 38, 39

*Clevinger v. Advoc. Hldgs., Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025) ...................................................................... 12

*Cole v. Young*,
    351 U.S. 536 (1956) ................................................................................... 31, 32

*Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ........................................................................................ 22

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................................ 22

*DCH Reg. Med. Ctr. v. Azar*,
    925 F.3d 503 (2019) ........................................................................................ 19

*Def. Logistics Agency*,
    5 F.L.R.A. 126–33 (1981) ............................................................................... 40

*Department of the Air Force & AFGE Local 987*,
    66 F.L.R.A. 589 (2012) ................................................................................... 16

*Dep't of the Navy & Navtelcom Unit Loc. No. 1*,
    6 F.L.R.A. 498 (1981) ..................................................................................... 16

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988) ................................................................................... 23, 24

*Doe v. District of Columbia*,
    796 F.3d 96 (D.C. Cir. 2015) ..................................................................... 33, 34

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ............................................................................................ 16

*FDA v. Wages & White Lion Invs., L.L.C.*,
    145 S. Ct. 898 (2025) ................................................................................. 24, 25

*FDA v. Wages & White Lion Invs., LLC*,
    604 U.S. 542 (2025) ........................................................................................ 33

*Federal Educ. Ass'n v. Trump*,
    2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025) ............................... 13, 31

*Fed. Educ. Ass'n v. Trump*,
    2025 U.S. Dist. LEXIS 157767 (D.D.C. Aug. 14, 2025) .......................... 15, 16, 21

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756–64 (D.C. Cir. 2022) .................................................................. 19

*Fed. L. Enf't Officers Ass'n v. Ahuja,*
   62 F.4th 551 (D.C. Cir. 2023) .............................................. 17

*Five Flags Pipe Line Co. v. Dep't of Transp.,*
   854 F.2d 1438 (D.C. Cir. 1988) ............................................ 19

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.,*
   391 F. Supp. 2d 1–9 (D.D.C. 2005) ...................................... 38

*Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd.,*
   561 U.S. 477–97 (2010) ...................................................... 34

*Gordon v. Holder,*
   632 F.3d 722 (D.C. Cir. 2011) ........................................... 3, 4

*Henderson for NLRB v. Bluefield Hospital Co., LLC,*
   902 F.3d 432 (4th Cir. 2018) .............................................. 41

*Holder v. Humanitarian L. Project,*
   561 U.S. 1 (2010) ........................................................... 22, 23

*Houston Cmty. Coll. Sys. v. Wilson,*
   595 U.S. 468 (2022) ............................................................ 36

*Lee v. Garland,*
   120 F. 4th 880 (D.C. Cir. 2024) .......................................... 23

*Loc. 1498, AFGE v. AFGE, AFL/CIO,*
   522 F.2d 486 (3d Cir. 1975) .................................................. 5

*Manhattan-Bronx Postal Union v. Gronouski,*
   350 F.2d 451 (D.C. Cir. 1965) ............................................... 5

*Mt. Healthy Cty. v. Doyle,*
   429 U.S. 274 (1977) ............................................................ 36

*N. Am. Butterfly Ass'n v. Wolf,*
   977 F.3d 1244 (D.C. Cir. 2020) ........................................... 19

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
   145 S. Ct. 2658 (2025) ................................................... 21, 45

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024) ................................................. 3736, 37

*Nat'l Treasury Emps. Union v. Trump,*
   780 F. Supp. 3d 237 (D.D.C. 2025) .......................... 15, 16, 39

*Nieves v. Bartlett,*
   587 U.S. 391 (2019) ............................................................ 36

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 12, 42

*NRC v. Texas*,
    605 U.S. 665 (2025) ................................................................ 19, 20, 23

*NTEU v. Trump*,
    2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025) ...................................... 2, 13, 40, 45

*NTEU v. Vought*,
    149 F. 4th 762 (D.C. Cir. 2025) ................................................................ 17

*Perry v. Clinton*,
    831 F. Supp. 2d 1 (D.D.C. 2011) ................................................................ 26, 27, 28

*Reichle v. Howards*,
    566 U.S. 658 (2012) ................................................................ 36

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819–32 (1995) ................................................................ 38

*Smith v. Ark. State Highway Emps., Local 1315*,
    441 U.S. 463 (1979) ................................................................ 38

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ................................................................ 12

*Thompson v. District of Columbia*,
    832 F.3d 339 (D.C. Cir. 2016) ................................................................ 33

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................ 14-15

*TikTok Inc. v. Garland*,
    122 F.4th 930 (D.C. Cir. 2024) ................................................................ 35

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) ................................................................ 21

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................ 20, 24, 33-34

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*,
    60 F.L.R.A. 202 & n.7 (2004) ................................................................ 17

*U.S. Dep't of the Treasury, U.S. Mint*,
    35 F.L.R.A. 1095 (1990) ................................................................ 40

*United States Department of Defense Ohio National Guard & AFGE Local 3970*,
    71 F.L.R.A. 829 (2020) ................................................................ 17, 40

*Wiest v. Tyco Elecs. Corp.*,
    812 F.3d 319 (3d Cir. 2016) ................................................................ 26, 36

*Williams v. Johnson*,
    701 F. Supp. 2d 1 (D.D.C. 2010) ................................................................ 33

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................ 12

*Zukerman & Krause Reporting, LLC v. U.S. Postal Serv.*,
    64 F.4th 1354 (D.C. Cir. 2023) ................................................................ 42

**Statutes**

5 U.S.C. § 101 ................................................................ 7

5 U.S.C. § 7101 ................................................................ 5

5 U.S.C. § 7103 ................................................ 1, 5-6, 6, 14, 22, 24, 30, 34, 35, 38

5 U.S.C. § 7104 ................................................................ 14

5 U.S.C. § 7106 ................................................................ 41

5 U.S.C. § 7112 ................................................................ 32

5 U.S.C. § 7115 ................................................................ 40

5 U.S.C. § 7116 ................................................................ 14

5 U.S.C. § 7118 ................................................................ 14, 40

5 U.S.C. § 7121 ................................................................ 14

5 U.S.C. § 7123 ................................................................ 14, 15, 16, 17

5 U.S.C. § 7131 (d) ................................................................ 43

5 U.S.C. §§ 7107–35 ................................................................ 1, 14, 18

5 U.S.C. §§ 7121–22 ................................................................ 14

5 U.S.C. § 7301 ................................................................ 5

22 U.S.C. § 3902(6) ................................................................ 30

22 U.S.C. § 4103(b)................................................................30

35 U.S.C. § 131 ................................................................ 8, 9, 10, 11

35 U.S.C. § 181 ................................................................ 7, 8, 29

**Other Authorities**

5 C.F.R. §§ 2423.3–2423.6 ................................................................ 14

27 Fed. Reg. 551 (Jan. 19, 1962) ................................................................ 5

34 Fed. Reg. 17,605 (Oct. 31, 1961) ................................................................ 5

36 Fed. Reg. 17,319 (Aug. 28, 1971) ................................................................ 5

36 Fed. Reg. 24,901 (Dec. 24, 1971) ........................................................................ 5

40 Fed. Reg. 5,743 (Feb. 7, 1975) ........................................................................... 5

44 Fed. Reg. 66,565 (Nov. 20, 1979) ....................................................................... 6

62 Fed. Reg. 12,529 (Mar. 14, 1997) ....................................................................... 6

67 Fed. Reg. 1,601 (Jan. 7, 2002) ...................................................................... 6, 40

73 Fed. Reg. 73,991 (Dec. 4, 2008) ......................................................................... 6

82 Fed. Reg. 5,325 (Jan. 17, 2017) .......................................................................... 6

90 Fed. Reg. 14,553 (Apr. 3, 2025) .......................................................................... 6

90 Fed. Reg. 42,683 (Sept. 3, 2025) ......................................................................... 6

## INTRODUCTION

Plaintiffs, the National Weather Service Employees Organization ("NWSEO") and the Patent Office Professional Association ("POPA"), are unions that represent certain employees of the National Oceanic and Atmosphere Administration ("NOAA") and the United States Patent and Trademark Office ("USPTO") respectively.   They have filed the present lawsuit principally challenging an August 28, 2025 Executive Order—Executive Order 14,343, *Further Exclusions from Federal Labor Management Relations Programs*—which made the required determinations under 5 U.S.C. § 7103(b)(1) to exclude the agencies and agency subdivisions identified in the Order from Chapter 71 of the Federal Service Labor-Management Relations Statute ("FSLMRS" or "the Statute"), 5 U.S.C. §§ 7107–35.   As is relevant here, the Order excluded certain subdivisions of the Department of Commerce, specifically: the National Weather Service (the "Weather Service") and the National Environmental Satellite, Data, and Information Service (the "Satellite and Information Service")—both part of NOAA—and the Office of the Commissioner for Patents and subordinate units, Patent and Trademark Office (the "Patent Office").

Plaintiffs sued on September 2, 2025, challenging Executive Order 14,343 as ultra vires (Count I); as retaliation and viewpoint discrimination in violation of the First Amendment (Count II); and as a violation of the Fifth Amendment's Equal Protection Clause (Count III).  *See* Compl. (ECF No 1) ¶¶ 52–72.  Plaintiffs also challenge on similar grounds an earlier Executive Order—Executive Order 14,251, *Exclusions from Federal Labor Management Relations Programs* (March 27, 2025)—to the extent it excluded from the FSLMRS the USPTO's Office of the Chief Information Officer.  That office has only twenty-five employees who were represented by POPA out of the "nearly 9,000 professional employees" for which POPA had acted as the exclusive representative.  Compl. (ECF No. 1) ¶ 5; Martin-Wallace Decl. ¶¶ 5, 33.

On October 24, 2025, seven weeks after filing this action, Plaintiffs moved for a

preliminary injunction predicated on only their ultra vires and First Amendment claims. Pls.' Mot. for a Prelim. Inj. ("Pls.' Mot."), ECF No. 15-1, at 20-37.[1]  As addressed more fully below, Plaintiffs' request for a preliminary injunction should be denied because Plaintiffs are not likely to succeed on the merits of their ultra vires and First Amendment claims, Plaintiffs have failed to establish irreparable harm, and the balance of the equities and the public interest favor Defendants.

The Government recognizes that this Court has rejected many of the arguments below in other lawsuits designated as related to this case, including most recently in *AFSCME v. Trump*, Civ. A. No. 25-3306 (D.D.C.) (oral ruling on November 14, 2025).  Although the Government respectfully disagrees with the Court's reasoning in those cases and preserves those arguments for appeal by restating them here,[2] this case is distinguishable in several material respects and should be considered on its own record.

