UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL WEATHER SERVICE
EMPLOYEES ORGANIZATION, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.

Defendants.

Civil Action No. 25-2947 (PLF)

**DECLARATION OF VALENCIA MARTIN-WALLACE**

Pursuant to 28 U.S.C. § 1746, I, Valencia Martin-Wallace, declare as follows:

1.      I am the Acting Commissioner for Patents for the United States Patent and

Trademark Office ("USPTO" or the "Agency"), and I have served in this role since February

2025.  In my current role, I am responsible for leading all aspects of the Patents organization,

which employs more than 10,000 of the USPTO's approximately 13,500 employees.  Before

February 2025, I served as Deputy Commissioner, where I led Patents efforts related to

international intellectual property harmonization, oversaw patent examining functions, and

spearheaded quality improvement efforts.  I have a Bachelor of Science in Electrical Engineering

and Juris Doctor and started my career at the USPTO 32 years ago as a patent examiner.  I

provide this declaration in support of Defendants' opposition to Plaintiffs' motion for a

preliminary injunction in the above-captioned case.  I make the following statements based upon

my personal knowledge and information provided to me in my official capacity.

2.      I am familiar with Executive Order 14,343 of August 28, 2025, *Further*

*Exclusions from Federal Labor-Management Relations Programs* (the "Further Exclusions

Executive Order").  Section 2 of the Further Exclusions Executive Order excludes the "Office of the Commissioner for Patents and subordinate units, Patent and Trademark Office" from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order No. 14,343 § 2, 90 Fed. Reg. 42,683, 42,683 (Sep. 3, 2025).

3.     I also am familiar with Executive Order 14,251 of March 27, 2025, *Exclusions from Federal Labor-Management Relations Programs* (the "Exclusions Executive Order"). Section 2 of the Exclusions Executive Order excludes the Office of the Chief Information Officer of each Executive department listed in 5 U.S.C. § 101 from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14,553 (Mar. 27, 2025).

4.     The USPTO is established as an agency of the United States, within the Department of Commerce ("DOC").  Its mission is to drive U.S. innovation and global competitiveness for the benefit of all Americans.  The Office of the Commissioner for Patents ("Patents") is a subdivision of USPTO that is responsible for granting U.S. patents and simultaneously keeping confidential technology, the release of which might otherwise be detrimental to national security.  Patents predominantly employs patent examiners, each of whom must possess the scientific or other technical expertise necessary to evaluate inventions' patentability.  Around 95% of the 10,000+ employees in Patents are patent examiners.  Of those patent examiners, the majority are GS-14 "primary examiners," senior examiners granted the authority to make final determinations on behalf of the Agency as to granting or denying a patent.  Patents also employs the equally vital staff who manage pre-examination processing, information technology ("IT"), classification, and other examination support needs.  In addition, it houses a legal team, the Office of Patent Legal Administration, aimed at the administration of examination policy, and the Office of International Patent Cooperation, which focuses on

coordinating patent examination across international patent systems, plus a few smaller niche offices.  According to the Patent Office Professional Association ("POPA") unit of recognition, it is the exclusive representative of "all professional employees at USPTO other than Trademark professionals."  *See* USPTO and POPA Collective Bargaining Agreement, Article 1 §§ 2,3.[1] Historically, this has included all patent examiners, plus a few hundred other professionals in Patents, as well as around 150 professionals outside of Patents.  On August 28, 2025, USPTO notified POPA that it would no longer recognize POPA as the exclusive representative of employees in Patents or OCIO.

5.      The USPTO Office of the Chief Information Officer ("OCIO") is responsible for safeguarding the information security of all USPTO data and ensuring that the IT systems are fully operational.  OCIO employees include, among others, information security specialists, engineers, cybersecurity experts, and software developers.  OCIO has approximately 500 employees, approximately 25 of whom fit within the POPA's unit of recognition.

6.      As the President determined, Patents, as well as OCIO, have national security and/or investigative work as a primary function.  Patent examiners and the other examination support staff in Patents, plus the OCIO teams that enable their work, are an incredible asset to the American people.  They are hard-working, well-trained, and diligent in fulfilling their roles of strengthening the U.S. intellectual property system and ensuring the proper protection and handling of sensitive technology.

### ***Patents Has National Security and Investigative Work as a Primary Function***

7.      Everyone in Patents plays a role in protecting U.S. national security and

---

[1]     In its filing, POPA cited to the CBA available at:
http://popa.org/static/media/uploads/CBA/popa_agreement.pdf.  USPTO does not dispute this
version.

America's economic strength against bad actors.  A primary function of the USPTO mission, carried out through the Patents organization, is issuing durable and reliable patents.  When a patent applicant discloses their invention in exchange for a patent, a fundamental piece of that bargain is that the patent will provide enforceable rights against unlawful infringers.  Without reliable and durable rights, the incentive to seek a U.S. patent decreases and the intellectual property system weakens, which in turn, disrupts the U.S. economy.  Economic security is a critical element of strong national security.  Additionally, a weakened U.S. patent system reduces the number of patent filings, which in turn reduces the number of applications for which the Agency has the opportunity to review and screen for direct impact on national safety.

8.    Patents is responsible for screening patent applications for national security-related material in order to protect American military secrets from foreign use against American interests.  The Invention Secrecy Act of 1951, 35 U.S.C. § 181, tasks the USPTO with reviewing inventions and assessing whether their release could harm national security.  Where that risk presents, the USPTO, through its Patents division, must refer the application to the appropriate defense agency for evaluation.  If the defense agency identifies risk, it reports back to Patents, who is responsible for issuing "secrecy orders" and ensuring confidentiality of the application.

