## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————— :
                                          :
NATIONAL WEATHER SERVICE                  :
SERVICE EMPLOYEES ORGANIZATION, *et al.*, :
                                          :
                    Plaintiffs,           :
                                          :
        v.                                :     Case No. 1:25-cv-02947-PLF
                                          :
DONALD J. TRUMP, *et al.*,                :
                                          :
                    Defendants.           :
                                          :
—————————————————————————— :


## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Submitted by:

Richard J. Hirn
D.C. Bar No. 291849
richard@hirnlaw.com
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
(202) 274-1812

Keith R. Bolek
D.C. Bar. No. 463129
kbolek@odonoghuelaw.com
April H. Pullium
D.C. Bar. No. 198026
apullium@odonoghuelaw.com
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, D.C. 20015
(2020) 362-0041

Counsel for Plaintiffs NWSEO and POPA

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................................ 1

I.    Plaintiffs Are Likely to Prevail on the Merits ...................................................... 1

   A.    This Court has Jurisdiction Because Plaintiffs' Challenge to the Executive Orders Does Not Fall Within the FSLMR Statute's Remedial Scheme. ........................................ 1

   B.    Plaintiffs Are Likely to Succeed on the Merits of Their *Ultra Vires* Claim ................... 8

   C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims. .......................... 15

II.    Executive Order Nos. 14,251 and 14,343 Inflict Irreparable Injury upon the Plaintiffs and the Employees They Represent .............................................................................. 19

III.    The Remaining Factors Favor the Plaintiffs. .................................................... 22

IV.    The Proposed Order and Bond Amount ............................................................. 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*Ace Motor Freight, Inc. v. I. C. C.*,
    557 F.2d 859 (D.C. Cir. 1977) .......................................................... 11

*AFGE v. Loy*,
    367 F.3d 932 (D.C. Cir. 2004) ........................................................... 4

*\*AFGE v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) ........................................................ 5, 8

*AFGE v. Secretary of Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ........................................................... 4

*Am. Fed'n of Gov't Emps. v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ........................................................ 3, 4

*\*Am. Fed'n of Gov't Emps. v. Trump.*,
    792 F. Supp. 3d 985 (N.D. Cal. 2025) ........................................... 1, 25

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
    No. C25-451 MJP, 2025 WL 2337222 (W.D. Wash. Aug. 13, 2025) ................. 4

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 1742853 (D.C. Cir. June 20, 2025), ......................................... 8

*\*Am. Foreign Svc. Ass'n v. Trump*,
    783 F. Supp.3d 248 (D.D.C. 2025) .................................................... 20

*\*Asseo v. Centro Med. del Turabo*,
    900 F.2d 445 (1st Cir. 1990) ...................................................... 19, 21

*\*Axon Enter., Inc. v. Fed. Trade Comm'n*,
    598 U.S. 175 (2023) ...................................................................... 5

*Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, LLC*,
    636 F. Supp.2d 1237 (D. Utah 2009). ................................................. 23

*\*Bennett v. U.S. Sec. & Exch. Comm'n*,
    844 F.3d 174 (4th Cir. 2016) ........................................................... 5

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .................................................................... 11

*Cole v. Young,
  351 U.S. 536 (1956).............................................................................. 1

Donohue v. Mangano,
  886 F.Supp.2d 126, 152 (E.D.N.Y. 2012) ....................................... 21

Fallbrook Hosp. Corp v NLRB,
  785 F.3d 729, 733 (D.C. Cir. 2015) .................................................. 1

*Fed. Educ. Ass'n v. Trump,
  No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025) .............. 4, 7, 9, 11

*Fed. Educ. Ass'n v. Trump, No. CV 25-1362 (PLF),
  2025 WL 2355747 (D.D.C. Aug. 14, 2025). ........................ 11, 20, 23, 24

*Franks Bros. Co. v. NLRB,
  321 U.S. 702 (1944).......................................................................... 19

Georgia v. Public Resource Org, Inc., 590 U.S. 255 (2020)........................ 12

Green v. U.S. Dep't of Justice,
  54 F.4th 738 (D.C. Cir. 2022)........................................................... 18

Grundmann v. Trump,
  770 F. Supp. 3d 166 (D.D.C. 2025) ................................................... 8

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB,
  426 F.2d 1243 (D.C. Cir. 1970) ............................................. 19, 21, 22

Levine v. C & W Mining Co,
  465 F. Supp. 690 (N.D. Ohio 1979).................................................. 22

Media Matters for Am. v. Fed. Trade Comm'n,
  No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)................ 18

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,
  429 U.S. 274 (1977)......................................................................... 17

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,
  783 F. Supp. 3d 290 (D.D.C. 2025) ............................................. 7, 19

*Nat'l. Treas. Emps. Union v. Trump,
  780 F.Supp.3d 237 (D.D.C. 2025)....................................... 1, 4, 12, 20, 24

*NLRB v. Electro-Voice, Inc.,
  83 F.3d 1559 (7th Cir. 1996). ............................................... 19, 21

*Sanders v. District of Columbia,
 85 F. Supp. 3d 523 (D.D.C. 2015) ................................................................. 16, 17

*Small v. Avanti Health Sys.,
 661 F.3d 1180 (9th Cir. 2011) ...................................................................... 19, 22

*Thunder Basin Coal Co. v. Reich,
 510 U.S. 200 (1994)……………………………………………………………….................5

Turgeon v. FLRA,
 677 F.2d 937 (D.C. Cir. 1982). .......................................................................... 6

Wilmer Cutler Pickering Hale and Dorr, LLP v. Exec. Off. of Pres.,
 784 F.Supp.3d 127 (D.D.C. 2025). ..................................................................... 18

**STATUTES**

5 U.S.C. § 7105 ....................................................................................................... 7

5 U.S.C. § 7106 ..................................................................................................... 21

5 § 7112(b)(6) ...................................................................................................... 13

51 U.S.C. § 60601(a)(2)(B) .................................................................................. 14

Pub. L. 95-454, Section 701, Oct. 13, 1978, 92 Stat. at 1195 ............................... 6

**AGENCY DECISIONS**

*Am. Fed'n of Gov't Emps., Loc. 2118,
 2 F.L.R.A. 916 (1980) .......................................................................................... 2

*Dep't of the Navy, Naval Telecom. Ctr., Ward Circle Activity,
 6 F.L.R.A. 498 (1981) .......................................................................................... 2

*Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, Bos. Dist. Off., Crim. Enf't
 Activity, 3 F.L.R.A. 30 (1980) ............................................................................. 2

Office of Personnel Mgmt.,
 5 F.L.R.A. 238 (1981) ........................................................................................ 13

Patent Office Prof'l Assn.,
 71 F.L.R.A. 1223 (2020) ..................................................................................... 7

*U.S. Attorney's Office, Southern Dist. of Texas,
 57 F.L.R.A. 750 (2002) ........................................................................................ 2

*U.S. Nuclear Regulatory Comm.*,
    66 F.L.R.A. 311 (2011) .................................................................................................. 13

**OTHER AUTHORITIES**

90 Fed. Reg. 50950 (Nov. 13, 2025) ................................................................................. 18

Antonin Scalia & Bryan A. Garner, READING LAW:
    THE INTERPRETATION OF LEGAL TEXTS 324–25 (2012) ..................................................... 12

