UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * *   )
NATIONAL WEATHER SERVICE          )     Civil Action
EMPLOYEES ORGANIZATION, et al.,   )     No. 25-02947
                                  )
              Plaintiffs,         )
                                  )
   vs.                            )
                                  )
DONALD J. TRUMP, et al.,          )     Washington, D.C.
                                  )     December 10, 2025
              Defendants.         )     1:29 p.m.
                                  )
* * * * * * * * * * * * * * *   )


TRANSCRIPT OF PRELIMINARY INJUNCTION
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:      RICHARD J. HIRN, ESQ.
                         LAW OFFICES OF RICHARD J. HIRN
                         5335 Wisconsin Avenue, Northwest
                         Suite 440
                         Washington, D.C. 20015

                         KEITH R. BOLEK, ESQ.
                         O'DONOGHUE & O'DONOGHUE, LLP
                         5301 Wisconsin Avenue, Northwest
                         Suite 800
                         Washington, D.C. 20015

FOR THE DEFENDANTS:      JEREMY S. SIMON, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE FOR
                           THE DISTRICT OF COLUMBIA
                         601 D Street, Northwest
                         Washington, D.C. 20530

                         TYLER BECKER, ESQ.
                         COUNSEL TO THE ASSISTANT ATTORNEY
                           GENERAL

REPORTED BY:                    LISA EDWARDS, RDR, CRR
                                Official Court Reporter
                                United States District Court for the
                                  District of Columbia
                                333 Constitution Avenue, Northwest
                                Room 6706
                                Washington, D.C. 20001
                                (202) 354-3269

THE COURTROOM DEPUTY:  This is Civil Action 25-2947, *National Weather Service Employees Organization, et al., versus Donald Trump, et al.*

Counsel, please approach the podium and state your appearances for the record.

MR. HIRN:  Richard Hirn for the Patent Office Professional Association and the National Weather Service Employees Organization.

MR. BOLEK:  Keith Bolek, representing the same Plaintiffs.

MR. SIMON:  Good afternoon, your Honor.  Jeremy Simon for the government.  With me at counsel table is Tyler Becker, counsel to the assistant attorney general.

THE COURT:  Good afternoon, everybody.

All right.  I've been down this road before.  Let me just say a couple of things to begin with.

I granted the Defendants' motion for leave to submit a declaration *ex parte* in camera under seal with classified information in it.  And I've read it.

Secondly -- and we're not going to discuss it here today.  If anybody feels they need to discuss it, we'll do it another time.  But I'm not going to do it today.

Secondly, I think I have five, maybe six other cases which raise all the same issues.  And I've decided several of them.  And so everybody knows, unless there's

some significant distinctions, that -- how I'm going to decide this motion.  And so we don't need to waste a lot of time except that everybody has to make their record, I suppose.

And then thirdly, it doesn't matter what I say, because on Monday a panel of the D.C. Circuit -- we've had a lot of stay motions and things like that.  But there's actually a merits panel on Monday that is going to hear argument on three of the cases in which I've granted preliminary injunctions.

And while none of us knows how they will come out or when they will issue an opinion, once this three-judge panel issues an opinion, then, you know, I'm done and you're done.  And we'll know what the Circuit thinks the law is and whether I'm right or whether I'm wrong.

But because it's a preliminary injunction, we have no choice but to go forward today, even though it may all be -- let me put it this way:  If I get reversed on all these other cases and I granted preliminary injunction today, then that would go away as well.  But since we won't know for several months, we're here.  And I'll hear what everybody has to say and I'll rule orally from the bench and you can take it from there.

So, Mr. Hirn, are you up?

MR. HIRN:  Thank you, your Honor.

Because the D.C. Circuit on Monday is only going to be considering the *ultra vires* claims raised by the three unions in those cases, we thought today that we would focus on our Plaintiffs' First Amendment claims, which would stand independent of the -- whatever the D.C. Circuit might do and would form a separate basis that would justify granting a preliminary injunction and potentially ultimately a final judgment for the Plaintiffs, regardless of the *ultra vires* theory.

And so to that end, we want to note that the fact sheet that accompanied the first exclusion order warned the unions that were not initially affected that the president would not tolerate union obstruction to the manner in which he was conducting or --

THE COURT:  Are you talking about the March fact sheet or the August fact sheet?

MR. HIRN:  The first fact sheet.

THE COURT:  Okay.

MR. HIRN:  The initial -- the March fact sheet. In that March fact sheet, the president said he would not tolerate union obstruction to the manner in which he managed the agencies, whether it is, quote-unquote, "fighting back against Trump" or, quote-unquote, "wildly filing grievances to block Trump policies."

And in order to make sure that the unions who are

not affected by the first order knew that they were in danger if they stirred the pot, in Section 7 of the March executive order, the president instructed agency heads to provide him a list of additional agencies and subdivisions that might be the subject of a subsequent executive order.

As Judge Leon wrote when he granted the preliminary injunction in the *Wilmer Cutler* case, quote, "The order shouts through a bullhorn:  If you take on causes disfavored by President Trump, you will be punished."

But instead of capitulating to the president's demand, the Plaintiffs in this case, two small yet very intrepid unions, continued to fulfill their duties to their members, if not their duties to the American public, and -- by engaging in undisputably protected First Amendment activity in response to an onslaught of changes made by the Administration.

For POPA's part, POPA being the acronym for the Patent Office Professional Association, it vigorously used the negotiated agreements and arbitration procedures in their collective bargaining agreement to challenge the implementation of some signature Trump Administration policies such as an April 24th grievance on the elimination of telework for newly hired patent examiners; a May 29th grievance challenging the elimination of telework for all the employees in the office of the chief financial officer,

chief information officer, office of public -- excuse me -- office of policy and international affairs at the PTO as well as the patent trial appeals board.

Another grievance filed on July 8th challenged the change in the practice of granting everyone early dismissal before federal holidays.

Beginning on July 3rd of this year, the PTO granted early dismissal to those employees who were actually working onsite but for the first time denied it to teleworkers in an effort to discourage the employees from teleworking.

A July 15th grievance that POPA filed challenged the granting of patent examiners who work onsite time off to attend a town hall at which Secretary Lutnick spoke, but failed to grant time off to teleworking patent examiners who attended virtually, which forced them to work longer hours on their own time.

And on July 9th, POPA filed another grievance when the PTO terminated the practice of granting early dismissal on the afternoon before the Juneteeth holiday, which was part of the Administration's attack on so-called DEI policies.

For NWSEO's part, it vigorously and loudly fought back against the Administration's drawdown of staff at the 122 National Weather Service offices nationwide by giving

interviews in not just local, national, but as well as international media outlets, warning the country of the grave risk posed by elimination of over 600 Weather Service staff members.

This produced embarrassing headlines such as one in *The New York Times* that said "Weather Service Prepares For Degraded Operations Amid Trump Cuts"; one that appeared in *USA Today* that said "First Came the Weather Service Staffing Cuts, Then Came the Tornadoes"; one story on the CBS News site that said "Short-Staffed Weather Service Enters Hurricane Season in Uncharted Territory: Meteorologists Share Their Concerns"; a *Newsweek* story titled "Weather Service Staffing:  Clearly A Concern That -- Ahead of Deadly Texas Floods"; and one in the *LA Times* saying, "Trump Cuts to California National Weather Service Leave Critical Holes."

