IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WEATHER SERVICE EMPLOYEES ORGANIZATION, et al., | : |
| Plaintiffs, | : |
| v. | : Case No. 1:25-cv-02947-PLF |
| DONALD J. TRUMP, et al., | : |
| Defendants. | : |

## SECOND DECLARATION OF JOANN BECKER

I, JoAnn Becker, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    As stated in my initial declaration submitted in this case, I have been employed by the National Weather Service as a forecaster for nearly three decades. I serve as National President of the National Weather Service Employees Organization ("NWSEO") since November 2023. I served as Executive Vice President of NWSEO from October 2019 through November 2023, and I held various other elected positions in NWSEO going back to 1997. In that capacity and as part of my responsibilities in that role, I have visited countless NWS and NOAA offices, discussed with hundreds of National Weather Service and other NOAA employees their job responsibilities and the operations of their offices, and met and discussed agency operations with scores of agency management officials, and engaged in innumerable negotiations with NWS and NOAA representatives over

working conditions of agency employees and agency operations, including a number

of the collective bargaining agreements that Mr. Jordan derisively refers to in his

declaration – all of which were *willingly* entered into by the agency. I have also

taken numerous training courses provided by the Federal Labor Relations

Authority on the provisions and operations of the Federal Service Labor

Management Relations Statute and, in addition to being an atmospheric scientist, I

also have a Master of Business Administration degree.

2.      In paragraph 3 of his declaration, Mr. Jordan refers to the Reorg. Plan

No. 4 of 1970 and erroneously states that the "primary functions of NESDIS and

NWS have evolved from these authorities transferred from DOW [*sic*, DOD]."

Section 1(e) of the Reorganization Plan transferred only hydrologic surveys of the

Great Lakes and Lake Champlain and research into and publication of data from

those surveys from the Army Corps of Engineers to NOAA. See exhibit A attached

hereto. That work is now being done by another NOAA line office, the National

Ocean Service, which is not part of either the National Weather Service or NESDIS.

3.      The satellite data to which Mr. Jordan refers in paragraph 4 is

provided to and utilized by everyone, all across the world, including U.S.

adversaries, and not just the Department of Defense.  For example, the data from

these satellites is used by National Weather Service forecasters for hurricane

tracking. https://www.pbs.org/newshour/science/why-forecasters-are-concerned-

about-losing-3-key-satellites-ahead-of-peak-hurricane-season. Anyone can obtain

DSMP data here: https://www.ncei.noaa.gov/products/satellite/defense-

meteorological-satellite-program. You will also note that the NESDIS website states: "*The Defense Meteorological Satellite Program (DMSP) will continue through September 2026, the planned end of the DMSP mission.*" According to a NOAA information statement: "Congress voted to terminate the DMSP program as far back as 2015 and DMSP will be replaced by the Weather System Follow-on Microwave (WSF-M) and the Electro-Optical/Infrared Weather System (EWS). DMSP satellites remain operational today but are more than a decade past their expected end of life."

https://www.ospo.noaa.gov/data/messages/2025/07/MSG_20250701_1815.html. In fact, DOD is now transitioning to use of a new set of military satellites the operation of which NESDIS has no involvement.

https://www.defensenews.com/space/2025/04/25/space-force-weather-satellite-deemed-ready-for-forecasts/ .

4.      The Space Force website which Mr. Jordan's declaration cited and from which he has apparently obtained his information is outdated. It says: "Current as of Oct 2020." See exhibit B attached hereto, page 3.

5.      Control Table 5, Exhibit 4B in NOAA's FY 2026 Budget Justification submitted to Congress reports that there are 901 Full Time equivalent employees in NESDIS. https://www.noaa.gov/sites/default/files/2025-06/NOAA%20FY26%20Congressional%20Justification.pdf . Of these 901 employees, only eight employees (consisting of four two-person crews who work rotating shifts) are assigned to the DMSP as satellite operators. I am at a loss to understand how

work that is performed by less than 1% of an agency's workforce can constitute a "primary function" of an agency.

6.      The weather observations and data Mr. Jordan refers to in paragraphs 9 and 10 of his declaration are also unrestricted and available to everyone, anywhere and is used by the National Weather Service, private forecasting companies, and the meteorological and military services of nations around the globe. There are no data products or observations produced uniquely for or specifically at the request of DOD. This includes the data and observations from the 22 NEXRAD radar units and 77 ASOS surface weather observation units operated by DOD. I am again at a loss to understand how the fact that DOD operates some radar and surface weather observation units proves that the "primary function" *of the NWS* is national security.

7.      Paragraph 11 of Mr. Jordan's declaration paints an inaccurate picture of the military's reliance on the NWS's Space Weather Prediction Center. DOD has its own Space Weather Operations Center whose "products are used for mission planning and environmental situational awareness by national agencies, Department of Defense operators, warfighters and decision makers." https://www.557weatherwing.af.mil/About-Us/Space-Weather/ . The Space Weather to Improve the Forecasting of Tomorrow (PROSWIFT) Act, Pub. L. No. 116-181, 51 U.S.C. § 60601(a)(2), defines the respective roles of the NWS and DOD in forecasting space weather and clearly states that DOD is itself responsible for space

weather forecasting "for the Department's unique missions and applications" and

not the NWS:

> (A) The National Oceanic and Atmospheric
> Administration provides operational space weather monitoring,
> forecasting, and long-term data archiving and access for civil
> applications, maintains ground-based and space-based assets to
> provide observations needed for space weather forecasting, prediction,
> and warnings, provides research to support operational
> responsibilities, and develops requirements for space weather
> forecasting technologies and science.

> (B) The Department of Defense provides operational space
> weather research, monitoring, and forecasting for the Department's
> unique missions and applications.

Similarly, Section 4 of Executive Order 13,744 (October 13, 2016), states that:

> The Secretary of Defense shall ensure the timely provision of
> operational space weather observations, analyses, forecasts, and other
> products to support the mission of the Department of Defense and
> coalition partners, including the provision of alerts and warnings for
> space weather phenomena that may affect weapons systems, military
> operations, or the defense of the United States.

and that:

> The Secretary of Commerce shall:

> (i) provide timely and accurate operational space weather forecasts,
> watches, warnings, alerts, and real-time space weather monitoring for
> the government, civilian, and commercial sectors, *exclusive of the
> responsibilities of the Secretary of Defense;*

(emphasis added). Section 3, "Responsibility," of the agency's own internal

regulation, *National Weather Service Instruction 10-1103, Notification Procedure

During a Significant Space Weather Event,* (Dec. 27, 2024), echoes this, stating that

the SWPC "will be the single voice of the U.S. Government and will coordinate the

5

dissemination of space weather information with its government, civilian and commercial partners, and with other entities, pursuant to established agreements, and *exclusive of the responsibilities of the Department of Defense.*"

https://www.weather.gov/media/directives/010_pdfs/pd01011003curr.pdf

8.      Although the National Ice Center is physically located in a NOAA facility, the U.S. Navy forms the core of National Ice Center with the Naval Ice Center, an Echelon V command under Naval Meteorology and Oceanography Command. https://usicecenter.gov/About. There are only four NWS employees assigned to the National Ice Center. Most of its products are available to the public on its website.

9.      Mr. Jordan incorrectly states in paragraph 16 of his declaration that telework at the NWS and NESDIS was cancelled in January 2025 (when he was employed as a private lobbyist and not by NOAA) because "it was necessary to the mission of NWS and NESDIS to eliminate telework for all employees of those organizations." First of all, telework was cancelled Department-wide as a result of the January 2025 "Return to In Person Work" order issued by the President, not because of a determination made by NESDIS and NWS that was required by their mission. Second, telework at the NWS and NESDIS was not cancelled until March 2025 and in the notice that was sent to me as the Union's President, I was told by NOAA that telework was being terminated as a result of the President's January 2025 government-wide order and not because the Department of Commerce

6

determined that it was necessary for the mission of the NWS or NESDIS as Mr.
Jordan claims. See exhibit C attached hereto.

10.    The claims made by Mr. Jordan in paragraph 17 of his declaration
about the certain bargaining and grievance activity that took place over ten years
ago are irrelevant. Mr. Jordan was not even employed by NOAA at the time so I am
yet again at a loss to understand how he would have any first-hand knowledge of
these activities or any basis to draw the conclusions that he did. The NWS willingly
and wisely agreed to provide the disposable items referred to in the arbitration case
Mr. Jordan discusses as a means to mitigate the spread of the H1N1 virus because
shift workers in forecast offices across the country eat at work during forecasting
shifts (since meal breaks are not scheduled) and use common kitchen facilities. This
benefited the agency because it reduced sick leave and promoted continuity of
forecasting operations.

11.    In footnote 1 to paragraph 21 of his declaration, Mr. Jordan
erroneously states that NWSEO continues to represent 1,229 employees in other
bargaining units in NOAA that were not excluded from collective bargaining by the
August executive order. NWSEO has continued collective bargaining rights in three
bargaining units: attorneys in the NOAA Office of General Counsel (89 employees);
NOAA's Aircraft Operations Center (approximately 55-60 employees) and NOAA's
Atlantic Oceanographic and Meteorological Laboratory in Key Biscayne
(approximately 35 employees).

12.     Paragraph 22 of Mr. Jordan's declaration fails to identify a single "initiative[ ] related to national security" with which the two NWSEO collective bargaining agreements have interfered.

13.     None of what Mr. Jordan states in paragraph 23 of his declaration is correct. There are ample provisions in Article 20, sections 7, 8 and 9 of the collective bargaining agreement that permit management to change an employees' shift schedule in a forecast office to provide coverage of a vacant shift, although some scenarios may create the entitlement to overtime. See pages 79-80 of the NWSEO-NWS collective bargaining agreement attached to Mr. Jordan's declaration. Earlier this year, NWSEO negotiated a supplemental agreement with the NWS, titled "Service Level Standards Table and Reduced Service Operations," to ensure proper shift coverage and back-up staffing allocations that have become necessary to provide a minimal level of services in the face of the disastrous staffing reductions that have occurred this year at NWS Forecast Offices as a result of as a result of the "Deferred Resignation Program, departures of probationary employees, employee reductions due to the Voluntary Early Retirement Authority/Voluntary Separation, Incentive Payment (VERA/VSIP) or a possible reduction in force (RIF)." See exhibit D attached hereto. The NWS's bargaining obligation did not "prevent[ ] NWS from adapting swiftly and decisively in response to exigent and evolving logistical needs" as Mr. Jordan claims. Rather it fell to us, working collaboratively with NWS management, to find solutions to problems caused by the political appointees of this Administration that endangered the safety of the American public.

