IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NATIONAL WEATHER SERVICE EMPLOYEES
ORGANIZATION, et al.,

        Plaintiffs,

V.                                      Case No. 1:25-cv-02947-PLF

DONALD J. TRUMP, et al.,

        Defendants.

## SECOND DECLARATION OF DR. PATRICIA DUFFY

I, Patricia Duffy, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am President of the Patent Office Professional Association. I am submitting this as a supplement to my earlier declaration in this case to address certain statements made in the Declaration of Acting Commissioner for Patents Valencia Martin-Wallace.

2. Paragraph 4 (VMW Decl): Ms. Martin-Wallace's statement that the USPTO/Office of the Commissioner for Patents is "responsible for granting U.S. patents and simultaneously keeping confidential technology, the release of which might otherwise be detrimental to national security" is misleading. A very small portion of cases is kept confidential for national security purposes. While primary patent examiners make "final determinations," their work is done in accordance with office policy and subject to review. Currently, primary patent examiners are subject to quality assurance review by Office of Patent Quality Assurance, Supervisory Patent Examiner quarterly review, and the newly added in early November 2025, a "streamlined review" of most office actions before they are mailed to applicants.

3. Paragraph 6 (VMW Decl): Ms. Martin-Wallace states that patent employees "are hard-working, well-trained, and diligent in fulfilling their roles of strengthening the U.S. intellectual property system and <u>ensuring the proper protection and handling of sensitive technology</u>" [emphasis added]. Framed as a compliment, the statement masks its inaccuracy. Patent examiners, other than

approximately two dozen out of 9000, are not trained in protecting and handling sensitive technology. This fact is essential.

4.  Paragraph 7 (VMW Decl): Ms. Martin-Wallace states that "[e]veryone in Patents plays a role in protecting U.S. national security." Patent examiners are not aware that they are protecting, nor have been trained to protect, national security. Her statement implies that everyone who works at the USPTO requires a clearance for national security purposes. (Only a handful of employees have a clearance for national security purposes.) Her statment implies that there is training for every examiner on national security practices (there is no such training), and that OCIO too would have procedures and policy surrounding the handling and disposal of national security data. Her statement is incompatible with telework (which has been available to patent examiners for over 25 years), which not only allows for remote work, but lacks any provision for that work to be done in a SCIF (sensitive compartmented information facility) and lacks any provision for how confidential documents may be shredded, burned, or otherwise disposed of securely, as would be done by the limited number of examiners actually authorized to examine applications that are designated as national security. Her statement is incompatible with the allowance for the transport of Agency laptops ("Universal Laptops") within the United States and on public transportation. Additionally, her statement that "a weakened U.S. patent system reduces the number of patent filings, which in turn reduces the number of applications for which the Agency has the opportunity to review and screen for direct impact on national safety" is implying that patent applications need to be filed by inventors so that the U.S. government can screen them for threats to national security. I do not believe that inventors are aware that a "primary" reason the USPTO encourages them to file applications is so they can be evaluated for threats to national security. This is not what I think of as

the promotion of the progress of science and the useful arts (Art I, Sec 8, U.S. Constitution), for example, cures for cancer, improvements to medical devices, a faster computer chip, electric vehicles, building a better golf ball, or improving a cereal shape.

5. Paragraph 8 (VMW Decl.): Ms. Martin-Wallace's references to "Patents" is misleading because she implies that every patents employee is involved. She, as Acting Commissioner for Patents, is responsible for "screening patent applications for national security related material" and if there is a risk of harm to national security, "the USPTO, through its Patents division, must refer the application to the appropriate defense agency for evaluation." 9000+ patent examiners are not trained and do not have this responsibility. If applications are identified as having a national security risk, the applications are examined by a small group of examiners with appropriate security clearances. They do not get assigned to the over 9000+ examiners who are not trained nor have security clearances to handle such applications.