For instance, on the merits, Plaintiffs' retaliation theory is factually flawed and logically inconsistent.  It centers almost entirely around the idea that their bargaining units were excluded by the August 28, 2025 Order—but not by the March 27, 2025 Order—because Plaintiffs only began to file grievances challenging the Administration's policies or to criticize the Administration after March 27, 2025.  Pls.' Mot. at 35 ("The fact that the POPA and NWSEO bargaining units were not included among the first tranche of exemptions in the March Executive Order but were excluded after they engaged in robust opposition to the [D]efendants' policies evinces that their

---

[1]    Because Plaintiffs' Fifth Amendment claim is not currently presented, Defendants do not address that claim in this opposition but reserve all arguments for later briefing.

[2]    While Defendants continue to preserve their relatedness objection (ECF No. 12), they also note that in three of the related cases courts of appeals have stayed preliminary injunctions similar to what Plaintiffs seek here.  *See* Pls.' Notice of Related Cases (ECF No. 2 (listing related cases); *NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025) ("*NTEU II*"); *AFSA v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025), *reh'g en banc denied* (July 30, 2025) ("*AFSA II*"); and *AFGE v. Trump*, 148 F. 4th 648 (9th Cir. 2025) ("*AFGE II*").

subsequent First Amendment activity rather than national security concerns is the motivation for their exclusion.").  But the record establishes that POPA and NWSEO filed grievances or unfair labor practice charges *before* the March 27, 2025 Executive Order and yet that Order did not encompass their bargaining units.  That "favorable treatment" in the March 27, 2025 Order negates Plaintiffs' retaliation theory, particularly when their subsequent grievances addressed matters of no greater scope than those filed prior to March 27, 2025.  Thus, notwithstanding this Court's ruling in other cases, these Plaintiffs have failed to adduce the "clear evidence" needed to rebut the presumption of regularity accorded to the President's national security determinations.

Moreover, to the extent the Court elsewhere questioned whether agencies or agency subdivisions had investigative or national security work as a primary function, the accompanying declarations amply demonstrate that the Patent Office, USPTO's Office of the Chief Information Officer, the Weather Service, and the Satellite and Information Service meet that requirement. Even were the Court to deem it appropriate to look behind President Trump's determination on that issue (an inquiry which, Defendants submit, would be improper), that determination remains discretionary under the Statute and is amply supported by the accompanying declarations.

As to irreparable harm, neither POPA nor NWSEO have offered any explanation for their seven-week delay in moving for a preliminary injunction.  *See Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011) (the absence of diligence in seeking preliminary injunctive relief "may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong" because "delay indicates a lack of irreparable harm").  Further, they allege no harm whatsoever related to POPA's loss of exclusive representation status for the small group of employees in USPTO's Office of the Chief Information Officer.  Plaintiffs also allege no harm related to NWSEO's loss of exclusive representation status for approximately 100 employees in the Satellite and Information Service. Compl. (ECF No. 1) ¶ 4; Pls.' Mot. at 27–41.  The Plaintiff unions' alleged harm instead is limited

to speculation about potential future harm to employees they represented in the Patent Office and at the Weather Service arising from changes to telework policies, increased productivity goals for patent examiners, and operational changes at the Weather Service still in the "planning stage." Pls. Mot. at 37-41.

POPA and NWSEO do not allege direct harm to themselves from these operational changes but surmise that their organizations could potentially mitigate, through collective bargaining, the speculated harm that these changes may cause some patent examiners and Weather Service employees. Such conjecture, however, does not amount to the certain, imminent, and irreparable harm required to justify the extraordinary relief requested. Importantly, although POPA and NWSEO note the cessation of automatic dues withholding, neither asserts that this lack of automatic withholding has threatened their financial viability. *Id*. at 17, 19, 37-41. POPA's declarant, moreover, omits any reference to its recent roll-out of an online payment platform for members to pay their dues directly to the union, *see* Ex. 1 hereto ("Our New Dues Paying Platform Is Live"), and NWSEO continues to act as the exclusive representative for over one thousand employees in bargaining units unaffected by the Executive Orders. Jordan Decl. ¶ 21 n.1.

The onerous preliminary injunction standard requires the Court to hold Plaintiffs to their burden and to consider Defendants' arguments on the record presented. Because Plaintiffs fail to establish any element of a preliminary injunction, the Court should deny their motion.

## BACKGROUND

## I.    The President's Authority to Control the Conduct of Federal Employees

The power afforded the President under the Constitution "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to

make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the FSLMRS, Presidents routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Loc. 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations in 1962 when he issued Executive Order 10,988, *Employee-Management Cooperation in the Federal Service*. 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*ATF*"). Multiple Presidents subsequently amended that Order. *See* Exec. Order No. 11,491, *Labor-Management Relations in the Federal Service*, 34 Fed. Reg. 17,605 (Oct. 31, 1961), as amended by Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971), Exec. Order 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743 (Feb. 7, 1975).

## II.    The FSLMRS Framework and Related Executive Orders

### A.  Background

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. That statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *ATF*, 464 U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. *See, e.g.*, 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National

Security Agency, among others); *see also* 5 U.S.C. § 7103(a)(12), (14) (defining "collective bargaining" as a good-faith effort to reach agreement with respect to "conditions of employment"—a term that is defined as excluding, for example, "policies, practices, and matters relating to the classification of any position"). FSLMRS also empowers the President to exempt additional agencies and their subdivisions from its requirements. Specifically,

> The President may issue an order excluding *any* agency or subdivision thereof from coverage under [the FSLMRS] *if the President determines* that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding their employees from engaging in collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since, with the sole exception of President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving, complex national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 17, 2017); Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Apr. 3, 2025).

**B. Executive Orders 14,251 and 14,343**

Executive Order 14,343, challenged here, is the latest such Executive Order. *See* Exec. Order No. 14,343 of Aug. 28, 2025, 90 Fed. Reg. 42,683 (Sept. 3, 2025). In Sections 1 and 2 of the Executive Order, the President determined that certain agencies and agency subdivisions— including the Patent Office, the Weather Service and the Satellite and Information Service— have

as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations. *Id.* §§ 1, 2(c). Moreover, in a prior Executive Order dated March 27, 2025, President Trump made a similar determination as to certain other agencies and agency subdivisions including, as is relevant here, the Office of the Chief Information Officer of each Executive department listed in 5 U.S.C. § 101, a designation which encompasses USPTO's Office of the Chief Information Officer. Exec. Order No. 14,251, § 2(b), 90 Fed. Reg. at 14,554; Martin-Wallace Decl. ¶ 35(b).

**C. The National Security or Investigative Functions of the Subdivisions at Issue**.

**1. The Patent Office and USPTO's Office of the Chief Information Officer**

The Patent Office is a division of USPTO that is responsible for granting U.S. patents and simultaneously maintaining confidential application materials, the release of which might otherwise be detrimental to national security. Most employees of the Patent Office are patent examiners (approximately 9,000 employees), each of whom must possess the scientific or other technical expertise necessary to evaluate inventions' patentability and assist the Patent Office in complying with the Inventions Secrecy Act of 1951. As addressed more fully in the accompanying Martin-Wallace Declaration, the Patent Office has both investigative and national security work as a primary function. Martin-Wallace Decl. ¶¶ 7-17.

Among other things, the Patent Office is responsible for screening patent applications for national security-related material to protect U.S. military secrets from foreign use against American interests. The Invention Secrecy Act of 1951, 35 U.S.C. § 181, tasks the Patent Office with reviewing inventions to assess whether their publication could harm national security and, when a determination is made that national security might be implicated, affording defense agencies the opportunity to review the applicable patent application. *Id*. Critically, Plaintiffs'

7

assertion that the "USPTO does not assess whether the release of patent applications could harm national security" (Pls.' Mot. at 31) ignores the express language of that statute, which provides that

> Whenever the publication or disclosure of an invention by the publication of an application or by the granting of a patent, in which the Government does not have a property interest, *might, in the opinion of the Commissioner of Patents, be detrimental to the national security*, he shall make the application for patent in which such invention is disclosed available for inspection to the Atomic Energy Commission, the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States."

35 U.S.C. § 181 (emphasis added). Although only a small number of the roughly 650,000 patent applications received by the USPTO each year are ultimately subject to a secrecy order, nearly twenty percent are flagged by the Patent Office for further Invention Secrecy Act screening. Pls.' Mot. at 31-32; Martin-Wallace Decl. ¶ 11.

Patent examination also is inherently investigative because in every case the examiner conducts an independent and comprehensive search of prior patents, patent applications, and other scientific literature (referred to as "prior art") to assess patentability. *See* 35 U.S.C. § 131. The patent examiner's independent and methodical investigation of the prior art is an aspect of the examination process. Martin-Wallace Decl. ¶ 16.

The USPTO Office of the Chief Information Officer is responsible for safeguarding the information security of all USPTO data, including data that implicate national security, and ensuring that the IT systems are fully operational. *Id.* ¶¶ 18-23. It has as primary functions investigative and national security work. *Id.* Its employees include, among others, information security specialists, engineers, cybersecurity experts, and software developers. *Id.* ¶ 5. The Office of the Chief Information Officer has approximately 500 employees but only a small proportion (approximately twenty-five, or five percent) were represented by POPA as their exclusive

collective bargaining representative.  *Id.*

## 2.  The Weather Service and the Satellite and Information Service

Weather significantly impacts on the feasibility of using military force and on ensuing operations, and, consequently, the global mission of the United States Armed Forces requires an extensive network of weather observers, analysts, and forecasters. The network includes the Weather Service, as well as other subdivisions of NOAA, as well as weather or environmental units within the United States Army, Navy, Air Force, and Marine Corps. *See* https://www.globalsecurity.org/intell/library/policy/army/fm/34-81/ch2.htm.    The    Weather Service and the Satellite and Information Service thus have national security as a primary function. Jordan Decl. ¶¶ 3-15.

For instance, the Weather Service, in collaboration with the Department of War and the Federal Aviation Administration ("FAA"), operates the Automated Surface Observing System (ASOS), which provides continuous real-time weather data from hundreds of weather stations across the United States.  The Weather Service, the Department of War, and the FAA also jointly operate the Net Generation Weather Radar (NEXRAD) system, a network of over a hundred S-band Doppler weather radars.  The U.S. military relies on both ASOS and NEXRAD data to inform its weather forecasts and weather models, and they are also essential to safe civilian air travel. *Id.* ¶ 10.