9.    Patents' employees review and have access to hundreds of thousands of inventions each year before the public learns about them.  This construct is intentional and puts Patents in a unique position to collect information about new technologies and determine which ones have implications on the safety and welfare of the nation.  Not just a funnel for information, Patents also acts as a filter, keeping significant and strategic technological advances out of the public eye to ensure America retains its global military and economic edge.  When disclosure of an invention might be detrimental to national security because, for instance, it could improve the

4

lethality of a foreign military, Patents makes the patent application "available for inspection to the Atomic Energy Commission, the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency" to determine whether it should be kept secret. 35 U.S.C. § 181. Upon such a determination, the USPTO is expressly authorized by Congress to "withhold the publication of" a patent application or the "grant of a patent therefor." *Id.*; *see also* 37 C.F.R. § 5.1(e) (instructing that applications will not be published if doing so would be detrimental to national security; such applications shall not be published until any secrecy order is lifted). In this way, the USPTO is on the frontlines in safe-guarding national security-related information for the benefit of the United States government and protecting our economic and national security from hostile and unlawful actors.

10.     In support of their Motion for Preliminary Injunction ("Pls.' Mot.", ECF No. 15-1), Plaintiffs submitted a Declaration of Robert Stoll, one-time Commissioner of Patents at USPTO (2009-2012). Pls.' Mot., Stoll Decl. (ECF No. 15-4). Mr. Stoll first asserts that "just two dozen patent examiners" conduct screening for assessment under the Invention Secrecy Act. It is correct that the technical evaluation of applications, once proposed for secrecy order or subject to secrecy order, is limited to a subset of patent examiners who have obtained security clearances and work in the Office of Licensing and Review, within Patents.

11.     Contrary to Mr. Stoll's assertion that only a handful of examiners are implicated, all examiners are expected to be vigilant in reviewing applications for sensitive subject matter and ensuring their proper handling. This responsibility attaches to all of the patent examiners and pre-examination processing staff in Patents, who have a responsibility to be on alert for sensitive material throughout the life cycle of the patent examination process, either in the

original submissions from applicants or in subsequent filings. *See Manual of Patent Examining Procedure (MPEP)*, §§ 115 and 121.[2] One of Plaintiffs' own declarations states – and USPTO does not dispute – that of the roughly 650,000 patent applications received by the USPTO each year, 120,000 are flagged for screening and approximately 10,000 are referred to defense agencies for evaluation. *See* Pls.' Mot., Chu Decl. (ECF No. 15-6) ¶ 6. In other words, while the ultimate number of secrecy orders issued may be a small fraction of total applications, the number that Patents must initially consider for such orders is nearly 20% of all applications. Much of this work is automated, but it underscores the very high volume of cases that come to the USPTO. And if not captured automatically, it is up to every examiner to handle properly. If an examiner is exposed to sensitive subject matter, they must flag it for additional review and protection. *See* MPEP § 115.[3] Further, if and when a patent application or paper filed with the USPTO bears a security marking, e.g., "Secret," "Confidential," etc., "[u]nder no circumstances can any such application, drawing, exhibit, or other paper be placed in public records, such as the patented files, until all security markings have been considered and declassified or otherwise explained." *See* MPEP § 121.[4] Everyone in Patents is responsible for ensuring this happens. Therefore, although it is true that the examination of applications ultimately subject to a secrecy order is narrowed to a subdivision of patent examiners for logistical reasons, the overriding requirement to ensure that applications, and other papers, that touch on national security matters are protected and treated with the appropriate care by all patent examiners is literally written into the patent examination process.

---

[2]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s115.html and https://www.uspto.gov/web/offices/pac/mpep/s121.html.

[3]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s115.html.

[4]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s121.html.

12.     Everyone in Patents also participates in ensuring a durable and reliable U.S. intellectual properly system, which is critical to the nation's security as described above.  All patent applications come to the USPTO with an expectation that the USPTO will hold the application in confidence prior to publication.  Prior to publication, the contents of the application remain trade secrets.  If an applicant maintains the application in pending status without a non-publication request or pays the issue fee should the application be allowed, they are electing to disclose the subject matter in exchange for patent protection, as part of "the patent bargain."  Whether or not applications raise national security concerns under 35 U.S.C. § 181, the USPTO, by law, must maintain applications in confidence for at least 18 months from actual filing date or a relied-upon earlier filed application's filing date, unless the applicant specifically requests otherwise or a patent issues (i.e., is granted and published).  35 U.S.C. § 122.  Patents actively preserves and secures this information, and trains its examiners and related personnel from the time they begin at the office about how important their roles are in making sure this information is restricted.  Safeguarding these filings protects American intellectual property from cybertheft by malicious actors, and instills confidence in U.S. patent filers, ultimately strengthening the U.S. patent system overall.

13.     Another primary function of Patents relates to detecting, deterring, and penalizing fraud in the intellectual property system.  The USPTO is burdened with processing large quantities of fraudulent patent filings, where the claimed invention is deliberately overstated, as well as with protecting legitimate rights-holders against entities purporting to be the USPTO who seek to steal fees and cause rights to lapse.  When a fraudulent filing results in a patent grant, it dilutes the value of legitimate patents and also complicates the lawful enforcement of those legitimate property rights.  In late 2024, the USPTO terminated roughly 3,100 patent applications

that had been filed with fraudulent signatures.[5]  The USPTO continues efforts to combat these various types of fraud, including through liaising with the DOC Inspector General and federal law enforcement.  The Agency's ability to quickly pivot in situations where fraud is detected – including by instructing patent examiners to handle certain applications in a particular way without having to negotiate first – is critical to quickly address fraud schemes.