*Coordinating Efforts to Prepare the Nation for Space Weather Events*, Exec. Order No. 13,744,
    81 Fed. Reg. 71573 (Oct. 18, 2016) ............................................................................. 14

Executive Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 18, 2025) ................................. 7

H.R. 11280, as reported July 31, 1978, Section 701, reprinted in *Legislative History of the
Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform
Act of 1978*, at 386 (1979) ............................................................................................. 6

https://tsunami.ioc.unesco.org/en/pacific/itic?hub=48 .................................................... 15

https://usicecenter.gov/About ........................................................................................... 15

https://www.opm.gov/labor-management-relations/labor-management-relations/faqs-eo-14251-
exclusions-from-federal-labor-management-relations-programs.pdf ............................ 2

OPM *Guidance On Executive Order Exclusions from Federal Labor-Management Programs* .... 2
*The DOGE Plan to Reform Government*, WALL STREET JOURNAL, (Nov. 20, 2024)
    https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-
supreme-court-guidance-end-executive-power-grab-fa51c020 ................................... 10

# GLOSSARY

FLRA ..................................................................................... Federal Labor Relations Authority

FSLMRS ......................................................... Federal Service Labor-Management Relations Statute

NESDIS ............................................. National Environmental Satellite, Data and Information Service

NOAA .................................................................... National Oceanic and Atmospheric Administration

NWS .................................................................................................... National Weather Service

NWSEO ............................................................. National Weather Service Employees Organization

OSPO ...................................................................................... Office of Satellite Products and Operations

POPA ...................................................................................... Patent Office Professional Association

USPTO .............................................................. United States Patent and Trademarks Office

VA .................................................................. United States Department of Veterans Administration

Plaintiffs National Weather Service Employees Organization ("NWSEO") and Patent Office Professional Association ("POPA") respectfully submit this reply brief in support of their motion for a preliminary injunction against the enforcement of Executive Order No. 14,251, *Exclusions from Labor-Management Relations Programs*, and Executive Order No. 14,343, *Further Exclusions from Labor-Management Relations Programs.*

## ARGUMENT

### I.    Plaintiffs Are Likely to Prevail on the Merits.

#### A.    This Court has Jurisdiction Because Plaintiffs' Challenge to the Executive Orders Does Not Fall Within the FSLMR Statute's Remedial Scheme.

"The administrative review scheme of [the Federal Service Labor Management Relations Statute or "FSLMRS"] is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order[s] at issue here." *Nat'l. Treas. Emps. Union v. Trump*, 780 F.Supp.3d 237, 249 (D.D.C. 2025), *appeal pending*, No. 25-5157 (D.C. Cir.). The government's claim that the plaintiffs should bring their challenge to the executive orders to the FLRA "is an odd suggestion" because the executive orders have excluded their agencies from Chapter 71. *Am. Fed'n of Gov't Emps. v. Trump.*, 792 F. Supp. 3d 985, 999 (N.D. Cal. 2025), *appeal pending*, No. 25-4014 (9th Cir.).

In fact, "this argument is not only meritless, it reflects real chutzpah." *Fallbrook Hosp. Corp v NLRB*, 785 F.3d 729, 733 (D.C. Cir. 2015). In the "Frequently Asked Questions" distributed to federal agencies following the issuance of Executive Order 14,251, the Office of Personnel Management instructed:

Q4:    In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

A4:    Yes. The statement should mention, and agencies should identify for the appropriate FLRA regional office, the Administration's position that the relevant agency or agency subdivision is no longer subject to the provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order. Under that position, *the union no longer has standing to file a charge or the FLRA to issue a complaint.*

https://www.opm.gov/labor-management-relations/labor-management-relations/faqs-eo-14251-exclusions-from-federal-labor-management-relations-programs.pdf (last visited Nov. 15, 2025) (emphasis added).

The FLRA has consistently dismissed unfair labor practice charges and other cases filed by unions that have lost recognition as a result of executive orders excluding agencies or subdivisions based on "national security" under 5 U.S.C. § 7103(b)(1). *U.S. Attorney's Office, Southern Dist. of Texas*, 57 F.L.R.A. 750 (2002) (dismissing three unfair labor practices cases); *Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, Bos. Dist. Off., Crim. Enf't Activity*, 3 F.L.R.A. 30, 31 (1980) (dismissing representation petition); *Am. Fed'n of Gov't Emps., Loc. 2118*, 2 F.L.R.A. 916, 917 (1980) (dismissing negotiability appeal). "Where the President has specifically excluded an agency or activity from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction." *Dep't of the Navy, Naval Telecom. Ctr., Ward Circle Activity*, 6 F.L.R.A. 498, 500 (1981) (dismissing representation petition).

The government's suggestion that plaintiffs could challenge the executive orders through the negotiated grievance and arbitration procedures moves beyond chutzpah to downright cynical. The March 27, 2025 OPM *Guidance On Executive Order Exclusions from Federal Labor-Management Programs* (at 5) instructs agencies to "cease participating in grievance procedures after terminating their CBAs" (which defendants have done) and "[t]o the extent that covered

2

agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings." https://www.opm.gov/chcoc/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (last visited Nov. 20, 2025). The USPTO, NWS, and NESDIS have followed that guidance and unilaterally terminated pending arbitration cases and fired the arbitrators selected to hear them. ECF No. 17-2, Declaration of Dr. Patricia Duffy ("Duffy Decl."), Ex. J; ECF No. 17-3, Declaration of JoAnn Becker ("Becker Decl."), Exs. I, J. On August 28, the Acting Deputy Director of HR at the USPTO wrote POPA's President stating in part, "[t]he agency will discontinue its participation in grievance and arbitration procedures arising under the Statute involving disputes brought on behalf of employees in Patents and/or OCIO." Duffy Decl. Ex. I at 2. The unions cannot proceed to arbitration without the agencies' cooperation. Each of the three collective bargaining agreements require the parties to jointly participate in the selection of and payment to an arbitrator, as is customary. *See* ECF No. 23-3, Declaration of Taylor Jordan ("Jordan Decl."), Ex. B (NWSEO-NWS CBA, Article 11, §§ 1, 5(A)) at 38, 41; Jordan Decl. Ex. C ("NWSEO-NESDIS CBA, Article 11, §§ 3, 11(a)) at 29, 31; POPA-USPTO CBA, Article 14, §§ 2(b), 4(n) at 35, 38, http://popa.org/static/media/uploads/CBA/popa_agreement.pdf (last visited Nov. 20, 2025).

By excluding the NWS, NESDIS, and most of the USPTO from the coverage of FSLMRS, President Trump has deprived the FLRA of jurisdiction to hear plaintiffs' challenges in this case. For this reason, the D.C. Circuit's decision in *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), is distinguishable. The unions in that case could still obtain "much of the . . . relief that they sought from the district court" because the underlying collective bargaining framework in the FSLMRS remained in place for those unions to invoke. *Id.* at 757. In this case,

the Executive Order removed the NWS, NESDIS and most of the USPTO completely from the FSLMRS's labor-management relations framework, depriving plaintiffs of any access to the FLRA. Thus, the FLRA cannot grant any "effective relief" to plaintiffs. *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, *6 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring). "In other words, this case is distinguishable from the cases relied upon by the government where the unions had 'several administrative options for challenging executive orders. . . .'" *NTEU*, 780 F. Supp. 3d at 250, *quoting Am. Fed'n of Gov't Emps v. Trump*, 929 F.3d at 757.