The Weather Service employees union also grieved and brought to arbitration the implementation of the president's hiring freeze as it affected temporary promotions in the agency as well as a grievance over the elimination of telework Weather Service-wide.  Both of those grievances were filed after the first executive order on March 27th.

When you combine the clear threat that accompanied and effectively that was part of the first March executive

order with the fact that almost all the vocal opposition to the Administration's efforts by both unions came after that order was issued, you have clear proof that the Plaintiffs' bargaining units were made subject to the second executive order in retaliation for the Plaintiffs' First Amendment activity.

The government has never offered an explanation of why the Weather Service, the National Environmental Satellite Information Service or the USPTO were not included in the first executive order if their primary function was so clearly national security.

In fact, on Page 35 of the government's brief in this case, the Defendants essentially admit that the Plaintiffs' First Amendment activity which the president -- which the president found incompatible with national security requirements [sic].

The government wrote:  The statute plainly allows the president to consider how the application of the statute's requirements, including through union grievances and litigation-enforcing CBAs, impacts national security functions.

In Paragraphs 26 through 30 of her declaration, in a section titled "Applying The Federal Service Labor-Management Relations Statute to Patents and Office of CIO is Detrimental to National Security," the acting patents

commissioner, Martin-Wallace, cites various grievances filed by POPA and bargaining units -- bargaining positions taken by POPA and the other union at the Patent Office, National Treasury Employees Union, as the basis for why collective bargaining is ostensibly incompatible with national security.

She specifically cites the grievance POPA filed over the cancellation of early dismissal before the --

THE COURT:  Which declaration is this?

MR. HIRN:  This is the Martin-Wallace declaration, the declaration in Paragraphs 26 through 30.

She cited for -- as an example of why collective bargaining at the PTO was incompatible with national security -- she cited as an example the grievance that POPA filed over the cancellation of the Juneteenth holiday.

In those paragraphs at 26 through 30, none of the matters that she discusses that she alleges form the basis for national security concerns have anything to do with national security.

In its brief to the D.C. Circuit in the appeal of the preliminary injunction granted to the Foreign Service Association, the government also argued that there was a false distinction between whether the provisions of the statute themselves cannot be applied in a manner consistent with national security and whether the union's use of those

provisions would be inconsistent with national security.

Thus, it admitted that the unions -- it was the unions' advocacy and behavior and not something inherent in the collective bargaining provisions of the statute that was inconsistent with national security and that resulted in the exclusion of particular agencies.

This all demonstrates causality.  And the government has offered no evidence that it would have taken these actions anyway based on bona fide national security concerns.

Evidence is required to do so, not merely a claim that it was motivated by national security.  And the weakness of their national security claims does nothing to refute the evidence of this retaliatory motive.  Thus, the Plaintiffs have demonstrated that they are likely to succeed on the -- their First Amendment claim.

When it recently denied the stay in *Media Matters versus FTC*, the D.C. Circuit reminded us that in First Amendment cases the likelihood of success plays a particularly profound role and will often be the determinative factor in the preliminary injunction analysis.

And with respect to the Plaintiffs' *ultra vires* claims, we agree with the Court's previous statements that the second executive order was merely an extension of the first and that the first executive order should be treated

as a whole rather than parsed through whether particular -- whether a particular agency's primary functions is national security.

Nonetheless, in this case, the Plaintiffs have demonstrated through the affidavits of the former commissioner of patents, the former NOAA administrator and the former chief scientist of NOAA that the primary function of the Weather Service of NESDIS and the PTO is not national security.

And we do want to observe that the whole rationale of why collective bargaining is supposedly inconsistent with national security requirements is based on a false premise. In the words of the second fact sheet, quote, "The procedural requirements in the statute can create delays in agency operations.  These delays can impact the ability of the agencies with national security responsibility to implement swiftly -- to implement policies swiftly and fulfill critical missions.

"And when changes are permissible under CBAs," the fact sheet continues, "agencies must complete midterm union bargaining, which can delay implementation of time-sensitive national security measures."

The government's brief in opposition in this case on Page 31 repeats this.  Quote:  "The president thus had ample basis to determine that the exclusions of the

subdivisions was necessary to ensure that they perform their missions efficiently and without delay."

That simply isn't a true statement of the agency's bargaining obligations under the statute.  In Section 7106(a) of the statute, it says that nothing in this chapter shall affect the authority of any management official of any agency to take whatever actions may be necessary to carry out the agency's mission during emergencies.

And the FLRA has repeatedly --

THE COURT:  Say that again.

MR. HIRN:  The FLRA has --

THE COURT:  Oh, okay.

MR. HIRN:  -- repeatedly and practically from Day One ruled that an agency need not engage in bargaining before taking an action if, quote, "a delay in implementation would have impeded the agency's ability to efficiently and effectively carry out its mission."

Thus, we're not asking the Court to substitute its judgment for that of the president on national security needs; only to correct the president's misunderstanding, if not misrepresentation, of what NOAA's and PTO's bargaining obligations actually are under the statute.

With regard to the Patent Office's elimination or enforcement of the first executive order eliminating collective bargaining rights for all employees in the office

of chief information officer, we agree with the -- with what Circuit Judge Pan wrote in her concurrence denying the stay in the *FEA* case that the inclusion of the office of chief information officer in each agency effectively spans the scope of Section 7103(b)(1) by adding a basis beyond that of national security.

Judge Pan wrote that the provision of the executive order effectively adds information resources management to the list of primary functions that can justify exempting an agency or subdivision from the requirements of the statute.

The president's enlargement by fiat of a list of primary functions in Section 7103(b) is likely *ultra vires*.

And the government has in this case, as it has in other cases, discounted or even ignored the plethora of case law in this circuit and probably every other circuit that holds that the loss of collective bargaining rights for any amount of time amounts to irreparable injury.

This injury extends to both the Weather Service bargaining -- to both NWSEO's bargaining units at the Weather Service as well as at NESDIS because their contracts have been canceled and collective bargaining has been terminated in both subdivisions.

It also --

THE COURT:  By the way, have you given the court

reporter this glossary of terms and abbreviations?

MR. HIRN:  Yeah.

THE COURT:  I've got it in front of me.  I had it printed out separately because you've been referring to a lot of agencies by their acronyms or by their letters.  And if she doesn't have it, please give it to her.

MR. HIRN:  Yeah.  I think we -- I think we did that this morning before we started.

THE COURT:  Okay.

MR. HIRN:  The loss of bargaining rights has come at a particularly vulnerable time, causing irreparable injury to these two units and their members.  At the PTO, management is making significant changes to the performance expectations of the 9,000 patent examiners that POPA at one time represented.  By increasing these expectations, it's forcing -- will be forcing the examiners to work longer hours on their own time in order to meet their production quotas processing patent applications.

And while discussions began with POPA about how this was to be implemented before the executive order came out, those discussions were terminated and no actual bargaining over the implementation of these new changes in performance expectations has been taking place.