8

14.    Mr. Jordan incorrectly states in paragraph 23 that "union efforts have delayed management implementation of a new GS-5 to GS-12 career ladder for NWS meteorologists." This agreement was negotiated and went into effect in 2019, and a copy of this agreement is attached hereto as exhibit E.

15.    In paragraph 24 of his declaration Mr. Jordan states that the NWS-NWSEO CBA "led to a lack of consistent and uniform practice across NWS with respect to office operations." This is Orwellian doublespeak. The whole purpose of the collective bargaining agreement is to ensure the consistency of practices throughout the NWS, while allowing variances when necessary for local mission needs.

16.    The ostensibly "onerous process for offering overtime assignments" referred to in paragraph 25 of Mr. Jordan's declaration simply requires management to attempt to contact an employee who was off work rather than assigning the 12-hour overtime shift to an employee who was already on duty in order to avoid having him or her work 24 hours in a row (in command of the nation's weather satellites). It should not be forgotten that management *freely agreed* to this process in the collective bargaining agreement.

17.    NWSEO was engaged in good faith discussion with NWS leadership about the matters discussed in paragraph 29 of Mr. Jordan's declaration when recognition was withdrawn. This is discussed in paragraph 30 of my initial declaration in this case. During those discussions, NWSEO has expressed deep concerns about overreliance on centralized, computer-generated forecasts because

9

such forecasts are much less reliable in many places such as marine regions, mountains and the tropics. Had those discussions been permitted to continue, I have every confidence that the parties would have reached agreement about the best way to implement further reliance on centralized forecasting without sacrificing forecast quality by the continued inclusion of human skill in the development of the forecasting product when necessary. Such discussions would benefit the agency because the viewpoints and experience of the 1,300 or so line forecasters would be included in the determination of how best to prepare the forecast product. I also note that Mr. Jordan claims that the centralization of forecasting is necessary to free up forecasters' time to "engage[ ] with communities, local officials and emergency managers." But those activities serve the general public and are not related to any purported role in national security or assistance to DOD.

18.     Similarly, paragraph 30 of Mr. Jordan's declaration fails to draw any connection between Article 14 and Article 15 of the NWSEO·NESDIS collective bargaining agreement and national security. The reliance on these two contract provisions is unexplained because Article 14 is basically a restatement of the Department of Commerce and NOAA's own merit assignment plans (as section 1 clearly indicates) and Article 15 is essentially a restatement of OPM temporary promotion regulations. Mr. Jordan's declaration claims that the CBA "restricts management's flexibility in assigning duties, relocating staff or modifying roles in response to emerging threats or operational needs." The contract article, to which

Mr. Jordan refers, states: "Management has the right to reassign employees in its sole discretion." See Article 14, section 11 (b), p. 59 of Exhibit C to Mr. Jordan's declaration. In addition, the Federal Service Labor Management Relations Statute states that "nothing in this chapter shall affect the authority of any management official of any agency-- . . . to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a).

JOANN BECKER

Signed on November 24, 2025 at Kansas City, MO.

11

# EXHIBIT A

raphy headed by Dr. James Wakelin, and by the information developed during both House and Senate hearings on proposed NOAA legislation.

Many of those who have advised me have proposed additional reorganizations, and it may well be that in the future I shall recommend further changes. For the present, however, I think the two reorganizations transmitted today represent a sound and significant beginning. I also think that in practical terms, in this sensitive and rapidly developing area, it is better to proceed a step at a time—and thus to be sure that we are not caught up in a form of organizational indigestion from trying to rearrange too much at once. As we see how these changes work out, we will gain a better understanding of what further changes—in addition to these—might be desirable.

Ultimately, our objective should be to insure that the nation's environmental and resource protection activities are so organized as to maximize both the effective coordination of all and the effective functioning of each.

The Congress, the Administration and the public all share a profound commitment to the rescue of our natural environment, and the preservation of the Earth as a place both habitable by and hospitable to man. With its acceptance of these reorganization plans, the Congress will help us fulfill that commitment.

RICHARD NIXON.

THE WHITE HOUSE, July 9, 1970.

**REORGANIZATION PLAN NO. 4 OF 1970**

Eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, as amended Pub. L. 94–461, §4(c)(1), Oct. 8, 1976, 90 Stat. 1969; Pub. L. 95–219, §3(a)(1), Dec. 28, 1977, 91 Stat. 1613; Pub. L. 98–498, title III, §320(c)(3), Oct. 19, 1984, 98 Stat. 2309; Pub. L. 99–659, title IV, §407(d), Nov. 14, 1986, 100 Stat. 3739; Pub. L. 112–166, §2(b)(1), Aug. 10, 2012, 126 Stat. 1283

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, July 9, 1970, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

SECTION 1. TRANSFERS TO SECRETARY OF COMMERCE

The following are hereby transferred to the Secretary of Commerce:

(a) All functions vested by law in the Bureau of Commercial Fisheries of the Department of the Interior or in its head, together with all functions vested by law in the Secretary of the Interior or the Department of the Interior which are administered through that Bureau or are primarily related to the Bureau, exclusive of functions with respect to (1) Great Lakes fishery research and activities related to the Great Lakes Fisheries Commission, (2) Missouri River Reservoir research, (3) the Gulf Breeze Biological Laboratory of the said Bureau at Gulf Breeze, Florida, and (4) Trans-Alaska pipeline investigations.

(b) The functions vested in the Secretary of the Interior by the Act of September 22, 1959 (Public Law 86–359, 73 Stat. 642, 16 U.S.C. 760e–760g; relating to migratory marine species of game fish).

(c) The functions vested by law in the Secretary of the Interior, or in the Department of the Interior or in any officer or instrumentality of that Department, which are administered through the Marine Minerals Technology Center of the Bureau of Mines.

(d) All functions vested in the National Science Foundation by the National Sea Grant College and Program Act of 1966 (80 Stat. 998), as amended (33 U.S.C. 1121 et seq.).

(e) Those functions vested in the Secretary of Defense or in any officer, employee, or organizational entity of the Department of Defense by the provision of Public Law 91–144, 83 Stat. 326, under the heading "Operation and maintenance, general" with respect to "surveys

and charting of northern and northwestern lakes and connecting waters," or by other law, which come under the mission assigned as of July 1, 1969, to the United States Army Engineer District, Lake Survey, Corps of Engineers, Department of the Army and relate to (1) the conduct of hydrographic surveys of the Great Lakes and their outflow rivers, Lake Champlain, New York State Barge Canals, and the Minnesota-Ontario border lakes, and the compilation and publication of navigation charts, including recreational aspects, and the Great Lakes Pilot for the benefit and use of the public, (2) the conception, planning, and conduct of basic research and development in the fields of water motion, water characteristics, water quantity, and ice and snow, and (3) the publication of data and the results of research projects in forms useful to the Corps of Engineers and the public, and the operation of a Regional Data Center for the collection, coordination, analysis, and the furnishing to interested agencies of data relating to water resources of the Great Lakes.

(f) So much of the functions of the transferor officers and agencies referred to in or affected by the foregoing provisions of this section as is incidental to or necessary for the performance by or under the Secretary of Commerce of the functions transferred by those provisions or relates primarily to those functions. The transfers to the Secretary of Commerce made by this section shall be deemed to include the transfer of authority, provided by law, to prescribe regulations relating primarily to the transferred functions.

SEC. 2. ESTABLISHMENT OF ADMINISTRATION

(a) There is hereby established in the Department of Commerce an agency which shall be known as the National Oceanic and Atmospheric Administration, hereinafter referred to as the "Administration."

(b) There shall be at the head of the Administration the Administrator of the National Oceanic and Atmospheric Administration, hereinafter referred to as the "Administrator." The Administrator shall be appointed by the President, by and with the advice and consent of the Senate, and shall be compensated at the rate now or hereafter provided for Level III of the Executive Schedule Pay Rates (5 U.S.C. 5314).

(c) There shall be in the Administration a Deputy Administrator of the National Oceanic and Atmospheric Administration who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be compensated at the rate now or hereafter provided for Level IV of the Executive Schedule Pay Rates (5 U.S.C. 5315). The Deputy Administrator shall perform such functions as the Administrator shall from time to time assign or delegate, and shall act as Administrator during the absence or disability of the Administrator or in the event of a vacancy in the office of Administrator.

(d) There shall be in the Administration a Chief Scientist of the National Oceanic and Atmospheric Administration who shall be appointed by the President and shall be compensated at the rate now or hereafter provided for Level V of the Executive Schedule Pay Rates (5 U.S.C. 5316). The Chief Scientist shall be the principal scientific adviser to the Administrator, and shall perform such other duties as the Administrator may direct. The Chief Scientist shall be an individual who is, by reason of scientific education and experience, knowledgeable in the principles of oceanic, atmospheric, or other scientific disciplines important to the work of the Administration. [As amended Pub. L. 94–461, §4(c)(1), Oct. 8, 1976, 90 Stat. 1969; Pub. L. 99–659, title IV, §407(d), Nov. 14, 1986, 100 Stat. 3739; Pub. L. 112–166, §2(b)(1), Aug. 10, 2012, 126 Stat. 1283.]

(e)(1) There shall be in the Administration a General Counsel and five Assistant Administrators, one of whom shall be the Assistant Administrator for Coastal Zone Management and one of whom shall be the Assistant Administrator for Fisheries. The General Counsel and each Assistant Administrator shall be appointed by the Secretary, subject to approval of the President, and shall be compensated at a rate now or hereafter pro-

vided for level V of the Executive Schedule Pay Rates (5 U.S.C. 5316).

(2) The General Counsel shall serve as the chief legal officer for all legal matters which may arise in connection with the conduct of the functions of the Administration.

(3) The Assistant Administrator for Coastal Zone Management shall be an individual who is, by reason of background and experience, especially qualified to direct the implementation and administration of the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(4) The Assistant Administrator for Fisheries shall be responsible for all matters related to living marine resources which may arise in connection with the conduct of the functions of the Administration. [As amended Pub. L. 95–219, §3(a)(1), Dec. 28, 1977, 91 Stat. 1613.]

(f) The President may appoint in the Administration, by and with the advice and consent of the Senate, two commissioned officers to serve at any one time as the designated heads of two principal constituent organizational entities of the Administration, or the President may designate one such officer as the head of such an organizational entity and the other as head of the commissioned corps of the Administration. Any such designation shall create a vacancy on the active list and the officer while serving under this subsection shall have the rank, pay, and allowances of a rear admiral (upper half).

(g) Any commissioned officer of the Administration who has served under (d) or (f) and is retired while so serving or is retired after the completion of such service while serving in a lower rank or grade, shall be retired with the rank, pay, and allowances authorized by law for the highest grade and rank held by him; but any such officer, upon termination of his appointment in a rank above that of captain, shall, unless appointed or assigned to some other position for which a higher rank or grade is provided, revert to the grade and number he would have occupied had he not served in a rank above that of captain and such officer shall be an extra number in that grade.