6. Paragraph 9 (VMW Decl.): Ms. Martin-Wallace's statement that "Patents' employees review and have access to hundreds of thousands of inventions each year before the public learns about them" and "also acts as a filter, keeping significant and strategic technological advances out of the public eye" is misleading and incorrect. Individual patent examiners do not review nor rifle through thousands of pending applications prior to publication, nor do they filter through applications looking for strategic technological advances. An individual examiner accesses the docket they are assigned, which averages approximately 8·12 new utility cases at any given time. When an examiner has access to an application (regardless of whether it has been published), it has already been through national security review. Examiners do not have any opportunity nor the

authority to weigh in on whether something should be published. Additionally, applications placed on an examiner's docket contain no readily apparent indicator or electronic flag that the application is unpublished or that a request to keep the application unpublished is pending. The majority of applications examiners examine are published (or had a request not to publish) before they are assigned (placed on the examiner's docket).

7.   Paragraph 11 (VMW Decl.): Ms. Martin-Wallace's statement that "all examiners are expected to be vigilant in reviewing applications for sensitive subject matter and ensuring their proper handling" and that this "responsibility attaches to all of the patent examiners" "who have a responsibility to be on alert for sensitive material throughout the life cycle of the patent examination process, either in the original submissions from applicants or in subsequent filings" is false. Further, she states "[i]f an examiner is exposed to sensitive subject matter, they must flag it for additional review and protection," which also is false. In my over 30 years as a patent examiner, I have never received training on screening applications for sensitive subject matter, what the office considers sensitive subject matter, what to do if I found sensitive information, nor how to handle sensitive information. There is no computer program, list of concepts or keywords provided to examiners to identify any application as "national security". Ms. Martin-Wallace admits that "[m]uch of this work is automated." Ms. Martin·Wallace further states that "if and when a patent application or paper filed with the USPTO bears a security marking, e.g., "Secret," "Confidential," etc., "[u]nder no circumstances can any such application, drawing, exhibit, or other paper be placed in public records, such as the patented files, until all security markings have been considered and declassified or otherwise explained."" I have never been trained on how to handle a patent application or paper filed marked "secret or confidential". Ms. Martin-Wallace's conclusion that "the overriding requirement to

ensure that applications, and other papers, that touch on national security matters are protected and treated with the appropriate care by all patent examiners is literally written into the patent examination process" is incorrect. Nothing in the patent examiner training that I have received in over three decades has ever covered national security matters. When I examine a patent application, I do not and have never conducted a national security review. Ms. Martin-Wallace agrees that "screening for assessment under the Invention Security Act" "is limited to a subset of patent examiners who have obtained security clearances and work in the Office of Licensing and Review, within Patents." (Paragraph 10, VMW Decl.)

8.   Paragraph 12 (VMW Decl.): Ms. Martin-Wallace's statement that "[s]afeguarding these filings protects American intellectual property from cybertheft by malicious actors, and instills confidence in U.S. patent filers, ultimately strengthening the U.S. patent system overall" [emphasis added] fails to recognize that the USPTO receives applications from foreign filers and that the USPTO does not make any filing or docket distinction between foreign applicants and US applicants. (Per National Science Foundation, 56% of U.S. patents were granted to foreign inventors in 2022.) Keeping applications confidential per 35 U.S.C. 122 applies to both U.S. and foreign applicants. In addition, U.S. applicants file abroad, and no USPTO safeguarding can protect them abroad from cybertheft. (Per National Science Foundation, 58,000 international applications were filed from the US in 2022.) Further, cybersecurity OCIO employees are not covered by a bargaining unit.

9.   Paragraph 13 (VMW Decl.): Ms. Martin-Wallace's statement that a "primary function of Patents relates to detecting, deterring, and penalizing fraud in the intellectual property system" is misleading. While Patents leadership may have this duty, patent examiners arn not trained on

identifying, "investigating", or flagging fraudulent filings. Also, her insinuation that negotiations would hold up dealing with fraud has no basis. In the one or two instances of fraud that I recall the agency addressing, they did so immediately, even when POPA was notified within our rights.