The Weather Service also operates the Space Weather Prediction Center ("SWPC") located in Boulder, Colorado.  SWPC provides real-time monitoring, forecasting, and alerts of damaging solar and geophysical events.  The SWPC works cooperatively with the U.S. Air Force 557th Weather Wing Space Weather Operations Center to support its operations and help protect Department of War assets—including critical in-space assets, such as Global Positioning System ("GPS") technology—from damage caused by geomagnetic storms and other solar disturbances.

Jordan Decl. ¶ 11.  In addition, the Weather Service operates the National Tsunami Warning Center ("NTWC") and Pacific Tsunami Warning Center ("PTWC").  These centers operate around the clock, 7 days a week, to issue warnings and related information of potential tsunamis that threaten life and property.  The Department of War does not operate its own warning centers but instead relies on tsunami warnings issued by the NTWC and PTWC to protect Department of War personnel and assets.  *Id*. ¶ 12.  Further, the Weather Service partners with the Army Corps of Engineers stateside in furtherance of the development of often strategically important engineering projects. *See id*.

The Satellite and Information Service is solely responsible for providing satellite command, control, and communications for the Department of War's Defense Meteorological Satellite Program ("DMSP").  The DMSP consists of several satellites in low Earth orbit that generate worldwide data critical to the operations of the Department of War.  Jordan Decl. ¶¶ 4-7.  Plaintiffs concede that the Satellite and Information Service "track[s] and operate[s] three weather satellites which comprise [DMSP]," but claims that "[t]hese satellites are scheduled to be decommissioned in 2026[,] and [that] [the Department of War] will operate their replacements." Spinrad Decl. (ECF No. 15-5) ¶ 8.  But such decommissioning has not yet occurred, and it remains possible that the DMSP could continue to operate beyond 2026.  Jordan Decl. ¶ 8.  Regardless, the mere prospect of future DSMP decommissioning has no bearing upon the Satellite and Information Service's current (undisputed) national security functions with respect to DSMP's existing operations.

Finally, both the Weather Service and the Satellite and Information Service are major contributors to the U.S. National Ice Center ("NIC"), located at the NOAA Satellite Operations Facility in Suitland, Maryland.  *Id*. ¶ 13.  NOAA operates the NIC in conjunction with the U.S. Navy and U.S. Coast Guard.  An important mission of the NIC is to empower U.S. naval forces

operating in the polar, subpolar, and Great Lakes regions with authoritative and timely snow, sea, and ice forecasts and related products in support of American national security interests. Providing the requisite forecasting data and satellite imagery for NIC's operations is one of the primary functions of both NWS and NESDIS. Jordan Decl. ¶ 14. The NIC's mission, and the products and services that it provides to the Navy and Coast Guard—by harnessing data and imagery furnished by the Weather Service and the Satellite and Information Service—are critical to U.S. national security, particularly given the increasing geostrategic competition between the United States and foreign powers in the high northern latitude of the globe. *Id*. ¶ 15.

## III.    The Instant Action and Plaintiffs' Motion for Preliminary Injunction

POPA is a labor union that, prior to the August 28, 2025 Further Exclusions Order, had served as the exclusive bargaining unit representative for all professionals in the Patent Office, excluding managers and trademark professionals. Most of those professionals are patent examiners (approximately 9,000). Compl. (ECF No. 1) ¶ 5; Martin-Wallace Decl. ¶ 4. In addition, POPA represented approximately twenty-five employees working in the Office of the Chief Information Officer. Martin-Wallace Decl. ¶ 5. On August 29, 2025, the USPTO notified POPA that it was no longer recognizing POPA as the representative for any employees in the Patent Office and the Office of the Chief Information Officer. Compl. (ECF No. 1) ¶ 49. POPA, however, continues to serve as the exclusive bargaining unit representative for employees in USPTO's Office of the Chief Financial Officer, Office of Policy and International Affairs, Office of Governmental Affairs, and the Patent Trial and Appeal Board. Martin-Wallace Decl. ¶ 26 n.9.

NWSEO is a national labor organization that had served as the exclusive bargaining representative of approximately 3,000 NOAA employees between the two at-issue bargaining units, including nearly 3,000 employees of the Weather Service and around 100 employees of the Satellite and Information Service. Jordan Decl. ¶ 21; Pls.' Mot. at 2-3. On August 29, 2025,

following the issuance of Executive Order 14,343, NOAA notified NWSEO that it was canceling the collective bargaining agreements ("CBAs") between NOAA and the NWSEO.  Jordan Decl. ¶ 31(b); Compl. (ECF No. 1) ¶¶ 50-51.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  The moving party must "make a clear showing" that the party is "likely to succeed on the merits. . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [the party's] favor, and that an injunction is in the public interest."  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter*, 555 U.S. at 20, 22); *see Clevinger v. Advoc. Hldgs., Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025) (acknowledging that *Winter* "can be read to require movants to establish *each* preliminary injunction factor independently," but declining to resolve whether the "sliding-scale" approach comports with *Winter*).  The Government maintains that the D.C. Circuit's sliding-scale approach does not comport with *Winter* and should not be applied.  But, at the very least, failure to show either a likelihood of success on the merits or a likelihood of irreparable harm suffices to defeat a preliminary injunction motion.  *See, e.g., Ark. Dairy Coop. Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  And the third and fourth factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Plaintiffs are unable to "make a clear showing" on *any* of four preliminary injunction factors, let alone "each" of them.  *See Starbucks Corp.*, 602 U.S. at 345.  Particularly given the "substantial overlap between" the factors courts use to assess a stay "and the factors governing preliminary injunctions," *Nken*, 556 U.S. at 434, it is instructive that the D.C. Circuit assessed each

prong of the stay factors in the Government's favor in both *NTEU II* and *AFSA II*—two cases that this Court has deemed "related" to the instant case.  *See NTEU II*, 2025 U.S. App. LEXIS 11952, at *2–7; *AFSA II*, 2025 U.S. App. LEXIS 15297, at *2–9.  The D.C. Circuit's reasoning in those "related" cases should inform this Court's disposition of the pending motion.[3]

## I.   Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims

Plaintiffs cannot establish a likelihood of success on the merits of their claims for at least two reasons.  First, this Court lacks jurisdiction to hear Plaintiffs' claims as those claims must be brought to the Federal Labor Relations Authority ("FLRA") in the first instance followed by review in a court of appeals.  Second, Plaintiffs' claims fail on the merits for reasons identified by the D.C. Circuit in *AFSA II* and the Ninth Circuit in *AFGE II*.  *See AFSA II*, 2025 U.S. App. LEXIS 15297, at *6–7 (concluding that, even assuming without deciding "that a form of review is appropriate here . . .  the Executive Order likely withstands the Association's 'attacks on [its] sufficiency'" because "[w]hen a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for a court to review"); *AFGE II*, 148 F. 4th at 655 (The "Order itself and the Fact Sheet fairly indicate that the President would have issued the Order, *regardless of Plaintiffs' speech*, based on the perceived impact of union activities and collective bargaining on the sound operation of agencies and subdivisions with national security-related missions.") (emphasis added).

### A.   The FSLMRS Precludes District Court Jurisdiction Over Plaintiffs' Claims.

In the FSLMRS, Congress established a dedicated review scheme for resolving federal labor disputes that provides multiple channels for a union to challenge conduct it alleges violates

---

[3]   Although the D.C. Circuit did not stay the preliminary injunction in *Federal Education Association v. Trump*, No. 25-5303, 2025 U.S. App. LEXIS 25013, at *1 (D.C. Cir. Sept. 25, 2025) ("*FEA II*"), the only portion of that decision that commanded a majority concerned the Government's failure to demonstrate irreparable harm absent a stay, a burden the Government does not bear when opposing a preliminary injunction motion.  *Id.*

the FSLMRS.  *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6.  For instance, the FLRA's General Counsel "shall investigate" an unfair labor practice charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)-(2); *see also id.* § 7104(f)(2).  Alternatively, an employee or union may file a "grievance" to challenge violations of CBAs or to pursue "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* § 7103(a)(9)(C)(ii); *see also id.* § 7121. The statute requires all CBAs to include procedures for resolving such grievances, culminating in an arbitration that can be appealed through the FLRA.[4]  *See id.* §§ 7121–22.  The FLRA is broadly authorized to order appropriate relief. 5 U.S.C. §§ 7105(f)–(g), 7118. The FLRA's final orders from these various routes, with few exceptions not relevant here, are subject to judicial review in the courts of appeal not district court.  *Id.* § 7123(a).  This Court lacks jurisdiction to review Plaintiffs' claims based on this channeling function.

      1.     The D.C. Circuit has held that the FSLMRS's statutory review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 637-38 (D.C. Cir. 2013).  Indeed, Plaintiffs NWSEO and POPA each has presented grievances to the Agency or filed unfair labor practice charges that could subsequently proceed through the FLRA process and in which the validity of the Executive Order could be challenged.  Pls' Mot. at 7-9 (POPA), 12-14 (NWSEO).  The district court thus lacks jurisdiction to review Plaintiffs' claims alleging that the government has acted contrary to the provisions of the FSLMRS, unless those claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal*

---

[4]     Agency refusal to arbitrate a grievance could be considered a ULP, *see* 5 U.S.C. § 7116(a), and an employee or union could file a ULP charge to compel arbitration, *see id.* § 7118.

*Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("*AFGE v. Trump*") ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope.").

This Court previously determined that the FSLMRS "administrative review scheme . . . is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here." *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 249 (D.D.C. 2025) ("*NTEU I*"); *Fed. Educ. Ass'n v. Trump*, 2025 U.S. Dist. LEXIS 157767, at *13 (D.D.C. Aug. 14, 2025) (quoting *NTEU I*, 780 F. Supp. 3d at 249) ("*FEA I*"); *accord AFL-CIO v. Trump*, No. 25-cv-2445-PLF, Hearing Tr. at 5–6 (D.D.C. Sept. 30, 2025). But, in reaching that conclusion, this Court repeatedly acknowledged that its conclusion was based on its view that the FLRA would likely dismiss any charge or grievance challenging the Executive Order for lack of jurisdiction. *See, e.g.*, *NTEU I*, 780 F. Supp. 3d at 249–51. Yet that would create a "final order" of the FLRA that would be reviewable in a court of appeals, 5 U.S.C. § 7123(a), demonstrating that review remains available.