14.    In his declaration, Mr. Stoll also asserts that defense agencies – like the Atomic Energy Commission or Department of Homeland Security – request secrecy orders, and not the USPTO.  Plaintiffs have relied on this assertion to incorrectly state that the USPTO is not tasked with implementing the Invention Secrecy Act.  *See* Pls.' Mot., Stoll Decl. (ECF No. 15-4) ¶¶ 5-6; Pls.' Mot. at 23.  Mr. Stoll's statement on the critical role of defense agencies is accurate – the USPTO no doubt needs input from these agencies to confirm potential risks to national security.  But this does not undermine the fact that Patents is tasked with both reviewing and safeguarding applications that contain sensitive technology, flagging applications that could implicate national security for defense agency review, issuing the secrecy orders, and ultimately lifting the secrecy orders contemplated by the Invention Secrecy Act.  On the contrary, USPTO's partnership with leading defense agencies to identify and protect technology that could be misused by adversaries underscores the critical nature of Patents' role in national security.  To be clear, the Invention Secrecy Act was built into Title 35 of the U.S. Code, "Patents," and charges the USPTO with managing the program that reviews technology ranging from nuclear energy breakthroughs to radar-jamming innovation to warhead production methods.  To suggest that Patents is not responsible for the Invention Secrecy Act just because other agencies also play vital roles is to

---

[5]    *Available at:* https://www.uspto.gov/about-us/news-updates/uspto-terminates-patent-application-proceedings-fraudulent-use-signature.

disregard the plain language of the statute.

15.    In short, it is everyone's job in Patents to be aware of and responsible for flagging new technology that might pose a risk to national security, as well as protect against disclosing documentation related to that new technology until it is appropriate to do so.

16.    Patent examination is also inherently investigative under 5 U.S.C. § 7103(b)(1)(A), because in every case the examiner conducts an independent and comprehensive search of prior patents, patent applications and other scientific literature ("prior art") to assess patentability.  *See* 35 U.S.C. § 131.  Patent applicants are required to disclose relevant information of which they are aware, but are not themselves required to review the prior art. Thus, Patents does not and cannot simply rely primarily on the applicant's representations regarding what is known in the relevant field.  To be able to conduct an appropriate investigation, all patent examiners must have science, engineering, or design degrees in the fields in which they examine.  The patent examiner's independent and methodical investigation of the prior art is an essential—and perhaps the most important—aspect of the examination process. USPTO's Manual of Patent Examining Procedure (MPEP) describes this aspect of the examination process:

> The examiner, after having obtained a thorough understanding of the invention disclosed and claimed in the nonprovisional application, then searches the prior art as disclosed in patents and other published documents….
> ….
> In the examination of an application for patent, an examiner must conduct a thorough and complete search of the prior art.
> …
> The areas to be searched should be prioritized so that the most likely areas of finding relevant prior art are searched first. Though areas to be searched should be prioritized, a thorough and complete search requires the consideration of references from each of the areas where the examiner is likely to find pertinent prior art.

MPEP §§ 904; 904.02.[6]  Examiners can even independently establish additional requirements for information from applicants, putting them squarely in an investigatory role.  *See* 37 C.F.R. 1.105 (giving examiners discretion to require any additional information reasonably necessary to properly handle a matter).

17.    To enable a thorough investigation, the USPTO provides patent examiners numerous, sometimes very specialized, tools for searching the prior art.  MPEP § 904.02 ("Search needs in some technologies (e.g., chemical structures, DNA sequences) are very specialized and can only be met through additional use of specific search tools specially constructed and maintained to respond to those needs.").  USPTO also requires patent examiners to document their search for prior art which becomes part of the patent application file.  MPEP § 719.05.[7]  In addition, examiners frequently interview the patent applicant to obtain additional information about the nature of the application's claims and specifications.  *See* MPEP § 713.[8] In short, a patent examiner is principally responsible for developing the factual record for determining whether or not a claimed invention is patentable and may thus be appropriately described as investigators.

### *OCIO Has National Security and Investigative Work as a Primary Function*

18.    Information offices across the government are critical to protecting national security.  For the USPTO OCIO in particular, it has primary responsibility for ensuring the operability and security of systems that enable the critical national security functions of Patents: reviewing and protecting patent applications subject to secrecy order; protecting the

---

[6]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s904.html.

[7]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s719.html.

[8]    *Available at*: https://www.uspto.gov/web/offices/pac/mpep/s713.html.

confidentiality of unpublished patent applications; and issuing durable and reliable patents.

19.    ***Securing critical information systems and networks.***  The Federal Information Security Modernization Act of 2014 ("FISMA") establishes a framework for securing government information systems and tasks federal Chief Information Officers with effective policies and resource management that enable agencies to comply.  *See* 44 U.S.C. §§ 3506, 3554. OCIO houses the Office of the Chief Information Security Officer, and sets and enforces cybersecurity policies, architectures, and controls that protect systems holding sensitive and national security related information from cyber intrusions, espionage, and disruption.  It is tasked with establishing strong authentication, network defenses, vulnerability management, and incident response to reduce the risk that adversaries can access or degrade highly sensitive data and systems.  There is no question that these functions are the primary function of any effective information security office.

20.    ***Ensuring continuity of operations and resiliency.***  OCIO responsibilities also include continuity planning, disaster recovery, and cloud/resilience strategies that keep essential agency functions running during attacks, natural disasters, or other crises.  Maintaining availability and recoverability of systems preserves government decision-making and other emergency response coordination.

21.    ***Managing security information sharing access and controls.***  OCIO designs information sharing frameworks, role-based access, and data classification/handling policies so authorized partners can securely exchange operational data while preventing unauthorized disclosure.  OCIO's National Security System product team has responsibility for sharing systems in partnership with the Department of Homeland Security that provide infrastructure for these communications.  Properly controlled data flows enable timely situational awareness and

coordinated responses without exposing sensitive data.

22.     ***Reducing supply-chain and technology risks.***  OCIO oversees procurement, software supply chain vetting, and technology risk assessments that limit insertion of malicious components, counterfeit hardware, or insecure services.  By enforcing secure acquisition standards and continuous monitoring, OCIO helps prevent adversaries from exploiting vendor vulnerabilities or backdoors to compromise systems tied to national security.