Likewise, *AFGE v. Loy*, 367 F.3d 932 (D.C. Cir. 2004), is also inapplicable. That case involved an effort to represent TSA agents, which was thwarted by the Department of Transportation invoking another statute, § 111(d) of the Homeland Security Act, to deny collective bargaining rights to screeners. In that case, the FLRA channels to seek an election and recognition were open to the union. This case is not about whether a new group of employees working for a newly created agency have the right to bargain collectively under the existing system, but whether the President can take away that right which employees have enjoyed for 50 years. "While the Loy Determination concerned elections and negotiability that the parties agreed were subject to the FLRA's jurisdiction, [this case] focuses on an agency action to rescind a fully-bargained-for CBA that was already in effect." *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, No. C25-451 MJP, 2025 WL 2337222, at *6 (W.D. Wash. Aug. 13, 2025) (finding jurisdiction over action to challenge rescission of existing bargaining agreement and continued recognition of existing bargaining unit). Nor is this a challenge to the Air Force's dress code, as was the case in *AFGE v. Secretary of Air Force*, 716 F.3d 633 (D.C. Cir. 2013), which could have gone through the FSLMRS process. Instead, it *is* a question of whether there is a FSLMRS process.

The bottom line is that *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989), entertained a claim such as that brought by plaintiffs, and it has not been overruled. And the only difference is that in this case, plaintiffs have proffered clear evidence that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them," and have thus rebutted the presumption of regularity and opened the door to judicial review of the exclusions.

The government nevertheless – and erroneously – argues that the "channeling" dictates in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994), require plaintiffs to bring their challenge before the FLRA rather than the district court. But the channeling requirements do not apply here even if there was a viable procedure to bring a challenge before the FLRA.

*i.*    The availability of "meaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 183 n.7 (4th Cir. 2016). "The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). The FSLMRS does not assure "meaningful judicial review" of a challenge to the executive orders, even if the executive orders themselves had not already shut the door to such administrative review.

The government claims that plaintiffs can litigate their claims through the statutory review scheme by alleging that the defendant agencies have committed unfair labor practices and then obtaining judicial review. This ignores the fact that plaintiffs must first convince the General Counsel of the FLRA to exercise their non-reviewable discretion to issue an unfair labor practice complaint against the agencies who comply with the executive orders. If a complaint does not issue, then plaintiffs will be foreclosed from obtaining any judicial review of their claims because the General Counsel's decision whether to issue a complaint is non-reviewable. *Turgeon v. FLRA*,

677 F.2d 937, 938-39 (D.C. Cir. 1982). Thus, if the FLRA's General Counsel follows Authority precedent or accepts an agency argument that he or she lacks jurisdiction (which OPM has advised agencies to make, *see supra* at 2), or if the General Counsel otherwise accepts the legal validity of the executive order or rejects the union's charge on the merits, *judicial review is completely foreclosed.* In other words, judicial review is only ultimately available in the unlikely case that the union wins "round one" and gets to plead its case before an Administrative Law Judge.

*ii.*    Plaintiffs' claims are also "wholly collateral" to the Statute's review provisions and outside of the FLRA's expertise. The FSLMRS's legislative history reveals that Congress did not intend for the FLRA to have any role in determining whether agencies can be excluded from the Statute's coverage. The bill that became the FSLMRS initially gave the FLRA the authority to exclude agencies from coverage based on its own determinations whether the agency "has as a primary function intelligence, counterintelligence, investigative, or national security work," and whether any requirement or provision of the law cannot be applied to the agency "in a manner consistent with national security requirements and considerations." H.R. 11280, as reported July 31, 1978, Section 701, reprinted in *Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978*, at 386 (1979). But a substitute amendment took that authority away from the FLRA and granted it to the President. *See id.* at 907 (Udall substitute amendment to title VII). And that amended provision was enacted as Section 7103(b). *See* Pub. L. 95-454, Section 701, Oct. 13, 1978, 92 Stat. at 1195.

The "regularity" of the President's decision to exclude two-thirds of the federal workforce from the coverage of the FSLMRS is not something that Congress intended a body such as the FLRA to determine.  Nor is the assessment of whether the President's actions were in retaliation for the exercise by the plaintiffs of their First Amendment rights listed among the duties assigned

to the Authority by the FSLMRS. 5 U.S.C. § 7105(a)(2). As Judge Pan explained in *Federal Education Association v. Trump*:

> [E]ven if the FLRA had jurisdiction over the Unions, the FSLMRS likely does not empower the FLRA to award relief for the claims that the Unions advance against the Executive Order: The Unions bring *ultra vires*, APA, and constitutional claims, but the FLRA generally hears only traditional labor-management disputes. *See* 5 U.S.C. § 7105(a)(2) (delineating the limited powers and duties of the FLRA). The government offers no authority suggesting that the FLRA can adjudicate *ultra vires*, APA, or constitutional challenges to an executive order, nor that the FLRA has the power to grant meaningful relief from the operation of an executive order.

*Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *7 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring).

The FLRA has long held that executive orders involving the FSLMRS have the force and effect of law that it must apply. *Patent Office Prof'l Assn.*, 71 F.L.R.A. 1223, 1224 (2020). "Agencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025).

In fact, it is the President's position that the FLRA members, like those of other so-called "independent agencies," lack the ability to exercise judgment contrary to his own. According to Section 7 of Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10,447 (Feb. 18, 2025):

> The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General.

Similarly, under the "unified executive" theory embraced by Exec. Order No. 14,215, the FLRA is not authorized to decide independently whether the President's determination that the exclusion

of the NWS, NESDIS and most of the USPTO complies with 5 U.S.C. § 7103(b)(1). This is especially so given that the President summarily removed the Chair of the FLRA even though the FSLMRS requires cause. 5 U.S.C. § 7104(b); *Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025), *stay granted*, No. 25-5165, 2025 WL 1840641 (July 3, 2025).

**B.     Plaintiffs Are Likely to Succeed on the Merits of Their *Ultra Vires* Claim.**

*i*.   As plaintiffs have demonstrated immediately above, there is no alternative statutory review scheme available to challenge the two executive orders, so the threshold requirement to obtain *ultra vires* review has been met.

*ii*.   There is simply no case support for the government's proposition that "ultra vires review is not available for discretionary determinations of the President regarding national security." That proposition is just another pipe dream of a would-be authoritarian Administration and its enablers. Although the panel of the Court of Appeals which issued a stay in *Am. Foreign Serv. Ass'n v. Trump* wrote that "it is unclear whether *ultra vires* review is available at all," 2025 WL 1742853, *2 (D.C. Cir. June 20, 2025), it simply overlooked or ignored the D.C. Circuit's still-binding decision in *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989), which conducted such a review. The government argues that if *ultra vires* review is available, the Court should limit its review to whether the President made the determinations required by the Statute, "as evidenced by the plain language of the Executive Order." ECF No. 24, Defs.' Opp. to Mot. for Preliminary Injunction ("Defs.' Br.") at 23. But, like the panel in *AFSA*, the government ignores the holding of *AFGE v. Reagan* that the facial validity of an executive order issued pursuant to section 7103 can be rebutted by "clear evidence" of irregularity, which would include "actual irregularity in the President's factfinding process or activity," or by evidence that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." 870 F.2d at 728.