The PTO is also continuing to disestablish telework in an agency that was once the leading agency for

telework in the federal government.  It has unilaterally canceled arbitration of a grievance challenging the elimination of telework for probationary employees.  And the PTO is now making significant changes in its awards program without bargaining, and it's also closing its Denver regional office without bargaining with the union over the impact that closing is going to have on the employees POPA represents.

At the Weather Service, the changes are more sweeping.  When the second executive order was issued, the union and management were collaboratively working on an entirely new operations model for the Weather Service which would have historically and fundamentally changed the way the Weather Service has been operating for three decades.  It would change the staffing of the 122 forecast officers nationwide.  It would have to -- it will result in the hiring of scientific specialists other than meteorologists for these offices and would have -- and it will produce greater reliance on computer models rather than human forecasting.

Now, those discussions were once underway, but they have now been terminated.

In addition, the Department of Commerce unilaterally canceled two pending arbitration hearings that were previously scheduled over teleworking and the hiring

freeze and fired the arbitrators.

It should not come as any surprise to the Court that we believe the restoration of collective bargaining rights at these agencies is in the public interest. And that's what exactly Congress found when it enacted the statute in 1978.

With -- it is in the public's interest to have continued discussions between the Weather Service management and the 1300 forecasters at the forecast offices around the country to ensure that the new operations model will actually work right and provide better services to the nation.

In the case of the Patent Office, it seems that someone at the agency agrees with us about the value of collective bargaining to the agency. Right now, on the agency's own website, there is a page that highlights the signing one year ago tomorrow of a new collective bargaining agreement with POPA. And reading from the agency's own website, as it appears today, it says that this new collective bargaining agreement, which has now been canceled for virtually everybody at the Patent Office, this new collective bargaining agreement, quote, "sets a government leading standard for the federal government labor relations by guaranteeing predecisional involvement and labor management cooperation."

It also says that through the CBA, collective bargaining agreement, and related labor management relations efforts, the United States PTO and POPA work together to prioritize operational excellence while preserving employee flexibilities that make the USPTO one of the top agencies to work for in the federal government.

So in finding the public interest and whether there is any harm to the government, we would just refer the Court to the PTO's own website, the page that says USPTO Patent Office Professional Association signed a new collective bargaining agreement.

Thank you.

THE COURT:  Thank you.

Mr. Simon.

MR. SIMON:  Thank you, your Honor.

So I recognize what the Court -- the Court's opening statement.  I'm going to do my best to try to convince the Court otherwise.

And I will -- we'll be reserving, obviously, on the jurisdictional discussion in our brief.  I'm not going to rehash that.  This is obviously not the first rodeo, as the Court already indicated.

But I will say this, your Honor:  This is a preliminary injunction motion.  And the Plaintiff still has to meet their burden under that high standard.  They cannot

just piggyback on the fact that there have been other cases before this Court where the Court has granted preliminary injunctive relief.  They need to meet their burden.

We submit that, given the significant difference between this case and the prior cases, that they have not done so.

Now, obviously, we're not conceding the preliminary relief was appropriate in those other cases. I'm just using that as a baseline of comparison as I make my argument today.

So I want to start with *ultra vires* and then I'll address the First Amendment issue.

So the presumption of regularity needs to be rebutted by clear evidence.  Clear evidence.  Now, there's no clear evidence that these unions were somehow targeted because they in their view opposed some sort -- opposed this Administration.

First, the union engaged in pre-March 27th conduct that they characterize in their brief as opposition to Administration priorities.  That was skipped over in Mr. Hirn's presentation.  But it was -- they really didn't have an answer to that in their reply brief.

What was some of that activity?  POPA filed a grievance on March 7th challenging the unilateral suspension of nonessential training while on duty time.

NWSEO filed an unfair labor practice charge challenging the elimination of teleworking on January 27th, 2025.

Now, there was a subsequent grievance related to telework that postdated March 27.  But it was the same issue.  It's still telework.

So they supposedly challenged administrative policies pre-March 27th, and they were not included in that order, in that executive order.

And, you know, the president -- the United States government is a vast -- vast entity.  And so the president can always choose to be as protective of national security as he wants to; and ongoing review of the national security apparatus is certainly understandable, given the vastness of the federal government.

So the fact that there was not -- that these bargaining units were not included in the first executive order does not mean that their primary function of the subdivisions -- agency subdivisions in which they worked was not national security.  And I will get into that in a moment.

Now, the post --

THE COURT:  In fact, the first executive order said there might be additions and there might be subsequent orders.  So that was contemplated right from the beginning

that there might be additions, as I recall.

MR. SIMON:  Yes.

Your Honor, I also want to recall to the Court, actually, the Court's own statements at the hearing in 25-3306.  The Court said:  I think you're right as a general proposition that whatever happened in March cannot be read to preclude the president from ever again taking action under 7103, that counsel -- Mr. Becker -- has to be right, that the same president could act legitimately under the statute.

The question here is whether there's evidence that he acted legitimately or not.

I'm going to go into --

THE COURT:  Well, your argument is the question is whether there's clear evidence that he acted illegitimately.

MR. SIMON:  That's correct.

Let's talk about the post-March 27th conduct. That is no greater in scope and indeed is much -- actually, we would submit less -- or more -- more, I guess, insubstantial in scale than what these unions engaged in pre-March 27th.

So for POPA, the grievance they filed on April 14th about teleworking concerned the cancellation of telework for about 100 probationary employees.

Now, recall that POPA, the patent division, has

about 9,000 or 10,000 employees.

The grievance on May 19th, that was a cancellation of telework in certain offices that impacted approximately 130 employees represented by POPA.

The grievance regarding the failure to provide early dismissal for Memorial Day and Juneteenth, you're talking about challenging a decision to not let employees leave two hours early.

That is hardly of the scale that -- of what the Court found significant in the prior cases.

And there is actually a logical reason to not allow telework folks that two-hour grace period.  They're already at home.  They don't have to fight through D.C. traffic to get home.

Not allowing the employees to attend a June 3rd town hall, denying the president -- the president of POPA the opportunity to speak at a March 27th town hall, those are respectfully not significant issues challenging any signature policy of this Administration.

And I will say, POPA has not alleged that they criticized the Administration publicly in any way.

Let's look at NWSEO.  They claim to have lobbied against reductions in staff.  But -- and that was something they highlighted in their brief.  But as we pointed out, other than about 100 out of a workforce of 4,369, only about

100 were allegedly nonvoluntary.  So again, this is not the RIF situation, for instance, as the Court had concerns about on a prior case.

Again, I already mentioned this, but they file a grievance in April 2025 for employees whose telework was canceled on March 21st, 2025.  But again, that's a continuation or related to the grievance that was filed -- or the unfair labor practice charge that was filed before March 27th.  So it just doesn't follow that the second grievance would somehow, you know, make them a target when they've already grieved it or challenged it prior to the March 27th order.

They cite to -- I think their main -- NWSEO's main so-called evidence are these news articles.

THE COURT:  These what?

MR. SIMON:  The news articles.  They list, like -- I don't know -- 25 or so in their brief.

Well, your Honor, the problem with that is, NWSEO didn't publish those news articles.  They didn't write those headlines.  They -- if you actually went -- go and look at those articles, there is a whole bunch of information in them and there's a quote or two from someone at NWSEO.  And they've highlighted, I guess, the quotes they thought to be most significant at Page 10 to 11 of their motion.