### SEC. 3. PERFORMANCE OF TRANSFERRED FUNCTIONS

The provisions of sections 2 and 4 of Reorganization Plan No. 5 of 1950 (64 Stat. 1263) shall be applicable to the functions transferred hereunder to the Secretary of Commerce.

### SEC. 4. INCIDENTAL TRANSFERS

(a) So much of the personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available, or to be made available in connection with the functions transferred to the Secretary of Commerce by this reorganization plan as the Director of the Office of Management and Budget shall determine shall be transferred to the Department of Commerce at such time or times as the Director shall direct.

(b) Such further measures and dispositions as the Director of the Office of Management and Budget shall deem to be necessary in order to effectuate the transfers referred to in subsection (a) of this section shall be carried out in such manner as he shall direct and by such agencies as he shall designate.

(c) The personnel, property, records, and unexpended balances of appropriations, allocations, and other funds of the Environmental Science Services Administration shall become personnel, property, records, and unexpended balances of the National Oceanic and Atmospheric Administration or of such other organizational entity or entities of the Department of Commerce as the Secretary of Commerce shall determine.

(d) The Commissioned Officer Corps of the Environmental Science Services Administration shall become the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration. Members of the Corps, including those appointed hereafter, shall be entitled to all rights, privileges, and benefits heretofore available under any law to commissioned officers of the Environmental Science Services Administration, including those rights, privileges, and benefits heretofore accorded by law to commissioned officers of the former Coast and Geodetic Survey.

(e) Any personnel, property, records, and unexpended balances of appropriations, allocations, and other funds of the Bureau of Commercial Fisheries not otherwise transferred shall become personnel, property, records, and unexpended balances of such organizational entity or entities of the Department of the Interior as the Secretary of the Interior shall determine.

### SEC. 5. INTERIM OFFICERS

(a) The President may authorize any person who immediately prior to the effective date of this reorganization plan held a position in the executive branch of the Government to act as Administrator until the office of Administrator is for the first time filled pursuant to provisions of this reorganization plan or by recess appointment, as the case may be.

(b) The President may similarly authorize any such person to act as Deputy Administrator and authorize any such person to act as Associate Administrator.

(c) The President may similarly authorize a member of the former Commissioned Officer Corps of the Environmental Science Services Administration to act as the head of one principal constituent organizational entity of the Administration.

(d) The President may authorize any person who serves in an acting capacity under the foregoing provisions of this section to receive the compensation attached to the office in respect of which he so serves. Such compensation, if authorized, shall be in lieu of, but not in addition to, other compensation from the United States to which such person may be entitled.

### SEC. 6. ABOLITIONS

(a) Subject to the provisions of this reorganization plan, the following, exclusive of any functions, are hereby abolished:

(1) The Environmental Science Services Administration in the Department of Commerce (established by Reorganization Plan No. 2 of 1965, 79 Stat. 1318), including the offices of Administrator of the Environmental Science Services Administration and Deputy Administrator of the Environmental Science Services Administration.

(2) The Bureau of Commercial Fisheries in the Department of the Interior (16 U.S.C. 742b), including the office of Director of the Bureau of Commercial Fisheries.

(b) Such provisions as may be necessary with respect to terminating any outstanding affairs shall be made by the Secretary of Commerce in the case of the Environmental Science Services Administration and by the Secretary of the Interior in the case of the Bureau of Commercial Fisheries.

[Amendment by Pub. L. 112–166 to section 2(d), effective 60 days after Aug. 10, 2012, and applicable to appointments made on and after that effective date, including any nomination pending in the Senate on that date, see section 6(a) of Pub. L. 112–166, set out as an Effective Date of 2012 Amendment note under section 113 of Title 6, Domestic Security.]

### MESSAGE OF THE PRESIDENT

To the Congress of the United States:

I transmit herewith Reorganization Plan No. 4 of 1970, prepared in accordance with chapter 9 of title 5 of the United States Code. The plan would transfer to the Secretary of Commerce various functions relating to the oceans and atmosphere, including commercial fishery functions, and would establish a National Oceanic and Atmospheric Administration in the Department of Commerce. My reasons for transmitting this plan are stated in a more extended accompanying message.

After investigation, I have found and hereby declare that each reorganization included in Reorganization Plan No. 4 of 1970 is necessary to accomplish one or

more of the purposes set forth in section 901(a) of title 5 of the United States Code. In particular, the plan is responsive to section 901(a)(1), "to promote the better execution of the laws, the more effective management of the executive branch and of its agencies and functions, and the expeditious administration of the public business;" and section 901(a)(3) "to increase the efficiency of the operations of the Government to the fullest extent practicable."

The reorganizations provided for in the plan make necessary the appointment and compensation of new officers as specified in section 2 of the plan. The rates of compensation fixed for these officers are comparable to those fixed for other officers in the executive branch who have similar responsibilities.

The reorganization plan should result in the more efficient operation of the Government. It is not practical, however, to itemize or aggregate the exact expenditure reductions which will result from this action.

RICHARD NIXON.

THE WHITE HOUSE, July 9, 1970.

### REORGANIZATION PLAN NO. 1 OF 1971

Eff. July 1, 1971, 36 F.R. 11181, 85 Stat. 819, as amended Pub. L. 93–313, title VI, §601(a), Oct. 1, 1973, 87 Stat. 416

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, March 24, 1971, pursuant to the provisions of chapter 9 of title 5 of the United States Code.

REORGANIZATION OF CERTAIN VOLUNTEER PROGRAMS

SECTION 1. ESTABLISHMENT OF AGENCY

[Superseded. Pub. L. 93–113, title VI, §601(a), Oct. 1, 1973, 87 Stat. 416. Section established the "Action" Agency.]

SEC. 2. TRANSFER OF FUNCTIONS

(a) [Superseded. Pub. L. 93–113, title VI, §601(a), Oct. 1, 1973, 87 Stat. 416. Subsec. (a) transferred to the Director of Action the functions of the Director of the Office of Economic Opportunity under 42 U.S.C. 2991 to 2994d, the functions of the Secretary of Health, Education, and Welfare under 42 U.S.C. 3044 to 3044e, the functions of the Small Business Administration under 15 U.S.C. 637(b), and other functions incidental to or necessary for the performance of the foregoing functions, including functions conferred upon the Director of the Office of Economic Opportunity by 42 U.S.C. 2941.]

(b) The function conferred upon the Director of the Peace Corps by section 4(c)(4) of the Peace Corps Act, as amended (22 U.S.C. 2503(c)(4)), is hereby transferred to the President of the United States.

SEC. 3. PERFORMANCE OF TRANSFERRED FUNCTIONS

[Superseded. Pub. L. 93–113, title VI, §601(a), Oct. 1, 1973, 87 Stat. 416. Section related to performance of transferred functions.]

SEC. 4. INCIDENTAL TRANSFERS

[Superseded. Pub. L. 93–113, title VI, §601(a), Oct. 1, 1973, 87 Stat. 416. Section related to incidental transfers.]

SEC. 5. INTERIM OFFICERS

(a) The President may authorize any person who immediately prior to the effective date of this reorganization plan held a position in the executive branch of the Government to act as Director of Action until the office of Director is for the first time filled pursuant to the provisions of this reorganization plan or by recess appointment, as the case may be.

(b) The President may similarly authorize any such person to act as Deputy Director, authorize any such person to act as Associate Director, and authorize any such person to act as the head of any principal constituent organizational entity of Action.

(c) The President may authorize any person who serves in an acting capacity under the foregoing provisions of this section to receive the compensation attached to the office in respect of which he so serves. Such compensation, if authorized, shall be in lieu of, but not in addition to, other compensation from the United States to which such person may be entitled.

SEC. 6. EFFECTIVE DATE

The provisions of this reorganization plan shall take effect as provided by section 906(a) of title 5 of the United States Code, or on July 1, 1971, whichever is later.

MESSAGE OF THE PRESIDENT

To the Congress of the United States:

America is a nation unique in the political history of the world. More than any other nation, it is the sum of the energies and efforts of all of its people. The American tradition of voluntary involvement—of freely committing one's time and talents in the search for civic improvement and social progress—gives an extra dimension to the meaning of democracy. In the past decade the Federal Government has built on this tradition by developing channels for joining the spirit of voluntary citizen service in America with public needs, both domestically and abroad. Many of these efforts have had marked success. But the circumstances in which these efforts were conceived have changed.

National and international needs have altered. The opportunities for voluntary service must be adapted and improved to meet these new needs.

Recognizing that private channels of voluntary action are a vital source of strength in our national life, I have supported the establishment and development of the National Center for Voluntary Action. The National Center is a private, non-profit partner in the effort to generate and encourage volunteer service. The Center works to promote the establishment of local Voluntary Action Centers, as well as to assist in the expansion of voluntary action organizations already in existence. It stimulates voluntary action by providing information on successful voluntary efforts, and it assists in directing those who wish to volunteer services to areas and endeavors in which their services are needed.

The National Center for Voluntary Action is functioning now to fill a vital need in the private voluntary sector. Now we must turn our attention to bringing government volunteer programs into line with new national priorities and new opportunities for meeting those priorities. We must take full advantage of the lessons of the past decade, and must build on the experience of that period if we are to realize the full potential of voluntary citizen service. This is no longer a matter of choice. We cannot afford to misuse or ignore the considerable talents and energies of our people. In the coming years, the continued progress of our society is going to depend increasingly upon the willingness of more Americans to participate in voluntary service and upon our ability to channel their service effectively.

One matter of consequence to the problems of properly channeling volunteer services and expanding government's role in the development of volunteer resources is the proliferation of government volunteer programs. It was perhaps inevitable that these programs would be generated almost at random across the spectrum of government concern for human needs. This occurred in a period when the Federal Government was still attempting to define its relationship with, and its purposes in, the area of voluntary service. Now the role of government has been confirmed and its responsibilities and obligations are clear. Meeting these responsibilities and obligations will be a long, difficult, and challenging adventure. But it is an adventure we can look to with excitement and with the knowledge that the only sure source of failure can be a failure of the will of the American people. I do not believe it will fail.

The foundation for a greatly expanded government contribution to volunteer service already exists. Now

# EXHIBIT

# B



**United States Space Force**

LEADERSHIP     NEWS     SPACE FORCE POLICY     CONTACT

Home     About Us     Fact Sheets

## FACT SHEETS

| Enter Keyword | Select a Category ▼ | Title A > Z ▼ |

ABCDEFGHIJKLMNOPQRSTUVWXYZ



PHOTO DETAILS / DOWNLOAD HI-RES

Defense Meteorological Satellite Program

 

## Mission

The Defense Meteorological Satellite Program (DMSP) has been collecting weather data for U.S. military operations for more than five decades and provides assured, secure global weather and space weather data to support Department of Defense (DOD) operations.