10. Paragraph 14 (VWM Decl.): Ms. Martin-Wallace's statement that "Patents is tasked with both reviewing and safeguarding applications that contain sensitive technology, flagging applications that could implicate national security for defense agency review, issuing the secrecy orders, and ultimately lifting the secrecy orders contemplated by the Invention Secrecy Act" is misleading. Again, a management responsibility, and a responsibility limited to a few national security examiners, does not translate into a primary duty for all patent examiners. As explained in paragraph 7 above (addressing VMW's paragraph 11), I have never been trained on national security nor told to flag an application that could implicate national security for defense agency review. Outside of the limited subset of a dozen or so patent examiners who have security clearances, the remaining over 9000 do not, cannot and have not performed such work in the last 30 years.

11. Paragraph 15 (VMW Decl.): Ms. Martin-Wallace's conclusion that "it is everyone's job in Patents to be aware of and responsible for flagging new technology that might pose a risk to national security as well as protecting against disclosing documentation related to that new technology until it is appropriate to do so," is incorrect. As already explained, patent examiners have never received training on screening applications for sensitive subject matter, what the office considers sensitive subject matter, what to do if they found sensitive information, nor how to handle it.

12. Paragraph 16 (VMW Decl): Ms. Martin-Wallace defines patent examination at Paragraph 16 (VMW Decl) as inherently investigative. Patent examiners search for prior art that is publicly available information (see 35 U.S.C 102 and 103) and apply Agency policy. Patent examiners do not have the investigative tools of law enforcement, intelligence and national security agencies. The laws and policies that the vast majority of patent examiners apply are vastly different from those who practice in intelligence, counterintelligence, and national security. See for example the Manual of Patent *Examining* Procedure for patent examiners vs. the FBI Manual of *Investigative* Operations and Guidelines. Furthermore, although Ms. Martin-Wallace states that "Examiners can even independently establish additional requirements for information from applicants, putting them squarely in an investigatory role," this is not common for examiners and to my understanding, such requests for information under 37 CFR 1.105 require permission from supervisors per Technology Center or agency policy. In fact, a requirement for information under 37 CFR 1.105 should be narrowly specified and limited in scope. It is a significant burden on both the applicant and the Office since the applicant must collect and submit the required information and the examiner must consider all the information that is submitted. A requirement for information is only warranted where the benefit from the information exceeds the burden in obtaining information. MPEP 704.14. Examiners have been chastised for applying 1.105 without supervisory approval, so it is rarely applied.

13. Paragraph 17 (VMW Decl): Ms. Martin-Wallace points to various activities that may be labeled as "investigative". Again, this lacks the context of 5 U.S. Code § 7103(b)(l). Ms. Martin-Wallace's statement that "examiners frequently interview the patent applicant to obtain additional information about the nature of the application's claims and specifications" is so

generalized as to be inaccurate. The MPEP states, "An interview should be had only when the nature of the case is such that the interview could serve to develop and clarify specific issues and lead to a mutual understanding between the examiner and the applicant, and thereby advance the prosecution of the application." **MPEP** 713.0l(IV). Interviews are generally not used to obtain additional information about the claims and the specifications because the examiner must rely on the original disclosure.

14. Paragraph 18 (VMW Decl): Ms. Martin-Wallace conflates national security with information security when she states that OCIO "has primary responsibility for ensuring the operability and security of systems that enable the critical national security functions of Patents". Information security does support national security, but they are not one and the same. As the names imply, one has to do with the securing of information, which can be regarding any subject matter, and the other has to do with the securing of the nation. Secrecy orders are outside the systems that most of OCIO supports.

15. Paragraph 19 (VMW Decl): Ms. Martin-Wallace asserts that OCIO performs information security operations including the holding of national security related information. The Agency has not shown that each and every employee removed from the bargaining unit in OCIO performs that handling of national security related information. Indeed, from paragraph 21 of her declaration, it would seem that any OCIO employee performing national security operations would be isolated to a specific team. In fact, the OCIO cybersecurity employees were never represented by POPA (or any other union), and as such, cybersecurity should not have been the basis for the Agency's decision to classify all OCIO employees as non· bargaining unit eligible.