In any event, this Court's jurisdictional conclusion runs counter to D.C. Circuit precedent. In *AFGE v. Loy*, the D.C. Circuit held that despite (a) the Transportation Security Administration's determination that airport screeners could not collectively bargain, and (b) the FLRA's agreement that the employees could not engage in collective bargaining, the union-plaintiffs' only pathway to assert their bargaining rights in federal court was in an appeal to a circuit court after FLRA proceedings. *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004). The FLRA has "exclusive authority to render judgment on the question" whether the exclusion of employees from collective bargaining rights is valid. *Id.* at 936.

In reaching a contrary jurisdictional conclusion, this Court invoked FLRA cases dismissing

unfair labor practice complaints involving excluded agencies.  *See, e.g.*, *NTEU I*, 780 F. Supp. 3d at 249–50; accord *FEA I*, 2025 U.S. Dist. LEXIS 157767, at *13-16.  But in none of those FLRA cases did the movants challenge the validity of the executive order's exclusions.  In *Department of Navy*, the FLRA dismissed a representation petition after finding that President Carter's executive order excluding units engaged in certain work from FSLMRS coverage applied to the proposed representation unit.  *Dep't of the Navy & Navtelcom Unit Loc. No. 1,* 6 F.L.R.A. 498, 500 (1981).  At issue in that case was the executive order's applicability to the employees in question, not the validity of the President's exclusion determinations.  *Id.*  Similarly, no party challenged the executive order excluding a subdivision from coverage in *Department of the Air Force & AFGE Local 987*, 66 F.L.R.A. 589, 598 (2012).  But, in any event, the FLRA's jurisdictional dismissals were "final order[s] of the [FLRA]" that could have been subject to judicial review in a court of appeals had the unions appealed them.  5 U.S.C. § 7123(a); *see also Loy*, 367 F.3d at 935-36 (finding that "the FLRA had the exclusive authority to render judgment on" whether a directive issued by the Under Secretary of Transportation "validly barred [Transportation Security Administration] screeners from engaging in collective bargaining")

Plaintiffs may not escape the exclusive administrative scheme by raising ultra vires or constitutional claims.  *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (holding that whether a claim is precluded under the Civil Service Reform Act does not "turn on the constitutional nature . . . but rather on the type of the employee and the challenged employment action"); *Loy*, 367 F.3d at 936 ("Review [of the unions' ultra vires claim] may be had, but it must be in the court of appeals and it may occur only after the claim has been presented to and finally decided by the FLRA."); *id.* (holding that the district court should have dismissed the union-plaintiffs' First and Fifth Amendment claims for lack of jurisdiction); *AFGE v. Trump*, 929 F.3d at 754-62 (dismissing on jurisdictional grounds broad constitutional and statutory challenges by

unions to Executive Orders issued by President Trump during his First Term based on the statutory channeling function)[5]; *NTEU v. Vought*, 149 F. 4th 762, 774 (D.C. Cir. 2025) (concluding that the district court lacked jurisdiction over the unions' claims because "a specialized-review scheme governs such claims"). This case requires the same outcome.

2. The three *Thunder Basin* factors, which determine whether district-court review nevertheless is available despite a statutory review scheme, also compel that conclusion. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–13). First, a finding of preclusion of district court jurisdiction here would not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve them (even on jurisdictional grounds) will be addressed by a court of appeals through the FSLMRS's exclusive statutory review process. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759; *Sec'y of Air Force*, 716 F.3d at 637–40 (describing "multiple paths" within the FSLMRS's "exclusive remedial regime" through which a union can obtain FLRA and then federal circuit court review).

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. This Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Supreme Court noted that

---

[5]    The FLRA has "consistently" resolved constitutional claims, including First Amendment retaliation claims. *See U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases); *see also United States Department of Defense Ohio National Guard & AFGE Local 3970*, 71 F.L.R.A. 829 (2020) (a case was eventually appealed to the Supreme Court in *Ohio Adjutant General's Department v. FLRA*, 598 U.S. 449 (2023)).

"separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* at 193-94. Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge the USPTO and NOAA's refusal to abide by provisions of their CBAs. *See* Pl. Mot. at 7-9, 12-14. 5 U.S.C. §§ 7103(a)(9), 7121(a)(1). And indeed, Plaintiffs allege that one charge made by POPA will be the subject of a "formal unfair labor practice complaint against the USPTO" once a new FLRA General Counsel is nominated and confirmed. Pls.' Mot. at 9; *see also* 5 U.S.C. §§ 7116(a)(8), 7118. Plaintiffs' claims thus are not collateral to the statutory scheme by any stretch. *See AFGE v. Trump*, 929 F.3d at 760.

For similar reasons, Plaintiffs' claims are clearly within the expertise of the FLRA—the third *Thunder Basin* factor. The FLRA is the federal authority on matters of federal labor relations. *E.g.*, *ATF*, 464 U.S. at 97 ("[T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act." (citation omitted)). And Plaintiffs' claims of interference with collective bargaining rights are exactly the type of claim the FLRA regularly hears. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. Thus, the *Thunder Basin* factors establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claims.

### B. Plaintiffs Are Unlikely To Succeed on the Merits of Their Ultra Vires Claim.

Because the President's determinations in Executive Orders 14,343 and 14,251 were not prohibited by statute, and the President's determinations in relation to the agency subdivisions at issue are not "utterly unreasonable," *AFSA II*, 2025 U.S. App. LEXIS 15297 at *4, Plaintiffs' ultra vires claim is unlikely to succeed. Section 7103(b) "delegates broad authority to the President to exclude parts of the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security."

*See id*. at *5-6.  For this reason, and those addressed below, Plaintiffs have failed to establish a likelihood of success on the merits of their ultra vires claim.

### 1. Ultra Vires Review Is Unavailable Because the FSLMRS Provides a Meaningful Opportunity for Judicial Review.

As an initial matter, "[u]ltra vires review is. . . unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'"  *NRC v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  Indeed, the D.C. Circuit has engaged in such "nonstatutory review" only "[i]f Congress ma[de] no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable to it[.]"  *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988).  Because the FSLMRS provides for administrative review of Plaintiffs' claims before the FLRA as addressed above, and provides an avenue for review by a court of appeal, Plaintiffs' ultra vires claim fail for that reason alone.

### 2. Ultra Vires Review Is Not Available for Discretionary Determinations of the President Regarding National Security.

Ultra vires review is "confined to 'extreme'" errors.  *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763–64 (D.C. Cir. 2022); *see also DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (2019) (noting "extremely limited scope" and "extraordinarily narrow" nature of ultra vires claims (citations omitted)).  Such a claim "applies only when an agency has taken action[s] entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute."  *NRC*, 605 U.S. at 861 (citation omitted).  That "specific prohibition" must be "clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it."  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted).  The Supreme Court recently reaffirmed that an ultra vires

claim is "essentially a Hail Mary pass." *NRC*, 605 U.S. at 681–82 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

In reviewing the plaintiffs' ultra vires claims in *AFSA II*, the D.C. Circuit observed—in relation to Executive Order 14,251—that "it is unclear whether *ultra vires* review is available at all" because the statute "commits the relevant decision to the President's discretion."  2025 U.S. App. LEXIS 15297, at *4-5 (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)).  Specifically, the D.C. Circuit found that a provision of the Foreign Service Act, containing nearly identical language as § 7103(b)(1), "delegates broad authority to the President to exclude parts" of the federal workforce from collective bargaining requirements "in the interest of national security." *See id.* at *5-6 (analyzing 22 U.S.C. § 4103(b)).

Additionally, *AFSA II* explained that "[e]ven assuming" the "justiciab[ility]" of an ultra vires claim here, the Court's "review must be exceedingly deferential."  *AFSA II*, 2025 U.S. App. LEXIS 15297, at *6.  Where, as here, "a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for a court to review."  *Id.  AFSA II* cited *Trump v. Hawaii* as an example. There, the Supreme Court "assumed that 'some form of review [was] appropriate,'" when considering the President's national security determinations under the Immigration and Nationality Act.  *Id.* at *7 (quoting *Trump v. Hawaii*, 585 U.S. 667, 686 (2018)). Notably, the Supreme Court "upheld the President's determination in a single sentence that did not inspect the President's rationale."  *Id.* (citing *Hawaii*, 585 U.S. at 686).

"Following that path," the D.C. Circuit in *AFSA II* ultimately "assume[d] without deciding that a form of review is appropriate here and conclude[d] that the Executive Order likely withstands the [unions'] 'attacks on [its] sufficiency.'" *Id.* (quoting *Hawaii*, 585 U.S. at 686).  In doing so, the D.C. Circuit briefly considered the specific national security role of the defendant agency in that case—the U.S. Department of State—observing that the Secretary of State is a

member of the National Security Council, and that the Department of State's mission is to "protect and promote U.S. *security*, prosperity, and democratic values[.]" *Id.* at *7-8 (quoting *About the U.S. Department of State*, www.state.gov/about/). The D.C. Circuit admonished that a "more 'searching inquiry' than this would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'" *Id.* at *8 (quoting *Hawaii*, 585 U.S. at 686).

Although identifying this case as related to the district court case underlying *AFSA II*, Plaintiffs nonetheless fail to cite *AFSA II*, inexplicably ignoring the D.C. Circuit's determination in that case that an ultra vires challenge to Executive Order 14,251 is unlikely to succeed. The Supreme Court has made clear that an appellate court's prior rulings must "inform" this Court's application of the stay factors "in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n,* 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) ("Lower court judges . . . are never free to defy [Supreme Court] decisions" including those in the context of a stay pending appeal). Just as the D.C. Circuit determined that the *AFSA II* plaintiffs were unlikely to succeed on their ultra vires claim, so too should this Court.

Yet, in both *FEA I* and *AFL-CIO*, this Court failed to apply the principles the D.C. Circuit relied on in *AFSA II*. This Court concluded that § 7103(b) is not "a 'delegat[ion] of broad authority' to the President," *FEA I*, 2025 U.S. Dist. LEXIS 157767, at *19 (alteration in original); *accord AFL-CIO*, Hearing Tr. at 50, notwithstanding the D.C. Circuit's conclusion that materially identical language "delegates broad authority to the President," *AFSA II*, 2025 U.S. App. LEXIS 15297, at *5. Further, this Court decided that the "fairly exacting limitations on the President's authority to invoke the statutory provision" permitted it to closely scrutinize the President's determinations. *FEA I*, 2025 U.S. Dist. LEXIS 157767, at *22. And this is notwithstanding the D.C. Circuit's (a) admonishment of a district court for "mandating a presidential demonstration of compliance with the section," *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) ("*AFGE v.*

21

*Reagan*"); *id.* at 726 (rejecting "that the courts are the instrumentalities for ensuring that the authority is properly exercised"); and (b)  recent guidance that, in the context of a similarly-worded statute, "there is little for a court to review." *AFSA II*, 2025 U.S. App. LEXIS 15297, at *6.