23.     ***Investigative work.***  Parts of OCIO are also engaged in a near-constant state of investigating.  OCIO engages in a wide range of investigative activity focused on discovering causes of problems, determining compliance gaps, and responding to incidents that affect information systems and data.  These activities include forensic analysis of intrusions, malware and suspicious activity; collecting and preserving logs of activities and incidents; identifying control failures and evaluating corrective actions; and data-loss investigations and continuous data-loss monitoring and prevention efforts.  In particular, the Office of the Chief Information Security Officer performs continuous monitoring and is engaged in 24/7 monitoring, detection, and investigation of suspicious events and potential data loss, investigating each instance of abnormal activity.

24.     Collectively these activities comprise the primary functions of OCIO.  This office, and other federal CIO offices are critical to national security because the establish and enforce the secure backbone of government operations, ensuring cybersecurity to defend against sophisticated threats and enable timely decision-making.

### ***Applying the Federal Service Labor-Management Relations Statute to Patents and OCIO is Detrimental to National Security***

25.     As stated in Executive Orders 14,343 and 14,251, the President has determined that applying the Federal Service Labor-Management Relations Statute ("FSLMRS" or

"Statute") to Patents and OCIO is inconsistent with national security requirements and considerations under 5 U.S.C. § 7103(b)(1)(B). The ability of the USPTO to carry out its national security functions is hindered by the requirement to comply with the FSLMRS, particularly the Agency's ability to quickly modify job duties and performance expectations of employees in order to meets its mission, and to efficiently manage employees with performance or conduct issues.

26.    The Patents organization comprises more than 10,000 of the USPTO's approximately 13,500 employees. Over 9,000 of those employees were represented by POPA in its capacity as exclusive representative (and another ~250 employees – consisting of non-professional support staff, none of whom are patent examiners – were represented by another union, National Treasury Employees Union, Chapter 243).[9]  In recent years, the unions have repeatedly stifled or attempted to stifle efforts to modernize and improve the Agency's examination and workforce management practices, including but not limited to:

- Demanding limits on the numbers and types of patent applications eligible for accelerated examination through agency pilot programs;

- Withholding approval of a new patent incentive program designed to reduce patent pendency;

- Insisting on maintaining ineffective incentive programs and rebuffing efforts to rework those programs to ensure positive return on investment;

- Creating barriers to removing unsuccessful employees through demands for extensive performance improvement processes in excess of statutory requirements;

---

[9]    Although over 9,000 employees were represented by POPA in its capacity as exclusive representative, that does not mean that all 9,000 employees were dues-paying members. As previously stated, most of those employees were patent examiners and approximately twenty-five were in the Office of the Chief Information Officer. POPA also represented in its capacity as exclusive representative (and continues to do so) approximately 150 total employees in USPTO's Office of the Chief Financial Officer, Office of Policy and International Affairs, Office of Governmental Affairs, Office of Public Engagement, and the Patent Trial and Appeal Board.

- Delaying the deployment of new information technology tools and opposing the Agency's efforts to make use of those tools mandatory because some examiners prefer to continue working as they have for years, sometimes requiring the Agency to maintain redundant systems;

- Using collective bargaining processes to shield themselves and their members from compliance with this administration's policies by insisting on CBA terms that extend into 2029;

- Insisting, in some instances, on telework agreements that place restrictions on the Agency's ability to periodically reconsider a position's eligibility for telework;

- Demanding that adverse actions under 5 U.S.C. §§ 4503 and 7512 be included in the scope of the negotiated grievance procedure and thus subject to arbitration, despite objective evidence that arbitration is slower and more expensive for agencies;

- Diverting significant amounts of employee time away from examination and into union officers' "official time" – over 17,000 hours in 2024; and

- Insisting on months-long negotiations over updates to the USPTO's IT security rules (the "Rules of the Road"), despite their clear link to IT security.

27.    As noted, patent examiners and other examination support staff are highly valued employees.  Patent examiners in particular do an immense amount of work to keep the patent system running.  On occasion, the USPTO's efforts to reward employees for doing top-notch work that helps to maintain the durable and reliable U.S. patent system has been stymied by POPA.  For example, earlier this year, Patents wanted to offer a monetary award for employees who did additional work – a win-win for everyone.  But the union refused to sign off on the final award, despite having bargained to completion.

28.    Plaintiffs point to the "expansive management rights clause" in the labor statute as a way to explain that unions do not obstruct agency actions in the face of national security needs.  Pls.' Mot. at 35.  But this ignores the statutory construct that, in many instances, agencies and unions must still reach agreement on appropriate arrangements regarding impacts of changes and procedures to be followed before management can implement those rights.  It also fails to

recognize that agencies can still get swept up in timely and costly litigation, even when properly

asserting management rights. In fact, POPA's own acceptance of the management rights concept

is belied by a live example that Plaintiffs cite to in their motion. Among the myriad complaints

listed Section III.A. of the motion, POPA points to its March 20, 2025 grievance over Patents'

determination to temporarily suspend all non-essential training conducted on duty time in order

to focus on patent examining. Pls.' Mot. at 35. The parties have a provision in Article 42,

Section 4 of the December 11, 2024 Collective Bargaining Agreement between POPA and

USPTO stating that the USPTO intends to maintain a professional training program. The

provision does not require that the professional training program have any specific elements, but

it does describe the program at the time of signing for illustration, which included a set bank of

hours for approved training. The agreement properly and intentionally leaves discretion to the

Agency to modify training availability if and when operations require it. When the USPTO

notified POPA that Patents was temporarily suspending non-essential training in an effort to

focus resources on driving down the inventory of unexamined patent applications – one of its

primary missions – POPA grieved this clear exercise of management rights. As the USPTO

communicated to POPA in its formal grievance response dated April 16, 2025:

> [T]the right to assign work includes the right to train, or not to train, employees. *Federal Aviation Administration, Burlington, Mass.*, 48 FLRA 1112 (1993). As a management right, management officials are precluded from negotiating over, as you have suggested, the decision to assign training. *Id*. Any impact and implementation over training has already been negotiated in the CBA, and, as explored further below, the Agency does not have to engage in midterm bargaining over subjects already contained in an existing agreement. *U.S. Dep't of HHS, SSA, Balt., Md.*, 47 FLRA 1004, 1018-19 (1993).