The government criticizes the Court for ostensibly failing to follow the *AFSA* panel's conclusion that the *ultra vires* challenge to Exec. Order No. 14,251 in that case was unlikely to succeed. But that panel assumed without deciding that *ultra vires* review was available and based its determination on the particular national security responsibilities of the State Department and USAID. As Judge Pan pointed out in her concurrence in *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025), the AFSA panel's musings about the reviewability of discretionary Presidential acts was dictum. *Id*. at *8 n.5. Plaintiffs suggest that Judge Pan's analysis of whether *ultra vires* review is available was more thoughtful, better grounded in case law, less ideological, and therefore provides superior guidance when choosing among the seemingly conflicting opinions of the various panels which have considered the government's stay requests in the related cases. Plaintiffs agree with Judge Pan's assessment that the specific two-part statutory requirements in § 7103 "cabin the President's discretion and delineate the outer bounds of his authority, thereby readily enabling *ultra vires* review." *Id*. at *8. For the sake of brevity, the analysis and conclusions in other parts of Judge Pan's concurrence on the "Availability of *Ultra Vires* Review" and "*Ultra Vires* Review" are incorporated herein. *Id*. at *7-*11.

    ***iii.*** Plaintiffs have rebutted the presumption of regularity. While NWSEO filed a *single* unfair labor practice charge and POPA filed a *single* grievance between January 20 and March 27, 2025, the plaintiffs' overwhelming opposition to the Administration's efforts took place after the date the first executive order was issued in March. *See, e.g*, Becker Decl. ¶ 12; Duffy Decl. ¶¶ 8, 11-16. And they were hardly "parochial" issues at all (though the materiality of that distinction is left unexplained). In NWSEO's case, it engaged in a widespread campaign in local, national and even international media warning the public of the dangers posed by the substantial cutbacks in

staffing at Weather Forecast Offices.[1] Most of the grievances filed by POPA and NWSEO challenged cutbacks in telework -- a signature Administration initiative to cut the size of the federal workforce. In a 2024 Wall Street Journal editorial, DOGE Directors Elon Musk and Vivek Ramaswamy wrote: "Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome." *The DOGE Plan to Reform Government*, WALL STREET JOURNAL, (Nov. 20, 2024) https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020 (Last visited Nov. 24, 2025). One of the other grievances filed by POPA was a challenge to the elimination of early dismissal in recognition of the Juneteenth holiday, which was part of the USPTO's efforts to eliminate so-called "woke" or "DEI" policies. And regardless of whether some of the plaintiffs' activity took place before March 27, it is not at all inconsistent with the conclusion that the volume of activity and culmination of opposition did not reach a tipping point until after March 27 when the President's patience was exhausted.

And the exclusion of the USPTO Office of Chief Information Officer, along with similar offices in every agency, also lacks the presumption of regularity for another reason. Judge Pan explained in her concurrence in *FEA* that:

> [I]t is notable that the Executive Order purports to expand the scope of § 7103(b)(1) by excluding from FSLMRS coverage "any other agency or subdivision . . . that has information resources management duties as the agency or subdivision's primary duty." 90 Fed. Reg. at 14554. That provision of the Executive Order effectively adds "information resources management" to the list

---

[1] The government claims that the union exaggerated the staffing losses. Defs.' Br. at 27. Whether it did or not is totally irrelevant to whether the President retaliated (and one might reasonably conclude that exaggerations on the union's part might in fact make its efforts less tolerable). Nonetheless, as NWSEO President Becker's declaration clearly states, the numbers included in the staffing losses are taken directly from a chart prepared by and obtained from NOAA. Becker Decl. ¶ 9 & Ex. A. The so-called "voluntary" losses were the result of affirmative efforts of the Administration to reduce staffing at the NWS by offering deferred resignation, voluntary early retirement authority (VERA) and voluntary separation incentive payments (VSIP).

of primary functions that can justify exempting an agency or subdivision from the requirements of the FSLMRS. The President's enlargement by fiat of the list of primary functions in § 7103(b)(1)(a) also is likely *ultra vires*.

*Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at *11.

*iv.*    And as Judge Pan wrote in her *FEA* concurrence, the legitimacy of the executive order should be considered as a whole, not on an agency-by-agency basis:

> First, the FSLMRS provides that "[t]he President may issue an *order* excluding any agency or subdivision thereof," suggesting that the order itself is the proper unit of review. 5 U.S.C. § 7103(b) (emphasis added). And second, an agency-by-agency analysis would require a court, in the first instance, to determine whether specific agencies meet § 7103(b)(1)'s requirements, even though it appears that the President himself did not conduct such an analysis.

*Fed. Educ. Ass'n*, 2025 WL 2738626, at *11 n.17. Or, as this Court wrote, "[o]nly by analyzing the Executive Order's exclusions in their entirety – rather than by determining whether individual exclusions are justified – can the Court ensure that it does not perform an overly intrusive inquiry that interferes with the President's authority." *Fed. Educ. Ass'n v. Trump*, No. CV 25-1362 (PLF), 2025 WL 2355747, at *13 (D.D.C. Aug. 14, 2025).

*v.*    But even if the Court were to determine whether individual exclusions were justified, the President exceeded the discretion granted him by § 7103(b)(1) when he excluded the NWS, NOAA and most of the USPTO from coverage of the Statute. And when reviewing whether the statutory requirements for exclusion have been met, the Court should limit its review to the reasons given in the Fact Sheets accompanying the executive orders, not new arguments and claims now offered by the government. "Post hoc rationalizations by imaginative government counsel do not suffice." *Ace Motor Freight, Inc. v. I. C. C.*, 557 F.2d 859, 864 (D.C. Cir. 1977); *accord*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

*a.*    In her declaration, the Acting Commissioner of Patents appears to initially and primarily rely on patent examiners' role in protecting "America's economic strength." Declaration

of Valencia Martin-Wallace, ECF No. 23-2 ("Martin-Wallace Decl.") ¶ 7. But the Court has rejected that expansive definition of "national security" before. *Nat'l Treas. Emps. Union v. Trump*, 780 F. Supp. 3d 237, 261 (D.D.C. 2025). The Court should continue to apply the definition of national security contained in *Cole v. Young*, 351 U.S. 536 (1956), rather than the more expansive definition now offered by the government, which would effectively encompass nearly the entire Federal government (as the exclusions have now done), which would allow the exception to subsume the rule. In *Cole*, the Court concluded that "national security" must be given a "narrow meaning"—one "comprehend[ing] only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.* at 544, 547. The Supreme Court adopted this definition, over the Government's proposed "indefinite and virtually unlimited" one, because an overly broad understanding of national security would mean that the Statute, "though in form but an exception to the general personnel laws" could be "utilized effectively to supersede those laws." *Id.* at 547. Given that *Cole* was on the books at the time Congress enacted FSLMRS, its definition of "national security" as it pertains to statutory protections for Federal employees is authoritative here. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation Of Legal Texts 324–25 (2012) (explaining that when the Supreme Court authoritatively interprets a term used in a particular field of law, that term acquires a "technical legal sense ... that should be given effect in the construction of later-enacted" laws in that field); *see also Georgia v. Public Resource Org, Inc.*, 590 U.S. 255, 270–71 (2020). Further, it is not enough to show that an agency has some national security functions, rather it must be shown that national security is a *primary* function.