And there really -- there's nothing about these

that are attacking the Administration.  You know, they say there's no question that the public safety for the community is at risk because of staffing reductions.

That's not attacking the Administration.  In fact, the July 9th article, the BBC article they cite, in the very same article, it says in June the Trump Administration said it would allow the NWS to hire more than 100 new positions despite the federal hiring freeze.  That strikes me as an administrative position aligning with what NWS was saying, not something that would cause the Administration to allegedly target them.

So I think the news article piece of this is really exaggerated.

Just on the telework issue, I just want to note also, recall that the prior administration also tried to end telework.  I think the COVID emergency ended in May 2023. Unions resisted that.  We pointed that out in our filing.

So, you know, this idea that ending telework -- and it was for such a small number of people at POPA in any event -- that that somehow would put a target on these unions is just not plausible; and even if the Court finds it plausible, it is not clear evidence.

Now, the other argument they made in their motion which they did not recite here and they sort of abandoned in their reply brief was that the statements in the August 2025

fact sheet were inaccurate and therefore pretextual.

You didn't hear anything about that by counsel in his arguments, because we established in our opposition that those statements were 100 percent accurate. So no pretext based on that fact sheet.

THE COURT: The first fact sheet?

MR. SIMON: This is the August 2025 fact sheet. That's the fact sheet that we contend is pertinent to this August 2025 exclusions order.

Now, even if the Court rules, despite the government's position that the presumption has -- they've presented clear evidence to rebut the presumption, the next step is for the Court to take a look at the president's determinations and determine whether they withstand scrutiny.

Now, we submit it's a very highly deferential standard here to evaluate the president's determinations, particularly when the union is asserting *ultra vires* review and the president's national security determinations are at play.

*Ultra vires* alone -- to establish *ultra vires*, there must be extreme error, plainly in excess of statutory authority, et cetera.

So let's look at the two determinations. Well, I guess we submit that the second part of the statute, whether

something interferes with national security considerations, is actually outside the purview of what this Court can review.  But let's talk about the first part, the primary function aspect.

So the primary -- we've -- we believe we have established very clearly that the USPTO, the Patent Office, is mandated by Congress in the Invention Secrecy Act to screen patent applications that could be detrimental to national security.

So if it's a function, a duty, mandated by statute, then it is -- we submit it is a primary function.

Function is not defined in the FSLMRS, but it is defined in the related statute involving the Foreign Service at 22 USC 3902, Paragraph 6, as a duty, an obligation, an activity and a whole host of other things.

So clearly, it is a duty imposed by Congress and therefore -- that relates squarely to national security, and therefore meets that statutory requirement.

And more importantly, your Honor, given the statutory duty imposed, we submit the Court cannot conclude that the president acted beyond -- *ultra vires*ly beyond his statutory authority in making the determination that the Patent Office, a subdivision of USPTO, has as a primary function national security work.

The OCIO, office of chief information officer:

POPA concedes that cybersecurity personnel within that office have been exempted individually under 5 USC 7112. That's because they have a national security function. There's clearly a national security function in an IT group that protects sensitive information, including national security sensitive information --

THE COURT:  So say that again.  There's clearly what?

MR. SIMON:  A primary function of national security within an office that -- office of chief information officer whose purpose is to protect the sensitive information that's maintained by the Patent Office.

I think it just follows, frankly, from the fact that Congress imposes a national security function on the Patent Office -- by definition almost, it must follow that the IT group that protects the technology and the databases and everything of that office has national security as a primary function.

I want to emphasize, your Honor, the -- this exclusion, 7103, is at an organizational level.  So whether the office is 20 people who does this particular work or 30 people, that doesn't -- that's not the issue.

The issue is whether the -- it is -- the subdivision has a primary function.  And because an office

within it does this type of work, then the subdivision has as a primary function national security.

For NESDIS, N-E-S-D-I-S, I don't think there's any dispute that they are solely responsible for providing satellite command control for the Department of Defense's defense meteorological satellite program.

In fact, the website of NESDIS says that they provide the military with important environmental information used in planning and conducting U.S. military operations worldwide.

For the National Weather Service, I'd ask that -- I'd like to turn the Court's attention to Exhibit D to the second Becker declaration.

THE COURT:  Which declaration?

MR. SIMON:  I'm sorry?

THE COURT:  The second which declaration?

MR. SIMON:  Becker.  That's attached to the reply. It's at 25-1.

In that declaration, Mr. Becker states that NWSEO, the union, negotiated a supplemental agreement with NWS. And he attaches that document as Exhibit D; and again, it's ECF Page 25-1 at ECF Pages 31 to 32.

The top of Page 31 of a document negotiated and agreed to by the union says "primary mission essential functions."  And it says, 8, which is on the top of Page 32,

"support to national security and emergency management."

Bullet point:  Providing mission-critical weather intelligence to the Department of Defense, the Department of Homeland Security and FEMA for national security emergency response and disaster recovery operations.

So if the union agrees that a primary or in the words of this document a primary mission-essential function is to support national security, how can they contend that the president exceeded his authority under the statute in making the same determination?  I submit they cannot do so. They have not met their burden.

And again, we're talking about a very highly deferential standard here in any event.

On the First Amendment, we contend that they have not established the requisite causation.  Again, we note again that they were not part of the first executive order, despite engaging in what they characterize as First Amendment opposition prior to that order.

And again, as I already explained to the Court, the post-March 27th activity that they identify is just not of the scale that would raise an inference of retaliation. It just is not.

POPA, they don't say they made any public criticism.  If their contention is that their First Amendment rights were violated because they grieved, you

know, not having a two-hour early dismissal, I just don't see that as plausible or meeting their burden.

So in response to some of Plaintiffs' arguments -- I apologize. I have to put my glasses on for it. All right. They say -- they challenge multiple signature policies of the Administration.

The only signature -- so-called signature policy they identify in their brief is telework. And we've already talked about that.

Again, for POPA, that's about -- the April telework grievance impacted about 100 employees; and the May one, about 130 out of 9,000.

The early dismissal, you know, meaning not having time off for one meeting, that's -- it just has no plausible connection to a so-called signature policy of the Administration. So their argument just doesn't -- it just doesn't hold.

They talk about how the statute allows the agency -- it says: Nothing in the statute prohibits the agency from taking whatever operational changes, et cetera, they need to respond to an emergency.

But the point is that they could still grieve that. All that really means is that if it went up to the FLRA and the FLRA agreed there was an emergency, it would get dismissed. It doesn't mean they can't grieve it. They

can't gum it up with going, you know, into the collective bargaining process.

THE COURT: But this has come up in all the other cases, too. Essentially, the president -- the Administration has emasculated the FLRA. They're not doing anything. I mean -- the Federal Labor Relations Authority. Yes.

MR. SIMON: Right. I think those are -- I mean, I don't know that that argument, your Honor, as I understand -- as I recall that, that was sort of meant -- addressed to the channeling issue, which I'm happy to address. But --

THE COURT: It's addressed, I think, to the jurisdictional channeling *Thunder Basin* issue. Right? You're supposed to channel through the agency before you go to court. But if the agency basically isn't doing anything, it can't do anything because they've been ordered not to and --

MR. SIMON: I guess, your Honor, what I'm addressing -- and I mean, we'll just refer to our briefs on that, because my understanding was the Court didn't want to engage in that.