## Features

Two primary operational DMSP satellites are in sun-synchronous low-earth polar orbits at about 450 nautical miles (nominal). The main weather sensor on DMSP is an optical system, which provides continuous visual and infrared imagery of cloud cover over an area approximately 1,600 nautical miles wide. Complete global coverage of weather features is accomplished every 14 hours providing essential data over data-sparse and data-denied areas. Additional satellite sensors measure atmospheric vertical profiles of moisture and temperature. Military weather forecasters can detect developing patterns of weather and track existing weather phenomena over remote areas, including the presence of fog, severe thunderstorms, dust and sandstorms, and tropical cyclones.

Other DMSP sensors measure space weather parameters such as charged particles, electromagnetic fields and ionospheric characteristics to assess the impact of the natural environment on ballistic-missile early warning radar systems, long-range communications and satellite communications. Additionally, data is used to monitor global auroral activity and to predict the effects of the space environment on satellite operations.

## Background

The first DMSP satellite, known at that time as the Defense Satellite Applications Program (DSAP), was launched in 1962. DMSP was initially classified and run by the National Reconnaissance Office (NRO) in support of the CORONA program. CORONA satellites had limited film onboard, and it was essential to have timely and accurate weather forecasts to ensure cloud-free pictures were taken of high-interest areas. DMSP data is also critical to the forecast process. Declassified in 1972, DMSP data was made available to civilian and scientific user communities.

In May 1994, the president directed the Department of Commerce (DOC) and DOD to converge their separate polar-orbiting weather satellite programs. A tri-agency organization consisting of the DOC, DOD and NASA was formed. As part of the convergence plan, DMSP operations were transferred from the DOD to the DOC in June 1998, with funding responsibility remaining with the U.S. Air Force. Satellite operations were moved to Suitland, Md., where the National Oceanic and Atmospheric Administration (NOAA) Office of Satellite and Product Operations (OSPO) provides the command, control and communications for DMSP, Polar-Orbiting Environmental Satellite (POES), Geostationary Operational Environmental Satellite (GOES), Joint Polar Satellite System (JPSS) and others. Satellite Control Authority (SCA) resides with 50th Operations Group, Detachment 1, located at the NOAA Satellite Operations Facility, for oversight of the DMSP constellation. Backup operations are performed at Schriever Air Force Base, Colo. DMSP continues to provide assured, secure, global environmental sensing data to support the warfighter.

DMSP spacecraft have the ability to store data onboard as well as transmit data directly to ground terminals. Sites are used to retrieve stored data and electronically transfer the data to Offutt AFB, Neb. Northern sites in U.S. Indo-Pacific command also support DMSP stored data distribution to users. DOD deployed tactical systems can receive direct broadcast of data when in the field of view of the satellite.

DMSP space vehicles and sensors were developed and acquired by the Space and Missile Systems Center (SMC) at Los Angeles AFB, Calif.

## General Characteristics

**Primary Function:** Collect cloud, atmospheric, space weather, and Earth surface data
**Weight:** 2,720 pounds (1,236.4 kilograms), including 772-pound (351 kilogram) sensor payloa
**Orbit Altitude:** Approximately 450 nautical miles (nominal)

**Dimensions:** 25 feet long (7.62 meters) with solar panels deployed
**Date Deployed:** August 1962

(Current as of Oct 2020)



Official United States Space Force Website

# EXHIBIT C






---------- Forwarded message ----------
From: **Gregory Hooker - NOAA Federal** <gregory.hooker@noaa.gov>
Date: Fri, Mar 21, 2025 at 12:14 PM
Subject: Courtesy Notice
To: Jay Harris - NOAA Federal <jay.harris@noaa.gov>, Evan Forde - NOAA Federal <evan.forde@noaa.gov>, <Laura.kistner@noaa.gov>, Andrew Davis - NOAA Federal <andrew.davis@noaa.gov>, Andy David - NOAA Federal <andy.david@noaa.gov>, Jennifer Lee - NOAA Federal <jennifer.lee@noaa.gov>, Peter Plantamura - NOAA Federal <peter.plantamura@noaa.gov>, Nick Tolimieri - NOAA Federal <Nick.Tolimieri@noaa.gov>, Carl Childs - NOAA Federal <carl.childs@noaa.gov>, Dean Carter - NOAA Federal <dean.carter@noaa.gov>, <nesdischair@nwseo.org>, Mitch Macdonald - NOAA Federal <mitch.macdonald@noaa.gov>, Dennis Floyd <dennisfloyd@ibew80.com>, Randi Ciszewski <ciszewski@bridgedeck.org>, <jmenendez@mebaunion.org>, IBEW Local 932 <office@ibew932.com>, <ncelona@seafarers.org>, Sam Spain <sspain@seafarers.org>, Dan Sobien <president@nwseo.org>, execvice <execvice@nwseo.org> Cc: Molly Baringer - NOAA Federal <molly.baringer@noaa.gov>, Chad Hepp - NOAA Federal <chad.m.hepp@noaa.gov>, Lawrence Beerkircher - NOAA Federal <lawrence.r.beerkircher@noaa.gov>, Kim amendola - NOAA Federal <kim.amendola@noaa.gov>, Ann Webber - NOAA Federal <ann.e.webber@noaa.gov>, Tracy Sims - NOAA Federal <tracy.sims@noaa.gov>, John Tarpley - NOAA Federal <john.tarpley@noaa.gov>, Jen Thatcher - NOAA Federal <jen.thatcher@noaa.gov>, Pamela Wright <pamela.wright@noaa.gov>, Monica Smit-Brunello <monica.smit-brunello@noaa.gov>, Moira Bressi - NOAA Federal <moira.bressi@noaa.gov>, David Murray - NOAA Federal <david.murray@noaa.gov>

Good Afternoon Union Reps,

This serves as courtesy notification of the Termination of Telework/Remote Work Agreements.

Please see attached

Gregory M. Hooker

Labor Relations Officer, Workforce Relations Division

443-570-4273 desk

Silver Spring, MD

gregory.hooker@noaa.gov



**If you are a Federal Employee, Provide Your Feedback on Our Service:** <mark>Customer Engagement Survey</mark>

- Check out the new Enterprise Services PORTAL your "one-stop" for PAR, payroll and benefits!
- Need NOAA HR information?  Check out our brand new OHCS Intranet site for NOAA employees: CLICK HERE
- Workforce Relations Division contact links: CLICK HERE

**Secure File Transfer:** (If you are emailing privacy sensitive information (such as last four SS#, medical information etc.) please be sure that you have protected the document via DOC secure service called KITEWORKS found at:  https://sfc.doc.gov
Please contact me directly if you are unsure on how to send your documents securely.

--

Mitch MacDonald, Attorney-Advisor
U.S. Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel
978-281-9249 Google Voice
351-322-4278 Cell Phone

Confidentiality Notice: This e-mail message is intended only for the named recipients. It contains information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify me immediately that you have received this message in error, and delete the message.  Please notify me if you believe you properly received this email, but prefer to not receive future emails of the same type.

**Secure File Transfer**: Please be sure if emailing any privacy-sensitive information that you have protected the document by a password or send it via DOC secure service -

**Return to Office.pdf**
76 KB


**Notification to NOAA Unions of Termination of Telework/Remote Work Agreements**

Dear Union:

Pursuant to our negotiated CBA, MOU/MOA, and negotiated telework policies, the Department of Commerce (DOC) will terminate all bargaining unit employee telework and/or remote work agreements in compliance with President Trump's Presidential Memorandum, *Return to In-Person Work* and corresponding Guidance from the Office of Personnel Management (OPM). Bargaining Unit employees will receive individual notices from their supervisor regarding the termination of their telework and/or remote work agreements. All Bargaining Unit employees, except for those granted exemptions per the Presidential Memorandum and implementing OPM and DOC guidance, will be required to return to in-office work full-time.

**Memo to Managers Regarding Termination of Employee Telework Agreements**

To All Managers:

In accordance with President Trump's Presidential Memorandum, *Return to In-Person Work* and corresponding guidance from the Office of Personnel Management, and Department of Commerce policy, and per our negotiated union agreements/MOUs/MOAs, NOAA management is directed to terminate all employee telework/remote agreements unless an exemption is appropriate per the guidance, i.e. employee is on a reasonable accommodation etc.

The following actions must take place in accordance with the terms of the respective union agreements for terminations of telework/remote work:

- Notify affected employees of the termination of the telework/remote work agreements. We have provided language for those notifications below.

- Work with employees to ensure a smooth transition back to the office.

- Address any logistical concerns and reinforce expectations regarding in-office attendance.

As indicated in the *Information Memorandum,* certain employees may be excused from compliance due to reasonable accommodations or other compelling reasons. Employees with existing remote work agreements will receive separate information about their work status.

**Employee Notification for Termination of Telework/Remote Work Agreements**

To:  Employee

From: Manager

Re: Termination of your Telework/Remote Work Agreement

This notice is to inform you that your telework/remote work agreement is terminated effective XXXXXX DATE.  You are required to return to in-office work full-time unless you are excused as a result of a reasonable accommodation or have received an exemption in accordance with DOC policy. Employees with existing remote work agreements whose remote work site in those agreements is more than 50 miles from the nearest NOAA/DOC work site or do not have an assigned office location will receive separate information about their work status.

This action is being undertaken to comply with President Trump's Presidential Memorandum, *Return to In-Person Work*, corresponding guidance from the Office of Personnel Management, and Department of Commerce policy, and is in accordance with our negotiated union agreements.

# EXHIBIT D

**Service Level Standards Table and Reduced Service Operations**
**April 9, 2025**

All CONUS Weather Forecast Offices (WFOs) and Alaska Regional WFOs will execute operating arrangements based on the updated service level memorandum issued by the AA and DAA on April 8, 2025, with the accompanying Service Level Standards table.

The NWS and NWSEO have agreed to a short-term mitigation plan as a result of the Deferred Resignation Program, departures of probationary employees, employee reductions due to the Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment (VERA/VSIP) or a possible reduction in force (RIF). These reductions compounded existing staffing shortages in many WFOs, resulting in some local offices facing severe shortages in key positions. In addressing the possible impacts of chronic staffing shortfalls, the NWS must balance operational workload, unique aspects of the office (i.e., staff experience), and employee health and wellness. To do this, the NWS is committed to taking a holistic approach, assessing unique factors for each office, to alleviate staff burnout while focusing collective effort on the highest value work (i.e., warning mission, IDSS).