16. Paragraph 20 (VMW Decl): Ms. Martin-Wallace outlines the non-national security information management responsibilities of OCIO. These responsibilities are common across any businesses and federal agency with information technology infrastructure, and are not specific to the USPTO. Their relation to national security is entirely dependent on whether or not the organizational missions supported by these systems are, in fact, related to national security.

17. Paragraph 21 (VMW Decl): Ms. Martin-Wallace identifies the operational distinction of information security vs national security in the form of a specific team that handles the national security product - what she identifies as the OCIO's National Security System product team. This specific team of individuals, not represented by any union, is charged with national security-related systems.

18. Paragraph 22 (VMW Decl): Ms. Martin-Wallace identifies information security operations that are purported to support national security. It is unclear whether any given team or employee's organizational mission is actually related to national security.

19. Paragraph 23 (VMW Decl.): Ms. Martin-Wallace again relies on a broad reading of "investigation" to unduly align the work performed by OCIO employees with the language of the code. See response to Paragraph 16 (VMW) above. Further and again, OCIO cybersecurity employees were never represented by POPA and so those cybersecurity tasks are irrelevant.

20. Paragraph 24 (VMW Decl.): See response to Paragraph 18 (VMW) above.

21. Paragraph 25 (VMW Decl.): Ms. Martin-Wallace's broad statement that "[t]he ability of the USPTO to carry out its national security functions is hindered by the requirement to comply

with the FSLMRS, particularly the Agency's ability to quickly modify job duties and performance expectations of employees in order to meets [sic] its mission, and to efficiently manage employees with performance or conduct issues" is unproven. Nothing has been presented by Ms. Martin-Wallace to show that "national security functions" are hindered. See my response to paragraph 26 (VMW Decl.) below.

22. Paragraph 26 (VMW Decl.): Ms. Martin-Wallace's broad statement that "the unions have repeatedly stifled or attempted to stifle efforts to modernize and improve the Agency's examination and workforce management practices," attacks positions in a vacuum without including the factual context.

23. Paragraph 26, bullet 1 (VMW Decl.): Ms. Martin-Wallace's statement that POPA demanded "limits on the numbers and types of patent applications eligible for accelerated examination" is correct and management agreed to the limits. The limits helped protect individual employees from being overburdened with more accelerated cases than they could handle. Accelerated cases include accelerated deadlines. POPA has an interest in protecting a patent examiner's ability to do their job, as should the agency. If an individual examiner is overloaded with accelerated examination cases, they would be set up to fail because they cannot work on the cases quickly enough to meet the accelerated deadlines. POPA worked with the agency to find a reasonable process and number so no one individual examiner would be overburdened with accelerated examination cases. The ever increasing number of accelerated examination applications, has a direct negative impact on the ability of examiners to provide timely actions in statutorily required applications known as Track I. The insistence by the agency to accelerate examination on

applications in an ever increasing variety of subject matter areas, prevents the examiner from working on applications having an older filing date. These accelerated applications, while requiring a petition and meeting criteria for inclusion, generally do not have to pay the filing fees required by the statutory program known as Track I. Thus, some applications are given a free ride to the top of the examination pipeline at the expense of applicants whose applications have been waiting for longer, much longer in some cases, for an action on the merits.

24. Paragraph 26, bullet 2 (VMW Decl.): Ms. Martin-Wallace's statement that POPA withheld "approval of a new patent incentive program designed to reduce patent pendency" is false. Although she offers no specifics, I assume she is referring to the Pendency Balance Award. POPA did not withhold approval of a new PBA award; in fact, POPA was working on an MOU with management when the USPTO decided to unilaterally implement it before POPA had a chance to fully consider and vote on the MOU.