What is more, this Court's conclusion that § 7103(b)(1) "contains not one, but two fairly exacting limitations on the President's authority to invoke the statutory provision" runs counter not only to *AFSA II* but also to Supreme Court precedent, including both *Dalton v. Specter*, 511 U.S. 462 (1994), cited in *AFSA II*, as well as *Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne*, 250 U.S. 163 (1919), which the Supreme Court cited in *Dalton*.  In *Dakota Central*, the Supreme Court reviewed a claim that the President exceeded the scope of his authority under a statute permitting him to take control of "any" telegraph or telephone line "whenever he shall deem it necessary for the national security or defense," *id*. at 181-82, 184, a statutory determination analogous to that authorized  under section 7103(b)(1)(B) ("cannot be applied . . . in a manner consistent with national security requirements and considerations").  The Supreme Court held in *Dakota Central* that the plaintiffs could not challenge the President's national security finding or argue that he exceeded his authority by taking "complete" possession and control "'of each and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States.'"  *Id*. at 182, 184.

At a minimum, this Court's determination that the second prong of § 7103(b)(1)—whether the provisions of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—contains an "exacting limitation[]" on Presidential authority is at odds with *Dakota Central*.  Indeed, when the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010).  Determining the "national security

requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"); *Lee v. Garland*, 120 F. 4th 880, 884 (D.C. Cir. 2024) (holding that a First Amendment claim was precluded by *Egan*).

Thus, to the extent ultra vires review is available at all, the Court should limit its inquiry to whether the President made the determinations required by the statute; notwithstanding Plaintiffs' protestations to the contrary, it is indisputable that he did so as evidenced by the plain language of the Executive Order. Consequently, because the challenged action was taken pursuant to delegated powers and not contrary to any specific statutory prohibition, Plaintiffs' ultra vires claim fails. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Plaintiffs point to no "clear and specific statutory mandate" that the President allegedly contravened. *See AFSA II*, 2025 U.S. App. LEXIS 15297, at *4 (citation omitted). Instead, they argue, without substantiation, that the President did not actually make the determination that Executive Orders 14,251 and 14,343 expressly rendered. *See* Pls.' Mot. at 22 (arguing that the President's determinations were not a "*bona fide* determination"). Because the Executive Orders make plain that the President made the required determinations, the Court's inquiry should end there.

### 3. To the Extent Ultra Vires Review Is Available, the President's Determinations Withstand Scrutiny.

Even if it were proper for this Court to look behind the facially-neutral Executive Order to determine whether the agency subdivisions at issue were permissibly excluded, the President's determinations withstand scrutiny. As an initial matter, any such necessarily highly deferential

inquiry should be limited to the President's determination under the first prong of the FSLMRS—that in the President's judgment the agency subdivisions at issue have as a primary function investigative or national security work. The President's determination as to the second prong of the FSLMRS—whether the provisions of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—is not a determination that courts are equipped to assess. *See Egan*, 484 U.S. at 529.

Regardless, as discussed below, Plaintiffs have failed to rebut the presumption of regularity afforded to Presidential action and thus cannot establish an abuse of discretion as to either of the President's determinations under § 7103(b)(1). And, to the extent the Court determines that the presumption has been rebutted, the record amply supports the President's determination that the two prerequisites in § 7103(b)(1) are met as they relate to the Patent Office, the USPTO Office of the Chief Information Officer, the Weather Service, and the Satellite and Information Service.

a. Plaintiffs Have Failed To Rebut the Presumption of Regularity

The Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action," *Hawaii*, 585 U.S. at 703, and courts "presume that [public officers] have properly discharged their official duties" absent "clear evidence to the contrary." *AFGE v. Reagan*, 870 F.2d at 727. That presumption is overcome only upon a "strong showing of bad faith or improper behavior." *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 923 (2025). Plaintiffs have not made that showing here.

First, other than USPTO's Office of the Chief Information Officer—which contained only twenty-five represented individuals—bargaining units represented by POPA and NWSEO were not excluded from FSLMRS coverage under Executive Order 14,251, issued on March 27, 2025, and neither POPA nor NWSEO argue irreparable harm arising from that Order. Further, Plaintiffs concede that "the USPTO did not enforce that exclusion [concerning the Office of the Chief

Information Officer in the March 27, 2025 Order] until after President Trump issued Executive Order No. 14,343" five months later.  Pls.' Mot. at 5 n.2.  Accordingly, as it relates to Executive Order 14,251, POPA and NWSEO are similarly-situated to those labor unions that allegedly were favorably treated by not having their bargaining units excluded by that Order.  *Id*. at 23.

Plaintiffs attempt to explain their "favorable treatment" by asserting that "unions who either endorsed . . . Defendant [Trump] for President or did not oppose his policies were unaffected" by the March 27, 2025 Order, placing themselves in the ranks of those unions who had not yet purportedly "oppose[d] his policies."  Pls.' Mot. at 23. POPA and NWSEO's theory of retaliation is thus that "[w]hen Plaintiffs filed grievances after March 2025 and embarrassed the Administration in the press, the President issued Executive Order No. 14,353, targeting Plaintiffs for the same [allegedly] spurious reasons he issued Executive Order No. 14, 251."  Pls.' Mot. at 26.  As Plaintiffs tacitly acknowledge, that flawed theory presumes that Plaintiffs did not file grievances or criticize the Administration prior to March 27, 2025.  *Id*. at 35 ("The fact that the POPA and NWSEO bargaining units were not included among the first tranche of exemptions in the March Executive Order but were excluded after they engaged in robust opposition to the defendants' policies evinces that their subsequent First Amendment activity rather than national security concerns is the motivation for their exclusion.").

But Plaintiffs' own allegations establish that POPA and NWSEO criticized the Administration or challenged its policies prior to the March 27, 2025 Executive Order, rendering their theory of retaliation inherently implausible.  Specifically, POPA initiated its first grievance on behalf of patent examiners against allegedly hostile conduct by the Administration on March 20, 2025.  *Id*. at 6; Ex. A to Duffy Decl. (ECF No. 15-2) at ECF pp. 14–15.  Likewise, NWSEO began criticizing the Administration in the press before the March 27, 2025 issuance of Executive Order 14,251 and also filed an unfair labor charge regarding the elimination of telework before

that Order, Pls.' Mot. at 11–14, on January 27, 2025. Jordan Decl. ¶ 16 and Ex. A.

Plaintiffs' theory of retaliation is thus fundamentally contradictory and belied by the timeline of their own conduct. Plaintiffs allegedly "stood" firm "against the "Defendants' efforts to harass, undermine, and dismantle the civil service" before the March 27, 2025 Executive Order but received the same "favorable treatment" under that Order as unions that supported the President's agenda or "did not oppose" it. Pls.' Mot. at 6, 23. That so-called favorable treatment despite alleged prior opposition activity is incompatible with Plaintiffs' theory that the inclusion of the bargaining units it represented five months later in the August 28, 2025 Executive Order was due to retaliatory animus as opposed to the legitimate, statutorily-authorized rationale set forth in the Order. *Wiest v. Tyco Elecs. Corp*., 812 F.3d 319, 332 n.8 (3d Cir. 2016) ("an employee's receipt of favorable treatment after engaging in protected activity severely undermines a claim that there was a causal connection between the activity and [a later] adverse employment action"); *Perry v. Clinton*, 831 F. Supp. 2d 1, 24 (D.D.C. 2011) (finding no inference of causation because "at Mr. Joria's first opportunity to retaliate against Ms. Perry—his review of her reimbursement requests in August 2003—he did not do so").

Plaintiffs' retaliation theory also fails because the grievances filed after the March 27, 2025 Executive Order concerned parochial issues that cannot plausibly be characterized as fighting "against the Defendants' [supposed] efforts to harass, undermine and dismantle the civil service and the mission of Federal agencies." Pls.' Mot. at 6; Compl. (ECF No. 1) ¶ 21. Specifically, the grievances filed by POPA after the March 27, 2025 Executive Order concerned: (i) an April 14, 2025 cancellation of telework for probationary patent examiners that impacted less than 100 individuals;[6] (ii) a May 19, 2025 cancellation of routine telework for employees within certain

---

[6]      Plaintiffs assert that eleven percent of these probationary employees "promptly quit." Pls.'

offices of the USPTO which impacted less than 200 employees represented by POPA;[7] (iii) the denial of a two-hour early dismissal for the 2025 Memorial Day holiday to telework employees but not on-site employees; (iv) the denial of any early dismissal before the 2025 Juneteenth holiday; (v) requiring telework employees to "attend on their own time" a "Town Hall" meeting on June 3, 2025; and (vi) denying the POPA President the opportunity to speak at a March 27, 2025 "Town Hall." Pls.' Mot. at 6–9. Plaintiffs have not identified any instances in which POPA criticized any policy of the Administration in the press, further undermining their retaliation theory. *See id.*

As to NWSEO, it claims to have lobbied against "reductions in staff and services," asserting that "the Trump Administration has successfully reduced the 4,369-member workforce of [the Weather Service] by 612 employees between January and June 2025." Pls.' Mot. at 10. The exaggerated nature of that assertion is revealed by NWSEO's own declarant, who acknowledges that, of these 612 employees, over 500 left voluntarily or as part of "regular separations" rather than terminations. Becker Decl. (ECF No. 15-3), Ex. A. Furthermore, as noted above, NWSEO's unfair labor practice charge concerning the elimination of telework originally was filed in January 2025—long before the March 27, 2025 Executive Order. Ex. A to Jordan Decl.; *see also* Pls.' Mot. at 13-14. And, although NWSEO allegedly filed a grievance addressed to a different issue after that Order, it concerned an alleged failure to make temporary promotions "as soon as practicable" after a position becomes vacant due to a government-wide hiring freeze. Pls.' Mot. at 12.

---

Mot. at 7. That amounted to ten employees out of ninety-nine that had been impacted. Martin-Wallace Decl. ¶ 29.

[7]     USPTO estimates that approximately 130 employees represented by POPA were impacted by this reduction in routine telework. Martin-Wallace Decl. ¶ 29 n.10; *see also* Duffy Decl. (ECF No. 15-2) ¶ 26.