Exhibit A. Upon receiving the USPTO's grievance response, POPA proceeded to invoke

arbitration over this clear exercise of management rights, over a topic that was also "covered by"

the parties' existing agreement. *E.g., AFGE Local 3937 and Soc. Sec. Admin., Baltimore, Md.*,

64 F.L.R.A. 17 (2009) (a party is not obligated to bargain over matters contained in or covered

by an existing agreement).

29.    Plaintiffs also point to the fact that "an agency need not complete bargaining before changing conditions of employment when immediate implementation is 'consistent with the necessary functioning of the agency, such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission.'"  Pls.' Mot. at 35, *internal citation omitted*.  The USPTO agrees.  But again, POPA's own cited grievances contradict its belief in this legal tenet.  In its argument on "standing firm" in Plaintiffs' motion, POPA cites its grievance over Patents' decision to return probationary patent examiners – examiners who have been in the job for less than one year – to work physically in the office, rather than telework full-time.  Pls.' Mot. at 15.  In light of increasing attrition rates during remote hiring of patent examiners in the years following Covid-19, the USPTO notified POPA on April 14, 2025 that:

> [T]he USPTO has determined that these employees must return to the office to effectively perform their positions, to support the agency's effort to accomplish its primary mission, and that their return is necessary for the proper functioning of the agency.  Their work on campus is necessary to address unacceptable retention levels for this group of employees, ensure proper training, and bolster collaboration including with Supervisory Patent Examiners who are already working onsite.

> Please advise Acting Labor Relations Division Chief Sonya Penn [ ] whether the bargaining unit has proposals for impact and implementation.  The USPTO will immediately implement this return to office initiative as provided by government-wide rule and any bargaining that is not concluded by the return to office date will be completed post-implementation.

Exhibit B.  Despite offering post-implementation bargaining on this issue, POPA elected not to engage in bargaining and instead initiated the grievance procedure on April 24, 2025 and ultimately invoked arbitration.  This change in telework policy impacted 99 individuals. Plaintiffs assert that eleven percent of these probationary employees "promptly quit," Pls.' Mot. at 7, but omits that that amounted to ten employees out of the ninety-nine that had been

16

impacted.[10]

30.     POPA is even forcing USPTO to litigate over matters that are specifically reserved to federal agency discretion by law.  As another of its cited grievances in Plaintiffs' motion, POPA is arguing with the USPTO over the fact that the Agency did not grant administrative leave in advance of the Juneteenth holiday.  Pls.' Mot. at 16.  5 C.F.R. § 630.1403(a)(4) dictates that "[a]n agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs." On July 9, 2025, POPA filed a grievance over the failure to grant unit employees early dismissal on June 18, 2025, in advance of the Juneteenth holiday on June 19, 2025.  After the USPTO denied the grievance, POPA invoked arbitration on August 14, 2025.  (This grievance ironically follows POPA's 2021 grievance related to the Agency's efforts to authorize the Juneteenth holiday in the first place, asserting that the USPTO failed to consider individuals on flexible or compressed schedules who were not scheduled to work on Friday, June 19th after the White House declared the holiday only two days prior.)  This grievance, along with POPA's other cited grievances related to failure to give administrative leave to teleworking employees, and the grievance related to discretionary training, all evidence direct resistance to management's efforts to improve agency operations and manage employee productivity.

31.     The USPTO's efforts to protect national security hinge on the ability to move quickly on policy changes.  In assessing 5 U.S.C. § 7103(b)'s primary concern that federal agencies not be hindered when running organizations with at least one primary function of

---

[10]     POPA also cites to its May 19, 2025 grievance related to telework eligibility.  Pls.' Mot. Duffy Decl. (ECF No. 15-2) ¶ 12.  The number of employees in the POPA bargaining unit that were impacted by the Agency's reevaluation of telework eligibility was approximately 130.  None were in Patents and 19 were in OCIO.

national security, consider these possible examples in the USPTO's case:

- The Agency (i.e., Patents' Office of International Patent Cooperation) might reach an agreement with a foreign intellectual property office that results in expedited examination for national security technology in exchange for reciprocal treatment (e.g., in the form of quicker adjudication on both ends). This allows for U.S. applicants to get IP rights faster for national security related technologies and supports potential enforcement needs in a timelier manner. In order to modify the performance appraisal plan for a union employee that sets the standard for speed of examination, the USPTO would ostensibly need to negotiate over the impacts of these changes before implementing or otherwise face litigation risk. A union could drag out such negotiations indefinitely.

- The Agency learns that a foreign adversary is committing fraud on the U.S. by backing organizations that falsely claim to be an organization of a certain size in order to receive preferred fee treatment. If the USPTO wants to introduce new job duties to combat this fraud that require a patent examiner or a pre-examination specialist to check the company name against another federal database, it would potentially need to negotiate over the procedures for doing so before being able to implement.

- The USPTO sees an increase in the number of patent applications that require secrecy orders under the Invention Secrecy Act, 35 U.S.C. § 181, and has to increase the number of patent examiners that have security clearances and/or work from secured locations. A union might argue that modifying these job requirements and/or changes to telework programs require bargaining under the Statute.

32.     As relevant to this case, USPTO has a collective bargaining agreement ("CBA") with POPA.[11] Specifically, USPTO entered into a CBA with POPA effective December 11, 2024, which has a nearly-5-year term and is in effect through June 29, 2029, pursuant to Article 53 of the agreement.