The government's characterization of all 10,000 patent examiners as "investigators" because they research prior art to determine the novelty of an invention is nothing less than "patently" absurd. "Investigators" within the meaning of the FSLMRS refers to those who look into the conduct of other people, not just someone who researches something. *See, e.g.*, *U.S. Nuclear Regulatory Comm.*, 66 F.L.R.A. 311 (2011) (criminal investigators); *Office of Personnel Mgmt.*, 5 F.L.R.A. 238, 247-48 (1981) (Investigators and Investigations Technicians who conduct investigations into applicants' qualifications and suitability for employment). Wholly apart from § 7103(b), § 7112(b)(6) of the FSLMRS precludes any bargaining unit of employees "engaged in intelligence, counterintelligence, *investigative*, or security work which directly affects national security," so the FLRA never would have certified the patent examiners bargaining unit in the first place if they were national security investigators. Executive Order 14,343 expressly says that it was being issued "to enhance the national security of the United States," and neither it nor the Fact Sheet that accompanied it made any mention of any exclusions of any employees because they were performing investigative work.

The Acting Assistant Patent Commissioner's claim that patent examiners are expected to be vigilant in in reviewing patent applications for sensitive national security information is not supported by the facts. Examiners (other than those in the Office of Licensing and Review) are not trained to do so nor are they trained on any national security matters, and the Acting Assistant Commissioner admits that the process is automated. Second Declaration of Patricia Duffy. ECF No. 25-2 ("Second Duffy Decl.") ¶¶ 7, 10. Further, the cybersecurity experts in the USPTO's Office of Chief Information Officer have already been excluded from POPA's bargaining unit and have never been eligible for union representation. Second Duffy Decl. ¶ 16.

*b*.        A review of Taylor Jordan's declaration shows that the government is grasping at straws in an effort to demonstrate that national security is a "primary function" of the NWS and NESDIS.  In his declaration Mr. Jordan claims that the "primary functions of NESDIS and NWS have evolved from these authorities transferred from [DOD]" by Reorg. Plan 4 of 1970. Jordan Decl. ¶ 3. That's just flat-out wrong. Section 1(e) of the Reorganization Plan transferred only hydrologic surveys of the Great Lakes and Lake Champlain and research into and publication of data from those surveys from the Army Corps of Engineers to NOAA. That work is now being performed by the National Oceans Service, not by NWS or NESDIS. Second Declaration of JoAnn Becker, ECF No. 25-1 ("Second Becker Decl.") ¶ 2; Declaration of Craig McLean, ECF No. 25-3 ("McClean Decl.") ¶¶ 7-12.

DOD has its own Space Weather Center whose "products are used for mission planning . . . warfighters and decision makers." It is not the NWS, but "[t]he Department of Defense [that] provides operational space weather research, monitoring and forecasting for the Department's unique missions and applications." Space Weather to Improve the Forecasting of Tomorrow Act, 51 U.S.C. § 60601(a)(2)(B) (2018). And the NWS's mandate to forecast space weather is "exclusive of the responsibilities of the Secretary of Defense" to "provi[de] . . . alerts and warnings for space weather phenomena that may affect weapons systems, military operations, or the defense of the United States." Section 4(a), (c), *Coordinating Efforts to Prepare the Nation for Space Weather Events*, Exec. Order No. 13,744, 81 Fed. Reg. 71573 (Oct. 18, 2016).

The tsunami warnings used by the Navy are the same ones that the Pacific Tsunami Warning Center sends to government agencies worldwide – *including to China, Russia, and North Korea* – as part of an international warning system arrangements made through UNESCO's

Intergovernmental                    Oceanographic                    Commission.
https://tsunami.ioc.unesco.org/en/pacific/itic?hub=48

The Navy, not NOAA, is the lead agency in, and is in command of, the National Ice Center; just four NWS employees are assigned to work there. https://usicecenter.gov/About; Second Becker Decl. ¶ 8. It provides openly accessible information for any person, of any nation, at any time. NOAA's role along with the Coast Guard is to promote global maritime safety as well as domestic maritime safety; this avoids unnecessary redundancy by relying on NOAA in part for their information. The Navy adds their own meteorological analysis and layers of protection to their own movements whether for ice or marine routing. McLean Decl. ¶ 18.

Even if national security is a "primary function" of these three offices in the NWS, there are over 150 NWS forecasting offices and centers around the country. These three discrete "subdivisions" could have been subject to a § 7103 exclusion without the unjustified exclusion of the entire NWS.

Operation of the three satellites that are part of the Defense Meteorological Satellite Program can hardly be characterized as a "primary function" of NESDIS since only 8 of the of 900 NESDIS employees are assigned to operate these satellites. And the DMSP program is about to come to an end. Second Becker Decl. ¶ 3.

### C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims.

*i.* The government disputes that a "causal connection" has been established between the plaintiffs' First Amendment activity and the second exclusion order because it ostensibly received favorable treatment in the first executive order. Defs.' Br. at 35. But as discussed above, the overwhelming bulk of the First Amendment activity was conducted after the first exclusion order was issued. "[T]he close temporal proximity between the protected speech and defendants'

allegedly retaliatory acts . . . may be sufficient to establish [the] 'causal connection' required for [a] retaliation claim." *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 535 -536 (D.D.C. 2015). And the government doesn't explain why the NWS, NESDIS and USPTO were exempted from the first executive order if their "national security" work was so predominant but was only discovered after they began filing a slew of grievances and making television appearances.

And although the government claims that, on the one hand, only national security and not First Amendment activity motivated the exclusion of the plaintiffs' agencies, it appears to admit that it was the plaintiffs' First Amendment activity which the President found incompatible with "national security requirements and considerations."[2] The government writes that

> the FSLMRS plainly allows the President to consider how the application of FSLMRS requirements, including through union grievances or litigation enforcing CBAs, impacts national security functions. That the President allegedly considered or responded to Plaintiffs' First Amendment activity does not violate the First Amendment.

Defs.' Br. at 35. The government then argues that the President would have excluded these agencies anyway (despite offering no explanation why they weren't excluded in the first exclusion order) even though it effectively conceded that it was the exercise of the plaintiffs' First Amendment activity which was found to be incompatible with national security requirements. *Id.* at 36.

The government then argues that it has demonstrated that it would have excluded the plaintiffs' agencies anyway because "Executive Order 14,343 states on its face that the President took the challenged action for national security reasons." Defs.' Br. at 37. That proves nothing: a mere incantation by the defendant of its pretext does not satisfy the *Mt. Healthy* requirement. The

---

[2] In her declaration, the Acting Commissioner of Patents admits that the Office of Commissioner of Patents was included in the exclusion order because of the positions POPA has taken and the grievances it filed – proof of both retaliation and causation. Martin-Wallace Decl. ¶¶ 26-30.

government has not "shown by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). "Without a searching inquiry into [defendants'] motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of *post hoc* rationalizations." *Sanders*, 85 F. Supp. 3d at 537 (quoting *Peacock v. Duval*, 694 F.2d 644, 646 (9th Cir. 1982)).