THE COURT: Well, that's fine. But I don't understand why you're relying on the existence of the FLRA for anything.

MR. SIMON:  Well, what I'm saying, your Honor, is that my point was simply this:  Mr. Hirn stated that the statute already says that management can take whatever steps they need to take in the event of an emergency.

I'm just simply pointing out that whether there is in fact an emergency would need to be adjudicated by somebody.  And the -- because I suspect, based on the examples that we've provided in our declarations, there's reason to believe at least that the union wouldn't necessarily agree in all cases or maybe in any case that something was an emergency that allowed them to be bypassed.

And they have -- with the collective bargaining rights, they have the ability to file a grievance or file an unfair labor practice charge, and therefore slow down the agency's response to what the agency believes to be an emergency.

It's not that the statute doesn't afford that right to management; it's just that the collective bargaining agreements allow the agencies to take steps to slow that process down.

That is the very reason the statute has this exclusion.  It's not First Amendment activity; it's -- the reason, for instance, the CIA is excluded from the outset is because there's a recognition that bargaining activity and the bargaining rights could interfere with that agency's

mission, which is, you know, obviously national security. So I just wanted to point that out.

On irreparable harm, this case is also significantly different than the other cases.

They concede that they are not alleging any threat to their financial viability by virtue of the exclusion being -- the exclusion of their bargaining units under the executive order.

They have not alleged any loss in membership. So to the extent they are alleging harm, it's regarding the lost ability to collectively bargain in their words, quote, "now" regarding the terms and conditions of employment.

And I believe, your Honor, that even if the Court accepts that -- their argument that the loss of collective bargaining can cause irreparable harm, we submit it cannot cause irreparable harm always, because then a union could come to court on a PI motion and never have to prove irreparable harm.

So I think the Court needs to look at what their evidence is. What have they proffered?

Most of what they've proffered has happened in the past. So it's -- it doesn't support the prospective relief that they are seeking.

POPA references something called the pending balance award implemented in April 2025 and currently

ongoing, which actually pays employees if they work more. The point or the goal of that is to reduce the backlog. So it's unclear how that harms anyone if they're making more money.

Closing the Denver office: That happened according to their own submission on October 1st, 2025, before they moved for preliminary injunctive relief.

The performance appraisal plan, according to their submission, was implemented October 2nd, 2025. So already it has been implemented.

And as I mentioned about the telework, we're talking about impacts for POPA on less than a few hundred employees.

And I'll also say, your Honor, that in the office of chief information officer and NESDIS -- so NESDIS is the other portion of NOAA that's at issue -- there's just a handful, really, of employees that are even represented by POPA. I think it's 25 for the office of chief information officer and around 100 in NESDIS.

So they haven't made any allegation about anything happening in those offices that's imminent concerning the terms and conditions of the employment of those individuals.

So setting aside past -- alleged past conduct, what have they identified for the Court that is imminent on the horizon where they are contending that the loss of

collective bargaining rights is going to cause them irreparable harm?

POPA has made no allegation of any -- anything, any operational change that's been announced that's imminent by the USPO. Everything Mr. Hirn told you that happened happened in the past.

NWS: They mentioned this move to some sort of centralization that in their motion they say is in the planning stages. And I think their argument is, Well, they haven't -- they're no longer -- they can no longer -- are at the table in the planning stages of this.

But the statute doesn't give the unions any right or -- doesn't impose on management any obligation to collectively bargain in the planning stage. So they can do it as a courtesy, but there's no statutory obligation. If there's no statutory obligation, how does that give rise to irreparable harm?

On the balance of the equities, your Honor, we would just submit that the president has determined the collective bargaining rights cannot be applied in a manner consistent with national security at these bargaining units. And so that is harm. That is significant to the government. I think *AFSA*, the D.C. Circuit stay decision, makes that point.

And then --

THE COURT:  Is that Judge Pan's concurring opinion --

MR. SIMON:  The --

THE COURT:  -- or is that --

MR. SIMON:  I'm sorry.  The *AFSA* one would be the one involving --

THE COURT:  -- the Katsas one?  You rely on the Katsas one; they rely on the Pan one.

MR. SIMON:  Well, we also rely -- I guess if Katsas is the *AFSA*, A-F-S-A, one, yeah.  But the Pan one was a concurrence, your Honor, and it was not the decision of the Court.  Judge Henderson issued a concurrence as well, which, you know, is -- reached sort of different conclusions.

But what's important in our view is that -- is that the actual ruling of the Court was not -- did not adopt --

THE COURT:  None of these stay decisions are precedential.

MR. SIMON:  In any event, we already referred the Court to the Martin-Wallace and Jordan declarations, which I think very extensively discuss many of -- the primary function, the equity issues.

And I would, your Honor, like to just make one correction to the Jordan declaration, which I don't think is

germane to the arguments that are now being made.  This is just sort of a housekeeping issue.

The number reported by NWSEO as to the number of individuals they still represent in NWS bargaining units is about 185, which is what they submitted in their reply.  And I think we now agree with that.

The higher number that was in the Jordan declaration was based on a miscounting and including other unions inadvertently.

So I just wanted to correct that for the record. I don't think it's relevant because that was pointed out in our brief to make the point that they haven't established any harm to their viability, to their financial viability, and -- or loss of membership.  And they haven't.  They've conceded in the reply that they are not making those arguments.  But I did want to just correct the record.

I don't know if the Court has any questions.  In the event the Court is going to grant a motion, as we state in our filing, we request that a bond be submitted -- be imposed.

THE COURT:  Why don't we take about ten minutes, and I'll come back and hear from Mr. Hirn.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  So tell me if I'm looking

at the right document.  Exhibit E to the second Becker declaration, 25-1.

MR. SIMON:  Your Honor, Exhibit D?

THE COURT:  Whatever you guys were talking about.

MR. SIMON:  Exhibit D, as in dog.

THE COURT:  Oh, I was looking at the wrong exhibit.  My law clerk thought you said E.  And that doesn't have 31 pages.

MR. SIMON:  It's not 31 pages.  It's on the header.

THE COURT:  But it's still E -- it's still D, as in dog, not E, as in Edward?

MR. SIMON:  That's correct.

THE COURT:  So I'm looking at the wrong document.  So Exhibit D -- I see.  25-1, Exhibit D, as in dog, Pages 31 and 32.  So maybe we can get that.

All right.  Now, give me a minute.  I'm looking for something here.

So I have a number of questions.  How can it be that the U.S. Patent and Trademark Office has as a primary function national security?  I don't see it.

I'd also like to hear more about -- I do understand that NOAA has national security responsibilities, all the satellites in the sky, whatever else is going on with weather impacts around the world.  Is it its primary

function?  It has national security responsibilities, but is it its primary function?

I don't see how the Patent and Trademark Office has any national security responsibilities, let alone it being its primary function.  I think that's just a nonstarter.

Secondly -- and again, I'm not saying which of the parties I'm addressing these to; I'm just telling you these are my thoughts -- what evidence is there that the president has animus towards either of the particular unions that are suing?  You know, we had a fact sheet and the OPM March 27th statement.  But where is the animus in this case with respect to these two unions?  Where is the evidence of that?