The table below defines options that can be consistently applied across NWS Weather Forecast Offices (WFO) to manage impacts due to staffing shortfalls. The measures outlined in the table below assume staffing shortfalls are longer-term (over one month). The consideration of these options will involve close coordination/dialog with regional/local management, NWSEO chairs and office stewards as outlined below.

WFOs would choose which options they would need to implement, given their current staffing profile, while balancing operational requirements.

The WFO vacancy rate, as indicated below, would be determined by combining the personnel in the lead meteorologist and meteorologist units. It would not consider management staff or positions such as the SSH, OPL, etc.

1

| Options for WFOs | Recommended Vacancy Rate for Implementation | Approval Authority | Expected Impacts |
|---|---|---|---|
| Managers (MIC, SOO, and WCM) increase shift coverage as needed | Any | Local Management Decision in coordination with DRD for consistency | ↓Impact to time available for management duties ↑Additional shift capacity |
| Implement fixed schedule shift flexibilities allowed by CBA Article 20 and Shift Flexibility team | Any | LOT | ↑Reduced workload |
| Limit social media posts to significant weather messaging only | > 15% | Local Management Decision in coordination with DRD for consistency | ↓Some loss of public and partner interactions ↑Reduced workload |
| Halt public outreach events and focus only on gov-to-gov requests | > 15% | Local Management Decision | ↓Some loss of public and partner interactions ↑Reduced workload |
| Reduce the number of shifts worked per day (to 6 shifts) | > 15% (highly experienced-level dependant) | LOT (for permanent 6-shift rotations follow recent guidance on LOT/RLC/NLC approval) | ↓Less capacity for services/high-impact events ↑Additional shift / IDSS capacity |
| Allow the twice-daily launch times to occur at 00Z, 06Z, 12Z, and/or 18Z (requires two people in the office) | > 15% | RD/DRD, in coordination with the OBS portfolio | Adjusted standard UA observational data set times ↑Reduced workload and increased flexibility |

2

| Reduce admin shifts; reduce or suspend focal point duty requirements | > 15% | LOT | ↓Decreased employee morale and less time for training ↑Additional shift / IDSS capacity |
|---|---|---|---|
| Reduce or eliminate Testbed Assignments | > 15% | Local Management Decision | ↓Loss of professional development opportunities for staff, loss of field perspectives in National Efforts ↑Reduced workload |
| Reduce staffing during "quiet" periods to one person/shift | > 20% | LOT, also in coordination with DRD. If in the planning schedule, follow CBA | ↓Less flexibility to cover last-minute leave; ↓Reduced ability to handle any no-notice events ↑Reduced burnout |
| Reduce Upper-Air launches to one per day (at 00, 06, 12, or 18Z) (requires two people in the office) | > 25% | RD/DRD, in coordination with the OBS portfolio | ↓Partial loss of UA observational data set ↑Reduced workload and increased flexibility |
| If applicable, and if they are trained and qualified, have SSH and OPL work operational shifts up to 40% of the time | > 35% | LOT | ↓Impact on time available for program duties; ↑Additional shift capacity |

| Routine service backup for specified periods and services | > 35% | RD/DRD | ↓Increased workload for backup office(s) Only viable if the backup office has less than a 15% vacancy rate |
|---|---|---|---|

3

| | | | |
|---|---|---|---|
| Reduce grid/forecast updates to once per day and/or NBM "load and go" except when there is a need during high-impact weather | > 35% | RD/DRD | ↓Possible reduction in forecast accuracy |
| Suspend all Upper-Air launches at an office | When the office goes down to only 3 shifts a day and there is no second person available for safety purposes | RD/DRD in coordination with OBS portfolio | ↓Total loss of UA observational data set ↑Reduced workload and increased flexibility |

**NWS Reduced Service Operations**

When offices have exhausted all appropriate measures listed in the table above and vacancy rates for meteorologists continue to increase, offices may transition to Reduced Service Operations as described below.

Reduced Service Operations is established to provide WFOs that fall to nine (9) or fewer operational meteorologists on station (Tier 1) or seven (7) or fewer operational meteorologists on station (Tier 2) options for maintaining degraded operations while weathering extreme staffing shortages. These thresholds do not account for non-BU meteorologists. This agreement reflects a mutually agreed-upon tiered approach between NWS and NWSEO by which offices in close geographical proximity collectively leverage staff and resources to provide degraded/reduced services to their respective areas of responsibility. This is intended to be used as a "stopgap" measure, expected to be used in the short term to address extreme short staffing.

**Primary Mission Essential Functions (PMEF):**

The NWS PMEFs as defined by the National Response Framework (NRF p.37):

1. **Issuance of Weather, Water, and Climate Warnings, Watches, and Advisories**

   o Continuous monitoring and dissemination of critical forecasts, watches, warnings, and advisories for life-threatening weather events, including hurricanes, tornadoes, severe storms, floods, winter storms, and wildfires.

2. **Operation of the National Weather Radar and Satellite Systems**

   o Maintaining and operating radar (e.g., WSR-88D), satellites (e.g., GOES, JPSS), and ground-based observation networks to ensure continuous data collection and situational awareness.

3. **Tsunami Warning and Detection**

   o Operation of the **Tsunami Warning Centers (Pacific and National Tsunami Warning Centers)** to detect, evaluate, and issue warnings for tsunamis impacting the U.S. and its territories.

4. **Aviation Weather Services for National Airspace System (NAS) Safety**

   o Providing critical aviation weather information to the **Federal Aviation Administration (FAA)** and airline operators to ensure flight safety and efficiency.

5. **Fire Weather Support for Wildland Firefighting**

   o Supporting **wildland fire suppression operations** through specialized fire weather forecasts and coordination with the National Interagency Fire Center (NIFC).

6. **Space Weather Monitoring and Alerts**

   o **NOAA's Space Weather Prediction Center (SWPC)** provides real-time alerts on solar storms that could impact GPS, power grids, and communications.

7. **Hydrologic Forecasting and Flood Warnings**

   o Operating the **River Forecast Centers (RFCs)** and providing real-time **flood forecasts and warnings** to protect lives and property.

8. **Support to National Security and Emergency Management**

   o  Providing mission-critical weather intelligence to the **Department of Defense (DoD), the Department of Homeland Security (DHS), and FEMA** for national security, emergency response, and disaster recovery operations

## Guardrails for Reduced Service Operations

- This is an option for offices that cannot maintain six operational shifts/day due to extreme staffing shortages caused by deferred resignations, termination of probationary employees, Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment (VERA/VSIP) or a possible reduction in force (RIF) and where the office meets the thresholds for Tier 1 or Tier 2 Reduced Service Operations.

- Tier 1 Reduced Service Operations are degraded operations when there are nine (9) or fewer meteorologists on-station. Offices with qualified IMETs may reduce their on-station staffing by one person to account for possible deployment.

- Tier 2 Reduced Service Operations are degraded operations when there are seven (7) or fewer operational meteorologists on-station.

- NWSEO does not permanently waive Article 20, Section 3A1 which states in part: *"Management will determine the work requirements of Weather Forecast Offices (WFOs) in coordination with the Union Steward, and will schedule a minimum of six (6) operational shifts per day taking into consideration operational needs and employee work-life balance…"* This is a temporary allowance to mitigate extreme staffing shortages across the NWS due to deferred resignations, terminations of probationary employees, VERA/VSIP, and a possible RIF.

- No offices will be closed permanently.

- It will take three to six months to complete IT/AWIPs work. However, until this work is completed, VPN or no machine access will be used until IT/AWIPs changes can be completed.

- Reduced Service Operations is not a long-term service backup.

- Reduced Service Operations must be requested and approved in advance with planning and coordination among affected offices.

6

- When offices are discussing pairing options for an office, they will need to consider the number of Lead Forecasters across the participating offices to ensure one Lead can be scheduled each shift.

- Conversations involving all participating LOTs must occur to ensure transparency, clarity, and coordination in the planning and implementation of Reduced Service Operations.

- Reduced Service Operations is not an option for unscheduled or emergency leave on the fixed schedule.

- The planning schedule for participating offices may be changed. Any gaps in coverage will be filled by voluntary OT/compensatory time (CT) and will be offered to participating offices equally.

- Any previously approved leave prior to Reduced Service Operations during the peak leave season will be honored. Otherwise, peak leave requirements under Article 19, section 3C still apply.

- Each approved Tier 1 or Tier 2 Reduced Service Operation will have a start and end date – it cannot be a permanent change.

- This plan is for CONUS WFOs and the Alaska Region and does not cover the Pacific Region.

- As part of any plans, consideration must be made for offices that serve as primary or secondary backup to offices not included in the groupings.

- The respective Regional Labor Council (RLC) will review and approve Reduced Service Operations Plans and notify the NLC when a plan is approved.

- If groupings of Tier 1 or Tier 2 offices involve two or more regions, it must be reviewed and approved by the NLC.

- A list of Tier 1 and Tier 2 offices with their start/end dates and their approved plans will be updated and maintained by the respective RLCs and shared with the NLC.

- A Reduced Service Operations Plan must be developed for Tier 1 or Tier 2 operations and agreed upon by all offices. A draft template is located here.

**Tier 1 Requirements:**

**Entrance Criteria**

- Involves two (2) WFOs paired together to support the PMEFs of the NWS in their two-county warning areas.

- Triggered by current or anticipated operational meteorologist losses, leaving nine (9) or fewer meteorologists on station. Offices with qualified IMETs may reduce their on-station staffing by one person to account for possible deployment.

- LOTs must submit a completed Reduced Service Operations Plan to the RLC to show how the two offices have collaborated over the combined operations and how they will work together during this staffing shortfall.

**Operational Requirements**

- Three shifts per day will be covered in both offices for a combined total of at least six shifts per day.

- Staff not working specific operational shifts may be primarily focused on event support, partner support, and event-related IDSS in support of our PMEFs

- At least one (1) person on shift in each participating office on a 24-hour basis.

- To the fullest extent possible, watch/warnings and IDSS responsibilities will remain in each office, although the paired office may provide support/assistance at times.

- Upper Air launches may be suspended during Reduced Service Operations, but special releases for significant weather operations are still possible.

- Two paired offices will "share" workload and responsibilities for products and services during the approved period, but not permanently.

- The schedules (planning and fixed) for participating offices will be combined into one Google sheet or some other easily accessible method and shared among all employees so everyone knows who is on shift in both offices.

- There must be at least one Lead Forecaster scheduled for every shift. In instances where there are two lead forecasters on shift, the fixed schedule should be annotated to show who will be the Forecaster in Charge for that shift.

- The fixed schedule will be annotated to show which MIC will make the decisions for that shift/day to minimize any confusion about who directs the work of the

8

combined staff on a daily basis.

- The scheduling responsibilities will be shared by the two participating offices and must be conducted collaboratively.