25. Paragraph 26, bullet 3 (VMW Decl.): Ms. Martin-Wallace's statement that POPA insisted on "maintaining ineffective incentive programs and rebuffing efforts to rework those programs to ensure positive return on investment" is false. Again, since she does not offer specifics, I assume Ms. Martin-Wallace is referring to existing award programs (i.e. gainsharing, docket management award, special achievement award). POPA does not believe these incentive programs are ineffective, and apparently neither does the agency. POPA and the agency have multiple incentive programs that management agreed to maintain in pre-decisional involvement and in the 2024 CBA. Ms. Martin-Wallace was a Deputy Commissioner of patents when these agreements were made. If Ms. Martin-Wallace is referring to the "re-working" of the docket management award,

management notified POPA in February that they wanted to negotiate changes to the docket management award. Management did not provide proposals until May. POPA provided timely counter-proposals in June. The parties had a single meeting in July, at which POPA requested data before entering into substantive negotiations. Management did not provide any data, and did not schedule any further discussions on the award. All substantial delays were clearly on the part of management and not POPA. Note that POPA requested to hear about all of the agency's incentive programs and that request was denied.

26. Paragraph 26, bullet 4 (VMW Decl.): Ms. Martin-Wallace is incorrect when she states that POPA has created "barriers to removing unsuccessful employees through demands for extensive performance improvement processes". When the agency stopped issuing oral warning performance improvement plans during covid, POPA did not litigate. The performance improvement process agreed to in 2024 was discussed pre-decisionally and management said they were merely codifying the management process. In fact, the current process is similar to, and stricter than, the process the agency has maintained for at least 30 years. The USPTO terminates unsuccessful employees ALL THE TIME. No proposed terminations were paused during pre-decisional discussions. Before the covid pandemic, a yearly average of 50 examiners with proposed removals came to POPA for guidance (this does not include the cases unknown to us); and the vast majority of decisions were/are to terminate. Due to the strict and inflexible examiner PAP, management and POPA agree that it was to both the agency's and the employee's benefit to give the employee additional time to improve. The agency itself explained that it invests time, effort and substantial resources into training patent examiners with the goal of having them become primary examiners. The agency recognizes that the evaluation and requirements of patent examining are hard and if faced with a difficult life event (e.g.

serious illness, death in the family, divorce, etc...) the examiner is only one difficult life event away from losing their job. Because the performance expectations are exacting and relentless, even a small amount of underperformance can jeopardize one's career. The agency benefits by not immediately terminating a valued, highly-skilled employee who is subject to a difficult life event, and by giving that employee the opportunity to get back on their feet performance-wise. With the goal of wanting to retain skilled employees, the agency, in dealing with unsuccessful employees, weighs 1) affording a limited time to an underperforming patent examiner to show they can yet again perform at their GS-level, or 2) terminating the experienced examiner, and hiring a brand new employee at a lower GS-level (and thus lower production/output), who for years will need much more management oversight and resources, and who will take years to get to the same level as the terminated experienced examiner. The performance management process was established with this in mind.

27. Paragraph 26, bullet 5 (VMW Decl.): Ms. Martin-Wallace's statement that "Delaying the deployment of new information technology tools and opposing the Agency's efforts to make use of those tools mandatory because some examiners prefer to continue working as they have for years, sometimes requiring the Agency to maintain redundant systems" misses context and is incorrect. Again, since she offers no specifics, I assume that many of the systems Ms. Martin-Wallace may be referring to are ones that were not ready for implementation and crashed with just a few hundred users during beta tests. Also, basic IT development best practices holds that redundant systems are more resilient and therefore more "secure."

28. Paragraph 26, bullet 6 (VMW Decl.): Ms. Martin-Wallace's statement that POPA used the "collective bargaining processes to shield themselves and their members from compliance with this administration's policies by insisting on CBA terms that extend into 2029" is incorrect. The

agency chose to reopen the parties' 1986 CBA. A CBA is not a one-way street where POPA won on all issues. An agreement requires two parties - management and the union. Most employees view the CBA as preserving the existing relationship, but not as gaining any new benefits. Ms. Martin-Wallace was a Deputy Commissioner of patents during the time the CBA was negotiated and agreed to by management.

29. Paragraph 26, bullet 7 (VMW Decl.): POPA never insisted on placing" restrictions on Agency's ability to periodically reconsider a position's eligibility for telework." POPA denies this allegation.