Plaintiffs largely concede the parochial nature of these issues, characterizing only the reductions in telework as a "signature polic[y] of the new Trump Administration." *Id*. at 34. But, as applied to the USPTO, the number of employees impacted by that alleged "signature" policy was a small fraction of the total USPTO workforce of approximately 13,000 employees or of the approximately 9,000 employees represented by POPA. Simply put, reductions in telework, and the other challenged management decisions identified in Plaintiffs' motion, hardly amount to efforts by management "to harass, undermine, and dismantle the civil service or the mission of Federal agencies." Pls.' Mot. at 6. Indeed, that erroneous characterization ignores that reduction in telework also was attempted by the prior Administration and also similarly encountered union resistance. *See Biden wants federal workforce to come to the office more. Some ask why?* (Sept. 7, 2023), *available at* https://www.npr.org/2023/09/07/1196787623/federal-workers-remote-office-ordered-taxpayers-telework-science.

Second, Plaintiffs contend that statements from the White House Press Office's August 28, 2025 "Fact Sheet" constitute "pretextual misrepresentation[]s" of the work performed by the Patent Office, the Weather Service and the Satellite and Information Service (Plaintiffs do not address the USPTO's Office of the Chief Information Officer other than to note that that Office was not referenced in the Fact Sheet). Pls.' Mot. at 28, 32; The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Aug. 28, 2025) ("Further Exclusions Fact Sheet") https://perma.cc/6FJG-H3YJ.

But putting aside whether that document is binding on the President, or can be truly said to reflect his motives,[8] the Fact Sheet is accurate. Plaintiffs' assertion that the USPTO "does not

---

[8]     Unlike Presidential Memoranda, which are attributed to and signed by the President, fact

assess whether the release of patent applications could harm national security" under the Invention Secrecy Act (Pls.' Mot. at 31) is contrary to the FSLMRS which states that "[w]henever the publication or disclosure of an invention by the publication of an application or by the granting of a patent . . . might, *in the opinion of the Commissioner of Patents*, be detrimental to the national security, he shall make the application for patent in which such invention is disclosed available for inspection to" defense agencies. *See* 35 U.S.C. § 181 (emphasis added). Although the defense agencies determine whether national security is actually implicated (in which case, the defense agency reports back to the Patent Office which, in turn, is then responsible for issuing "secrecy orders"), the initial assessment of whether public disclosure of an application "could harm national security" (the phrase used in the Fact Sheet) is made by the Patent Office. Martin-Wallace Decl. ¶ 14. Similarly, Plaintiffs acknowledge that the Satellite and Information Office currently "track[s] and operate[s] three weather satellites" for the Department of War and that the Weather Service "provides" the U.S. military with weather data. Pls.' Mot. at 29-30. The accompanying Jordan Declaration confirms the accuracy of these statements from the Fact Sheet that Plaintiffs baselessly claim to be inaccurate and thus pretextual. Jordan Decl. ¶¶ 4-15.

Finally, Plaintiffs cherry-pick statements from the White House Press Office's "Fact Sheet" issued at the time of Executive Order 14,251. Pl. Mot. at 23–26; *see also* The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/W93G-Z889 ("Fact Sheet"). Again, putting aside whether that document is binding on the President, or can be

---

sheets are not direct statements of the President but rather provide information about his policies and actions. *Compare* The White House, *Strengthening the Suitability and Fitness of the Federal Workforce* (Mar. 20, 2025), https://perma.cc/4YTF-HB6S (signed by President Trump) *with* The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/W93G-Z889.

truly said to reflect his motives (particularly with respect to a distinct Executive Order issued five months later), the isolated statements identified by Plaintiffs do not carry the same meaning as the document taken as a whole. *See AFGE II*, 148 F. 4th at 655 (observing that the Fact Sheet taken as a whole "conveys an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities"). More to the point, they also can have no bearing on bargaining units that were not excluded by that Order, such as the agency subdivisions at issue here.

b.  The President's Determinations Withstand Further Scrutiny

Even assuming the President's determinations under the statute are reviewable, the President acted within his discretion in determining that the two requirements for an exclusion order under § 7103(b)(1) were satisfied as to the agency subdivisions at issue, and those discretionary determinations are entitled to significant deference. First, the President appropriately determined that these subdivisions "ha[ve] as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A). Second, the President acted in accordance with the discretion afforded under the statute in determining that the provisions of Chapter 71 cannot be applied to these subdivisions "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B).

Section 7103(b)(1)(A) does not require that each individual in an organization is predominately involved in (or even minimally involved in) national security or investigative work. Rather, § 7103(b)(1) requires only that (A) "*the agency or subdivision* has as a primary function intelligence, counterintelligence, investigative, or national security work" as determined by the President. *Id*. § 7103(b)(1) (emphasis added). Although "function" is not defined in § 7103(b), it is defined in the related statute governing collective bargaining in the Foreign Service that contains a similar exclusion provision modeled after § 7103(b)(1). *See* 22 U.S.C. § 3902(6); *id.* ¶ 4103(b).

30

"Function" is broadly defined in section 3902(6) as "any duty, obligation, power, authority, responsibility, right, privilege, discretion, or activity," and, thus, the work of a subdivision can entail multiple "primary" functions—for instance, one related to a "duty," another to a "discretion," and another related to an "activity," among others. As set forth in the accompanying declarations, each of these subdivisions has either national security or investigative work as a primary function. Martin-Wallace Decl. ¶¶ 7-24; Jordan Decl. ¶¶ 4-15. The record thus affords this Court no basis—under what would necessarily be a highly deferential standard were the President's determination in this regard reviewable—to conclude otherwise.

These activities, moreover, directly contribute to the national security interests of the United States.[9]  *Id*. The President thus had ample basis to determine that the exclusion of these subdivisions was necessary to ensure that they could perform their missions efficiently and "without delay"—goals that were not compatible with the procedural and other requirements of the FSLMRS and of the CBAs with POPA and NWSEO.  *See* Further Exclusions Fact Sheet. Although the Court should not substantively evaluate the President's determination, *see, e.g.*, *AFGE v. Reagan*, 870 F.2d at 727, the record nonetheless support his determination that the FSLMRS and CBAs cannot be applied to the Patent Office, the USPTO's Office of the Chief Information Officer, the Weather Service and the Satellite and Information Service consistent with national security requirements and considerations.

Nor is the President's discretion cabined by the Supreme Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536 (1956), where the Supreme Court interpreted the

---

[9]    Further, this Court should refuse to evaluate the inclusion of other agencies in Executive Order 14,343, as Plaintiffs did not challenge these determinations. Without a record describing these agencies functions, it would be inappropriate to "rely largely on [this Court's] say-so to determine that the non-party excluded agencies and subdivisions" do not satisfy the criteria. *FEA II*, 2025 U.S. App. LEXIS 25013, at *39 (Henderson, J., dissenting).

undefined term "national security" in the context of a statute that "specified 11 named agencies to which [that statute] should apply." *Id.* at 544. In determining whether an agency head acted according to the statute at issue in deciding to dismiss a civilian employee "in the interest of the national security," the Court in *Cole* concluded that the term "national security" in that specific statute was used in a "definite and limited sense"—namely, to refer to "those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare[.]" *Id.* at 543–44. The *Cole* Court did not purport to announce a generally applicable definition of "national security" across the United States Code; rather, it construed particular statutory language in the context of specific personnel decisions based on its surrounding statutory context, specifically the eleven agencies expressly included in the act.

That the reference to "national security" in § 7103(b)(1) is more expansive than the definition adopted in *Cole* under a different statute is evident from a comparison of the unqualified language in § 7103(b)(1) with the qualified reference to national security in another provision of the same statute, specifically § 7112(b)(6). That section exempts from labor union representation units that include "any *employee* engaged in intelligence, counterintelligence, investigative, or security work which *directly affects* national security." *See* 5 U.S.C. § 7112(b)(6) (emphasis added). The reference to an individual "employee" and the qualifying phrase "directly affects" are not contained in section 7103(b)(1) and that omission reflects that "national security" in section 7103(b)(1) is broader than applied in *Cole*. Nonetheless, the *Cole* definition of "national security" plainly covers the agency subdivisions at issue, which are "directly concerned with the Nation's safety." Martin-Wallace Decl. ¶¶ 7-24; Jordan Decl. ¶¶ 3-15.

## C. Plaintiffs Are Unlikely To Succeed on the Merits of Their First Amendment Retaliation Claim.

To prevail on a claim of First Amendment retaliation, Plaintiffs must prove that: "(1) [they]

32

engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiffs' position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). To establish a "causation link [] a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)). "Only once the plaintiff meets this burden of showing at least some causal nexus between [its] speech and the alleged retaliatory conduct does the burden shift to the defendant to show why it would have taken the same action even in the absence of any protected activity." *Williams v. Johnson*, 701 F. Supp. 2d 1, 18 (D.D.C. 2010) (citation omitted); *accord Thompson v. District of Columbia*, 832 F.3d 339, 346 (D.C. Cir. 2016) (citing *Mt. Healthy Cty. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). As discussed above, the presumption of regularity and general principles of deference to the executive on matters of national security prevent this Court from looking behind the President's facially valid exercise of statutory authority based on national security prerogatives.

1.　　Executive actions that are facially valid—that is, within the lawful authority of the Executive—are entitled to a presumption of regularity. As already addressed above, that presumption imposes a bar to review that is difficult to surmount. Overcoming it requires a "strong showing of bad faith or improper behavior." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Plaintiffs cannot clear that bar.

As courts have held time and again, a court's review of a presidential decision is limited to

"whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). The President wields significant constitutional and statutory authority over both matters of national security and federal labor-management relations. *See, e.g.,* 5 U.S.C. § 7103. Thus, "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against a plaintiff's asserted constitutional interests. *Mandel*, 408 U.S. at 770. Here, the President has acted within the bounds of his clear authority over USPTO and NOAA employees. *See, e.g.*, *Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496–97 (2010) ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)). And even if the Court could properly look behind the President's stated determination, Plaintiffs' claim fails on the merits.

  2. Plaintiffs cannot meet their burden of establishing a causal connection for their retaliation claim. And in any event, "[e]ven assuming that Plaintiffs have made out a prima facie claim of retaliation, . . . the government has shown that the President would have taken the same action even in the absence of the protected conduct," as the Ninth Circuit concluded in considering a similar First Amendment claim brought by a different union. *AFGE II*, 148 F. 4th at 654-55. a.