33.     This CBA covered all employees for whom POPA served as the exclusive bargaining representative. That included employees in Patents (9,260 people) and OCIO (25 people) up until August 28, 2025, when USPTO stopped recognizing POPA as the exclusive bargaining representative for these employees. POPA is still recognized as the exclusive bargaining representative for employees in the Office of the Chief Financial Officer, Office of

---

[11]     *Available at*: http://popa.org/static/media/uploads/CBA/popa_agreement.pdf.

Policy and International Affairs, Office of Governmental Affairs, Office of Public Engagement, and Patent Trial and Appeal Board.

34.     The above-referenced CBA generally interferes with USPTO's ability to execute and implement the President's initiatives related to national security.  The Executive Orders remove these obstacles.  For example:

a.      The CBA restricts the USPTO's ability to implement **government-wide rules and regulations** from the President that conflict with the CBAs (without renegotiation and agreement with the unions).  *See* CBA, Article 2 § 1.

b.      In addition to any legally required bargaining, when the Agency contemplates exercising a management right that requires a change to a condition of employment, the CBA provides that it must also engage in **pre-decisional discussions**, meeting with the union at least two times before making any determination on whether or how to make the contemplated change.  *See* CBA, Article 16 § 8.  This pre-decisional union involvement applies to any such contemplated change, whether or not it involves a matter of national security.

c.      The automation provisions of the CBA require significant union input before the Agency can make any **changes related to information technology (IT) development and deployment**, whether or not it is necessary for the security functions of the Agency.  *See* CBA, Article 17.  Management must engage in multiple formal meetings with the union per year, plus a series of follow-up discussions, regarding priorities for IT development for products that will be routinely used by bargaining unit members.  Thereafter, USPTO must engage in an iterative process with the union before implementing any new product.  For instance, before implementing even commercial "off

the shelf" software or services, management must first provide a demonstration or description of the IT product to the union, meet with the union to discuss any foreseeable adverse impacts of its implementation, engage in at least one month of discussion with the union, and, if an agreement is not reached between the parties, participate in post-implementation bargaining. Custom software is even more burdensome.

d.    The CBA also places considerable constraints on **management's ability to timely manage performance and make necessary changes to the duties or functions of the organization**. Under the performance management provisions of the CBA, when the performance of a patent examiner falls below fully successful, the CBA requires management to maintain extended evaluation and performance improvement periods that go well beyond federal requirements, hindering the Agency's ability to take timely performance-based actions against employees whose role is inherently investigative. *See* CBA, Article 32. Similarly, the CBA includes adverse actions taken under 5 U.S.C. §§ 4503 and 7512 in the negotiated grievance procedure that are thus subject to arbitration, slowing down the ultimate resolution of any contested conduct or performance-based action.

e.    Before implementing any **reorganization or realignment** of more than three employees, the Agency must notify the union at least four weeks prior to the effective date, and, upon request, consult with the union for at least two weeks. *See* CBA, Article 38. This could be particularly challenging in considering potential immediate needs to move individuals in and out of the Licensing and Review Office (that does the more detailed review of applications under secrecy order).

20

### *Government Harms from a Preliminary Injunction*

35.    USPTO will suffer the following harms if Plaintiffs' requested preliminary injunction is entered and the Agency is forced to return its labor management operations to the status quo that existed prior to its August 28, 2025 implementation of the Executive Orders:

a.    The preliminary injunction would prevent the Agency from complying with the President's directions in the Executive Orders, in which the President made national-security determinations entrusted to him by Congress.

b.    On August 28, 2025, pursuant to the Exclusions Executive Order (March 27, 2025) and the Further Exclusions Executive Order (August 28, 2025), the USPTO notified POPA that it was excluding employees from Patents (pursuant to the August 28 order) and OCIO (pursuant to the March 27 order) from the Statute and that POPA was no longer the exclusive bargaining representative for employees in Patents and OCIO.[12] In the period between March 27, 2025 and August 28, 2025, USPTO was seeking to determine whether its OCIO was covered by the portion of the March 27, 2025 Exclusions Executive Order that excluded the Office of the Chief Information Officer of each Executive department listed in 5 U.S.C. § 101.

c.    Upon issuing the August 28, 2025 notice, the Agency turned off the automatic dues payments of almost 10,000 POPA employees.  The POPA CBA has not been terminated, because POPA continues to operate at USPTO, representing employees in other divisions.  However, USPTO immediately discontinued any bargaining activities, grievances filed under the POPA negotiated grievance procedure, and official time for

---

[12]    USPTO provided a similar notification to NTEU 243 (not party to this suit) as to the employees in Patents and OCIO for which it had been the exclusive bargaining representative.

employees that no longer have an exclusive union representative (all individuals may still avail themselves of the USPTO's administrative grievance procedure, which is available to all non-bargaining employees).  In addition, Patents has critically adopted a revised performance appraisal plan for all patent examiners.  USPTO has also agreed with POPA to suspend arbitration where the impacted employees are entirely in Patents.  Should the court grant a preliminary injunction reversing these actions, the Agency would face significant operational and resource burdens.  Reinstating these obligations would require the immediate redeployment of staff time and expertise, including dedicated efforts of Human Resources and Labor Relations specialists, payroll personnel to resume dues processing, and attorneys from the Office of General Counsel to re-engage in arbitration.