*ii.*    Finally, the plaintiffs have, of course, identified how the exclusions are largely coextensive with the unions who opposed the President and how the President has preserved the bargaining rights of those unions who have supported him politically. The labor community is still waiting for *some* explanation of why the collective bargaining rights of all the police and firefighter units were preserved regardless of agency and why Customs and Border Protection is the only subdivision in the Department of Homeland Security that was not excluded. Could it be because the police and Border Patrol unions supported the President in his re-election bid and because the International Association of Fire Fighters uncharacteristically stayed neutral? The Fact Sheet accompanying Executive Order 14,251 said as much: "President Trump supports constructive partnerships with unions who work with him." To these plaintiffs' knowledge, no other explanation has been offered by the government in any of the litigation over the Executive Orders.[3] And, indeed, the Veterans Administration identified particular unions rather than

---

[3]  In fact, in the government's appellate brief in *AFSA*, it wrote in regard to Customs and Border Patrol employees that "as the White House explained, where unions are engaged in such 'constructive partnerships' with agencies, *Fact Sheet*, the President was entitled to conclude that collective-bargaining provisions can be applied 'in a manner consistent with national security requirements and considerations,' 22 U.S.C. § 4103(b), and exclusion is thus unwarranted." *See* Attachment A at 47-48. The government also argued that there is a "false distinction between whether 'the provisions of the FSLMRS themselves' cannot be applied in a manner consistent with national security and whether 'the unions' use of these provisions' would be inconsistent with

agency subdivisions who would retain collective bargaining rights because "they have filed no or few grievances against VA." ECF No. 15-1, Pls.' Mem. in Supp. of Mot. for Preliminary Injunction ("Pls.' Br.") at 24. However, now that they have been caught in this patently discriminatory action, the VA has rolled it back and rescinded these carveouts from the exclusion of the VA from coverage of the FSLMRS without any explanation. 90 Fed. Reg. 50950 (Nov. 13, 2025).

One cannot forget that in the Fact Sheet accompanying the first exclusion order, the White House said that "President Trump refuses to let union obstruction interfere with his efforts" and that "he will not tolerate mass obstruction that jeopardizes his ability to manage agencies" the way he wants. "The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!" *Wilmer Cutler Pickering Hale and Dorr, LLP v. Exec. Off. of Pres.*, 784 F.Supp.3d 127, 151 (D.D.C. 2025).

In sum, Plaintiffs have established a likelihood of success on their First Amendment claim, which weighs heavily in favor of granting preliminary injunctive relief. "In cases involving the First Amendment, the likelihood of success plays a particularly pronounced role" and "will often be the determinative factor in the preliminary injunction analysis." *Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at *3 (D.C. Cir. Oct. 23, 2025) (denying stay) (quoting *Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022)).

---

national security," *id.* at 45, thus admitting that it was the unions' advocacy and behavior and not something inherent in the collective bargaining strictures of the FSLMRS that was inconsistent with national security that resulted in their exclusion, demonstrating causality.

**II.    Executive Order Nos. 14,251 and 14,343 Inflict Irreparable Injury upon the Plaintiffs and the Employees They Represent.**

"[T]he D.C. Circuit has repeatedly recognized that interference with collective bargaining rights constitutes irreparable harm." *N. Am. Bldg. Trades Unions v. Dep't of Defense*, 783 F. Supp.3d 290, 313 (D.D.C. 2025). "The loss of bargaining power . . . cannot be restored through damages or later litigation." *Id.* Both the employees and their representatives are now denied the opportunity to negotiate over terms and conditions of employment, as well as enforce agreements addressing those matters. *Small v. Avanti Health Sys.*, 661 F.3d 1180, 1191 (9th Cir. 2011). This loss is especially injurious because of the major changes that the NWS and the USPTO are now undergoing. *See* Pls.' Br. at 39-41; Becker Decl. ¶¶ 28-30; Duffy Decl. ¶¶ 22-25.

Courts have documented the effects of such deprivations for over eighty years: "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944). Indeed, "there is a very real danger that if [an employer] continue[s] to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees." *Asseo v. Centro Med. del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990). "Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("*IUE*"). This combination of "deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996).

These principles guided this Court in its prior decisions where it found that unions and employees have been irreparably injured as a result of President Trump's issuance of Executive

Order No. 14,251. *Fed'l Educ. Ass'n v. Trump*, ___ F. Supp.3d ___, 2025 WL 2355747, *15-*18 (D.D.C. Aug. 14, 2025) ("*FEA*"); *Am. Foreign Svc. Ass'n v. Trump*, 783 F. Supp.3d 248, 269-71 (D.D.C. 2025) ("*AFSA*"); *Nat'l Treas. Emps. Union v. Trump*, 780 F. Supp.3d, 237, 263-66 (D.D.C. 2025) ("*NTEU*").[4] The Court recognizes that "[t]he loss of collective bargaining rights is deemed to be irreparable because the value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Fed'l Educ. Ass'n*, 2025 WL 2355747, at *18 (quoting *Am. Fed'n of Gov't Emps. v. Trump*, 792 F. Supp.3d 985, 1004 (N.D. Cal. 2025), *appeal pending*, No. 25-4014 (9th Cir. 2025).

The foregoing legal principles, along with a quick read of the Plaintiffs' Memorandum in Support, quickly dispose of the Defendants' irreparable harm arguments in this case. First, the Defendants claim that the Plaintiffs failed to allege harm to their representation of employees in USPTO's Office of the Chief Information Officer or the Satellite and Information Service, as well as to themselves as organizations. Defs.' Br. at 39. If one reads the very first sentence, as well as the very first paragraph, of the Plaintiffs' irreparable injury argument in its memorandum in support, they would see the argument that both NWSEO and POPA, as unions, and the employees they represent (which includes those in USPTO's Office of the Chief Information Officer and the Satellite and Information Service) suffer irreparable harm by Executive Order Nos. 14,251 and 14,343, because those orders removed the employees' agencies from the coverage of the FSLMRS, resulting in the withdrawal of recognition and repudiation of collective bargaining agreements. Pls.' Br. at 37-38.

---

[4]   As the Court is aware, the Government has appealed all three cases to the D.C. Circuit, where they are pending. The appellate court granted stays of the injunctions in the *NTEU* and *AFSA* cases but denied the request for stay in the *FEA* case.

Second, the Defendants claim that the Plaintiffs do not suffer any irreparable harm with respect to the loss of dues because they have not attempted to show that such a loss threatens their very existence. Defs.' Br. at 39-40. If one reads beyond the first paragraph of the Plaintiffs' irreparable harm argument, then they would learn that neither NWSEO nor POPA argued economic loss as  irreparable harm. Both unions focused on the irreparable harm that has been inflicted by the loss of bargaining rights. Pls.' Br. at 37-41.

Third, the Defendants claim that the Court cannot "infer that POPA or NWSEO will lose all their members because they no longer serve as the exclusive bargaining representative for these employees." *Id.* at 39-40. That argument misstates the injury. Rather, it is loss of support of those employees during the period of deprivation that will irreparably impair the unions' ability to represent those employees once bargaining rights are restored. *IUE*, 426 F.2d at 1249. *See also Electro-Voice, Inc.*, 83 F.3d at 1573; *Asseo*, 900 F.2d at 454.