Thank you.  I have Exhibit D now.

Where is the but-for causation in these cases? That's something that I discussed in some of the prior opinions -- I'm not sure which of the opinions -- in which we had a long discussion on but-for causation, but maybe one of my law clerks can find which one of the three or four of them it is.  I'm not sure whether it's *Federal Education* or *AFSA*.

And then a separate question:  irreparable harm. I've said that in some of the other cases that the loss of collective bargaining rights is enough in those cases for there to be irreparable harm.  And we discussed that today.

And Mr. Simon made some arguments about why the harm alleged here with respect to the National Weather Service Employees Organization -- that the only alleged harm is the loss of collective bargaining, not a loss of membership, nothing else, and that a lot of what happened in this case happened in the past.  And was there enough to show irreparable harm with respect to NWSEO on collective bargaining?

But he also said that with respect to the other Plaintiff, POPA, that there's been no allegation of any irreparable harm or any harm.

So those are the questions that I've got in my mind for you all to answer.

I now have Pages 31 and 32 of Exhibit D, which discusses the primary mission and essential functions of the National Weather Service.  And it doesn't say anything -- as Mr. Simon pointed out, it doesn't say anything about national security.  At the very end, it does.  It says -- it lists seven specific things and then it says:  Support to national security and emergency management providing mission-critical weather intelligence to the Department of Defense, DOD, the Department of Homeland Security and FEMA for national security emergency response and disaster recovery.  So maybe that is -- maybe that is sufficient.

Okay.  So as you can see, I've got a lot of questions.  And I guess we can start with Mr. Hirn because

it was his turn for rebuttal, but some of those questions are for Mr. Simon.

And while Mr. Hirn started by saying that he was going to talk about First Amendment and not *ultra vires*. I mean, feel free to talk about either or both in rebuttal.

MR. HIRN: With regard to the but-for, how we see it is the fact sheet in the first executive order set -- had a clear threat: The president will not tolerate obstruction to the way he manages his agencies, whether by fighting back, filing grievances -- wildly filing grievances and then leaving the door open for further exclusions and then actually taking the action by excluding the people that defied what the president commanded in that fact sheet; and that was that he was not going to tolerate obstruction by wildly filing grievances and by opposing his policies, how he was managing the agencies. And that's exactly what these two unions did.

There was a modicum of activity before the March 28th executive order -- March 27th executive order. There was one grievance filed just a few days before on March 20th at the PTO and one unfair labor practice. But almost everything we talked about took place in the ensuing months.

There was not 25 news articles; there was well over 40 articles. All but three of them came out after the

first executive order and after that threat on March 27th. They were major embarrassments to the Administration.  There were not 100 jobs lost; there was -- it was a criticism of the drawdown of 600 Weather Service employees.

And there is an exhibit attached to the first declaration of Joanne Becker, a NOAA document that the union obtained, that shows that the cumulative loss of people from the termination of probationary employees, from the offering of early retirement, from the offering of deferred resignation, coupled with the hiring freeze, led to a loss of 600 positions over a matter of a number of months.  And that became the lightning rod for the press's interests that the NWSEO stroked by offering and engaging in interviews that was publicly critical of the Administration for those cutbacks such that, as Mr. Simon noted, later on during the course of the summer the Weather Service changed course and started -- and said they were going to rehire and started saying, Well, we're going to back-fill those vacancies. That's how impactful that publicity was.

The document that is attached to the Becker declaration, if we look at the top of the previous page, it is -- this is not -- this is quoted from some other document out of context.  And we don't have that -- we don't have that in the record.

THE COURT:  What's quoted out of context?

MR. HIRN:  The Nos. 1 through 8.  The primary mission function.  It says at the top of the previous page, the page numbered 5 in that document, the Weather Service -- NWSEO's primary mission and central functions is defined by the national response framework, Page 37.

I don't know what that is.  But it's obviously a different document that's not in the record.  So we don't know what context this was in.

But the more important point is that the information received by the Department of Defense as explained in the affidavit from the former chief scientist at NOAA, Craig McLean, and the former NOAA administrator, Richard Spinrad, they make the clear point that all the -- anything that the Department of Defense is relying upon from the Weather Service is publicly available products that are given to everyone.

And to the extent that, for example, the National Tsunami Center, that the Navy relies on the warnings from the -- the national tsunami warnings from the National Tsunami Center, those are the public warnings that by international treaty, a UNESCO agreement, and are provided to all the Pacific nations, including China and North Korea.

Dr. Spinrad makes the point that all the information that the Weather Service provided to the Department of Defense is open-source and is actually

available to the military departments of every other country in the world.

The space weather prediction center:  They have their own -- the military has their own space weather prediction center.  There's a statute that says that the Department of Defense has to create -- has to maintain their own space weather prediction center for prediction of space weather on which the military operations are going to rely.

The ice center, which is referred to in the government's -- in Mr. Jordan's affidavit from the government, talks about the ice center, that it is a joint center by the Department of Defense, the Coast Guard and the Weather Service.

But there's only four employees -- and as Ms. Becker's affidavit explains, her second affidavit, there's only four Weather Service employees there.  The work that they produce is available to the public.  And the Department of Defense employees at that center, they do the stuff that's used for the Navy transit of the polar ice regions.  They have their own -- they do their own products, but they just happen to all do it in one place.

So we've identified or the government has identified three suboffices within the Weather Service who supposedly are supporting the military.  They're all providing products that are available to everyone.  And even

if they didn't, all the government would have had to have done was exclude those three offices from the coverage of the collective bargaining statute.

Instead, they're using it as a leverage to exclude 150 offices, where you have just a handful of people doing this work even if it was specialty work for the Department of Defense, which it is not.  Even if it was, however, they are leveraging that as an excuse to strip 4,000 -- nearly 4,000 employees of their collective bargaining rights.

With regard to the NOAA satellite service, the defense meteorological satellite program is obsolete, is being shut down.  It's being replaced by the Department of Defense's own meteorological satellites that they're going to track and operate themselves.  And there are only eight NESDIS employees assigned as satellite operators to that program out of 901 NESDIS employees.  That's less than 1 percent of all of NESDIS's employees that are doing this ostensibly primary function of national security.

And the products from those satellites are once again used by everybody.  They're used by the hurricane forecasters; they're available to the private sector; it's available on the NESDIS's website.  None of these are military-focused or specific products that anybody is doing. And the defense meteorological satellite program is about to be over.

So that's our response to the -- to whether the Weather Service is involved in national security.

We answered the but-for, how we view it.

And I forgot what else your Honor was particularly interested in.

THE COURT:  I asked about irreparable harm.

MR. HIRN:  Yes.  Yes.

At the Weather Service, at the Weather Service and at PTO, we're in a constant state of change.  At the Weather Service in particular, there was ongoing discussions on how to reorganize weather forecasting operations nationwide. That is on ongoing process that's being developed.  Under our collective bargaining agreement, the union had a right to be -- input and to participate in that.  And that input was being highly welcomed by Weather Service leadership. They wanted buy-in from the employees.  They wanted to know from the employees, is this really going to work in real time in the field?