- Management will make it clear who is making work assignments for each shift by annotating the fixed schedule.

- Participating LOTs will have an equal voice in making decisions, and all decisions should be made collaboratively.

- Any disputes over the schedules will be adjudicated by the LOTs in the participating offices. If the LOTs are unable to come to a consensus, the matter will be elevated to the RLC for decision.

- The overall management of individual staff will remain with their home MICs unless otherwise designated by regional management.

- Prior to the end of the Reduced Service Operations, a decision to extend, modify, or discontinue the Reduced Service Operations will be made by the RLC. The RLC will notify the NLC of any change in status.

## Exit Criteria

- Staffing shortage in the participating offices improves, and there is no longer a need to operate in this manner.

- Once new forecasters are onboarded to meet the requirement for more than 10 forecasters on station, the offices will begin the transition to exit this arrangement.

- The LOTs will develop an exit plan and will submit the exit plan to the RLC in advance. The exit plan will document best practices and lessons learned while operating at a Tier 1 Reduced Service Operations level.

- The RLC will notify the NLC when an exit plan is submitted and send the exit plan to the NLC.

9

**Tier 2 Requirements:**

**Entrance Criteria**

- Tier 2 Reduced Service Operations involve three (3) WFO weather forecast offices grouped together to support the NWS PMEFs across the three-county warning areas.

- Triggered by current or anticipated personnel losses, leaving seven (7) or fewer operational meteorologists remaining on station.

- Tier 2 arrangements will be tested for no more than 3 months. At the conclusion of the test period, a determination by the RLC will be made to extend, modify, or discontinue the test.

- LOTs must submit a completed Reduced Service Operations Plan to the RLC to show how the three offices have collaborated over the combined operations and how they will work together during this staffing shortfall.

- A three-office Reduced Service Operations Plan must be approved by the RLC. The RLC must provide the NLC with approved plans along with the start/end date of operations.

**Operational Requirements**

- Three shifts per day are required in most offices, there may be periods less than six (6) hours/day where one of the offices will not be staffed. In this three-office configuration, only one office can be unstaffed daily.

- Staff not working specific operational shifts may be primarily focused on event support, partner support, and event-related IDSS in support of our PMEFs

- Upper Air launches may be suspended during Reduced Service Operations, but special releases for significant weather operations are still possible.

- The three combined offices will "share" workload and responsibilities for products and services for a specific amount of time, not permanently.

- The schedules (planning and fixed) for participating offices will be combined into one Google sheet or some other easily accessible method and shared among all employees so everyone knows who is on shift in both offices.

- A lead forecaster will be on shift at one of the three offices at all times. In instances where there are more lead forecasters on shift, the schedule should be

annotated to show who will be the Forecaster in Charge for that shift.

- The schedule will be annotated to show which MIC will make the decisions for that shift/day to minimize any confusion about who directs the work of the combined staff on a daily basis.

- The scheduling responsibilities will be shared by the three participating offices and must be conducted collaboratively.

- Management will make it clear who is making work assignments for each shift by annotating the fixed schedule.

- Participating LOTs will have an equal voice in making decisions, and all decisions should be made collaboratively.

- Any disputes over the schedules will be adjudicated by the LOTs in the participating offices. If the LOTs are unable to come to a consensus, the matter will be elevated to the RLC to decide.

- The overall management of individual staff will remain with their home MICs unless otherwise designated by the region.

## Exit Criteria

- Prior to the end of the Tier 2 Reduced Service Operation, a decision to extend, modify, or discontinue the Tier 2 operation will be made by the RLC. The RLC will notify the NLC of any change in status.

- Staffing shortage in the participating offices improves, and there is no longer a need to operate in this manner.

- Once new forecasters are on board and meet the requirement for more than 10 forecasters at the station, the offices will begin the transition to exit this arrangement.

- The LOT will develop an exit plan in advance and submit it to the RLC for approval.

- The exit plan will document best practices and lessons learned.
  The RLC will notify the NLC when an exit plan is submitted and will send the NLC the exit plan.

- The LOT will inform the RLC of their exit status as early as possible to ensure any preparations needed are completed in a timely manner.

11

For NWSEO

For NWS

JoAnn Becker
Digitally signed by JoAnn Becker
Date: 2025.04.10 08:07:33 -05'00'

MAINELLI
MCINERNEY.MICHELLE.1365
819722
Digitally signed by MAINELLI
MCINERNEY.MICHELLE.1365819722
Date: 2025.04.10 10:36:40 -04'00'

_____

JoAnn Becker                    Date
President
NWSEO

_____

Michelle Mainelli               Date
Deputy Assistant Administrator
NWS

# EXHIBIT E

# MEMORANDUM OF UNDERSTANDING
## National Weather Service (NWS)
### And
## National Weather Service Employee Organization (NWSEO)
### GS 5-12 Meteorologist Progression Program

This Memorandum of Understanding (MOU) memorializes the agreement between NWS and NWSEO regarding the implementation of the GS 5-12 Meteorologist Progression Program. The agreement will go into effect in accordance with the provisions of 5 USC 7114 (c). The GS 5-12 Meteorologist Progression Program will be implemented as outlined in the attached July 2018 Management Proposal, supplemented and amended by the attached March 25 2019 Settlement Agreement.

ERICKSON.MAR
Y.C.1365826923

Digitally signed by
ERICKSON.MARY.C.1365826923
Date: 2019.03.26 19:44:48
-04'00'

---

Mary Erickson
NWS Deputy Assistant Administrator

Daniel Sobien
NWSEO President

3/26/19

---

Date

3/26/19

---

Date

1

# Meteorologist, GS-5/12

## Career Progression Program
## Management Proposal
## July 2018

# TABLE OF CONTENTS

Introduction                                                    Page 4

Implementation                                                  Page 5


Competency Model and Training Program                           Page 8
        Competency Assessment Tool
        Pre-Implementation Roll-Out Training


Promotion Assessment Process                                    Page 10
        Steps in the Assessment Process


Initial Promotion Process at Implementation                     Page 11


Recruitment                                                     Page 12


Program Review                                                  Page 13


Appendices                                                      Page 14

## Introduction

Management will implement a GS-5/12 non-competitive, competency based career path for all current and future GS-5/7/9/11/12 Meteorologists at National Weather Service (NWS) Weather Forecast Offices (WFO), and for applicable operational meteorologist positions at the National Centers for Environmental Predictions' (NCEP) Weather Prediction Center (WPC) and National Hurricane Center (NHC).

This initiative allows NWS to effectively capture the talent of current Meteorologist Interns and future Meteorologists while meeting the changing Impact Based Decision Support Service (IDSS) needs of our core customers and partners more efficiently. The plan acknowledges the education, training, and skill sets of Meteorologist Interns by removing the word "Intern" from their position title. It provides a career path for all current and future Meteorologists to reach the full performance potential of GS-12 without having to bid on Journeyman Forecaster vacancies or move to a new location. Meteorologists at lower grade levels will not be restricted to public service desk duties. They will become fully integrated into all aspects of the operational forecast team in a streamlined and expedited manner by progressing into the same work unit as other General Forecasters at every WFO.  All GS-5/12 Meteorologists will complete operational duties, IDSS, data collection, public service and climate duties, as well as other duties as assigned.

## Rationale
**Supports vision to Evolve NWS to build a Weather-Ready Nation.**

Impact Based Decision Support Services connect our forecasts and warnings to decision makers at the local, state, and federal levels and allow our experts to provide actionable information beyond legacy forecasts and warnings.  Every office has an unmet demand for IDSS that continues to increase over time.  The GS-5/12 Career Progression Program builds the workforce that we need to deliver critical IDSS services and ensures that our Meteorologists have the required competencies, training and experience to meet our future needs.

**An essential component for field unlocks of staff time.**

The GS-5/12 Career Progression Program ensures that all meteorologists are able to meet growing needs such as IDSS demands and new forecasting techniques, while continuing to maintain high standards in data acquisition, quality control, climate data and products, and public service responsibilities. This program promotes a team approach to prioritizing and completing all operational duties.  All GS-5/12

4

Meteorologists will become a part of the same work unit.  This provides increased staffing flexibility that will unlock staff time for:

- Meeting increased demands of IDSS workload at every WFO.
- Improving participation in meetings and exercises with our core customers and partners.
- Improving engagement with local decision makers to understand their risk thresholds and decision points.
- Ensuring we are meeting customer needs for weather, water and climate information. In other words, building a Weather-Ready Nation.

**Benefits the Agency and Meteorologists**

This program provides staffing flexibilities that promote an "all hands on deck" approach to IDSS and high impact weather events. It will reduce periods of vacant positions by reducing the number of recruitment and hiring actions.  Meteorologists, in the early stages of their career, will be empowered to gain experience in all skill areas important to the evolving nature of the NWS mission.  Clear expectations for career advancement will promote consistency in training and experiential opportunities for early career meteorologists.

This plan will advance GS-5/12 meteorologists who demonstrate proficiency of core competencies linked to a promotion assessment, ensuring each employee is able to contribute at the level expected. This non-competitive, competency based career promotion program aligns with other government agencies: WFMO reports that GS-5/12 progressions are common elsewhere in federal government and RFC hydrologists currently follow a similar progression.

## Implementation

Management will implement the GS-5/12 Career Progression Program in two phases. Activities associated with the first phase of implementation  will occur within Q1 FY2019 and include the following:

1.      A single career progression is implemented that combines the Meteorologist (Intern) and Journeyman Meteorologist position into one "Meteorologist" position at grades GS-5/7/9/11/12.  Accordingly, all Meteorologist (Interns) and Journeyman Meteorologists at WFO's and NCEP's  NHC and WPC will be realigned, via submission of a Personnel Action Request in HR Connect, to a new Meteorologist position description at the same grade level currently held.  The realignment personnel actions will not change the employee's grade level (unless they are due a promotion on the date of the realignment action and the promotion action has been submitted through HR Connect for processing).

5

2.      Current Meteorologist (Interns) will be grandfathered into the program. When Meteorologist (Interns) are realigned to the new position description, they will have noncompetitive promotion potential to the GS-12 level.  In addition, the parenthetical title, "Intern", will no longer be assigned to the position.

3.      All new vacancy announcements will specify the full promotion potential to the GS-12 level and include language that clearly communicates program expectations and the application of a competency model for promotion between grades.

4.      Supervisors will use the Competency Assessment Tool to assess promotion readiness of all eligible GS-11 Meteorologists.  In addition, supervisors will prepare and submit the personnel action to promote in the HR Connect System.  See **Initial Promotion Process at Implementation** below for additional information.