30. Paragraph 26, bullet 9 (VMW Decl.): Ms. Martin-Wallace's estimate that union officers spent over 17,000 hours on "official time" in 2024 cannot be confirmed. Despite agreeing to provide information on official time use on a biweekly basis in the CBA (Article 9, Section 2A), the agency has never shared such data with POPA. Assuming Ms. Martin-Wallace's estimate is accurate, POPA estimates that it must include time available to POPA's approximately 9,000 to attend the union's annual meeting, as well as time spent negotiating with the agency on agency-initiated discussions (including the extensive 2024 CBA discussions). POPA would be derelict in its duty to represent bargaining unit members if POPA did not engage with management on agency initiatives. The agency controls the number of changes it makes outside the CBA negotiation process.

31. Paragraph 26, bullet 10 (VMW Decl.): The rules of the Road discussions were a multi-union negotiation where it was clear that the agency was focused on blocking the ability of bargaining unit members' ability to contact POPA and to forward representatives critical information regarding their personal situations. Additionally, the repeated drafts of the provision blocked the ability of the officers of the union to forward critical information to outside counsel when requesting

assistance with various employee and POPA concerns. Again, the agency was responsible for the delay in that they were in control of setting the meeting cadence and timeliness in addressing the Unions' concerns.

32. Paragraph 27 (VMW Decl.): Ms. Martin-Wallace's statement that "the union refused to sign off on the final award, despite having bargained to completion" is incorrect. Assuming this is the Pendency Balance Award (PEA) (again, since Ms. Martin-Wallace offers no specifics) POPA and management engaged in pre· decisional discussions on the monetary awa1·d. POPA was prepared to bring the draft MOU to a vote before its executive committee. Management informed POPA that they were going to implement it before that vote could occur.

33. Paragraph 31, bullet 1 (VMW Decl.): Ms. Martin-Wallace's hypothetical, that "the Agency (i.e., Patents' Office of International Patent Cooperation) might reach an agreement with a foreign intellectual property office that results in expedited examination for national security technology in exchange for reciprocal treatment (e.g., in the form of quicker adjudication on both ends)" is striking in suggesting that the USPTO would enter into an agreement to have U.S. national security technology examined in foreign intellectual property offices. The closest existing program for expedited examination is the Patent Prosecution Highway (PPH) program, which "speeds up the examination process for corresponding applications filed in participating intellectual property offices." uspto.gov. Applications subject to a secrecy order are not eligible to participate in PPH. uspto.gov, FAQ 5.

34. Paragraph 31, bullet 2 (VMW Decl.): Ms. Martin-Wallace's second hypothetical does not reflect how the USPTO has handled fraud in the past. First, in my experience, fraud is rare. If not rare, then the fraud is not brought to the attention of patent examiners because it is handled before an

application is docketed to an examiner. In one instance I am familiar with - once fraud was detected, the affected applications were removed from examiners dockets and none of the affected unassigned applications were assigned. The issue was dealt with by a few managers knowledgeable about the fraud. In her hypothetical, it would also be more efficient to have a few managers deal with the fraudulent cases, scan all cases for the company names against "another federal database" rather than rely on over 9000+ examiners who have had no training on identifying, "investigating", or flagging fraudulent filings. (See response to paragraph 13 (VMW Decl.)

35.     Paragraph 31, bullet 3 (VMW Decl.): Ms. Martin-Wallace's third hypothetical is speculative. To my knowledge, the number of examiners in licensing and review has varied over time. Management places the proper number of examiners in the licensing unit.

36.     Paragraph 34 (VMW Decl.): Ms. Martin-Wallace asserts that several sections of the parties' agreed to CBA hinder management's ability to implement the President's agenda, including matters of national security. This list omits Article 16, Section 9, which sets forth a process when the agency is required to implement a change in an emergency or as an overriding exigency; and fails to acknowledge that POPA and the agency freely reached agreement on all of the provisions of the CBA.