  To prevail on their First Amendment claim, Plaintiffs must show that retaliatory animus is the "but-for" cause of the adverse action and that the President lacks an independent basis for taking such action. *Doe*, 796 F.3d at 107 (quoting *Aref*, 774 F. Supp. 2d at 169); *AFGE II*, 148 F. 4th at 654. As addressed above, Plaintiffs' theory presumes they did not oppose the Administration prior to March 27, 2025, and that their alleged non-opposition explains the omission of the bargaining units they represent from the March 27, 2025 Executive Order. Pls.' Mot. at 35. But that is undermined by their own allegations, which establish that these bargaining units were not

encompassed by the March 27, 2025 Order—received "favorable treatment" under Plaintiffs' theory—notwithstanding previously filed grievances and unfair labor practice charges by POPA and NWSEO and criticisms made in the press by NWSEO. Pls.' Mot. at 6, 11-14. That pre-March 27, 2025 "opposition" activity negates Plaintiffs' theory of causation as addressed above. Further, as the Ninth Circuit has recognized, the Fact Sheet accompanying the March 27, 2025 Executive Order "does not express any retaliatory animus," but "conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions." *AFGE II*, 148 F. 4th at 655. To read out those legitimate considerations from the Fact Sheet—the very considerations that the FSLMRS's exclusion contemplates—would be contrary to First Amendment caselaw requiring that this Court defer to the Government's interest in national security and employment matters when balancing First Amendment freedoms. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 685 (1996) (recognizing the Government's "legitimate interests as contractor [or employer], deferentially viewed," can sometimes "outweigh [any] free speech interests at stake"); *see also TikTok Inc. v. Garland*, 122 F.4th 930, 953 (D.C. Cir. 2024) (affording great weight to the Government's "evaluation of the facts" because the Act "implicates sensitive and weighty interests of national security and foreign affairs" (citing *Humanitarian L. Project*, 561 U.S. at 33–34)).

Congress granted federal employees collective bargaining rights subject to the President's ultimate determination that the provisions of the FSLMRS can be applied to those employees' employing agency or one of its subdivisions in a manner consistent with "national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Thus, the FSLMRS plainly allows the President to consider how the application of FSLMRS requirements, including through union grievances or litigation enforcing CBAs, impacts national security functions. That the President allegedly considered or responded to Plaintiffs' First Amendment activity does not violate the First

Amendment.  As with other retaliation claims where courts require a greater showing from Plaintiffs, this case presents "causal complexities" wherein First Amendment activity is a "wholly legitimate" consideration in taking the challenged action.  *See Nieves v. Bartlett*, 587 U.S. 391, 401 (2019); *see also Reichle v. Howards*, 566 U.S. 658, 668 (2012).  Viewed in this light, Plaintiffs' "evidence" is unpersuasive.  Plaintiffs do not assert that the August 28, 2025 Further Exclusions Fact Sheet exhibits any indication of retaliatory animus.  Pls.' Mot. at 35-36.  Instead, they argue erroneously that "NOAA and the USPTO do not have the national security responsibilities attributed to them by the [Executive Order 14,343] and its Fact Sheet and are thus a pretext masking another motivation."  *Id.*   Defendants already have established above that the statements in the Further Exclusions Fact Sheet are accurate.  The opinions to the contrary of Plaintiffs' declarants cannot rebut the national security assessments of the President.

   b. Even if the Court finds otherwise, Plaintiffs' claim nonetheless fails under the *Mt. Healthy* burden shifting-framework where, as here, the President would have taken the challenged action absent the asserted retaliatory motive.  *See Mt. Healthy Cty. v. Doyle.*, 429 U.S. 274, 287 (1977); *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 203 (2024) (Jackson, J., concurring) ("Requiring that causal connection to a retaliatory motive is important, because '[s]ome official actions adverse to . . . a speaker might well be unexceptionable if taken on other grounds.'" (quoting *Hartman v. Moore,* 547 U.S. 250, 256 (2006))).  That is evident from Plaintiffs' bargaining units not being included within  the March 27, 2025 Executive Order despite their prior grievances and criticism of the Administration, which demonstrate that Plaintiffs' subsequent activity—the only activity they assert served as the basis for the alleged retaliation—could not have been the but-for cause of their bargaining units' inclusion in the August 28, 2025 Further Exclusions Order.  *Wiest*, 812 F.3d at 332 n.8.

Moreover, Executive Order 14,343 states on its face that the President took the challenged action for national security reasons. Similarly, the White House Fact Sheets reiterate the national security concerns that motivated the President's determinations. That Plaintiffs or this Court may disagree with such national security determinations does not mean the President was not legitimately motivated by them. Congress entrusted the democratically elected President to make such determinations, and it is clear that the President would have taken the specified action for independent national security considerations. *AFGE II*, 148 F. 4th at 655.

3.      Plaintiffs' viewpoint discrimination claim merely repackages their retaliation claim and should be dismissed as duplicative. *See Bailey v. BOP*, 780 F.Supp.3d 96, 123–24 (D.D.C. April 11, 2025) (dismissing a duplicative First Amendment claim). "[D]etermining whether government action violates the First Amendment requires [the] application of different doctrines that vary depending on the circumstances." *Vullo*, 602 U.S. at 201 (Jackson, J. concurring). Plaintiffs' allegations are best analyzed under the retaliation framework discussed above, and this Court should refuse to entertain a separate viewpoint discrimination claim that was not properly raised in Plaintiffs' Complaint.[10]

Plaintiffs' viewpoint discrimination claim would nonetheless fail on the merits. It has the same faulty premise as Plaintiffs' retaliation claim—that the bargaining units represented by Plaintiffs were not included in Executive Order 14,251 because Plaintiffs only began opposing the Administration's policies after the issuance of that Order—when Plaintiffs own allegations establish pre-March 27, 2025 opposition. That undermines any alleged inference that these

---

[10]      Plaintiffs' Complaint only alleges a single-count First Amendment violation broadly titled "Violation of NWSEO's and POPA's First Amendment Rights." Compl. (ECF No. 1) ¶¶ 59-67. All of the allegations in that section of the Complaint, which focus almost entirely on the President's alleged response to Plaintiffs' protected activity, fit within the retaliation framework discussed above. *See id.* Moreover, Plaintiffs' assertions of protected activity and evidence of improper motive are the same for both potential claims. Pls.' Mot. at 33-37.

bargaining units were excluded five months later by Executive Order 14,343 based on Plaintiffs' viewpoints. There also is no First Amendment right to collective bargaining. "[T]he First Amendment does not impose any affirmative obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979) (Arizona's recalcitrance to negotiate with union "no First Amendment problems"). Likewise, courts recognize that "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8–9 (D.D.C. 2005); *see also AFGE, AFL-CIO v. Loy*, 281 F. Supp. 2d 59, 65 (2003). Courts have thus uniformly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g.*, *NTEU v. Reagan*, 1981 WL 150530, at *3 (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Nor does Executive Order 14,343 otherwise impinge on any protected activity: it does not bar Plaintiffs from recruiting employees to join their unions, petitioning the Government, or engaging in any other protected First Amendment activity.

Moreover, the Executive Order does not distinguish between unions, let alone draw lines based on unions' viewpoints. Instead, it distinguishes agencies or subdivisions. That sets this case far apart from the viewpoint discrimination cases Plaintiffs cite in support of their theory. *See* Pls.' Mot. at 36 (citing, for example, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831–32 (1995) (adjudicating whether a university's refusal to provide otherwise-available funds for expression of a particular viewpoint is viewpoint discrimination)). Unlike in those cases, Plaintiffs can identify nothing about the *agency* exemptions in Executive Order 14,343 that discriminates based on a *union's* viewpoint.

## II.    Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction

Plaintiffs have not satisfied the D.C. Circuit's "high standard for irreparable injury." *England*, 454 F.3d at 297.  Plaintiffs must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (citation omitted).

As an initial matter, Plaintiffs allege no harm whatsoever related to their representation of USPTO's Office of the Chief Information Officer or the Satellite and Information Service and thus have no basis to seek preliminary injunctive relief in connection with the President's exclusion of those subdivisions.  Pls.' Mot. at 37–41.  The alleged irreparable harm is instead limited to POPA's assertion of alleged harm related to its representation of patent examiners and NWSEO's assertion of alleged harm related to its representation of Weather Service employees.  *See id.*

Importantly, neither POPA nor NWSEO allege any irreparable harm to themselves as organizations.  Although Plaintiffs note that their automatic dues collections have been reduced, they do not argue, nor do their declarants attest, that the reduction in dues threatens their financial viability.  Pls.' Mot. at 17, 37-41; Duffy Decl. (ECF No. 15-2) ¶ 21; Becker Decl. (ECF No. 15-3) ¶ 24.  Financial harm suffered by unions, even if significant, is "not clearly irreparable" where plaintiff unions have not shown "whether such financial harm 'threatens the [unions'] very existence.'"  *FEA I*, 780 F. Supp. 3d at 265 (quoting *Wis. Gas Co.*, 758 F.2d at 674).  Here, Plaintiffs do not attempt to show that the failure of USPTO and NOAA to withhold union dues "threatens" their "very existence."  *See id.*  Nor can the Court infer that POPA or NWSEO will lose all their members because they no longer can serve as the exclusive bargaining representative for these employees.  *See AFGE II*, 148 F. 4th 656(finding it "speculative whether Plaintiffs will

experience harm through 'weakened support for unions'" (citation omitted)).

Any such assertion is speculative because unions can continue to represent the interests of federal government employees and maintain a vibrant membership even when their bargaining units have been excluded from FSLMRS coverage. For example, the National Association of United States Attorneys ("NAUSA"), founded in 1992, represents the interests of Assistant United States Attorneys ("AUSAs"). *See* https://www.naausa.org/about (last visited Nov. 16, 2025). United States Attorneys' Offices were excluded from FSLRMS coverage in 2002, Executive Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002), but NAUSA still boasts over 1,500 members. *See* https://www.naausa.org/history (last visited Nov. 16, 2025).