36.     USPTO would face numerous costs and damages if the Court were to enter Plaintiffs' requested preliminary injunction, including the costs of arbitrations/grievances, costs of reinstituting automatic dues withholding, costs associated with reinstituting official time, and costs of returning to negotiations, among others.  Were the Court to enter Plaintiffs' requested preliminary injunction, and it was later determined that the Agency had been wrongfully enjoined or restrained, the Agency estimates that it would incur more than $358,808 in damages and costs, including but not limited to the following in the first 6 months:

      a.     Staff time, which has been calculated by identifying the estimated number of hours required to perform each function and multiplying those hours by an average hourly rate for each employee or position involved.  This includes time spent by Human Resources Specialists, Human Resources IT Specialists, Attorneys in the Office of General Counsel, and senior leaders from Patents and OCIO to engage in negotiations.  USPTO has a history of involving multiple senior executives when negotiating the

complex matters that relate to patent examination, which generally require subject matter experts. The hourly rates used for these calculations are based on current salary data, inclusive of benefits and overhead, to reflect approximate cost to the Agency.

 i. Time related to Agency preparations for existing arbitrations and grievances, including (1) time spent handling grievances by Labor Relations Specialists (320 hours); (2) attorney hours spent preparing case files, scheduling and attending hearings, conducting legal review, and other arbitration prep (1,280 hours); (3) time spent by management officials testifying or preparing documentation (192 hours). USPTO estimates this work would cost approximately $167,808.

 ii. The POPA CBA allows for up to 15,000 hours of official time per year for certain representational activities, plus a reasonable amount of time spent on negotiations or litigation matters. *See* CBA, Article 9 §§ 3, 4. Conservatively, reinstituting official time for POPA representatives would likely be at least 1,500 hours for time spent on these activities over a six-month period. USPTO estimates this cost would be approximately $141,000.

 iii. Time spent restarting union dues collection, including Human Resources IT staff time and vendor time spent reconfiguring systems, processing back dues, and managing ongoing deductions. USPTO estimates this work would cost approximately $50,000.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 19, 2025.

VALENCIA MARTIN-WALLACE

# EXHIBIT A



# United States Patent and Trademark Office

*Office of the Commissioner for Patents*

DATE:         April 16, 2025

TO:            Irakli Kiknadze
                  Director of Grievances
                  POPA

From:         Jerry Lorengo
                  Deputy Commissioner for Patents

Digitally signed by
Users, Lorengo, Jerry
Date: 2025.04.16
15:26:23 -04'00'

Subject:      Association Grievance
                  Docket #: 2025-POPA-11787

This decision is in response to POPA's Association grievance filed on March 20, 2025, regarding the March 7, 2025 suspension of non-essential training for Patents employees.

**Background**

A grievance meeting was held on March 31, 2025 between you, Kathleen Duda (POPA President), Patricia Duffy (POPA Vice President), Richard Hirn (POPA Counsel), Tashiana Adams (Assistant Commissioner), Stefanie Wehagen (Agency Counsel), Jamie Freedman (Labor Relations Specialist), and I. In your grievance, you argue that the suspension of non-essential training violates Article 42, Section 3 "Outside Conferences, Seminars, Meetings and Classes," as well as the provisions in Section 4 "Professional Training Program" of the parties' Collective Bargaining Agreement (CBA). Specifically, you allege that the reasons the Agency gave for suspending training programs in the March 7, 2025 memo to employees were not an appropriate basis for suspension under these provisions. Further, you argue that the Agency was obligated to bargain this change, which constitutes an unfair labor practice, and a contractual violation of Article 16, Sections 2(b) and 3.

**Requested Remedy**

As remedy, you requested the following:

- The Agency shall immediately retract the "Updated Employee Training Plan Guidance," and restore the status quo ante.

- Employees who were denied the opportunity to engage in training during the pendency of the grievance should be promptly given the opportunity to "make-up" the lost training opportunity and all examiners should be notified of that opportunity.

- Employees shall be made whole for any consequential losses that resulted from the delay or denial of training, such as a delayed promotion.

- Employees who would have been given the opportunity to engage in training on duty time but did so on their own time as a result of the March 7 directive shall be granted overtime or, at the employee's option, compensatory time off.

**Discussion**

As a preliminary matter, your grievance rests largely on the notion that in Article 42, Section 4, the Agency agreed to provide the same training for the lifetime of the CBA, absent "funding constraints." I disagree. Importantly, the right to assign work includes the right to train, or not to train, employees. *Federal Aviation Administration, Burlington, Mass.*, 48 FLRA 1112 (1993). As a management right, management officials are precluded from negotiating over, as you have suggested, the decision to assign training. *Id.* Any impact and implementation over training has already been negotiated in the CBA, and, as explored further below, the Agency does not have to engage in midterm bargaining over subjects already contained in an existing agreement. *U.S. Dep't of HHS, SSA, Balt., Md.*, 47 FLRA 1004, 1018-19 (1993).

The Agency has not violated Article 42, Section 4 of the CBA, because it is not obligated, as the Union suggests, to maintain the same training program indefinitely under the terms of the agreement. The first sentence of Article 42, Section 4 states "[t]he Agency *intends* to maintain a professional training program in Patents, under appropriate laws, rules, regulations, and funding constraints." (Emphasis added.) As noted in the CBA, the Agency planned on maintaining *a* professional training program, not a particular training program, which it has done and continues to do. Indeed, the training program remains robust, including, among others, a number of mandatory classes, Technical Training, Legal Studies Training, union-sponsored training, and any training that an employee and supervisor both agree is necessary to do their job. While the CBA captures the content of the Agency's training program at the time it was executed, there is nothing in the language that obligates the Agency to continue each element of the program. Instead, regarding "employee selected training," Article 42, Section 4.E describes a "set bank of hours that members of the bargaining unit can use to participate in selected approved training." The language assumes that employees may only use a bank of hours for training that has been previously approved by the Agency; here, as contemplated by the CBA, the Agency has simply suspended its approval of training under the bank for the time being. Nothing in Section 4 dictates that the Agency must continue to approve once-available training indefinitely. Additionally, as noted above, the decision to assign training is a management right, and to the extent the Union argues that this section would prevent the Agency from exercising that right, it is unenforceable.