Fourth, the Defendants claim that the Plaintiffs' arguments require this Court to "speculate about potential future harm to the employees they represent arising from changes that management is attempting to implement…." Defs.' Br. at 41. Once again, this misstates the harm. President Trump has deprived the NWSEO and POPA of the ability to negotiate <u>right now</u> over changes to employees' terms and conditions of employment. *Donohue v. Mangano*, 886 F.Supp.2d 126, 152 (E.D.N.Y. 2012) (noting court has found irreparable injury where there is an "ongoing erosion of the employer-union relationship"). Even where management makes a decision that it has "the absolute right to make under the FSLMRS," Defs.' Br. at 41, the FSLMRS requires management to negotiate with unions over procedures with respect to the exercise of management rights, as well as appropriate arrangements to address employees' harms resulting from the exercise of those rights. 5 U.S.C. §§ 7106(b)(2) & (b)(3). The Executive Orders relieve the Defendants of those

obligations; and, once the responsibilities are restored, the Defendants "may reap a second benefit … because the union is gone or because it is too weak to bargain effectively." *IUE*, 426 F.2d at 1249.

For these reasons, the Defendants' final argument – that the loss of bargaining rights can be remedied with a favorable merits ruling in the future (Defs.' Br. at 41) – fails miserably. The Plaintiffs pointed out in their memorandum in support: "[c]ollective bargaining derives its value in real time, enabling employees to address their employment conditions through their collective bargaining representative when it matters the most." Pls.' Br. at 38. Retroactive bargaining pursuant to a final remedy cannot redress the loss of "the variety of benefits that good faith collective bargaining with the Union[s] might have otherwise secured [for the employees] in the present." *Small*, 661 F.3d at 1192 (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001)). This is why "[t]he value of the right to enjoy the benefits of union representation is immeasurable once it is delayed or lost," giving rise to irreparable injury. *Levine v. C & W Mining Co*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), *aff'd in relevant part, vacated in other part*, 610 F.2d 432 (6th Cir. 1979). That irreparable injury exists in this case.

### III.    The Remaining Factors Favor the Plaintiffs.

The remaining factors of the injunctive standard – the balance of equities and public interest – favor the Plaintiffs. Rather than directly address that point, the Defendants cursorily claim that "[a] preliminary injunction would inflict harm on the public and the President by interfering with the national security determinations regarding the agency subdivisions at issue entrusted to the President by Congress." Defs.' Br. at 42. The President's "national security determinations" are pretext, as illustrated by his own White House's explanation of Executive

Order Nos. 14,251 and 14,343 in Fact Sheets issued contemporaneously with the orders.[5] Adding

to the pretextual nature is the fact that the Defendants fail to provide any explanation as to how

granting the injunction would interfere with national security considerations (which is one of the

determinations required by 5 U.S.C. § 7103(b)(2) when making the exclusion determination in the

first place).

The Defendants spend the rest of their balance of harms and public interest arguments

calculating the potential cost of complying with their duty to bargain with the Unions, as well as

their obligation to follow the collective bargaining agreements, which they claim will likely be

unrecoverable if they prevail on the merits. As this Court has previously recognized, "[g]ranting

the preliminary injunction would merely require the government to function as it has for over a

half a century…." *FEA*, 2025 WL 2355747, at *19. While the Defendants bemoan the additional

costs created by their decisions to terminate the collective bargaining agreements and repudiate

the collective bargaining relationships with the Unions, the Defendants proceeded anyway with

those decisions, as well as to take additional steps to reallocate operations and resources during

the pendency of this action. All of the resulting costs amount to little more than self-inflicted

injuries. "Defendants had several courses of action that [they] could have taken that would have

avoided or lessened these harms, but they did not. *Bad Ass Coffee Co. of Hawaii, Inc. v. JH

Nterprises, LLC*, 636 F. Supp.2d 1237, 1251 (D. Utah 2009). "And when a party knowingly takes

actions that increase the potential for harm if an injunction is ordered against them, courts give

---

[5] The Defendants admit that the Fact Sheets "provide information about [the President's] policies and actions." Defs. Br. at 28-29, n.8. Thus, the statements in the Fact Sheets explain why President Trump took the actions set forth in the Executive Order, removing NWS and USPTO from the scope of the FSLMRS and stripping NWSEO and POPA – along with the affected employees – of their bargaining rights. The President's pretextual explanations and viperous animus are now as indelible as the injuries he inflicted are irreparable.

those harms little weight in the balancing test." *Id.* Thus, the Defendants' cost complaints neither tilt the balance of the equities in the Defendants' favor nor do they present a valid defense of the public's interest. *FEA*, 2025 WL 2355747, at *18-*19. The public's interest is better served "in ensuring that the laws enacted by their representatives are not imperiled by executive fiat." *NTEU*, 780 F. Supp.3d at 267.

## IV.    The Proposed Order and Bond Amount.

The Plaintiffs are willing to modify their proposed order to conform to the order issued by the Court in other cases, that is, invalidating the Executive Orders as they apply to the Plaintiffs' bargaining units in the agencies and subdivisions at issue in this case. They have filed a revised order with this reply brief.

The Court should reject the Defendants' request for a bond in the amount of $591,583 ($358,808 from POPA and $232,775 from NWSEO) if it issues a preliminary injunction in this case. Defs.' Br. at 45. Those totals represent the amount of self-inflicted costs racked up by the Defendants since the repudiation of the collective bargaining agreements and the termination of the collective bargaining relationship. *Compare id.* at 45 *with id.* at 43-44. While the Defendants have been incurring greater costs by reallocating and reorganizing, they have also cut off the Plaintiffs' primary source of revenue, namely, the dues allotments (which, ironically, the Defendants add to their growing lists of costs even those dues come out of members' pay). Defs.' Br. at 43-44.

More importantly, the Court has "broad discretion" in setting an injunction bond. *FEA*, 2025 WL 2355747, at *19. The Court should not set the bond at an amount that rewards the Defendants for imposing greater costs upon themselves, while also inflicting irreparable harm upon the Plaintiffs by cutting of their dues income and reducing their value of their services on

behalf of their represented employees. *Id.* Indeed, "[i]t makes little sense to exacerbate the financial strain by requiring the [Union Plaintiffs] to post [a] bond" in the amount suggested by the Defendants. *Id.* (quoting *Nat'l Endowment for Democracy v. United States*, No. 25-6048 (DLF), ___ F. Supp.3d ___, 2025 WL 2305477, at *7 (D.D.C. Aug. 11, 2025)).

For these reasons, and as this Court and another one have done in related cases, the Court should only require $100 per Plaintiff for the bond, $200 total. *FEA*, 2025 WL 2025 WL 2355747, at *19; *Am. Fed'n of Gov't Emps.*, 792 F. Supp. at 1006.

## CONCLUSION

For the foregoing reasons and those set forth in the Plaintiffs' Memorandum in Support of its Motion for Preliminary Injunction, both Exec. Order Nos. 14,251 and 14,343 constitute unlawful action that is *ultra vires*. The Plaintiffs respectfully request that the Court enter a preliminary injunction with respect to the implementation and enforcement of the Executive Order as set forth in the revised draft order filed with this Reply Brief.