Those conversations, which will lead to bargaining over whatever will eventually be decided upon, are ongoing; and the union is being cut off from an opportunity to continue those discussions and then to -- and then the opportunity to bargain over the impact of whatever is decided.

That is an immediate, ongoing harm.  This is going

to be the greatest change in Weather Service operations since the reorganization of the National Weather -- the reorganization and modernization of the National Weather Service in the early 1990s that brought us the 122 forecast offices we have today.

The Weather Service today is essentially following the processes of the early 1990s.  But that is going to be changing as a result of computer technology, AI, a new priority, an outreaching to the local emergency managers, which is relatively new that the Weather Service is doing. The union has been a part of those discussions.

The union -- in fact, the document that the -- that is attached as Exhibit D that the government has been referring to in Joanne Becker's declaration, that is a result of recent negotiations that the union sat down with management to come up with a plan and a process to keep the forecast offices running without the 600 people there.  How to do it, how to do backup, how to do load-sharing.  This was an ongoing process.

And this process that just happened this year, it is an example of how the public interest is served by the collective bargaining and collaborative labor relations efforts that were ongoing at the National Weather Service. And everything like that is now being cut off.

Similarly, at the PTO, there is a new emphasis on

alleviating the backlog of patent obligations that's called pendency that led the agency this year in October to issue new performance standards for the 9,000 patent examiners that are going to make them work more time -- I mean, do more work on their own time without compensation.  If the union could tomorrow, if a preliminary injunction is granted, go back to management to sit down at the bargaining table to negotiate appropriate arrangements and accommodations and mitigation of the impact that these new performance standards are having on the employees, on the 9,000 patent examiners.

And in light of the dynamic -- the overall dynamic changes going on in the federal government, there is going to be something new tomorrow at each one of these agencies.  And that the unions -- these two unions will be cut off and their employees that they represent will be cut off to have any counterbalance, to have any input, to have any form to seek the mitigation of any adverse impacts.  They will be cut off from the opportunity to provide input that will better agency operations for the public's benefit.

And I'm not being Pollyanish here, but that's exactly why Congress enacted the statute to begin with.  It understood that having the input from the rank-and-file employees through their chosen representative is going to better serve the government and the public by providing

better public services through that dialogue, through that engagement.

One point that I do want to rebut that the government said in their argument is that the filing of grievances slows down agencies' responses.

It does not. The filing of a -- when a union files a grievance, it does not act as an injunction. It does not stop management from engaging in whatever it is that's being grieved, unless of course management sees the light of day and grants the grievance and changes course.

And while all the grievances that POPA has been filing was not a public First Amendment -- a public speech First Amendment activity like the Weather Service employees engaged in, the First Amendment protects the right to petition. And the case law is clear that filing a grievance is an aspect -- the filing of union grievances is protected by the right to petition the government and is also a First Amendment activity, even though it is privately engaged in.

And throughout the government's arguments, their briefs and their affidavits, they're complaining that the filing of a grievance -- and even in the president's first fact statement -- the filing of grievances is somehow obstructing the government, harming national security.

The filing of grievances does not do that. Only if management admits that -- finds that they are indeed

doing something wrong and grants the grievance. Other than that, it is a First Amendment right to petition the government.

And to the extent that the filing of grievances is being used throughout these executive orders and with regard to these two Plaintiffs as an excuse to say that that is a grounds to strip them of their collective bargaining rights is a direct impingement of the First Amendment right. That is the retaliation for the exercise of a First Amendment right to petition the government.

It can't be -- the documents can't be any clearer that the filing of grievances is what is annoying the government and why they're pulling recognition. But that is a First Amendment right to petition the government.

And it doesn't harm -- and the filing of grievances harms in no way national security.

All right. I think on that I'll call it a day. Thank you.

THE COURT: All right, Mr. Simon. I raised some questions with you, too.

MR. SIMON: Thank you, your Honor.

Let me first address, if I could, the Court's statement that the Court does not see how the Patent Office has a primary function of national security.

I want to emphasize it doesn't have -- the statute

7103 doesn't say "the primary function"; it just says "a primary function."  And the term "function" is broadly defined in the statutory provision that I previously referenced.

I just want to direct the Court to the Invention Secrecy Act that is 35 USC 181.  We quote it in relevant part at Page 8 of our opposition.  I'll paraphrase.  But what it says is, whenever the publication or disclosure of an invention by the publication of an application or by the granting of a patent... -- again, I'm paraphrasing -- might in the opinion of the commissioner of patents be detrimental to the national security, he, meaning the commissioner of patents, shall make the application for patent in which such invention is disclosed available for inspection to various defense agencies.

Now, the Martin-Wallace declaration, Paragraph 11, says that 120 -- each year, 120,000 patents are screened, are flagged for screening pursuant to the Invention Secrecy Act.

THE COURT:  How many?

MR. SIMON:  120,000 out of I think roughly 600,000 or so.  So it's about 20 percent.

Each year, 10,000 are referred to defense agencies for evaluation.

There's an office within the patent division

called the Office of Licensing Review which makes the referral determinations of the applications that are screened.

Now, there's an automated process that does the initial screening.  So when 600,000 come in, there's some sort of automated process.  And that reduces it down to the 120,000 number.

But then it has -- those have to then be screened and the folks in this Office of Licensing Review need to make the determination under the Invention Secrecy Act whether that publication of that patent might be detrimental to national security.

So we submit -- now, they don't make the ultimate decision as to whether it's detrimental to national security.  That's done by the defense agencies.  But they have the statutory duty imposed by Congress to do that.

So we submit a duty imposed by Congress on the Patent Office makes that function a primary function of that agency subdivision, and therefore satisfies -- or at a minimum, under the review that the Court is undertaking here, amply supports the president's determination that the Patent Office has national security work as a primary function.

And there's other -- you know, this is --

THE COURT:  You discussed that statute in your

brief, I see.

MR. SIMON:  We do.  It's also discussed in the Martin-Wallace declaration as well as some other aspect of what the Patent Office does.

In terms of animus, again, POPA has not publicly taken any -- there's been no assertion that they've publicly criticized the Administration.  Counsel mentions private grievances, private grievances, which happened before the March 27th order as well.

So again, we submit that the things that happened after March 27th are in no greater scale and indeed are smaller scale than the ones that happened before.

And even if the Court were to find some kind of causal connection there, we think we've established for the very same reason that these subdivisions would have been excluded regardless of the alleged retaliatory animus.  Why? Because they filed grievances before March 27th.  They were not part of that order or that exclusion order.

And so filing grievances of the same or less scale afterwards just doesn't raise a plausible inference that they would not have been, you know, excluded but for that activity.

And I think the -- we would refer the Court to the Ninth Circuit decision on that.  The Ninth Circuit in one of the AFG cases out there in a decision staying an appeal of a

PI made -- I mean, made essentially a similar holding.  I don't know what the specific facts -- I can't recall the specific facts.  But I think these facts are very likely less than what was at issue in the Ninth Circuit.

So they talk about -- counsel talked about 600 reductions at NWSEO -- I'm sorry -- at NWS and referred the Court to Exhibit A of the first Becker declaration.  That's Exhibit A.  But if you look at that exhibit, most of those were voluntary.