**NOTE:** All Meteorologists covered by the career progression program are expected to progress through the career ladder up to the GS-12 grade level.  However, promotions are not automatic.  Meteorologists at the GS-11 level that meet the conditions described in the assessment process (below) will be considered for promotion to the GS-12 level based on the new competency model.  Supervisory determinations to promote will be based on employees meeting all the conditions outlined in the Promotion Assessment Process.

5.      Meteorologists at the GS-11 level that do not meet time in grade requirements at the time of implementation will be assessed for promotion when the conditions described in the assessment process (below) are met.

6.      Meteorologists at the GS-5, 7 and 9 levels will be promoted based on existing practice until the competency assessment tool has been completed to cover these grade levels.

7.      Regional Directors and the NCEP Director will assign a designee at Regional Headquarters or applicable NCEP Center to work with CFO2 to review promotion assessments on a quarterly basis during the first year of implementation to ensure the process is conducted in a fair and timely manner.  After the first year, reviews will be conducted on an as needed basis.  The designee will also serve as the point of contact for final review and concurrence/non-concurrence of any decision to not promote an employee.

8.      A "Whole Office Concept" will be used to provide forecasters earlier and more frequent opportunities to gain applied knowledge and experience in areas of interest. Whether they are interested in building relationships with our core partners first hand, or participating in cutting edge national research-to-operations prototypes, NWS benefits by ensuring that any WFO can put its best team forward to provide the best science that directly benefits our partners and the public safety at large.

As part of the Whole Office Concept, all GS-5/12 Meteorologists will become a part of the same work unit.  The combined unit will provide greater staff flexibility that will allow NWS to meet increasing partner demands for IDSS at every WFO.  This demand includes the provision of both remote and in-person high impact event decision support as requested by our partners that will lead to more proactive and timely decisions saving lives; greater and more frequent participation in meetings and exercises that will result in a better understanding of community risk thresholds and decision points; robust participation in practice exercises and drills that will ensure our life saving capabilities are optimized across all weather, water, and climate threats.  Additionally, the combined units will increase the ability of each WFO to integrate new observational and predictive datasets that will improve local mesoscale weather forecasting techniques and flood water inundation predictions especially in the first 18-36 hours.

Management understands that shift schedule decisions are made at the local level. This practice will continue upon implementation of the GS-5/12 progression plan, but there will no longer be separate Meteorologist Intern and Journey Meteorologist rotations with separate duties.  Management will provide the work requirements to develop schedule rotations designed to meet the demands of all operational duties, such as forecasts and warnings, IDSS, data acquisition, upper air launches, climate products, public service, and radar interpretation and warnings.  The schedule rotations should allow for flexibility in staffing to meet the changing requirements of IDSS and allow for surge staffing during high impact weather and IDSS events.

9.      Meteorologists in Charge (MIC) will supervise all meteorologists at the Weather Forecast Office (WFO). This will include meteorologists at the GS-5 and GS-7 levels. The remaining Data Acquisition Program Managers (DAPM) will continue to supervise GS-5/7 Meteorologists at applicable WFO's. If a DAPM position is vacated, the MIC will supervise GS-5/7 Meteorologists.

The second phase is expected to be effective in Q1 2020 and includes the following activity:

7

1.    When the Competency Assessment Tool is completed for the GS-5/7/9 grade levels, employees at the GS-5/7/9 levels will be assessed for promotion when the conditions described in the assessment process (below) are met.


## Competency Model and Training Program

A GS-1340-5/12 competency model will be implemented.  It consists of five dimensions and 15 competencies specific to NWS Meteorologist positions at WFO's and NCEP's NHC and WPC.  (See attached GS-5/12 Career Progression Program Dimensions and Competencies).  NWS will provide covered Meteorologists with training and experience for each required dimension and competency.

Training and experience will be aligned with the competency model.  Each dimension and competency will be supported by training, utilizing a continuous learning approach, to include web-based modules, live and recorded webinars, simulations, forecast challenges, seasonal readiness training, on-the-job experience, etc. Management will ensure that meteorologists can effectively complete the training required for each grade in a period of one year.  While it is important that NWS create an approach to train each and every competency, it is understood that due to unforeseen circumstances, some training may not be offered each year. Consequently, the assessment to promote or not promote at each grade can draw on formal or on-the-job training, specialized experience, demonstration of abilities/skills, work examples, or skills assessments.

### Competency Assessment Tool

A competency assessment tool will be used across all offices to assess promotion readiness of Meteorologists in the Career Progression Program. The tool will be flexible in that it allows for various methods to exhibit and assess competence. The tool will be integrated into the Commerce Learning Center (CLC) which is used by the NWS to track all employee training.  Further, the assessment process will be rigorous and consistent across offices to ensure employees exhibit the appropriate level of competence for each dimension.

The assessment tool will be available to assess the readiness of GS-11 Meteorologists for promotion to the GS-12 level at phase one of implementation.  The tool will be available to assess promotion readiness to the GS-7/9/11 level in phase two.  MIC's, Supervisors (at National Centers), or DAPM's (if applicable) will use the Competency Assessment Tool to assess how a meteorologist performs in the operational environment.

## Pre-Implementation Roll-out Training

Three training modules will be developed to ensure all covered GS-5/12 Meteorologists as well as supervisors/managers and co-workers understand how the GS-5/12 Competency Assessment Process will proceed. The modules will consist of recorded webinar training available on the CLC.  One overview module will be released for the entire NWS Organization explaining the GS-5/12 promotion and assessment process. This module will include the history of the program, the benefits and impacts to the operational unit, an overview of the Dimensions/Competencies and where to go on the Insider page for the latest information.  Two more in-depth modules will also be released. One module will be specifically geared for GS-5/12 Meteorologists and Lead Meteorologists.  The second module will be geared for all MIC's/DAPM's/WCM's/SOO's as well as Regional/National Center (NC) supervisors and managers.

The module for GS-5/12 Meteorologists and Lead Meteorologists will include the benefits of the program to the stakeholders, the impact on office operations, the process for providing input to the management team conducting the Competency Assessments, a further explanation of the competencies within each dimension, the Competency Assessment Tool within the CLC that will be used, the training available centrally within the CLC to support each competency, the responsibility of the SOOs and the lead meteorologists in providing On-the-Job-Training (OJT) as part of the learning process, the difference between the annual performance appraisal process and the competency assessment process, the impact of an unfavorable competency assessment, the timelines for conducting the competency assessments, the initial 12 month probationary period for all new hires, and the changes in the Meteorologist Position Description (PD) and performance plans as this program is implemented.

The module for the WFO MIC's/DAPM's/WCM's/SOO's and Regional/NC supervisors and managers will include training on how to use the Competency Assessment Tool within the CLC, training available within the CLC for each Dimension/Competency and grade level,  the details about each of the competencies within each dimension,  the difference between completing training and demonstrating competency, the assessment timeline and process, the assessment documentation required, methods of acquiring input from bargaining unit co-workers and partners/customers, the discussion with employees about expectations of career progression through the program to the full performance GS 12 level, the procedures after a negative assessment recommendation, the expectations/process for periodic assessments during the initial 12 month probationary period for all new hires, the changes to the PDs and performance plans as this program is implemented, and the differences between the performance appraisal process and the competency assessment process.

All three modules described in the above section will be released prior to implementation of the program. Regional Headquarters and National Centers are expected to have follow-on conference calls/webinars to finalize the implementation details within their area of responsibility.

## Promotion Assessment Process

NWS management proposes a simple and logical promotion assessment process tied to the competency model. The first line supervisor/manager is responsible for determining promotion readiness. The promotion process has no effect on within grade increases.

Employees will be promoted to the next higher grade if all of the following conditions are met:

1. He/she meets the qualification requirements;
2. He/she has been given grade building opportunities and has successfully demonstrated the competency to perform them at the next higher level, as indicated by the immediate supervisor and based on job experience, training, and demonstration of competencies.  (**Note:** Employees must have a "meets or exceeds" rating to be eligible for promotion; however a "meets or exceeds" rating ALONE is not sufficient to meet the promotion eligibility requirement.).
3. There is enough grade-determining work;
4. The time in grade requirement has been met;
5. The employee's performance meets or exceeds expectations; and,
6. No administrative restriction on promotions has been imposed by the NWS or an authority above the NWS level.

Employee's qualifications for promotion potential to the next higher grade, as well as the employee's progress and accomplishments, should be discussed at the annual and mid-year performance review meetings, at a minimum.  Supervisors are encouraged to meet more frequently with employees, especially new and early career employees as well as those at higher grade levels that require additional coaching, mentoring and training.

### Steps in the Assessment Process

The entire promotion assessment process must be conducted in a timely manner. Employees should be notified of the promotion decision prior to their anniversary date.

The supervising MIC, DAPM, or National Center supervisor will initiate the competency assessment process two months prior to the employee's anniversary date, following the steps below:

1.     Using the Competency Assessment Tool within the CLC, the MIC, DAPM, or NC supervisor will evaluate each eligible employee's competency to perform at the next higher level.  Any technical questions about the Tool within CLC will be answered by the Office of the Chief Learning Officer.  While an employee's online and on-station formal training record should be used as input, the completion of training does not equate to demonstration of competency within an operational environment.  The supervisor will evaluate each employee against the competencies within each dimension.

   A. An employee must receive an assessment to promote for each dimension in order to receive an overall decision to promote to the next higher grade.
   B. The supervisor will also solicit input from the Warning Coordination Meteorologist, Science and Operations Officer, Lead Forecaster, co-workers and partners/customers, as appropriate.

2.     When the assessment has been completed and a decision to promote has been made, the supervisor will check the "recommend promotion" box and print the assessment for submission with the promotion action in HR Connect.

3.     The supervisor will prepare and submit the personnel action to promote in the HR Connect System.  The HR Connect submission must also include a copy of the promotion assessment determination.  The submission to promote will follow the normal review and concurrence procedures established at Regional Offices or NCEP Centers. The Region or NCEP Center should submit the full promotion package, via HR Connect, to Accenture Federal Services (AFS) for processing no later than one full pay period prior to the employees anniversary date.  Requests for promotion must be received by AFS at least one full pay period before the effective date of the promotion.

4.     If the supervisor determines that the promotion should be delayed, the employee will be re-assessed in 240 days.  This time will allow the employee to build and exhibit the required skill sets, as well as provide time for the supervisor to conduct a fair assessment.  The first line supervisor or other management designee will prepare a written explanation that provides the employee with the reasons why the promotion was not approved and any steps that should be taken to enhance his or her qualifications for promotion. This may include on-the–job training/experiences, formal training, attendance at webinars or recorded webinars, experiential IDSS activities, such as conducting core partner briefings or leading webinars or conference calls.

A.    During the 240 day reassessment period, the employee will ensure that he/she receives the assistance/guidance/mentoring needed to be eligible for promotion.