37.     Paragraph 34.b (VMW Decl.): Ms. Martin-Wallace declares that the agency must engage in pre-decisional discussions before determining whether and how to make a change a condition of employment. POPA and the agency have successfully bargained over time-sensitive matters within the pre-decisional discussion framework, including over issues relating to the Licensing & Review Office, where secrecy applications are examined. Most patent examiners,

including those in Licensing & Review, work outside the commuting area from USPTO's Alexandria campus. When management needed examiners in the Licensing & Review area to report to the Alexandria campus in order to examine secrecy applications, POPA and management quickly reached an agreement outside of the parties' negotiated telework agreements, allowing the agency to quickly bring those employees on site to perform such work.

38. Paragraph 34.c (VMW Decl.): Ms. Martin-Wallace's statement that "The automation provisions of the CBA require significant union input before the Agency can make any changes related to information technology (IT) development and deployment, whether or not it is necessary for the security functions of the Agency" is such an overgeneralization that it does not accurately reflect reality. For example, the USPTO moved the data center to Manassas and POPA's only input was not to have outages in critical systems at a critical time (count weekends; end of quarters and fiscal year) so that examiners and their supervisors could move work forward in furtherance of the agency's mission. OCIO delivers frequent updates and changes to its systems at a speed unthinkable 6 years ago.

39. Paragraph 34.d (VMW Decl.): Ms. Martin-Wallace's assertion that the CBA hinders "the Agency's ability to take timely performance-based actions against employees whose role is inherently investigative" is false for two reasons. First, I address the topic of performance-based actions in response to Ms. Martin-Wallace's paragraph 26, bullet 4, above and the USPTO regularly terminates examiners who are unable to meet the rigorous performance standards of the patent examiner PAP. The performance management framework agreed to by the parties includes timelines for performance improvement that have not changed substantially over the last 30 years. The Agency has benefited by retaining experienced examiners, rather than terminating them over lapses

in performance and replacing them with new examiners who take years to achieve the same levels of production. As to Ms. Martin-Wallace's assertion that the negotiated grievance procedure "slow[s] down the ultimate resolution of any contested conduct or performance-based action," only a miniscule number of such actions have historically been grieved by POPA (let alone proceeded to arbitration), relative to the number of conduct and performance-based actions issued by the agency. Second, I address Ms. Martin-Wallace's redefinition of examiners as investigators in the response to her paragraph 16, above.

40. Paragraph 34.e (VMW Decl.): Ms. Martin-Wallace states that the requirements of the parties' CBA article on reorganizations and realignments "could be particularly challenging in considering potential immediate needs to move individuals in and out of the Licensing and Review Office (that does the more detailed review of applications under secrecy order)." The parties have historically worked together successfully on time-sensitive matters involving the Licensing and Review Office. (See paragraph associated with VMW Decl. 34.b).

41. Paragraph 35.a. (VMW Decl): Ms. Martin-Wallace's assertion that "the preliminary injunction would prevent the Agency from complying with the President's directions in the Executive Orders," contains no specifics on what directions would be prevented.

42. Paragraph 35.c (VMW Decl.): Ms. Martin-Wallace's assertion that "POPA continues to operate at USPTO, representing employees in other divisions" is misleading. Duly-elected POPA officers and delegates are no longer permitted official time to engage in the duties they were elected to perform.

43. Paragraph 36 (VMW Decl.): Ms. Martin-Wallace states that "The Agency estimates

that it would incur more than $358,808 in damages and costs," should the requested preliminary injunction be entered and later overturned. This includes hours worked by senior executives in Patents and labor relations personnel engaging in negotiations. To my knowledge staffing in these areas has not been reduced. The agency is legally required to negotiate with the union, and there should be no additional cost to the agency in directing existing staff to negotiate with POPA or handle grievances. Further, it is not clear how significant "Human Resources IT staff time and vendor time spent reconfiguring systems" will be required if the agency must restart dues collection, as human resources processed hundreds of dues deduction forms in January and February, continued to process dues deductions for Patents and OCIO employees through the August 28 executive order, and continues to process dues deductions for remaining POPA bargaining unit employees.

*Patricia Duffy*

Patricia Duffy

Executed on November 24, 2025 in Alexandria, Virginia.