Regardless, any alleged economic harms are reparable. Arbitrators and ALJs have broad latitude to fashion appropriate remedies to make a union whole, including requiring an agency to compensate for revenues lost if found to have improperly withheld dues. Indeed, when a ULP causes unions to suffer monetary losses, the FLRA may order the agency to pay backpay, restore leave, or otherwise reimburse the union. *NTEU II*, 2025 U.S. App. LEXIS 11952, at *3 ("the Union can seek to recover missing dues in subsequent [FLRA] proceedings if the Union ultimately prevails"). And when agencies have violated the dues deduction requirements of 5 U.S.C. § 7115, the FLRA routinely orders agencies to reinstate the deductions, and to reimburse the union its lost dues. *See, e.g., U.S. Dep't of the Treasury, U.S. Mint*, 35 F.L.R.A. 1095, 1100 (1990); *Def. Logistics Agency*, 5 F.L.R.A. 126, 131–33 (1981); *see U.S. Dep't of Def. Ohio Nat'l Guard,* 71 F.L.R.A. 829, 873, 875 (2020) (upholding ALJ decision requiring agencies to reimburse unions when the agency's unlawful conduct prevented dues withholding); *see also* 5 U.S.C. § 7118(a)(7) (authorizing the FLRA to issue an order that gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of the Civil Service Reform Act). Thus, Plaintiffs asserted economic loss is not irreparable.

Rather than focus on alleged harm to themselves as organizations—as would be required for this Court to afford them injunctive relief—POPA and NWSEO speculate about potential future harm to the employees they represent arising from changes that management is attempting to implement to improve performance and better advance their agencies' national security mission. Specifically, these changes include modifications to telework policies, increased production quotas for patent examiners, and the Weather Service's alleged development, currently "in the planning stages," of a new model for how weather forecasts are issued (Pls.' Mot. at 39-41)—all changes that management has the absolute right to make under the FSLMRS. *See* 5 U.S.C. § 7106(a). Plaintiffs surmise that their ability to negotiate on employees' behalf regarding these changes might mitigate in some unspecified way harm to individual employees which Plaintiffs intimate might result from these operational reforms. Pls.' Mot. at 39–41. But the potential mitigation of speculative harm to employees does not amount to the certain, imminent or irreparable harm required to justify the extraordinary relief requested. And, to the extent any individual employee actually is adversely impacted by these changes at some point in the future—a hypothetical occurrence that remains unpled—the employee still could file a grievance on his or her own behalf outside the negotiated grievance procedure.

At bottom, Plaintiffs appear to argue that any loss of bargaining rights necessarily causes irreparable harm. Not so. Any loss of collective bargaining rights can be remedied upon a favorable ruling later in this case, as the FLRA has broad authority to issue remedial relief. *See AFGE II*, 148 F. 4th at 656. And "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *Id*. Moreover, an alleged loss of collective bargaining rights alone does not constitute irreparable harm. While Congress in the FSLMRS may have recognized that collective bargaining provides benefits in the federal workforce, "it does not follow that" absent a preliminary injunction the "public's interest in industrial peace is likely to be irreparably harmed during the time it takes

to [adjudicate this case]." *Henderson for NLRB v. Bluefield Hospital Co., LLC,* 902 F.3d 432, 441 (4th Cir. 2018). To hold such a loss irreparable merely because Congress deemed such rights valuable or because those rights go to the primary mission of unions would negate the irreparable harm requirement in all cases involving unions and collapse the *Winter* test to a determination of whether Plaintiffs are likely to succeed on the merits. This is an insufficient basis to grant the extraordinary relief of a preliminary injunction.

### III.    The Balance of the Equities and the Public Interest Favor the Government

A preliminary injunction also is not appropriate because the balance of the equities and the public interest weigh in the Government's favor. *See Nken,* 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). The Court can decline to grant a preliminary injunction where, as here, these equitable factors favor the Government, even if Plaintiffs show that they suffer an irreparable injury and lack an adequate remedy at law. *See Zukerman & Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023).

A preliminary injunction would inflict harm on the public and the President by interfering with the national security determinations regarding the agency subdivisions at issue entrusted to the President by Congress. *See* Martin-Wallace Decl. ¶¶ 25-34; Jordan Decl. ¶¶ 22-30; *see also AFSA II*, 2025 U.S. App. LEXIS 15297, at *8–9 ("[T]he balance of [the] equities favors the Government. The competing interests—union representation versus national security—were already weighed by Congress when it passed the [FSLMRS].").

As established in the accompanying declarations, the USPTO and NOAA also would be harmed by the granting of a preliminary injunction for additional reasons.

*USPTO*: Upon issuing the August 28, 2025 notice advising POPA that it was no longer recognized as the exclusive bargaining representative of employees in the Patent Office and the Office of the Chief Information Officer, USPTO stopped the automatic dues withholdings of

almost 10,000 POPA represented employees.  The POPA CBA has not been terminated, because POPA continues to operate at USPTO, representing employees in other divisions.  However, USPTO immediately discontinued any bargaining activities, participation in grievances filed under the POPA negotiated grievance procedure, and official time for employees that no longer have an exclusive union representative.  Martin-Wallace Decl. ¶ 35.

In addition, the Patent Office has adopted a revised performance appraisal plan for all patent examiners.  USPTO has also agreed with POPA to suspend arbitration where the impacted employees are entirely in the Patent Office.  Should the Court grant a preliminary injunction, the Agency would face significant operational and resource burdens.  Reinstating these obligations would require the immediate redeployment of staff time and expertise, including dedicated efforts of HR and Labor Relations specialists, payroll personnel to resume dues processing, and attorneys from the Office of General Counsel to re-engage in arbitration, and also reinstituting official time for POPA representatives. Martin-Wallace Decl. ¶¶ 35-36.  USPTO estimates that the costs of reinstating these obligations would be approximately $358,808.  *Id.* ¶ 36.  Thus, were the Court to enter the requested preliminary injunction, and it was later determined that the Agency had been wrongfully enjoined or restrained, the Agency estimates several hundred thousand dollars in likely unrecoverable financial harm.

*NOAA*:  NOAA has terminated the two applicable CBAs with NWSEO effective August 29, 2025.  Following that termination, NOAA has not granted any official time (as defined in 5 U.S.C. § 7131(a) and (d)) under the two terminated CBAs, or permitted NWSEO officials to use NOAA office space to conduct representational activities for employees who were previously covered by the terminated CBAs.  Jordan Decl. ¶ 31.  Further, the Weather Service and the Satellite and Information Service discontinued bargaining activities, grievance procedures, and arbitrations under the terminated CBAs.  *Id*. Should the Court grant a preliminary injunction, the Weather

Service and the Satellite and Information Service would face significant burdens on agency operations and resources. Reversing these actions would necessitate the immediate redeployment of staff time and expertise, including dedicated efforts of human resources and payroll specialists, to reimplement dues processing, and of attorneys from the Office of the General Counsel to recommence arbitration proceedings, and also resuming the granting of official time. *Id.*

NOAA also would incur numerous costs if the Court were to enter Plaintiffs' requested preliminary injunction, including costs associated with arbitrations under the two-at issue CBAs, reconstituting and resuming collection of union dues and payment for official time, and recommencing negotiations on issues falling within the ambit of the CBAs' mandatory pre- and post-implementation bargaining provisions. If the Court were to enter Plaintiffs' requested preliminary injunction, and it was later determined that the Agency had been unlawfully enjoined or restrained, the Agency estimates that it would incur more than $232,775 in financial harm that is likely unrecoverable. *Id.* ¶ 32. For these reasons, the balance of the equities and the public interest weigh in Defendants' favor, and the Court should deny Plaintiffs' requested injunction.

## IV. Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, It Should Decline To Enter Plaintiffs' Proposed Order.

If the Court nonetheless decides to grant the motion, it should reject Plaintiffs' proposed order and instead enter an order similar to those it recently entered in related cases. *See e.g.* Order, ECF No. 44, *AFL-CIO v. Trump*, 1:25-cv-2445 (D.D.C. Oct. 1. 2025). Plaintiffs' proposed order is flawed because it seeks to declare Section 2 of Executive Order 14,251 and 14,343 unlawful in their entirety rather than as applied to "the Plaintiffs' bargaining units [at the relevant agency subdivisions[11]] and all employees in the Plaintiffs' bargaining units [at those agency

---

[11]    The relevant agency subdivisions here are the Weather Service, the Satellite and Information Service, the Patent Office, and USPTO's Office of the Chief Information Officer.

subdivisions]" as in the *AFL-CIO* order.  Similarly, it seeks to enjoin the implementation of Section

2 of the Executive Orders in their entirety rather than "with respect to the Plaintiffs' bargaining

units [at the relevant agency subdivisions] and all employees in the Plaintiffs' bargaining units [at

those agency subdivisions]" as in the *AFL-CIO* order.

In addition, Plaintiffs' Proposed Order fails to include any bond.  The Court should require

Plaintiffs to post security consistent with Federal Rule of Civil Procedure 65(c).  The D.C. Circuit

recently clarified that "injunction bonds are generally required." *NTEU II*, 2025 U.S. App. LEXIS

11952, at *7 n.4.  Based on the above-stated injuries to Defendants should this Court enter

injunctive relief, this Court should require more than just a "nominal" bond and instead should

order a bond of at least $358,808 from POPA and $232,775 from NWSEO.[12]  Martin-Wallace

Decl. ¶ 36; Jordan Decl. ¶ 32.  Because Plaintiffs have not agreed to pay back any such costs should

the Government prevail, these funds would be unrecoverable absent a bond.  *See National

Institutes of Health v. American Association of Public Health*, 145 S. Ct. 2658, 2659 (2025).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: November 19, 2025                    BRETT A. SHUMATE
                                            Assistant Attorney General

                                            YAAKOV M. ROTH
                                            Principal Deputy Assistant Attorney General
                                            TYLER J. BECKER
                                            Counsel to the Assistant Attorney General
                                            Civil Division

---

[12]    This Court has in the past ordered a bond in name only. *See, e.g.*, Order, ECF No. 44, *AFL-CIO v. Trump*, 1:25-cv-2445 (D.D.C. Oct. 1. 2025) (directing plaintiffs to post a nominal bond of $100).  For the reasons explained by the D.C. Circuit in *NTEU v. Trump*, it is quite "doubt[ful]" such amount is "appropriate" to pay the costs and damages sustained by Defendants should it be found that the requested preliminary injunction "'wrongfully enjoin[s] or restrains'" them.  2025 WL 1441563, at *3 n.4 (quoting Fed. R. Civ. P. 65(c)).  A bond in name only—such as what this Court ordered in *AFL-CIO*—lacks justification in Rule 65(c).

ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
Civil Division, Federal Programs Branch

JEANINE FERRIS PIRRO
United States Attorney

By: _/s/ Jeremy S. Simon_
JEREMY S. SIMON, D.C. Bar #447956
Assistant United States Attorney
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*