Moreover, I disagree with your contention that the Agency is limited to suspending approved training programs only due to "funding constraints." You allege that Article 42, Section 4 does

2

not authorize the Agency to suspend the enumerated training programs (such as the training bank) for the reasons it has provided, i.e. "to focus available examining resources on driving down the inventory of unexamined patent applications," and you note the "inventory" of unexamined applications at the time Article 42 was negotiated was comparable to what it is now. While, as previously noted, this section of the CBA captures that the Agency intended to maintain a professional training program, "under appropriate laws, rules, regulations, and funding constraints," this language merely captures that any training program itself would be subject to funding constraints, just as it would be subject to applicable law, not that it would remain unchanged absent a funding issue. Again, the intent during CBA negotiations was to list trainings that were offered at that time, but were subject to change. Proposals requiring an agency to assign specific types of training to specified employees affect the right to assign work. *Social Security Administration, Casa Grande District Office, Casa Grande, Ariz.*, 58 FLRA 148 (2002). As such, the Agency is within its rights to suspend any training programs it deems necessary, and in this case, certain non-essential ones.

I also find unsupported your allegation that the suspension of the Training Bank violates Article 42, Section 3, "Outside Conferences, Seminars, Meetings and Classes." Section 3.B states that "[t]o cover attendance at a conference or other training for which the Agency will not pay, a supervisor may authorize up to sixteen (16) hours of duty time for the employee to attend the training at their own expense. If an employee does not have sufficient hours remaining in the selected training bank (see Subsection 4.E below), they may request approval for additional duty time from a designated manager in the chemical, electrical, mechanical, and design areas, respectively." Under Section 3, supervisors retain the ability to approve or disapprove training on duty time; accordingly, the Agency's decision to not authorize training at this time is not contrary to the agreement. Moreover, an agreement that forced management to authorize training would excessively interfere with management's right to assign work, and would therefore be invalid.

Finally, you alleged that the Agency had a duty to provide the Union with notice and opportunity to bargain over the suspension of the training bank. In support of this contention, you cited *Internal Rev. Serv., (District, Region and National Office Unit and Service Center Unit)*, 18 F.L.R.A. 326 (1982) for the proposition that the suspension of the employee-selected training bank required impact and implementation bargaining, but the instant matter is distinguishable from the facts in *IRS*. In *IRS*, the agency terminated an entire training program for certain employees where there was no indication of an agreement between the parties that contemplated management's discretion to approve or disapprove the programming. Here, however, the Agency did not make any "promise," as the Union alleged, that it would maintain the current employee training bank, but rather reflected that the current program contained a bank that could be used for *selected approved training*. Accordingly, the impact and implementation of the training programs we temporarily suspended were fully negotiated in, and are covered by, Article 42. [1] Under the agreement reached, the Agency retained the discretion to select and approve training moving forward, and it appropriately exercised that discretion.

---

[1] The intent of the March 7, 2025 memo to Patents employees was explained to POPA in conversations before it went out, and POPA had the chance to review its contents beforehand, but did not raise any request to bargain at that time.

As part of your remedy, you requested employees shall be made whole for any consequential losses that resulted from the delay or denial of training, such as a delayed promotion, as part of your remedy. You also requested that employees who would have been given the opportunity to engage in training on duty time but did so on their own time as a result of the March 7 directive shall be granted overtime or, at the employee's option, compensatory time off. The Union has offered no evidence of an individual harmed as a result of the suspension of non-essential training, such as delayed promotions. Only non-essential training has been suspended and, again, any training that an employee needs to do their work can be approved by their supervisor on a case-by-case basis. To the extent an employee would like more training it can be taken on their own time, but the Agency continues to grant time for mandatory training, so the request for overtime or comp time is unsupported. Further, by filing this grievance, POPA has foreclosed employees from raising these issues in their own grievances.

**Decision**

After reviewing the information relating to this particular grievance, including the statements made by you during the March 31, 2025 Grievance meeting, the following are my findings:

You have provided no evidence that the decision to suspend non-essential training was improper. Given the lack of persuasive evidence, the inappropriate remedies requested, and for the reasons stated throughout this document, I deny your grievance and the remedies you have requested.

# EXHIBIT B



# United States Patent and Trademark Office

*Office of the Chief Administrative Officer*

TO:        Patent Office Professional Association

FROM:   Anne Mendez
            Acting Chief Administrative Officer

DATE:    April 14, 2025

RE:        Notice for Return to Office of Probationary Patent Examiners (Utility & Design)

Probationary Patent Examiners in the POPA bargaining unit who live within 50 miles will be directed to report to the USPTO headquarters in Alexandria, Virginia. These employees will be required to work on campus for one year. Individual employees will be notified shortly, including return dates beginning in approximately 30 days. They will receive office assignments prior to their return to office date.

Employees with a reasonable accommodation or who qualify for a military spousal exemption for telework may continue to comply with those terms. Employees may also apply for a reasonable accommodation or military spousal exemption. Employees with probationary periods expiring in April or May will be excluded. The USPTO will provide the bargaining unit a list of impacted employees.

In setting telework levels and excluding these positions from telework eligibility, the USPTO is exercising its management rights to determine the agency's mission and organization, direct employees, and assign work under 5 U.S.C. § 7106(a). As outlined in the Office of Personnel Management's *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (Feb. 3, 2025), any provisions to the contrary in a collective bargaining agreement or other agreement between the USPTO and the bargaining unit are unlawful and cannot be enforced.

In addition, the USPTO has determined that these employees must return to the office to effectively perform their positions, to support the agency's effort to accomplish its primary mission, and that their return is necessary for the proper functioning of the agency. Their work on campus is necessary to address unacceptable retention levels for this group of employees, ensure proper training, and bolster collaboration including with Supervisory Patent Examiners who are already working onsite.

Please advise Acting Labor Relations Division Chief Sonya Penn (Sonya.Penn@uspto.gov) whether the bargaining unit has proposals for impact and implementation. The USPTO will immediately implement this return to office initiative as provided by government-wide rule and any bargaining that is not concluded by the return to office date will be completed post-implementation.