DATED: November 26, 2025                 Respectfully submitted,

                                         */s/ Richard J. Hirn*

                        By:      _____
                                         RICHARD J. HIRN
                                         D.C. Bar No. 291849
                                         5335 Wisconsin Ave., NW, Suite 440
                                         Washington, D.C. 20015
                                         (202) 274-1812
                                         richard@hirnlaw.com

                                         General Counsel for NWSEO and POPA


                                         */s/ April H. Pullium*

                                         KEITH R. BOLEK
                                         D.C. Bar No. 463129
                                         APRIL H. PULLIUM

D.C. Bar No. 198026
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, Suite 800
Washington, D.C. 20015
(202) 362-0041
kbolek@odonoghuelaw.com
apullium@odonoghuelaw.com

# Attachment A

**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5184**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

AMERICAN FOREIGN SERVICE ASSOCIATION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

and considerations.  Other determinations may reflect a different view and assessment.  But Congress provided no standards by which to judge a President's invocation of § 4103(b)(1), leaving it to the President to make those determinations.  *See Webster*, 486 U.S. at 600.  The district court's suggestion that the President must have acted contrary to statute because he took a capacious view of national-security interests is entirely misplaced.

**b.**  Second, the district court viewed statements in a White House fact sheet as indicating that the President had considered improper factors.  *See NTEU*, 780 F. Supp. 3d at 255-256.  But even if that fact sheet represented the motivations of the President in issuing the executive order, it does not reflect any motivations inconsistent with the statute.  Rather, the fact sheet merely explains how unions' activities have impaired the functioning of agencies in a manner that could undermine national security—a circumstance that is plainly relevant to the President's determination under § 4103(b).  The fact sheet notes, for example, that the FSLMRS can "enable[] hostile Federal unions to obstruct agency management" by preventing agencies from removing employees for poor performance or misconduct and impede agencies

43

from taking other operational measures including, for example, "modify[ing] cybersecurity policies."  The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H (*Fact Sheet*).  Such considerations are entirely in accord with an executive order issued to protect President Trump's "ability to manage agencies with vital national security missions" and "to ensure that agencies vital to national security can execute their missions without delay and protect the American people."  *Id.*; *see AFGE* Stay Order, No. 25-4014, __ F.4th __, 2025 WL 2180674, at *4 (9th Cir. Aug. 1, 2025) (per curiam) ("The Fact Sheet … conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions," and thus demonstrates "an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities.").

The district court drew a false distinction between whether "'the provisions' of the FSLMRS themselves" cannot be applied in a manner consistent with national security and whether "the unions' *use of* these provisions" would be inconsistent with national security. *NTEU*, 780 F. Supp. 3d at 256. Applying the provisions of the FSLMRS and subchapter X to certain agencies and subagencies would be inconsistent with national-security requirements precisely *because* unions can use those provisions in a manner that "jeopardizes [the President's] ability to manage agencies with vital national security missions," which necessarily includes, *inter alia*, ensuring performance accountability. *Fact Sheet.* Union activity that makes it difficult for agencies engaged in national-security work to terminate poor performers not only obstructs President Trump's "policy directives and 'agenda'" (which includes improving the functioning of these agencies), *NTEU*, 780 F. Supp. 3d at 256, but also impairs the agencies' ability to safeguard national security, and it is thus a legitimate consideration under § 4103(b). As another example, the fact sheet describes how a union obtained an FLRA decision holding that U.S. Immigration and Customs Enforcement had to bargain before addressing cybersecurity threats by

45

blocking access to web-based email services on its network.  *See U.S.*

*Dep't of Homeland Sec. U.S. Immigration & Customs Enf't & AFGE*

*Nat'l Immigration & Customs Enf't Council 118*, 67 F.L.R.A. 501 (2014).

Rather than suggesting a "retaliatory motive," JA283, the fact sheet

reasonably describes how collective bargaining has been used to

undermine national-security requirements.

Instead of acknowledging the relevance of union activity to the

§ 4103(b) determination and presuming that the fact sheet indicated

legitimate considerations regarding past union practices, the district

court drew the most negative possible inference and attributed

unconstitutional motives to the President:  The court suggested that the

President issued the executive order to "punish" certain unions because

of their opposition to his agenda.  *NTEU*, 780 F. Supp. 3d at 256.  In

doing so, the district court disregarded both the deference owed to the

President's national-security assessments and its duty not to assume

"that the President was indifferent to the purposes and requirements of

the Act, or acted deliberately in contravention of them."  *AFGE*, 870

F.2d at 728.

46

**c.** Third, the district court erred in declaring that the OPM guidance demonstrates that the executive order was motivated by unrelated policy goals. *See NTEU*, 780 F. Supp. 3d at 256-257. The guidance notes the policy of this Administration "to eliminate waste, bloat, and insularity" within agencies, OPM Guidance 5, and as applied to agencies that have as a primary function intelligence, investigative, or national-security work, these policies are directly relevant to the policy goals of § 4103(b). Congress may have thought inefficiencies are tolerable in certain circumstances as the price for allowing federal employees to organize, but Congress made clear that labor interests cannot be allowed to undermine national security. In agencies like the State Department, for example, removing "procedural impediments to separating poor performers" is a national-security imperative, OPM Guidance 3. So is the ability to optimize the efficiency of an agency through restructuring, even when that involves layoffs. *Contra NTEU*, 780 F. Supp. 3d at 257.

The Foreign Service Act does not permit courts to second-guess the President's decisions about how agencies must be operated so that employees can best perform their national-security work. Rather, the

47

statute expressly leaves that judgment to the President.  Judicially

second-guessing the President's national-security determinations would

be "inconsistent with the broad statutory text and the deference

traditionally accorded the President in this sphere."  *Hawaii*, 585 U.S.

at 686.  Furthermore, "'when it comes to collecting evidence and

drawing inferences' on questions of national security, 'the lack of

competence on the part of the courts is marked.'"  *Id.* at 704.  The

district court erred in rejecting the presumption of regularity based on

its disagreement with a determination that Congress appropriately left

to the President.

    **d.**  In addition to the reasons identified in *NTEU*, the district

court here also opined that AFSA had overcome the presumption of

regularity because the executive order does not strip collective-

bargaining rights from U.S. Customs and Border Protection employees,

and because the Secretary of Veterans Affairs had exercised his

authority to restore collective-bargaining rights to certain unions who

had filed no or few grievances against the Department of Veterans

Affairs.  JA282-283.  But as the White House explained, where unions

are engaged in such "constructive partnerships" with agencies, *Fact*

48

*Sheet*, the President was entitled to conclude that collective-bargaining

provisions can be applied "in a manner consistent with national security

requirements and considerations," 22 U.S.C. § 4103(b), and exclusion is

thus unwarranted.  The President's exclusion order is not undermined

by any tailoring-related complaints; rather such complaints

demonstrate that the President applied the statutory factors when

making his determination.

### 3. The President's determinations reasonably apply the criteria of § 4103(b)

Even if the district court could properly look behind the

President's determination, the government would still prevail because

that determination is reasonable and not "'obviously beyond the terms

of the statute,'" *North Am. Butterfly Ass'n*, 977 F.3d at 1263.

**a.** The President reasonably determined that subdivisions of the

Department of State and USAID have intelligence, investigative, or

national-security work as "a primary function," 22 U.S.C. § 4103(b)(1).

An agency subdivision can have multiple primary functions, as

Congress recognized through its use of the article "a."  And although

Congress does not always enumerate an agency or agency subdivisions'

primary functions, where it has, it frequently lists several.  *See, e.g.*, 22