So again, this is of a different character than some of the other cases before the Court.  These are folks voluntarily accepting deferred resignations or early retirements.  If you exclude those people, you're looking more -- the number is closer to about 100 out of over 4,000.

So again, not the same magnitude of -- in connection with some of the other cases this Court has had before it.

And this idea that NWS's decision to rehire -- that was announced, I guess, in June or July was because of, you know, what they characterize as NWSEO criticism: There's nothing in the record that says that.  That's entirely speculative.

Going back to Exhibit D, as in dog, to the second Becker declaration, I just want to emphasize, that's a document they submitted.  They attached that to their reply.

And it's explained in Paragraph 13 of the second Becker declaration.  That explains it.

They say -- NWSEO says it reached agreement.  And it was not in the context of these centralization changes that counsel referenced as sort of still being ongoing or in the planning stages.  That was in reference to some of these reductions in staffing that occurred in connection with some of those, you know, deferred resignation/voluntary retirement.  And I'll acknowledge I think about 100 people were also maybe let go involuntarily, according to that exhibit.

So as to -- the other point I'd like to make, your Honor, is counsel suggested the size of the office within an agency subdivision dictates whether the work performed by that office is or is not a primary function of the agency subdivision.

I don't think the statutory language supports that.  It's a primary function, not the primary function.  And the fact that there are offices within each of these agency subdivisions that performed work that's related to national security or the national security work suffices to support the president's determination to exclude the agency subdivision because the exclusion in 7103 is an organizational exclusion, not an employee-by-employee exclusion.

In terms of the NESDIS -- and, your Honor, I'll say, I tried to avoid the acronyms in our filing.

THE COURT:  Well, I'm glad that a glossary was provided.  It's very helpful.  I've got it right in front of me.

MR. SIMON:  So NESDIS was the small unit within NOAA that operates satellites for -- a portion of NESDIS operates satellites for the Navy or the -- I don't know which branch, but for the military.  That's -- I don't think that's disputed.  I think they're contending that -- well, it may go out of operation next year.

Now, what's relevant is, as of the time of -- that this executive order issued, it was still in operation, still operated by NESDIS and therefore still -- a primary function is national security.

There's also, you know, no guarantee.  Just because something's projected to go out of service and be replaced by something else in the government doesn't mean it's necessarily going to happen or at least going to happen on that timetable.

On the irreparable harm, again, there's really nothing in the record.  Counsel's making some arguments to the Court.  But where in the record is there some operational change that is imminent in which collective bargaining rights will cause any of these unions irreparable

harm?

Again, for POPA, I don't believe counsel identified anything. And in fact, I think he said something about how -- who knows what's going to happen tomorrow? That's quintessentially speculation and cannot support a preliminary injunction.

And on the NWS issue about the organizational change, the centralization, counsel stated that NWSEO has been involved in giving input on that. But I'll just note that the statute, Section 7106, says: Nothing affects management from determining the organization of an agency.

So nothing in the statute -- so to the extent management was receiving input, that was entirely at its discretion. And so if management chooses or now as a result of the executive order is not seeking input on an operational change before it has been implemented, then that can't be irreparable harm because they don't have a statutory right to that.

Again, on the pendency award and the performance appraisal issues regarding the PPO -- regarding the PTO, those were the only things I believe counsel identified specifically. The pendency award I believe their declaration says was implemented or -- you know, went into effect in April. And then the performance appraisal went into effect early October.

So these already are in effect.  They've already been implemented.

And so again, we would submit that that can't support prospective relief.

If the Court has any other questions...

THE COURT:  No.

MR. SIMON:  Thank you.

THE COURT:  Anything else, Mr. Hirn?

MR. HIRN:  Very quickly.

Two things.  Counsel just referred to the grievances, plural, filed before March 27th at the Patent Office in the plural.

It was but one.  March 20th, just a day before the executive order, which I'm sure the Texas executive order was well under development by then.  But just one grievance filed at the PTO before that.

And secondly, at the PTO, this Office of Licensing and Review, where the initial screening of the patent applications for national security implications are conducted, there's only 25 patent examiners involved of a patent examination core of 9,000.

So it's not a primary function based on sheer numbers.

And the government is simply trying to use that, to leverage that, as a justification for excluding everybody

else when it could have just excluded that office.

But more importantly, the former commissioner of patents, Robert Stoll, provided an affidavit which is in the record. He not only was a former commissioner of patents, but he was also for a while the direct supervisor of this particular office.

And he said: While employed by the USPTO, none of the procedural requirements of federal labor relations, including the USPTO's collective bargaining agreement with POPA, created any delays that impacted the ability of the commissioner of patents or the Office of Licensing and Review to carry out their responsibilities under the Invention Secrecy Act; and I cannot imagine a situation, a scenario, under which that would occur.

That's not an opinion. He was the man in charge of that office.

THE COURT: Okay.

MR. HIRN: Thank you.

THE COURT: Do we have a schedule for summary judgment briefing?

MR. SIMON: No, your Honor.

THE COURT: Why don't you all get together and come up with a schedule.

I'm going to take this motion for preliminary injunction under advisement. I'm not sure when I'll issue

an opinion.  So you may as well get started on your summary judgment briefing, assuming there's going to be summary judgment motions.  You don't need to hear from me before you do that.

You look puzzled.

MR. HIRN:  Yes.  Well, I think we're looking puzzled perhaps because we were briefing summary judgment in the *AFSA* case and you stayed it.

THE COURT:  I stayed it because somebody asked me to.

MR. HIRN:  I don't think we did, did we?

MR. SIMON:  Your Honor, the government asked.  And I guess the predicate of that was the pendency of the --

THE COURT:  Appeals.

MR. SIMON:  -- of the appeals, which are now even more -- closer to finalization than they were then.

So I guess all I would say, your Honor, is the Court should not be surprised if we request deferral of summary judgment briefing in light of the -- so the Court can have guidance from the D.C. Circuit.

THE COURT:  All I'm saying is this:  Do whatever you want.  I'm not promising to -- in the other cases that have been argued here, I guess after the *NTEU* opinion -- I issued a couple written opinions and then we were back here and I gave some oral opinions.  I can't keep them all

straight.  Right?  And I said "for the same reasons," essentially, and I explained my reasons here orally.

I find this one more complicated and more difficult.  And I'm not ready to say in my own mind whether I'm going to grant or deny a preliminary injunction.  So therefore, I'm not going to give you an oral opinion, because I don't have an opinion.

But I don't know when I will decide it.  So if you want to agree on summary judgment briefing, fine.  If you want to wait until I decide the preliminary injunction question in this case, fine.  If you want to wait until the Circuit decides in the three cases they're hearing argument on on Monday, that's okay, too.

Just talk to each other and file something and let me know if you agree on a course of action or if you disagree on a course of action.

I don't mind staying this until I decide the preliminary injunction if that's what you want or staying it until we see what the D.C. Circuit does if that's what you want.  If you reach an agreement, I'll probably endorse your agreement.  If you have differing views, then I'll decide what to do.  But I'm just not prepared to give an opinion today, unlike the other cases that I've heard.  Okay?

MR. HIRN:  Thank you.

MR. SIMON:  Thank you, your Honor.

THE COURT:  Thank you.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 17th day of December, 2025.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269