B.    If, after 240 days, the decision is not to promote, the supervisor will explain the reasons for non-promotion (as indicated above), and identify any additional steps that should be taken by the employee to be considered for a promotion at a later date.  Employees will remain at their current grade level until the required competencies for promotion are demonstrated.  When the supervisor determines that the employee has met the requirements for promotion, steps 1 through 3 above will be followed.

C.    The supervisor must inform the designated Region or NCEP point of contact of all decisions to not promote an employee after the initial 240 day reassessment process has concluded.  The explanation for non-promotion will be forwarded to the point of contact for review and concurrence/non-concurrence.

D.    Within two weeks of the submission to not promote, the Region or NCEP point of contact will concur or not-concur with the supervisor.  In the case of non-concurrence, the Region or NCEP Center point of contact will discuss the rationale with the first line supervisor and work to reach a consensus decision.

## Initial Promotion Process at Implementation

Due to the large number of GS-11 Meteorologists that will be eligible for promotion and in order to ensure equitable and fair treatment of all employees in the initial implementation period, the following will apply:

- All employees will be assessed for promotion readiness as indicated in the Implementation section of this Proposal.

- All promotions will be effective on the same date, at the beginning of a pay period, and after all employee assessments are completed.

## Recruitment

At implementation, all new vacancy announcements for Meteorologists positions will indicate the full promotion potential to the GS-12 level and include language that clearly communicates program expectations and the application of a competency model for promotion between grades.

12

## Program Review

For the first year of implementation, the NWS Management and Organization Division (CFO2), in conjunction with the Regional Directors, will formally review the program and process on a quarterly basis to ensure that it is being executed as intended. For the purpose of these quarterly reviews, each Regional Director will assign a designee in the Regional Headquarters to work with CFO2 to review promotion assessments and ensure the process is conducted in a fair and timely manner. In the case of NCEP, the NCEP Center Director will assign a designee to work with CFO2. One year after implementation, and subsequently each year after that, CFO2 and the Region/NCEP point of contact will assess the program once a year as needed. In addition, CFO will establish metrics and indicators to monitor and evaluate program effectiveness. Lessons learned and program improvements will be implemented, as required.

# Appendices

## A. GS-5-12 Career Progression Program Dimensions
**Note: All competencies will be grouped into these five dimensions.**
**Developed by the Workforce Workstream, which included Bargaining Unit Members**

| | Dimension | Definition |
|---|---|---|
| 1 | Info. mgmt., data collection, and quality control | Collects, analyzes, interprets, and applies data from environmental observational systems. Manages environmental data systems and uses applications for real time and/or historical data analysis. |
| 2 | Generation of forecasts, outlooks watches and/or warnings | Diagnoses the environment to assess and adjust forecasts and issues appropriate outlooks, watches, warnings, and/or advisories within a collaborative inter-office framework. |
| 3 | IDSS | Develops trusted relationships, captures external needs, and provides actionable information and interpretative services to enable partners' decisions when weather, water, or climate has a direct impact on the protection of lives and livelihoods. |
| 4 | Management, teamwork and leadership | Collaborates and co-creates with colleagues to create impact, leverages talents of other stakeholders and colleagues, develops ownership of individual work, and influences others. Effectively understands roles and responsibilities of position. |
| 5 | Integration of science and technology | Demonstrates expertise in the theory of weather, water and climate sciences, is up-to-date on latest scientific and technological developments, and can contribute to science-based and technology-based solutions and related assessments to operational challenges and improvements. |

14

## B. GS-5/12 Career Progression Program Competencies and Definitions
**Developed by the Workforce Workstream, which included Bargaining Unit Members**

|   | Dimension | Competency Title | Competency Definition |
|---|---|---|---|
| 1 | Info. mgmt., data collection, and quality control | Collecting data, observations and information | Collect meteorological data and information from partners, users, and other data providers, including public outreach and training. |
| 2 | Info. mgmt., data collection, and quality control | Managing information and ensuring quality control | Organize and ensure quality of incoming meteorological data and reports from a variety of data sources. Effectively uses applications for real-time and historical data analysis. |
| 3 | Generation of forecasts, outlooks, watches and/or warnings | Diagnosing the environment | Assess and diagnose the environment for a multitude of weather, water, and climate elements. |
| 4 | Generation of forecasts, outlooks, watches and/or warnings | Assessing and issuing scientifically-sound environmental forecasts | Assess and issue forecast information, make adjustments as needed, incorporate sound decision making, and leverage inter-office collaboration. |
| 5 | Generation of forecasts, outlooks, watches and/or warnings | Developing and issuing hazardous environmental information and alerts | Identify hazardous environmental information and incorporate this information including timely watches, warnings, advisories, and hazard outlooks into products and services. |
| 6 | IDSS | Developing and maintaining trusted relationships | Identify, develop, manage, and prioritize when needed a set of stakeholder relationships including core partners. |

15

A

| 7 | IDSS | Understanding partner impacts and needs | Assess and evaluate partner impact thresholds and tailor decision support services accordingly to provide optimal support to partners. |
|---|---|---|---|
| 8 | IDSS | Demonstrating situational awareness | Utilize all available tools to combine environmental information with knowledge of partner impacts to achieve effective decision making for both internal and external stakeholders. |
| 9 | IDSS | Developing and delivering effective written and oral communication to link forecast information with decision making | Effectively communicate weather, water and climate information, and impacts to partners to inform decision making and lead to action. |
| 10 | Management, teamwork and leadership | Exhibiting teamwork | Work with others to achieve goals; facilitate cooperation, trust, and group identity; foster commitment and team spirit; manage and resolve conflicts. |
| 11 | Management, teamwork and leadership | Leading others | Encourage honesty, transparency, and open dialogue to influence others actions and growth towards the attainment of desired goals. |
| 12 | Management, teamwork and leadership | Leveraging diversity and respecting others | Value the talents of all employees and work in a professional manner with colleagues and superiors. |
| 13 | Management, teamwork and leadership | Managing programs | Develop ownership of focal areas and develop facility in managing several programs and/or projects simultaneously to create value and impact. |

16

| 14 |  | Developing and maintaining scientific skillsets | Understand theory, able to engage in independent scientific assessments, develop case studies, and conduct applied research for personal growth and for continuing to improve science-based solutions for NWS. |
| 15 |  | Developing and maintaining technical skillsets | Incorporate best practices from outside NWS to stay current with latest developments in technologies and tools and contribute to science-based and technology-based solutions and related assessments to operational challenges and improvements. |

17

**Settlement Agreement**
**GS5-12 Progression**
**March 25 2019**

This Settlement Agreement supplements and amends the July 2018 Management Proposal for the GS5-12 Progression.

With this agreement, NWSEO agrees to withdraw its grievance and agrees to the implementation of the GS5-12 Career Progression Program as written in the July 2018 proposal as supplemented and amended by this agreement.

The plan as amended by the Settlement Agreement will go into effect in accordance with the provisions of 5 USC 7114(c), and will remain in effect unless superseded by a new Collective Bargaining Agreement.

### *FLSA Exemption*
GS 5/7/9/11 Meteorologist positions remain FLSA non-exempt.

### *GS5/12 in WFO Honolulu, WSO Pago Pago, and at National Hurricane Center and Weather Prediction Center*
When the GS5-12 initiative is implemented, Meteorologist Interns at WFO Honolulu will be reclassified on new PDs as Meteorologists and will have promotion potential to the GS-12 grade level. NWS will not downgrade GS-13 General Forecaster or GS-14 Lead Forecaster positions in WFO Honolulu as a result of the implementation of this program.

When the GS5-12 initiative is implemented, Meteorologist Interns at the National Hurricane Center and WPC will be reclassified on new PDs as Meteorologists and will have promotion potential to the GS-12 grade level.

The parties recognize that the implementation of the career progression program does not constitute a change to the job duties of the GS-13 and GS-14 forecasters in WFO Honolulu and that those job duties will remain separate duties from the GS 7-12 meteorologists.

WSO Pago Pago will be included in the GS5-12 Career Progression Program.

### *When Conducting Periodic Reviews of the Program*
When NWS conducts planned periodic reviews of the GS5-12 program, NWSEO will be briefed and be given an opportunity to provide input on the program.

### *HMTs*
Nothing in the GS5-12 Progression Agreement changes the PDs or duty stations of existing Hydrometeorological Technician (HMT) or Observing Program Leaders (OPLs).

NWS will continue to advertise HMT positions simultaneously with entry-level Meteorologist positions. HMTs will be advertised as MAP-Only, 1341 GS 11.

Management and NWSEO will meet to set a common vision for the future of the HMTs at the next National Labor Council, as well as mobility for Met Techs from specific hardship (AK, Pacific) locations.

### Article 20 on Shift Scheduling
NWS will continue to set shift schedules in accordance with Article 20 of the Collective Bargaining Agreement.

### Applicability
This agreement does not supersede or nullify any previous collective bargaining agreements, MOUs, or arbitration decisions not specifically referenced here.

This agreement supersedes the 2003 Staffing MOU, 2004 Staffing Plan (Point 1), and applicable elements of the 2016 Reassignment MOU (section titled "Increase Intern Hiring Efficiency") to the extent they conflict.

The implementation of a career ladder progression is unrelated to staffing levels.

### 2003 Staffing MOU
NWS management will advertise positions as GS-1340-5/7/9 DE-only with new GS 5-12 position descriptions for external candidates (new hires) quarterly.

NWS management will, twice-yearly, advertise GS-1340-11/12 positions as GS-1340-11/12 MAP-only, Government-wide.

When deciding how to fill a meteorologist vacancy in an office (either through a 5/7/9 announcement or an 11/12 announcement) the manager will give due consideration to the skill set and experience level of the current office staff as well as local operational requirements.

This agreement supersedes the May 8, 2003 MOU on advertising GS-9 and 11 vacancies internally.

### Career Ladder Promotions
At the GS 5 to 7, 7 to 9, and 9 to 11 levels, career ladder promotions will not be dependent on passing the Competency Assessment Tool in order to obtain promotion to the next grade level. Phase 2 is eliminated.

For promotions from the GS 11 to GS 12 level, the Competency Assessment Tool will be used as described in the July 2018 Management Proposal.

Managers will work with employees at all levels to use the Competency-Model and perform the training and on-the-job actions necessary to demonstrate competencies along their career progression. Employees that cannot complete the Competency Model and Training Program, or fail the Competency Assessment Tool, will remain as a GS 11 and do the duties of a GS 11.

***Review Period***

If the supervisor determines that the promotion to the GS 12 level should be delayed, the employee will be re-assessed, as soon as possible after the employee and the supervisor feel s/he is ready, but no later than 120 days from the date the promotion would have been effective.